UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-23588-BLOOM/Louis

HAVANA DOCKS CORPORATION,

      Plaintiff,

v.

MSC CRUISES SA CO. and
MSC CRUISES (USA) INC.,

      Defendants.

_____/

## ORDER

    **THIS CAUSE** is before the Court upon Plaintiff Havana Docks Corporation's ("Havana Docks" or "Plaintiff") Motion for Reconsideration and Leave to Amend, ECF No. [42] ("Motion"), and its accompanying Notice of Filing the Declaration of Aziza Elayan-Martinez in Support of Plaintiff's Motion, ECF No. [41] ("Notice"). Defendant MSC Cruises SA Co. and MSC Cruises (USA) Inc. (collectively, "MSC") filed a response in opposition, ECF No. [45] ("Response"), to which Plaintiff replied, ECF No. [49] ("Reply"). On March 9, 2020, the Court held a hearing on the Motion, during which the parties argued their respective positions. The Court has carefully considered the Motion, all supporting and opposing submissions, the arguments presented at the hearing, the record in this case, the applicable law, and is otherwise fully advised. For the reasons set forth below, Plaintiff's Motion is granted.

## I. BACKGROUND

    On August 27, 2019, Havana Docks initiated this action against MSC pursuant to Title III of the Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C. § 6021, *et seq.* (the

"LIBERTAD Act," "Title III," or the "Act"), which is commonly referred to as the Helms-Burton Act. ECF No. [1] ("Complaint"). The Court briefly reiterates the facts alleged in the instant case.

Havana Docks is a U.S. national, as defined by 22 U.S.C. § 6023(15), and "is the rightful owner of an interest in and claim to certain commercial waterfront real property in the Port of Havana, Cuba," identified as the Havana Cruise Port Terminal (the "Subject Property"). *Id.* ¶ 8. In addition, the Complaint alleges that Plaintiff continuously owned, possessed, and used the Subject Property from 1917 until the Cuban Government confiscated it in 1960, *id.* ¶ 9, and that, since the confiscation, the Subject Property has not been returned, nor has Havana Docks received adequate and effective compensation for the confiscation of the Subject Property, *id.* ¶¶ 10-12.

Plaintiff's ownership interest in and claim to the Subject Property has been certified by the Foreign Claims Settlement Commission (the "FCSC") pursuant to the International Claims Settlement Act of 1949, 22 U.S.C. § 1621, *et seq.* (the "Claims Settlement Act"). *Id.* ¶ 13.[1] In the Certified Claim, which is central to the dispute between the parties in this action, the FCSC found, based on the record before it, that:

> [Havana Docks] obtained from the Government of Cuba the renewal of a concession for the construction and operation of wharves and warehouses in the harbor of Havana, formerly granted to its predecessor concessionaire, the Port of Havana Docks Company; that claimant acquired at the same time the real property with all improvements and appurtenances located on the Avenida del Puerto between Calle Amargura and Calle Santa Clara in Havana, facing the Bay of Havana; . . . and that claimant corporation also owned the mechanical installations, loading and unloading equipment, vehicles and machinery, as well as furniture and fixtures located in the offices of the corporation.

ECF No. [41-8] at 7. Critically, the FCSC also stated that "[t]he terms of the concession granted by the Cuban Government were to expire in the year 2004, at which time the corporation had to deliver the piers to the government in good state of preservation." *Id.* at 9.

---

[1] The Court will refer to Havana Docks' claim to the Subject Property, ECF No. [41-8], as the "Certified Claim" for the remainder of this Order.

Moreover, according to the Complaint, beginning on or about December 2018, MSC "knowingly and intentionally commenced, conducted, and promoted their commercial cruise line business to Cuba using the Subject Property by regularly embarking and disembarking their passengers on the Subject Property without the authorization of Plaintiff or any U.S. national who holds a claim to the Subject Property." ECF No. [1] ¶ 14. Thus, MSC is alleged to have participated in, and profited from, the Cuban Government's confiscation and possession of the Subject Property without Plaintiff's authorization. *Id.* ¶ 15. Plaintiff claims that MSC's knowing and intentional conduct relating to the Subject Property constitutes "trafficking," as defined under 22 U.S.C. § 6023(13)(A), and that MSC is liable to Plaintiff for all money damages allowed by statute. ECF No. [1] ¶¶ 16-17.

## A. The LIBERTAD Act

Since Fidel Castro seized power in Cuba in 1959, Cuba has been plagued by "communist tyranny and economic mismanagement," that has substantially deteriorated the welfare and health of the Cuban people. *See* 22 U.S.C. §§ 6021(1)(A), (2). This communist Cuban Government has systematically repressed the Cuban people through, among other things, "massive and systemic violations of human rights" and deprivations of fundamental freedoms, *see id.* §§ 6021(4), (24), and the United States has consistently sought to impose effective international sanctions for these violations against the Castro regime, *see id.* §§ 6021(8)-(10).

In 1996, Congress passed the LIBERTAD Act "to strengthen international sanctions against the Castro government" and, relevant to the instant case, "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." 22 U.S.C. §§ 6022(2), (6). To that end, under Title III of the Act, Congress denounced the Cuban government's history of confiscating property of Cuban citizens and U.S. nationals,

explaining that "[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development." 22 U.S.C. §§ 6081(2)-(3). The Act explains that foreign investors who traffic in confiscated properties through the purchase of equity interests in, management of, or entry into joint ventures with the Cuban Government to use such properties "complicate any attempt to return [these expropriated properties] to their original owners." *Id.* §§ 6081(5), (7). The LIBERTAD Act cautions that:

> [t]his "trafficking in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise, to the current Cuban Government and thus undermines the foreign policy of the United States—
> (A) to bring democratic institutions to Cuba through the pressure of a general economic embargo at a time when the Castro regime has proven to be vulnerable to international economic pressure; and
> (B) to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government.

*Id.* §§ 6081(6)(A)-(B).

Further, the lack of effective international remedies for the wrongful confiscation of property and for unjust enrichment from the use of that property by foreign governments at the expense of the rightful owners left U.S. citizens without protection against wrongful confiscations by foreign nations and their citizens. *Id.* § 6081(10). Congress therefore concluded that, "[t]o deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." *Id.* § 6081(11); *see also* 22 U.S.C. § 6082(a)(1)(A). As a result, in passing Title III of the LIBERTAD Act, "Congress created a private right of action against any person who 'traffics' in confiscated Cuban property." *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1284

(S.D. Fla. 2019) (citing 22 U.S.C. § 6082(a)(1)(A); 22 U.S.C. § 6023(13)(A)). As that court observed:

> Shortly after Helms-Burton was passed, however, the President invoked Title Ill's waiver provision, and "Title III has since been waived every six months, . . . and has never effectively been applied." *Odebrecht Const., Inc. v. Prasad*, 876 F. Supp. 2d 1305, 1312 (S.D. Fla. 2012). That changed on April 17, 2019, when the U.S. Department of State announced that the federal government "will no longer suspend Title III." *See* U.S. Department of State, Secretary of State Michael R. Pompeo's Remarks to the Press (Apr. 17, 2019), https://www.state.gov/remarks-to-the-press-11/. As a result, Title III became effective for the first time on May 2, 2019 . . . .

*Id.*

## B. Relevant Proceedings

On the same day that the suspension of Title III was lifted, Havana Docks filed one of the first actions in the nation asserting a claim under the Act for trafficking against Carnival Corporation ("Carnival"). *See generally* Complaint, *Havana Docks Corp. v. Carnival Corp.*, No. 19-cv-21724 (S.D. Fla. May 2, 2019), ECF No. [1] ("*Carnival*"). The Complaint in *Carnival* alleged substantially similar facts as those alleged in the instant case, except that the trafficking alleged in *Carnival* began in May 2016. *See generally id.*; *id.* ¶ 12. On May 30, 2019, Carnival filed a Motion to Dismiss, arguing in relevant part that Havana Docks failed to state a claim under the LIBERTAD Act because the Complaint and the Certified Claim attached as an exhibit indicated that Havana Docks did not have an ownership interest in the Subject Property at the time Carnival began utilizing it. *See* Motion to Dismiss, *Carnival*, No. 19-cv-21724 (S.D. Fla. May 30, 2019), ECF No. [17] at 11-15 ("Carnival's Motion to Dismiss"). This Court rejected the argument and agreed with Havana Docks that Carnival's interpretation conflated ownership of an interest in property and ownership of a certified claim to such property, noting that the Act does not contain any requirement that the trafficking occur during the time in which a claimant holds its interest in

the property. *See* Order, *Carnival*, No. 19-cv-21724 (S.D. Fla. Aug. 28, 2019), ECF No. [47] at 8

("*Carnival* Order"). Ultimately, the Court denied Carnival's Motion to Dismiss. *Id.*

On August 27, 2019, Havana Docks filed three additional actions under the LIBERTAD

Act against: (1) MSC in this case, *see generally* ECF No. [1]; (2) Royal Caribbean Cruises, Ltd.

("Royal Caribbean") for trafficking that began in April 2017, *see generally* Complaint, *Havana*

*Docks Corp. v. Royal Caribbean Cruises, Ltd.*, No. 19-cv-23590 (S.D. Fla. Aug. 27, 2019), ECF

No. [1] ("*Royal Caribbean*"); and (3) Norwegian Cruise Line Holdings, Ltd. ("NCL") for

trafficking that began in 2017, *see generally* Complaint, *Havana Docks Corp. v. Norwegian Cruise*

*Line Holdings, Ltd.*, No. 19-cv-23591 (S.D. Fla. Aug. 27, 2019), ECF No. [1] ("*NCL*").[2]

Regarding those three cases, MSC and NCL both moved to dismiss Havana Docks'

Complaint in their respective cases and attached the Certified Claim, arguing in relevant part that

Plaintiff's claim failed as a matter of law because Havana Docks' interest in the Subject Property

was a leasehold interest that expired in 2004, and Havana Docks therefore could only assert a claim

under Title III for trafficking that occurred prior to the expiration of its leasehold interest. *See* ECF

No. [24] at 9-10 ("MSC's Motion to Dismiss"); Motion to Dismiss, *NCL*, No. 19-cv-23591 (S.D.

Fla. Oct. 11. 2019), ECF No. [31] at 17-21 ("NCL's Motion to Dismiss").[3] In its responses in both

cases, Havana Docks relied heavily on the Court's holding in the *Carnival* Order in arguing that it

had sufficiently alleged a claim for relief under Title III.

---

[2] Unlike the Complaint in *Carnival*, the Complaints in the instant case, *Royal Caribbean*, and *NCL* did not attach the Certified Claim as an exhibit. *See generally* ECF No. [1]; Complaint, *Royal Caribbean*, No. 19-cv-23590 (S.D. Fla. Aug. 27, 2019), ECF No. [1]; Complaint, *NCL*, No. 19-cv-23591 (S.D. Fla. Aug. 27, 2019), ECF No. [1].

[3] Royal Caribbean, on the other hand, filed an Answer in response to Havana Docks' Complaint in *Royal Caribbean*. *See* Answer to the Complaint, *Royal Caribbean*, No. 19-cv-23590 (S.D. Fla. Oct. 4, 2019), ECF No. [17].

In ruling on MSC's Motion to Dismiss and NCL's Motion to Dismiss, the Court found it necessary to reconsider its ruling in the *Carnival* Order. The Court determined that the issue regarding the nature of Havana Docks' underlying ownership interest was dispositive, reasoning that because the Certified Claim was predicated on Plaintiff's time-limited leasehold interest, Havana Docks could not, as a matter of law, state a claim for relief under the Act based on trafficking that occurred after Plaintiff's leasehold interest expired. *See Havana Docks v. MSC Cruises SA Co.*, No. 19-cv-23588, 2020 WL 59637, at *3 (S.D. Fla. Jan. 3, 2020) ("*MSC*"); *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, 2020 WL 70988, at *3 (S.D. Fla. Jan. 7, 2020) ("*NCL*"). The Court explained that any contrary result would improperly entitle Plaintiff to recover for trafficking in other property interests, thereby granting Havana Docks more rights to the Subject Property than it otherwise would have had by virtue of the confiscation. *MSC*, 2020 WL 59637, at *4-5; *NCL*, 2020 WL 70988, at *5. Thus, the Court granted MSC's Motion to Dismiss and NCL's Motion to Dismiss, and dismissed both cases with prejudice because, based upon the facts as alleged, Havana Docks could not state a claim against either MSC or NCL as a matter of law. *MSC*, 2020 WL 59637, at *5; *NCL*, 2020 WL 70988, at *5.

Plaintiff now moves, pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), for reconsideration of the Court's dismissal with prejudice in its Order on MSC's Motion to Dismiss, ECF No. [40] ("*MSC* Order"), and requests leave to file an Amended Complaint, ECF No. [42-1] ("Amended Complaint"), to further clarify the scope of its Certified Claim and to allege additional facts that the Court has not considered, but that are relevant to its claim. MSC opposes Plaintiff's requests.[4]

---

[4] Havana Docks, in *NCL*, filed the same motion for reconsideration as the Motion presently before the Court in this case. *See* Motion for Reconsideration and Leave to Amend, *NCL*, No. 19-cv-23591 (S.D. Fla. Feb. 4, 2020), ECF No. [44]. Likewise, after the Court ruled on the motions to dismiss in this case and in *NCL*, Royal Caribbean moved for judgment on the pleadings in *Royal Caribbean*. *See* Motion for Judgment on

On March 9, 2020, the Court held a consolidated hearing on the motions pending in this case, *Royal Caribbean*, and *NCL*, which was attended by Plaintiff's counsel, MSC's counsel, Royal Caribbean's counsel, and NCL's counsel. During this hearing, Havana Docks argued that the Court should reconsider its dismissal with prejudice based on errors of fact and law, and permit Plaintiff to file the Amended Complaint curing the deficiencies noted in the *MSC* Order. MSC, Royal Caribbean, and NCL collectively argued that neither reconsideration nor amendment was warranted because the Court concluded that Havana Docks' claim failed as a matter of law.

## II.  LEGAL STANDARD

### A.  Motion for Reconsideration

"While Rule 59(e) does not set forth any specific criteria, the courts have delineated three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) the availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice." *Williams v. Cruise Ships Catering & Serv. Int'l, N.V.*, 320 F. Supp. 2d 1347, 1357-58 (S.D. Fla. 2004) (citing *Sussman v. Salem, Saxon & Nielsen, P.A.*, 153 F.R.D. 689, 694 (M.D. Fla. 1994)); *see also Burger King Corp. v. Ashland Equities, Inc.*, 181 F. Supp. 2d 1366, 1369 (S.D. Fla. 2002). A motion for reconsideration requests that the Court grant "an extraordinary remedy to be employed sparingly." *Burger King Corp.*, 181 F. Supp. 2d at 1370. A party may not use a motion for reconsideration to "relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 957 (11th Cir. 2009) (quoting *Michael Linet, Inc. v. Vill. of Wellington, Fla.*, 408 F.3d 757, 763 (11th

---

the Pleadings, *Royal Caribbean*, No. 19-cv-23590 (S.D. Fla. Jan. 10, 2020), ECF No. [26]. Havana Docks also moved for leave to amend its Complaint in *Royal Caribbean*, asserting nearly identical arguments as those presented in the instant Motion and the motion for reconsideration in *NCL*. *See* Motion for Leave to File First Amended Complaint, *Royal Caribbean*, No. 19-cv-23590 (S.D. Fla. Feb. 12, 2020), ECF No. [32].

Cir. 2005)). "This prohibition includes new arguments that were 'previously available, but not pressed.'" *Id.* (quoting *Stone v. Wall*, 135 F.3d 1438, 1442 (11th Cir. 1998) (per curiam)).

A motion to reconsider is "appropriate where, for example, the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Kapila v. Grant Thornton, LLP*, No. 14-61194-CIV, 2017 WL 3638199, at *1 (S.D. Fla. Aug. 23, 2017) (quoting *Z.K. Marine Inc. v. M/V Archigetis*, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992)) (quotation marks omitted). A motion for reconsideration "is not an opportunity for the moving party . . . to instruct the court on how the court 'could have done it better' the first time." *Hood v. Perdue*, 300 F. App'x 699, 700 (11th Cir. 2008) (citation omitted).

Under Rule 60(b), a party may seek relief from a final judgment. Fed. R. Civ. P. 60(b). "The first five provisions of Rule 60(b) provide relief in specific circumstances, including in the event of mistake, fraud, or newly discovered evidence. Rule 60(b)(6) provides a catch-all, authorizing a court to grant relief from a judgment for 'any other reason that justifies relief.'" *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 741 F.3d 1349, 1355 (11th Cir. 2014) (quoting Fed. R. Civ. P. 60(b)(6)). "By its very nature, the rule seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the 'incessant command of the court's conscience that justice be done in light of all the facts.'" *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981) (quoting *Bankers Mortg. Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970)).[5] Thus, a movant seeking relief under Rule 60(b) "must demonstrate a justification so compelling that the [district] court was required to vacate its order." *Cano v.*

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981), the Court of Appeals for the Eleventh Circuit adopted as binding precedent decisions of the Court of Appeals for the Fifth Circuit handed down prior to September 30, 1981.

*Baker*, 435 F.3d 1337, 1342 (11th Cir. 2006) (per curiam) (quoting *Cavaliere v. Allstate Ins. Co.*, 996 F.2d 1111, 1115 (11th Cir. 1993)).

"Rule 60(b)(6) motions must demonstrate that the circumstances are sufficiently extraordinary to warrant relief." *Aldana*, 741 F.3d at 1355 (quotation marks and citations omitted). "It is well established . . . that relief under Rule 60(b)(6) is an extraordinary remedy which may be invoked only upon a showing of exceptional circumstances." *Griffin v. Swim-Tech Corp.*, 722 F.2d 677, 680 (11th Cir. 1984) (quotation marks and citation omitted); *see also Frederick v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1288 (11th Cir. 2000) ("Federal courts grant relief under Rule 60(b)(6) only for extraordinary circumstances."). Relief under Rule 60(b)(6), however, only applies to cases that do not fall into any other category of Rule 60(b). *United States v. Route 1, Box 111, Firetower Rd.*, 920 F.2d 788, 791 (11th Cir. 1991). In any event, whether to grant relief pursuant to Rule 60(b) is ultimately a matter of discretion. *Aldana*, 741 F.3d at 1355 (quoting *Cano*, 435 F.3d at 1342).

### B. Motion to Amend

Apart from initial amendments permissible as a matter of course, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). A plaintiff should be afforded the opportunity to test their claim on the merits as long as the underlying facts or circumstances may properly warrant relief. *Foman v. Davis*, 371 U.S. 178, 182 (1962). However, "[a] district court need not . . . allow an amendment (1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001). "In this circuit, these

'same standards apply when a plaintiff seeks to amend after a judgment of dismissal has been entered by asking the district court to vacate its order of dismissal pursuant to Fed. R. Civ. P. 59(e).'" *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1077 (11th Cir. 2004) (quoting *Thomas v. Town of Davie*, 847 F.2d 771, 773 (11th Cir. 1988)). In any event, "the grant or denial of an opportunity to amend is within the discretion of the District Court." *Foman*, 371 U.S. at 182.

Further, the Eleventh Circuit has explained that, "when a motion to amend is filed after a scheduling order deadline, Rule 16 is the proper guide for determining whether a party's delay may be excused." *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418 n.2, 1419 (11th Cir. 1998). Federal Rule of Civil Procedure 16 states that requests for leave to amend after the applicable deadline, as set in a court's scheduling order, require a showing of "good cause." Fed. R. Civ. P. 16(b)(4). "This good cause standard precludes modification unless the schedule cannot be met despite the diligence of the party seeking the extension." *Sosa*, 133 F.3d at 1418 (quotation marks omitted). Good cause exists when "evidence supporting the proposed amendment would not have been discovered in the exercise of reasonable diligence until after the amendment deadline passed." *Donahay v. Palm Beach Tours & Transp., Inc.*, 243 F.R.D. 697, 699 (S.D. Fla. 2007) (citation omitted). "[E]ven if the opposing party would not be prejudiced by the modification of a scheduling order, good cause is not shown if the amendment could have been timely made." *Id.* If the party seeking relief "was not diligent, the [good cause] inquiry should end." *Sosa*, 133 F.3d at 1418 (quoting *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)). Thus, a plaintiff "must establish good cause for their delay in seeking to amend the pleadings after the Court's deadline for amendment before the Court may consider whether to grant leave to amend

under Rule 15." *Remington v. Newbridge Sec. Corp.*, No. 13-cv-60384, 2014 WL 505153, at *12 (S.D. Fla. Feb. 7, 2014).

## III. DISCUSSION

Plaintiff's Motion requests that the Court reconsider its dismissal with prejudice and permit Havana Docks to file the Amended Complaint, which will cure the deficiencies discussed in the *MSC* Order and sufficiently allege facts that support a claim against MSC under Title III. Specifically, Plaintiff argues that the Court made errors of fact and law in dismissing the case with prejudice without giving Havana Docks a single opportunity to amend its Complaint to allege that: (1) Under the Eleventh Circuit's opinion in *Glen v. Club Mediterranee S.A.*,[6] the Certified Claim itself is the property interest that remains after the confiscation of the Subject Property and this interest is not time limited; (2) Plaintiff's concession agreement included a 99-year leasehold interest that was cut short by 44 years due to the confiscation, and therefore never expired; (3) The concession agreement included an indemnity right to be paid by the Cuban Government to Havana Docks that was triggered by expropriation, which was not time limited and was included in the valuation of the loss in the Certified Claim; and (4) The Certified Claim recognizes ownership of property interests beyond the concession itself and the FCSC included the losses of these other property interests in its valuation. Thus, Plaintiff contends that reconsideration is warranted because, if permitted to replead, Havana Docks can allege facts sufficient to state a claim under Title III.

In its Response, MSC argues that reconsideration is unwarranted in this case because Plaintiff is simply attempting to relitigate its previous arguments. MSC asserts that Plaintiff has not shown good cause supporting its untimely request for leave to amend because the "new" facts

---

[6] *Glen v. Club Mediterranee S.A.*, 450 F.3d 1251 (11th Cir. 2006) ("*Glen II*"); *see also Glen v. Club Mediterranee S.A.*, 365 F. Supp. 2d 1263 (S.D. Fla. 2005) ("*Glen I*"), *aff'd*, 450 F.3d 1251.

alleged in the Amended Complaint were available to Plaintiff before it filed the initial Complaint, and thus could have been alleged before dismissal. Further, MSC argues that Havana Docks' request for leave to amend nonetheless should be denied because any amendment is futile, as Plaintiff cannot allege any facts sufficient to cure the fundamental timing defect discussed in the *MSC* Order. As such, MSC argues that Plaintiff's Motion should be denied.

In its Reply, Plaintiff contends that reconsideration is procedurally proper where, as here, it is necessary to cure errors of fact and law. Havana Docks asserts that such errors exist in this case because the Court's *MSC* Order did not accept Plaintiff's allegations as true, as required at the dismissal stage, and instead made improper findings of fact with regard to the nature of the concession and the Certified Claim that were adverse to Plaintiff and were contrary to the LIBERTAD Act's plain text and the Eleventh Circuit's reasoning in *Glen II*. Further, Havana Docks contends that there was no undue delay in seeking leave to amend because Plaintiff was relying on this Court's ruling in the *Carnival* Order regarding the sufficiency of the claims alleged and could not have anticipated that the Court would reverse course. Plaintiff also argues that amendment is not futile here and that the futility issues MSC raises present factual challenges that are inappropriate for determination at the dismissal stage. Therefore, Plaintiff contends that amendment is warranted in this case.

In *NCL*, the Court recently granted Plaintiff's motion for reconsideration, permitted Havana Docks to file an Amended Complaint, and vacated its Order on NCL's Motion to Dismiss based on nearly identical arguments and issues as those presented here. *See* Order, *NCL*, No. 19-cv-23591 (S.D. Fla. Apr. 14, 2020), ECF No. [53]. A similar result is warranted in this case. Specifically, following an extensive review of the arguments presented in the parties' briefs and the arguments addressed at the hearing, the issues raised in each of Havana Docks' cases under

Title III, and the limited relevant caselaw concerning the LIBERTAD Act, the Court agrees with

Plaintiff that reconsideration of its *MSC* Order is warranted to correct errors of fact and law that,

when compounded, led the Court to incorrectly dismiss the instant action with prejudice.

## A. Errors of Fact

First, the Court agrees with Havana Docks that instead of accepting the well-pleaded

factual allegations in the Complaint as true, as required on a motion to dismiss under Rule

12(b)(6),[7] the Court in its *MSC* Order made impermissible findings of fact. In particular, the Court

made one finding of fact which served as the foundation for the subsequent errors in the *MSC*

Order:

> In this case, Plaintiff does not dispute that the property interest at stake is a
> concession that expired in 2004. Accordingly, the property interest in this case is
> time-limited by its terms, and the claim that Plaintiff owns is a claim covering the
> time-limited interest, which expired in 2004.[n.1]

> [n.1] . . . . Here, the property interest held by Plaintiff at the time
> was a time-limited concession that by its own terms expired in 2004.

*MSC*, 2020 WL 59637, at *3 & n.1 (citation omitted). The finding that the concession expired in

2004 was premised upon the language in the Certified Claim that "[t]he terms of the concession

granted by the Cuban Government were to expire in the year 2004, at which time the corporation

had to deliver the piers to the government in good state of preservation." ECF No. [41-8] at 9. Yet,

in its consideration of MSC's Motion to Dismiss, the Court only had the benefit of reviewing the

---

[7] *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (To survive a motion to dismiss under Rule 12(b)(6), the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." (citations omitted) (footnote omitted)); *see also Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance . . . dismissals based on a judge's disbelief of a complaint's factual allegations"); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009) (At the dismissal stage, "the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true. The threshold is 'exceedingly low' for a complaint to survive a motion to dismiss for failure to state a claim upon which relief can be granted." (citations omitted)).

Certified Claim and the resulting erroneous factual finding that the concession expired in 2004 was premised upon the record available to it at that time.[8] Regardless, the Court now recognizes that this finding was incorrect. In fact, Havana Docks' concession agreement reflects that Plaintiff was granted a 99-year leasehold interest, not a leasehold interest ending on a date certain. ECF No. [42-1] at 7, ¶ 15. Further compounding the error was the fact that this specific characterization of the concession as a 99-year leasehold interest was notably absent from the briefing in *Carnival*, *NCL*, and the instant action. Indeed, the Court was first apprised of the fact that Plaintiff's interest was a 99-year leasehold interest in the instant Motion.[9]

Plaintiff also rightfully notes that the Court's conclusion that the concession expired in 2004 is inconsistent with the actual text of the Certified Claim. After a close reading of the Certified Claim, the Court agrees with Havana Docks that the Certified Claim did not place a temporal limitation on Plaintiff's claim that expired in 2004. Instead, the FCSC noted that "[t]he terms of the concession granted by the Cuban Government *were* to expire in the year 2004, at which time the corporation had to deliver the piers to the government in good state of preservation." ECF No. [41-8] at 9 (emphasis added). The distinction between the language in the Certified Claim that the concession terms *were* to expire and the Court's incorrect factual finding that the property interests at issue *actually did* expire in 2004 is critical, and this misinterpretation

---

[8] While MSC argues that Plaintiff could have timely alleged the 99-year leasehold interest but failed to do so, the Court is cognizant of the fact that Havana Docks could not have anticipated that its previously sufficient allegations would fail in this case. Thus, the Court finds that Plaintiff's failure to clarify the nature of its leasehold interest under these circumstances is excusable.

[9] Similarly, Plaintiff first clarified the nature of its property interest in the Subject Property in its Motion for Leave to File First Amended Complaint in *Carnival*, its Motion for Leave to File First Amended Complaint in *Royal Caribbean*, and its Motion for Reconsideration and Leave to Amend in *NCL*. *See* Motion for Leave to File First Amended Complaint, *Carnival*, No. 19-cv-221724 (S.D. Fla. Feb. 3, 2020), ECF No. [74]; Motion for Leave to File First Amended Complaint, *Royal Caribbean*, No. 19-cv-23590 (S.D. Fla. Feb. 12, 2020), ECF No. [32]; Motion for Reconsideration and Leave to Amend, *NCL*, No. 19-cv-23591 (S.D. Fla. Feb. 4, 2020), ECF No. [44].

of the text of the Certified Claim served as the foundation for the Court's resulting analysis in the *MSC* Order. Ultimately, the nature of Havana Docks' leasehold interest, and the Court's mistaken designation of the same in its *MSC* Order, compel the conclusion that the Court engaged in improper fact finding, rather than accepting Plaintiff's factual allegations as true for the purposes of MSC's Motion to Dismiss.

Additionally, from the limited allegations in Plaintiff's Complaint that it owned an interest in "certain commercial waterfront *real* property in the Port of Havana, Cuba," ECF No. [1] ¶ 8 (emphasis added), coupled with the language in the Certified Claim quoted above, ECF No. [41-8] at 9, the logical inference was that Havana Docks' Certified Claim was "limited by its own terms as the claim relates to nothing more than the time-limited concession Plaintiff had at the time the property was confiscated by the Cuban Government," *MSC*, 2020 WL 59637, at *4; *see also id.* at *5 ("Plaintiff is the rightful owner only of a time-limited concession that expired in 2004."). The Certified Claim, however, contradicts the conclusion that Havana Docks only had an interest in real property, which the Court overlooked. *See generally* ECF No. [41-8]. Further, these additional property interests reflected in the Certified Claim, such as the ownership interests in fixtures and equipment, are not time limited. The Court's analysis in the *MSC* Order overlooked these additional certified property interests and instead relied entirely on the language in the Certified Claim with regard to the concession's expiration in 2004. As delineated above, the Court agrees that it made errors of fact in its *MSC* Order that warrant reconsideration here.

**B.  Errors of Law**

    **1.  *Glen I* and *Glen II***

Through the lens of these admittedly improper — and incorrect — factual findings, the Court concluded that Havana Docks was the owner of only a time-limited concession that expired

in 2004. Further, based on this understanding, the Court made an error of law in its subsequent

analysis. Importantly, the true nature of Havana Docks' interest in the concession (i.e., a 99-year

leasehold interest) elucidates why the Court's ultimate holding in its *MSC* Order is at odds with

the Eleventh Circuit's reasoning in *Glen II* and the district court's reasoning in *Glen I*, which the

Eleventh Circuit affirmed.

> Specifically, the district court in *Glen I* explained that:
>
> the [United States] Supreme Court in *Sabbatino* recognized the power of the Cuban government to expropriate property within its borders and to vest the property right in Cuba. *See Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 414-15 (1964) (Cuba's confiscation vested in Cuba the "property right in" and "dominion over" sugar expropriated by Cuba, even though Cuba failed to compensate the former owners). . . . [Further], Titles III and IV of the Helms-Burton Act, do not provide that those whose property was taken by the Cuban government retain *legal title* to that property. Rather, Title III permits any U.S. national "who owns a claim to such [confiscated] property for money damages" to sue those who traffic in such property. 22 U.S.C. §§ 6082(a)(1)(A). Title IV provides sanctions against those who traffic in "confiscated property, a claim to which is owned by a United States national." 22 U.S.C. §§ 6082(a)(2). Titles III and IV simply imply that people like the Glens may own a *claim* for compensation under U.S. law, but they do not *own* the expropriated land itself.

*Glen I*, 365 F. Supp. 2d at 1269-70 (footnote omitted). In affirming the district court's reasoning,

the Eleventh Circuit emphasized that "[t]he Helms-Burton Act refers to the property interest that

former owners of confiscated property now have as ownership of a 'claim to such property.'" *Glen*

*II*, 450 F.3d at 1255 (quoting 22 U.S.C. § 6082(a)(1)(A)); *see also id.* (noting that actions brought

under Title III are "actions brought 'on a claim to the confiscated property' against traffickers in

the property" (quoting 22 U.S.C. § 6082(a)(4))). As such, the reasoning in *Glen I* and *Glen II*

stands for the notion that the Cuban Government's confiscation of property extinguished any

ownership rights of those who owned the property prior to the expropriation. *See Glen II*, 450 F.3d

at 1255; *Glen I*, 365 F. Supp. 2d at 1269-70. Moreover, obtaining a claim certified by the FCSC

allows the victim of such a confiscation to memorialize the *value* of the property interest lost and

to put other actors on notice of the victim's outstanding right to compensation based on the now-extinguished property interest taken.[10] This certified claim is *not* an interest in the confiscated property itself; rather, it represents the dollar amount that the victim has suffered by being deprived of its property interests — a point that MSC concedes. *See* ECF No. [45] at 7; *see also Glen I*, 365 F. Supp. 2d at 1270.

In accordance with *Glen I* and *Glen II*, the Cuban Government's expropriation of the Subject Property extinguished all rights Havana Docks had to the remaining concession term of 44 years. Thus, in lieu of its property interest in the remaining 44 years of the concession to the Subject Property, which the Cuban Government confiscated, Plaintiff now owns an interest only in the Certified Claim, which reflects the right to compensation for the value of loss Plaintiff sustained due to the expropriation. Moreover, because the Cuban Government's wrongful confiscation extinguishes any property interests a rightful owner previously had in the expropriated property, this Court's holding in its *MSC* Order is at odds with *Glen I* and *Glen II*. In particular, the *MSC* Order essentially forecloses any recovery under the Act for trafficking because no trafficking could ever possibly occur in a *claimant's* property interest after confiscation — and thus complete extinguishment — of any interest in the property previously owned. Limiting the allowable period of recovery to the term of the underlying property interest, in effect, nullifies Title III entirely because the Cuban Government's confiscation extinguished all of Plaintiff's

---

[10] Under the Claims Settlement Act, the FCSC is tasked with certifying "the amount and validity of claims by [U.S.] nationals . . . against the Government of Cuba . . . for losses resulting from the nationalization, expropriation, intervention, or other taking of, or special measures directed against, property . . . ." 22 U.S.C. § 1643b(a). In determining the "value of properties, rights, or interests taken, the [FCSC] shall take into account the basis of valuation most appropriate to the property and equitable to the claimant, including but not limited to, (i) fair market value, (ii) book value, (iii) going concern value, or (iv) cost of replacement." *Id.*; *see also* 22 U.S.C. § 1643f(a) ("The Commission shall certify to each individual who has filed a claim under this subchapter the amount determined by the Commission to be the loss or damage suffered by the claimant which is covered by this subchapter.").

property interests in the Subject Property. As such, requiring that Plaintiff only recover damages for trafficking occurring within the 44 years after confiscation is untenable, given that, under *Glen I* and *Glen II*, Plaintiff's interest in the remaining 44 years was extinguished at the time of expropriation. In addition, as discussed in more detail below, the Court concludes that the statutory interpretation of the language of Title III in its *MSC* Order was incorrect and that its conclusions in the *MSC* Order were contrary to the Act's express purpose.

### 2. Liability for Trafficking Under Title III

Based upon its erroneous factual findings, the Court in its *MSC* Order construed the liability provision of § 6082(a)(1)(A) too narrowly — a construction which it now concludes is not in keeping with the Act. Instead, the Court's ruling in the *Carnival* Order was consistent with the language and purpose of the Act. As such, the reasoning in the *MSC* Order incorrectly conflates the Certified Claim with Havana Docks' former interests in the Subject Property.

Title III of the LIBERTAD Act states that "any person that . . . traffics in property which was confiscated by the Cuban Government . . . shall be liable to any United States national who owns the claim to such property for money damages . . . ." 22 U.S.C. § 6082(a)(1)(A).[11]

> Finding that the Castro government was "offering foreign investors the opportunity to purchase an equity interest in, manage, or enter into joint ventures" involving confiscated property in order to obtain "badly needed financial benefit, including hard currency, oil, and productive investment and expertise," 22 U.S.C. § 6081(5), (6), Congress established a civil remedy for any United States national owning a claim to "property" confiscated by the Cuban government after January 1, 1959, against "any person" who "traffics" in such property, *id.* § 6082(a)(1)(A) . . . .

*Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 125 (2d Cir. 2000). Thus, the Act aims "to deter third-party foreign investors from trafficking in confiscated property . . . . [and] [t]his

---

[11] The amount of money damages available under Title III is the greater of: "(a) the amount certified by the Foreign Claims Settlement Commission under the International Claims Settlement Act of 1949, (b) the amount determined by a special master pursuant to § 6083(a)(2), or (c) the fair market value of the property." *Garcia-Bengochea*, 407 F. Supp. 3d at 1284 n.1 (citing § 6082(a)(1)(A)(i)).

purpose is achieved through the establishment of a new statutory remedy available . . . to 'United States nationals who were the victims of these confiscations . . . [to] deny traffickers any profits from economically exploiting Castro's wrongful seizures.'" *Glen II*, 450 F.3d at 1255 (quoting 22 U.S.C. § 6081(11)); *see also id.* at 1255 n.3 (citing 22 U.S.C. § 6081(5), (6) (defining "'trafficking' in confiscated property" as transactions in "property and assets some of which were confiscated from United States nationals."); 22 U.S.C. § 6081(11) ("United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States . . . .")).

The LIBERTAD Act provides an expansive definition of "property," stating: "The term 'property' means any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." 22 U.S.C. § 6023(12)(A). Moreover, the definition of "confiscated" incorporates the Act's broad definition of "property."

> **(4) Confiscated**
> As used in subchapters I and III, the term "confiscated" refers to —
> (A) the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959 —
>> (i) without the property having been returned or adequate and effective compensation provided; or
>> (ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure; and
> (B) the repudiation by the Cuban Government of, the default by the Cuban Government on, or the failure of the Cuban Government to pay, on or after January 1, 1959 —
>> (i) a debt of any enterprise which has been nationalized, expropriated, or otherwise taken by the Cuban Government;
>> (ii) a debt which is a charge on property nationalized, expropriated, or otherwise taken by the Cuban Government; or
>> (iii) a debt which was incurred by the Cuban Government in satisfaction or settlement of a confiscated property claim.

*Id.* § 6023(4).

"The Castro government has utilized from its inception and continues to utilize . . . confiscation . . . and other forms of terror and repression, as means of retaining power." 22 U.S.C. § 6021(15). "The view long held by the United States is that an alien whose property is expropriated is entitled to 'prompt, adequate, and effective' compensation." *Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 888 (2d Cir. 1981). "The wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development." 22 U.S.C. § 6081(2).

As such, Congress has found that trafficking in confiscated property by foreign investors "undermines the foreign policy of the United States . . . to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government," and the transfer of these confiscated properties "would complicate any attempt to return them to their original owners." *Id.* §§ 6081(6)(B), (7). Because "[t]he international judicial system . . . lacks fully effective remedies for the wrongful confiscation of property and for unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property," Congress has sought "to provide protection against wrongful confiscations by foreign nations and their citizens, including the provision of private remedies." *Id.* §§ 6081(8), (10). As such, "[t]o deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations [are] endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." *Id.* § 6081(11). In enacting Title III, "Congress intended 'to create a "chilling effect" that [would] deny the current Cuban regime venture capital, discourage third-country nationals from seeking to profit from illegally confiscated property, and

help preserve such property until such time as the rightful owners can successfully assert their claim.'" *Havana Club Holding*, 203 F.3d at 125 (citation omitted) (emphasis omitted); *see also* 22 U.S.C. § 6022(6) ("The purposes of this [Act] are . . . to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime.").

Accordingly, the LIBERTAD Act defines "traffics" as follows:

> **(13) Traffics**
> (A) As used in [Title] III, and except as provided in subparagraph (B), a person "traffics" in confiscated property if that person knowingly and intentionally —
>> (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
>> (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or
>> (iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,
> without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A).

Thus, under the Act, the definition of "traffics" relates to offending conduct in the broad concept of "confiscated property" — i.e., in any property that was nationalized, expropriated, or otherwise seized by the Cuban Government to obtain ownership or control, without the property having been returned or adequate and effective compensation — "without the authorization of any United States national who holds a claim to the property." *Id.* § 6023(13); *see also id.* § 6023(4).

"[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Patel v. U.S. Att'y Gen.*, 917 F.3d 1319, 1326 n.5 (11th Cir. 2019) (quoting *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 824 (2018)). Likewise, in construing a statute, a court is "not allowed to add or subtract words from [the] statute." *Friends of the Everglades v. S. Fla.*

*Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009). Yet, notably absent from the definition of "traffics" is any limitation on the scope of "trafficking" to only a specific "interest in property." Instead, subsection (i) explicitly includes in "traffics" obtaining "an interest in confiscated property," which strongly contradicts any interpretation limiting "traffics" based on a claimant's property interest. 22 U.S.C. § 6023(13)(A)(i). Further contradicting any need to constrict the definition of "traffics" is the fact that each reference to "trafficking" in the substantive provisions of Title III concerns trafficking in "confiscated property," rather than in any "interest in confiscated property."[12] Thus, the Court's narrow construction of "traffics" in its *MSC* Order was improper because it inserted "an interest" into each statutory reference to "confiscated property."

Further, as discussed above, Title III states that "any person that . . . traffics in property which was confiscated by the Cuban Government . . . shall be liable to any United States national who owns the claim to such property for money damages . . . ." 22 U.S.C. § 6082(a)(1)(A). Reading the liability language in a way that gives effect to each of the definitions above establishes that the Court's limiting construction was in error. Taken together, these provisions state that "any person that . . . traffics in," *id.* § 6082(a)(1)(A), "any property . . . whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest," *id.* § 6023(12)(A), "which was confiscated by the Cuban Government," *id.* § 6082(a)(1)(A), through "the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property . . . . without the property having been returned or adequate and effective compensation provided," *id.* § 6023(4), "shall be liable to any United States national who owns the claim to such property for money damages," *id.* § 6082(a)(1)(A).

---

[12] *See, e.g.*, 22 U.S.C. § 6081(11) ("To deter trafficking in wrongfully confiscated property . . . ."); *id.* § 6082(a)(1)(A) ("any person that . . . traffics in property which was confiscated by the Cuban Government . . . ."); *id.* § 6082(a)(3)(A) ("Any person that traffics in confiscated property . . . .").

Further, "such property" in the phrase "the claim to such property" refers to "property which was confiscated by the Cuban Government." *See Such*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/such (last visited Mar. 29, 2020) (defining the adjective "such" as "of the character, quality, or extent previously indicated or implied").

Additionally, the Court's construction of Title III's liability provision in its *MSC* Order overlooked the fact that other provisions of the Act refer specifically to "[a]n *interest in property* for which a United States national has a claim certified . . . ." *See, e.g.*, 22 U.S.C. § 6082(a)(5)(D) (emphasis added).[13] "It is well settled that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Duncan v. Walker*, 533 U.S. 167, 173 (2001) (quoting *Bates v. United States*, 522 U.S. 23, 29-30 (1997); *Russello v. United States*, 464 U.S. 16, 23 (1983)). Accordingly, limiting the meaning of "traffics in [confiscated] property" to trafficking only in the specific "interest in property for which a United States national has a claim certified" is contrary to the express language used in various parts of the Act. Instead, Title III's plain language creates liability for trafficking in the broadly defined

---

[13] Section 6082(a)(5)(D) states, in full, that:

> An interest in property for which a United States national has a claim certified under title V of the International Claims Settlement Act of 1949 may not be the subject of a claim in an action under this section by any other person. Any person bringing an action under this section whose claim has not been so certified shall have the burden of establishing for the court that the interest in property that is the subject of the claim is not the subject of a claim so certified.

*Id.*; *see also* 22 U.S.C. § 6083(a)(1) ("In any action brought under this subchapter, the court shall accept as conclusive proof of ownership of *an interest in property* a certification of a claim to ownership of *that interest* that has been made by the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949 . . . ." (emphasis added)). Notably, even the definition of "traffics" under Title III refers to "an interest in property." 22 U.S.C. § 6023(13)(A) ("a person 'traffics' in confiscated property if that person knowingly and intentionally . . . purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds *an interest in confiscated property* . . . ." (emphasis added)).

"confiscated property" — i.e., in any property that was nationalized, expropriated, or otherwise seized by the Cuban Government to obtain ownership or control, without the property having been returned or adequate and effective compensation — not in a particular interest in confiscated property.

Further, the *MSC* Order essentially concluded that any recovery by Plaintiff on its Certified Claim (i.e., the monetized amount of the loss incurred by Plaintiff from the confiscation) for trafficking in the Subject Property that occurred after the concession was set to expire would allow Havana Docks in effect to recover additional *monetary remedies* beyond those to which it was entitled. The amount of monetary damages memorialized in the Certified Claim, however, is the dollar value of the remainder of the leasehold term that Plaintiff was deprived of, coupled with the value of the other itemized property interests delineated in the Certified Claim, and this discrete amount would not change depending on the timing of the trafficking. *See* 22 U.S.C. §§ 1643, 1643b(a), 1643f(a). Any recovery for the trafficking alleged in this action would not, as MSC argues and as the *MSC* Order held, entitle Plaintiff to recover compensation for an interest in the Subject Property that it did not own, nor would it effectively treat Havana Docks' interest as a fee simple interest. *See* ECF No. [45] at 8-10; *MSC*, 2020 WL 59637, at *3-4. The amount of damages Plaintiff is entitled to recover under the Certified Claim would still be the certified value of its confiscated interests in the Subject Property that were expropriated, not the value of the fee simple interest or any other property interest that it did not own. Thus, permitting Havana Docks' cause of action in this case to proceed allows Plaintiff to attempt to recover only the amount of compensation for its interests in the Subject Property that were confiscated.

In the *MSC* Order, the Court further took issue with Plaintiff's reading of the Act because it would give Plaintiff the right to recover compensation for trafficking in property interests beyond

the "property interest [owned] at the time of the Cuban Government's wrongful confiscation," and determined that recovery was precluded in this case because, as in the context of takings, Havana Docks was only entitled to receive just compensation for the interest in property that was taken. *MSC*, 2020 WL 59637, at *3. Yet, as explained above, the amount of compensation Plaintiff can recover under the Certified Claim is the value of the losses it sustained *for the property interest confiscated*. *See* 22 U.S.C. §§ 1643, 1643b(a), 1643f(a). However, the issue of the amount of compensation that Plaintiff is entitled to recover in this case is entirely distinct from the issue of the trafficking that creates liability under the Act. Here, the recovery itself "only extend[s] as far as the particular right from the bundle that [Havana Docks] has acquired." *MSC*, 2020 WL 59637, at *3.[14] The liability provision, on the other hand, imposes liability for trafficking in the more broadly defined "confiscated property" — a term that, as discussed above, is not limited solely to the interest Plaintiff originally owned in the Subject Property. Thus, consistent with established takings principles under property law, which require payment of just compensation for the property interest taken, any recovery Plaintiff obtains pursuant to the Certified Claim in this case would be for the value of its confiscated property interests, not for the value of any other interests in the Subject Property that Havana Docks did not own. *See, e.g.*, *United States v. Gen. Motors Corp.*, 323 U.S. 373, 382 (1945) ("When [the government] takes the property, that is, the fee, the lease, whatever he may own, terminating altogether his interest, under the established law it must pay him for what is taken, not more . . . ."); *Alamo Land & Cattle Co., Inc. v. Arizona*, 424 U.S. 295, 304 (1976) ("The measure of damages is the value of the use and occupancy of the leasehold for

---

[14] This is also consistent with the Act's requirement that "the court shall accept as conclusive proof of ownership of *an interest in property* a certification of a claim to ownership of that interest that has been made by the Foreign Claims Settlement Commission under title V of the International Claims Settlement Act of 1949 . . . ." 22 U.S.C. § 6083(a)(1) (emphasis added). Therefore, the recovery amount under the Certified Claim is limited to the particular rights from the bundle that Havana Docks owned.

the remainder of the tenant's term . . . ." (quoting *United States v. Petty Motor Co.*, 327 U.S. 372, 381 (1946))).

In sum, after having had the benefit of full briefing on the issues presented by all parties and the parties' oral arguments at the hearing, the Court agrees with Plaintiff that the *MSC* Order was incorrect because it was premised upon errors of fact and law.

### C.  Leave to Amend

Based on the errors in the Court's *MSC* Order, the Court concludes that good cause exists to vacate its *MSC* Order, reopen this case, and permit Havana Docks to file its Amended Complaint. Allowing Plaintiff to file the Amended Complaint is warranted because Havana Docks reasonably relied on the Court's holding in its *Carnival* Order in gauging the sufficiency of the allegations plead in the instant action.[15] Additionally, the errors of fact and law in the Court's *MSC* Order also support permitting Havana Docks to file its Amended Complaint.

Moreover, the Court disagrees with MSC regarding the futility of permitting Plaintiff to file its Amended Complaint. Instead, the Court finds that Havana Docks can sufficiently allege a claim under Title III, in light of the Court's discussion above with regard to the express language

---

[15] As the Supreme Court has explained,

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason — such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. — the leave sought should, as the rules require, be "freely given." Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is . . . inconsistent with the spirit of the Federal Rules.

*Foman*, 371 U.S. at 182 (citation omitted).

and purpose of the Act and the additional allegations in the Amended Complaint regarding Havana

Docks' various property interests. Plaintiff's Amended Complaint would also not fail as a matter

of law because, contrary to the Court's previous conclusion in its *MSC* Order, the liability

provision of Title III does not contain any temporal limitation. Likewise, the Court finds the

allegations in the Amended Complaint to be sufficient to assert a claim under Title III because

Plaintiff has adequately alleged that it owned a Certified Claim to an interest in the Subject

Property that was wrongfully confiscated and that MSC knowingly trafficked in the confiscated

Subject Property. ECF No. [42-1] at 5-10, ¶¶ 12-27.[16] Thus, the Court concludes that allowing

Havana Docks to file its Amended Complaint would not be futile in this case. *See Bryant*, 252

F.3d at 1164 (concluding that the district court's finding of futility "ignore[d] the fact that the

district court earlier had found the complaint sufficient, thus justifying, until [the Eleventh

Circuit's] opinion, the plaintiffs' belief that they did not need to include any further allegations in

the Amended Complaint"). Finally, given the significant factual and legal errors contained within

the *MSC* Order, the Court believes it necessary to vacate its *MSC* Order in its entirety.

---

[16] *See Glen II*, 450 F.3d at 1255 ("The Helms-Burton Act refers to the property interest that former owners of confiscated property now have as ownership of a 'claim to such property.' When (or if) the portion of Title III that allows private litigants to bring lawsuits becomes effective, actions brought pursuant to the new statutory scheme would be actions brought 'on a claim to the confiscated property' against traffickers in the property." (citations omitted)); *Glen I*, 365 F. Supp. 2d at 1269-70 ("Title III permits any U.S. national 'who owns a claim to such [confiscated] property for money damages' to sue those who traffic in such property." (citation omitted)); *Garcia-Bengochea*, 407 F. Supp. 3d at 1288 ("The Helms-Burton Act also requires the plaintiff to show that he 'owns the claim' to the confiscated property." (quoting § 6082(a)(1)(A))); *Gonzalez v. Amazon.com, Inc.*, No. 19-23988-CIV, 2020 WL 1169125, at *2 (S.D. Fla. Mar. 11, 2020) (discussing the insufficiency of allegations regarding an actionable ownership interest); *see also Havana Club Holding*, 203 F.3d at 125 ("Finding that the Castro government was 'offering foreign investors the opportunity to purchase an equity interest in, manage, or enter into joint ventures' involving confiscated property in order to obtain 'badly needed financial benefit, including hard currency, oil, and productive investment and expertise,' Congress established a civil remedy for any United States national owning a claim to 'property' confiscated by the Cuban government after January 1, 1959, against 'any person' who 'traffics' in such property, and broadly defined 'property' . . . ." (citations omitted)); *Lamb v. ITT Corp.*, No. 8:09CV95, 2010 WL 376858, at *4 (D. Neb. Jan. 26, 2010) (Title III "creates a civil cause of action for damages in the amount that was certified by the Foreign Claims Settlement Commission." (footnote omitted)).

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiff's Motion, **ECF No. [42]**, is **GRANTED**.

2. The Court's Order on the Motion to Dismiss, **ECF No. [40]**, is **VACATED**.

3. The Clerk of Court is directed to **REOPEN** the above-styled case. The Court will

   enter a separate order resetting all trial and pre-trial deadlines.

4. Plaintiff must separately refile its Amended Complaint, **ECF No. [42-1]**, **by no**

   **later than April 27, 2020**.

**DONE AND ORDERED** in Chambers at Miami, Florida on April 17, 2020.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record