## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 19-cv-23588-BLOOM/Louis

HAVANA DOCKS CORPORATION,

      Plaintiff,

v.

MSC CRUISES SA CO. and
MSC CRUISES (USA) INC.,

      Defendants.

_____/

### <u>ORDER</u>

**THIS CAUSE** is before the Court upon Defendants MSC Cruises SA Co. and MSC Cruises (USA) Inc. (collectively, "MSC") Motion to Dismiss Amended Complaint, ECF No. [69] ("Motion"). Plaintiff Havana Docks Corporation ("Havana Docks" or "Plaintiff") filed its Response in Opposition, ECF No. [73] ("Response"), to which MSC filed a Reply, ECF No. [77] ("Reply"). MSC also submitted two Notices of Supplemental Authority in Support of its Motion to Dismiss Amended Complaint, ECF Nos. [82] & [85], and Plaintiff submitted an additional Notice of Supplemental Authority, ECF No. [89]. The Court has carefully considered the Motion, all opposing and supporting submissions, the record in this case, and the applicable law, and is otherwise fully advised. For the reasons set forth below, MSC's Motion is denied.

### I.  BACKGROUND

### A.  The LIBERTAD Act

Since Fidel Castro seized power in Cuba in 1959, Cuba has been plagued by "communist tyranny and economic mismanagement," that has substantially deteriorated the welfare and health of the Cuban people. *See* 22 U.S.C. §§ 6021(1)(A), (2). The communist Cuban Government has

systematically repressed the Cuban people through, among other things, "massive and systemic violations of human rights" and deprivations of fundamental freedoms, *see id.* §§ 6021(4), (24), and the United States has consistently sought to impose effective international sanctions for these violations against the Castro regime, *see id.* §§ 6021(8)-(10).

In 1996, Congress passed the Title III of the Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C. § 6021, *et seq.* (the "LIBERTAD Act," "Title III," or the "Act"), commonly referred to as the Helms-Burton Act, "to strengthen international sanctions against the Castro government" and, relevant to the instant case, "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." 22 U.S.C. §§ 6022(2), (6). Under Title III of the Act, Congress denounced the Cuban Government's history of confiscating property of Cuban citizens and U.S. nationals, explaining that "[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner, undermines the comity of nations, the free flow of commerce, and economic development." 22 U.S.C. §§ 6081(2)-(3). The Act explains that foreign investors who traffic in confiscated properties through the purchase of equity interests in, management of, or entry into joint ventures with the Cuban Government to use such properties "complicate any attempt to return [these expropriated properties] to their original owners." *Id.* §§ 6081(5), (7). The LIBERTAD Act cautions that:

> [t]his "trafficking" in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise, to the current Cuban Government and thus undermines the foreign policy of the United States—
>     (A) to bring democratic institutions to Cuba through the pressure of a general economic embargo at a time when the Castro regime has proven to be vulnerable to international economic pressure; and
>     (B) to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government.

*Id.* §§ 6081(6)(A)-(B).

Further, the lack of effective international remedies for the wrongful confiscation of property and for unjust enrichment from the use of that property by foreign governments at the expense of the rightful owners left U.S. citizens without protection against wrongful confiscations by foreign nations and their citizens. *Id.* § 6081(10). Congress therefore concluded that, "[t]o deter trafficking in wrongfully confiscated property, United States nationals who were the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." *Id.* § 6081(11); *see also* 22 U.S.C. § 6082(a)(1)(A). As a result, in passing Title III of the LIBERTAD Act, "Congress created a private right of action against any person who 'traffics' in confiscated Cuban property." *Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1284 (S.D. Fla. 2019) (citing 22 U.S.C. § 6082(a)(1)(A); 22 U.S.C. § 6023(13)(A)).

> Shortly after Helms-Burton was passed, however, the President invoked Title III's [suspension] provision, and "Title III has since been waived every six months, . . . and has never effectively been applied." *Odebrecht Const., Inc. v. Prasad*, 876 F. Supp. 2d 1305, 1312 (S.D. Fla. 2012). That changed on April 17, 2019, when the U.S. Department of State announced that the federal government "will no longer suspend Title III." *See* U.S. Department of State, Secretary of State Michael R. Pompeo's Remarks to the Press (Apr. 17, 2019), https://www.state.gov/remarks-to-the-press-11/.

*Id.*; *see also* 22 U.S.C. § 6085(c) (presidential power to suspend the right to bring a cause of action under Title III). On May 2, 2019, the suspension of claimants' rights to bring actions under Title III was lifted, enabling them to file suit against alleged traffickers.

**B.  This Case**

On August 27, 2019, Havana Docks initiated this action against MSC pursuant to Title III of the LIBERTAD Act for MSC's alleged trafficking in property that was confiscated from

Plaintiff by the Cuban Government in 1960. ECF No. [1]. On April 20, 2020, Plaintiff filed an Amended Complaint, ECF No. [56],[1] which alleges the following facts:

Havana Docks is a U.S. national, as defined by 22 U.S.C. § 6023(15), and "is the rightful owner of an interest in and certified claim to certain commercial waterfront real property in the Port of Havana, Cuba," identified as the Havana Cruise Port Terminal (the "Subject Property"). ECF No. [56] ¶ 7. Plaintiff continuously owned, possessed, managed, and used the Subject Property from 1917 until the Cuban Government confiscated it in 1960, *id.* ¶ 8, and that, since the confiscation, the Subject Property has not been returned, nor has Havana Docks received adequate or effective compensation for the confiscation of the Subject Property, *id.* ¶¶ 9-10. Havana Docks' claim to the Subject Property has never been settled pursuant to any international claim settlement agreement or other settlement procedure. *Id.* ¶ 10.

Plaintiff's ownership interest in and claim to the Subject Property has been certified by the Foreign Claims Settlement Commission (the "FCSC") pursuant to the International Claims Settlement Act of 1949, 22 U.S.C. § 1621, *et seq.* (the "Claims Settlement Act"). *Id.* ¶ 12.[2] In the Certified Claim, a copy of which is attached to Plaintiff's Amended Complaint, the FCSC found, based on the record before it, that:

> [Havana Docks] obtained from the Government of Cuba the renewal of a concession for the construction and operation of wharves and warehouses in the harbor of Havana, formerly granted to its predecessor concessionaire, the Port of

---

[1] The Court previously provided a detailed review of the procedural history in this case and Havana Docks' related cases. *Havana Docks Corp. v. MSC Cruises SA Co.*, No. 19-cv-23588, 2020 WL 2534295, at *1 (S.D. Fla. Apr. 17, 2020) ("*MSC*"), *certificate of appealability denied*, No. 19-cv-23588, 2020 WL 3451681 (S.D. Fla. June 24, 2020); *see generally Havana Docks Corp. v. Carnival Corp.*, No. 19-cv-21724 (S.D. Fla. 2019) ("*Carnival*"); *Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*, No. 19-cv-23590 (S.D. Fla. 2019) ("*Royal Caribbean*"); *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591 (S.D. Fla. 2019) ("*NCL*"). As such, the Court will not repeat the history of this litigation in this Order, except where relevant to the instant Motion.

[2] The Court will refer to Havana Docks' claim to the Subject Property, ECF No. [56-1], as the "Certified Claim" for the remainder of this Order.

> Havana Docks Company; that claimant acquired at the same time the real property
> with all improvements and appurtenances located on the Avenida del Puerto
> between Calle Amargura and Calle Santa Clara in Havana, facing the Bay of
> Havana; . . . and that claimant corporation also owned the mechanical installations,
> loading and unloading equipment, vehicles and machinery, as well as furniture and
> fixtures located in the offices of the corporation.

ECF No. [56-1] at 7. "The concession granted the Plaintiff a term of 99 years for the use of,
improvement, construction upon, operation and management of the Subject Property," from which
Havana Docks benefitted until 1960, when the Subject Property was confiscated by the Cuban
Government, along with all of its other property interests. ECF No. [56] ¶ 15. "The concession
never expired by its term." *Id.* Rather, when the Subject Property was confiscated, "Havana Docks
still had a balance of 44 years of concessionary rights remaining . . . [and] Plaintiff has never
received any compensation nor been indemnified for the expropriation of the Subject Property,
including for the concession or any other property interests." *Id.* ¶¶ 15, 18.

Moreover, according to the Amended Complaint, beginning on or about December 2018,
MSC "knowingly and intentionally commenced, conducted, and promoted their commercial cruise
line business to Cuba using the Subject Property by regularly embarking and disembarking their
passengers on the Subject Property without the authorization of Plaintiff or any U.S. national who
holds a claim to the Subject Property." *Id.* ¶ 21. MSC has had constructive knowledge of Plaintiff's
publicly available Certified Claim to the Subject Property since the FCSC completed the Cuban
Claims Program on July 6, 1972. *Id.* ¶ 23. Moreover, MSC has "had actual knowledge of Plaintiff's
[Certified Claim] . . . since at least February 11, 2019, due to a notice letter sent by Plaintiff to
[MSC] pursuant to 22 U.S.C. § 6082(a)(3)(D)." *Id.* ¶ 24. "On information and belief, [MSC]
trafficked in the Subject Property until June 2019." *Id.* ¶ 25. Thus, MSC is alleged to have
knowingly and intentionally participated in, and profited from, the Cuban Government's
confiscation and possession of the Subject Property without Plaintiff's authorization. *Id.* ¶ 22.

Plaintiff further alleges that MSC's knowing and intentional conduct relating to the Subject Property constitutes "trafficking," as set forth under 22 U.S.C. § 6023(13)(A), and that MSC is liable to Havana Docks for all money damages allowed by statute. ECF No. [56] ¶¶ 26-27.

MSC now files the instant Motion asserting the following bases for dismissal: (1) Havana Docks lacks Article III standing to sue because it cannot allege injury in fact that is traceable to MSC's conduct; (2) Applying Title III to MSC's pre-May 2019 operations in Cuba violates the *Ex Post Facto* Clause because such application would be both retroactive and punitive; (3) Applying Title III to MSC's operations in Cuba violates the Due Process Clause because MSC was not given fair notice of its potential liability through the Act's retroactive application; (4) Title III's penalties are grossly excessive and arbitrary in violation of the Due Process Clause; and (5) Havana Docks has failed to sufficiently allege that MSC trafficked in each property interest contained within the Certified Claim. In its Response, Havana Docks takes the opposing position on each of MSC's bases for dismissal.

## II. LEGAL STANDARD

### A. Article III Standing

One element of the case-or-controversy requirement under Article III of the United States Constitution is that plaintiffs "must establish that they have standing to sue." *Raines v. Byrd*, 521 U.S. 811, 818 (1997). It is a threshold question of "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Sims v. Fla. Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1458 (11th Cir. 1989) (en banc). "'The law of Article III standing . . . serves to prevent the judicial process from being used to usurp the powers of the political branches,' and confines the federal courts to a properly judicial role." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408

(2013); *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Further, "standing requirements 'are not mere pleading requirements but rather [are] an indispensable part of the plaintiff's case.'" *Church v. City of Huntsville*, 30 F.3d 1332, 1336 (11th Cir. 1994) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). "Indeed, standing is a threshold question that must be explored at the outset of any case." *Corbett v. Transp. Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019) (citing *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005)), *cert. denied*, 140 S. Ct. 900 (2020). "In its absence, 'a court is not free to opine in an advisory capacity about the merits of a plaintiff's claim.'" *Id.* (quoting *Bochese*, 405 F.3d at 974). "In fact, standing is 'perhaps the most important jurisdictional' requirement, and without it, [federal courts] have no power to judge the merits." *Id.* (footnote omitted) (quoting *Bochese*, 405 F.3d at 974).

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision."

*Valley Forge Christian Coll. v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982) (quoting *Gladstone, Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979)). In other words, to establish standing, a plaintiff must allege that: (1) it "suffered an injury in fact that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical;" (2) "the injury is fairly traceable to conduct of the defendant;" and (3) "it is likely, not just merely speculative, that the injury will be redressed by a favorable decision." *Kelly v. Harris*, 331 F.3d 817, 819-20 (11th Cir. 2003).

"The party invoking federal jurisdiction bears the burden of proving standing." *Fla. Pub. Int. Rsch. Grp. Citizen Lobby, Inc. v. E.P.A.*, 386 F.3d 1070, 1083 (11th Cir. 2004) (quoting *Bischoff v. Osceola Cty.*, 222 F.3d 874, 878 (11th Cir. 2000)). "If at any point in the litigation the plaintiff ceases to meet all three requirements for constitutional standing, the case no longer

presents a live case or controversy, and the federal court must dismiss the case for lack of subject matter jurisdiction." *Fla. Wildlife Fed'n, Inc. v. S. Fla. Water Mgmt. Dist.*, 647 F.3d 1296, 1302 (11th Cir. 2011) (citing *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1277 (11th Cir. 2006)). "In assessing the propriety of a motion for dismissal under Fed. R. Civ. P. 12(b)(1), a district court is not limited to an inquiry into undisputed facts; it may hear conflicting evidence and decide for itself the factual issues that determine jurisdiction." *Colonial Pipeline Co. v. Collins*, 921 F.2d 1237, 1243 (11th Cir. 1991). "When a defendant properly challenges subject matter jurisdiction under Rule 12(b)(1) the district court is free to independently weigh facts, and 'may proceed as it never could under Rule 12(b)(6) or Fed. R. Civ. P. 56.'" *Turcios v. Delicias Hispanas Corp.*, 275 F. App'x 879, 880 (11th Cir. 2008) (quoting *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003)).

### B. Rule 12(b)(6) Motion

A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. These elements are required to survive a motion brought under Rule 12(b)(6) that requests dismissal for failure to state a claim upon which relief can be granted.

When reviewing a motion under Rule 12(b)(6), a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076, 1084 (11th Cir. 2002). However, this tenet does not apply to legal conclusions, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *see also Iqbal*, 556 U.S. at 678; *Thaeter v. Palm Beach Cty. Sheriff's Office*, 449 F.3d 1342, 1352 (11th Cir. 2006). Moreover, "courts may infer from the factual allegations in the complaint 'obvious alternative explanations,' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 682).

A court, in considering a Rule 12(b)(6) motion, "may consider only the complaint itself and any documents referred to in the complaint which are central to the claims." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009) (citing *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997)); *see also Maxcess, Inc. v. Lucent Techs., Inc.*, 433 F.3d 1337, 1340 n.3 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity." (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002))).

## III. DISCUSSION

As noted, MSC's Motion asserts numerous bases for dismissal: (1) Havana Docks lacks Article III standing; (2) Applying Title III violates the *Ex Post Facto* Clause; (3) Applying Title III violates the Due Process Clause; (4) Title III imposes penalties for liability that are grossly excessive and arbitrary in violation of the Due Process Clause; and (5) Plaintiff failed to allege

that MSC trafficked in each property interest listed in the Certified Claim. Plaintiff takes the opposing position on each of these bases for dismissal. The Court addresses each argument in turn.

### A. Article III Standing

MSC first challenges Havana Docks' Article III standing, arguing Plaintiff cannot allege any concrete injury in fact that is fairly traceable to MSC's conduct. Havana Docks responds that it has sufficiently satisfied all of the Article III standing requirements at this stage in the litigation. MSC, in its Reply, contends that the only injury Havana Docks has asserted is the confiscation, which is only traceable to the Cuban Government, not to MSC, and that none of MSC's conduct harmed Plaintiff. MSC also submitted two Notices of Supplemental Authority in support of the Motion, which appended two recent cases that address Article III standing: *Trichell v. Midland Credit Management, Inc.*, 964 F.3d 990 (11th Cir. 2020), and *Glen v. American Airlines, Inc.*, No. 4:20-cv-482-A, 2020 WL 4464665, at *1 (N.D. Tex. Aug. 3, 2020). *See* ECF Nos. [82] & [85]. Similarly, Plaintiff submitted a Notice of Supplemental Authority in support of its argument that it has Article III standing: *Cueto Iglesias v. Pernod Ricard*, No. 20-cv-20157 (S.D. Fla. Aug. 17, 2020). *See* ECF No. [89].

As discussed above, Article III standing "is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc.*, 136 S. Ct. at 1547 (citing *Raines*, 521 U.S. at 820). "[T]he irreducible constitutional minimum of standing contains three elements," *Lujan*, 504 U.S. at 560, namely, (1) injury in fact that is concrete, particularized, and not conjectural; (2) causation or traceability; and (3) redressability. *Corbett*, 930 F.3d at 1232. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts

that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).

The Court will address each element of Article III standing individually below.

**1. Injury in Fact**

"The 'foremost' standing requirement is injury in fact." *Trichell*, 964 F.3d at 996 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)).

> An injury in fact consists of "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." [*Lujan*,] 504 U.S. at 560 (quotation marks omitted). A "concrete" injury must be "*de facto*" — that is, it must be "real, and not abstract." *Spokeo, Inc.*, 136 S. Ct. at 1548 (quotation marks omitted). A "particularized" injury "must affect the plaintiff in a personal and individual way." *Id.* (quotation marks omitted). Each subsidiary element of injury — a legally protected interest, concreteness, particularization, and imminence — must be satisfied. *See id.* at 1545; [*Lujan*,] 504 U.S. at 560.

*Id.* at 996-97.

MSC argues Plaintiff cannot allege facts to support the elements of injury in fact — namely, a legally protected interest, concreteness, particularization, and imminence. *See* ECF No. [69] at 3-5; *see also Trichell*, 964 F.3d at 996-97 ("Each subsidiary element of injury . . . must be satisfied [for standing].").

<u>First</u>, legally protected interest. "No legally cognizable injury arises unless an interest is protected by statute or otherwise." *Cox Cable Commc'ns, Inc. v. United States*, 992 F.2d 1178, 1182 (11th Cir. 1993); *see also Bochese*, 405 F.3d at 980. "That 'interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right.'" *Bochese*, 405 F.3d at 980-81 (quoting *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 772 (2000)). Here, Havana Docks alleges it has a Certified Claim to the Subject Property, and that MSC trafficked in the Subject Property without authorization. Under the Act, trafficking in confiscated property is an invasion of a legally protected interest — i.e. a statutorily constructed property interest in the

Subject Property, which conveys a *right* to prevent third-party use of the same. The remedy for the violation of that right is compensation from third parties for trafficking in the Subject Property. That the legal right and remedy at issue in this case are statutorily constructed does not sway the Court's analysis in favor of MSC, because, as discussed in the ensuing sections, Plaintiff's injury is concrete, particularized, and imminent.

      <u>Second</u>, concreteness. Although a statutorily-constructed right may be insufficient to convey standing on its own,[3] *Trichell*, 964 F.3d at 997 ("Article III standing requires a concrete injury even in the context of a statutory violation." (quoting *Spokeo, Inc.*, 136 S. Ct. at 1549)), it is sufficient where the right is constructed to address a concrete harm. *See also Spokeo, Inc.*, 136 S. Ct. at 1549 ("Congress may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." (alteration adopted; citation and internal quotation mark omitted)). As detailed above, Congress was prompted to enact Title III because the remedies for (1) the wrongful confiscation of property by foreign governments; and (2) the subsequent unjust enrichment and economic exploitation of that property by foreign investors at the expense of the rightful owners, were ineffective. 22 U.S.C. § 6081(10).[4] Quite simply, the right identified

---

[3]  The Court notes "[i]njury in fact is a constitutional requirement, and '[i]t is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.'" *Spokeo, Inc.*, 136 S. Ct. at 1547-48 (quoting *Raines*, 521 U.S. at 820 n.3); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). "Even when [the] political branches appear to have granted [federal courts] jurisdiction by statute and rule, [federal courts] are still obliged to examine whether jurisdiction exists under the Constitution." *Salcedo v. Hanna*, 936 F.3d 1162, 1166 (11th Cir. 2019). Ultimately, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Spokeo, Inc.*, 136 S. Ct. at 1549. Rather, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* As explained in this section, the Court has examined the alleged rights and injuries and finds that Plaintiff has established an injury in fact.

[4]  Title III makes it clear that "[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner," 22 U.S.C. §§ 6081(2)-(3), by foreign investors who traffic in confiscated properties "complicate any attempt to return [these expropriated properties] to their original owners," *id.* §§ 6081(5),

by Congress was a property interest, and MSC presents no clear argument why an infringement on a property right lacks concreteness. MSC appears to argue that the injury here is not concrete because it began years ago when the Subject Property was initially confiscated by the Cuban Government. While the injury may have its origin in the confiscation, MSC does not explain how its continued use of the Subject Property makes Plaintiff's harm less tangible today. Stated otherwise, Havana Docks' injury is "real" because it is not receiving the benefit of its interest in the Subject Property and MSC's subsequent trafficking in the confiscated property has undermined Plaintiff's right to compensation for that expropriation

Moreover, MSC's Notices of Supplemental Authority, ECF Nos. [82] & [85], are inapposite. In particular, the facts of this case are distinguishable from those in *Trichell* because Havana Docks sufficiently alleges that MSC profited from its use of the Subject Property at Havana Docks' expense, ECF No. [56] ¶¶ 21-22, whereas *Trichell* involved a statutory violation without any corresponding concrete injury to the plaintiffs. Moreover, the district court in *Glen v. American Airlines* observed that the plaintiff admitted that neither the Cuban government's confiscation of the properties nor the hotels' operations constituted injuries in fact. Contrary to the conclusion in *Glen v. American Airlines* that the plaintiff had no standing because there was no allegation of concrete harm, the Court finds that the allegations of profiting from the use of property that was expropriated without obtaining consent or paying adequate compensation to the original owner is sufficient concrete harm for standing purposes. *See, e.g.*, *Glen v. Club Mediterranee S.A.*, 365 F. Supp. 2d 1263, 1272 (S.D. Fla. 2005) (explaining that the injury to a plaintiff whose property was expropriated was a lack of compensation (citing *Talenti v. Clinton*, 102 F.3d 573, 578 (D.C. Cir. 1996)), *aff'd*, 450 F.3d 1251 (11th Cir. 2006).

---

(7), and undermine U.S. foreign policy aiming "to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government," *id.* § 6081(6)(B).

<u>Third</u>, particularity. Havana Docks argues its injury is particularized because the injury is entirely personalized to its interest in its Certified Claim to the Subject Property, and MSC does not contest this point. The Court concludes that Havana Docks' injuries here are particularized because, rather than presenting a generalized harm, Havana Docks' injury is entirely personalized to its interest in its Certified Claim to the Subject Property. *See* ECF No. [56] ¶¶ 12-17. Stated differently, Plaintiff seeks only to vindicate its own property rights in this action. *Spokeo, Inc.*, 136 S. Ct. at 1548 ("For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" (citation omitted)). This is sufficient for particularity.

<u>Fourth</u>, imminence. Although MSC raises no issue regarding imminence in this case, the Court nonetheless has an independent obligation to address all aspects of its jurisdiction. Imminence is satisfied where, as here, "both the challenged conduct and the attendant injury have already occurred." *Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1118 (9th Cir. 2017). Accordingly, Havana Docks' injury here is actual and not conjectural.

In sum, Havana Docks has alleged sufficient facts to recover monetary damages for the injuries it sustained as a result of MSC's unlawful trafficking in the Subject Property, to which it owns a Certified Claim.[5]

---

[5] As the Eleventh Circuit explained in *Glen*, Title III's purpose is

> to deter third party foreign investors from trafficking in the confiscated property (defined as "purchas[ing] an equity interest in, manag[ing], or enter[ing] into joint ventures using property and assets some of which were confiscated from United States nationals."). *See* 22 U.S.C. § 6081(5), (6), (11). This purpose is achieved through the establishment of a new statutory remedy available (if not suspended) to "United States nationals who were the victims of these confiscations . . . [to] deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11). The Helms-Burton Act refers to the property interest that former owners of confiscated property now have as ownership of a "claim to such property." 22 U.S.C. § 6082(a)(1)(A). When (or if) the portion of Title III that allows private litigants to bring lawsuits becomes effective, actions brought pursuant to the new statutory scheme would be actions brought "on a claim to the confiscated property" against traffickers in the property. 22 U.S.C. § 6082(a)(4).

Case No. 19-cv-23588-BLOOM/Louis

## 2.  Causation

To establish Article III standing, a plaintiff must also demonstrate that the injuries sustained are fairly traceable to the defendant's conduct.

> To satisfy Article III's causation requirement, the [] plaintiffs must allege that their injuries are "connect[ed] with the conduct of which [they] complain." *Trump v. Hawai'i*, 138 S. Ct. 2392, 2416 (2018). *See also Duke Power Co. v. Envtl. Study Grp.*, 438 U.S. 59, 75 n.20 (1978) (explaining that Article III standing "require[s] no more than a showing that there is a substantial likelihood" of causation) (quotation marks omitted). Significantly, "[p]roximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003). A plaintiff therefore need not show (or, as here, allege) that "the defendant's actions are the very last step in the chain of causation." [*Bennett v. Spear*, 520 U.S. 154, 168-69 (1997). *See also Moody v. Warden*, 887 F.3d 1281, 1285 (11th Cir. 2018)] (explaining that we "must not confuse weakness on the merits with absence of Article III standing") (citation and quotation marks omitted).

*Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125-26 (11th Cir. 2019), *cert. denied*, No. 19-1185, 2020 WL 2814788 (2020).

"Congress has the power to define injuries *and articulate chains of causation* that will give rise to a case or controversy where none existed before." *Spokeo, Inc.*, 136 S. Ct. at 1549 (emphasis added) (citation omitted). In enacting Title III, Congress recognized that there exists a causal link between a claimant's injury from the Cuban Government's expropriation of their property and a subsequent trafficker's unjust enrichment from its use of that confiscated property. *See* 22 U.S.C. § 6081(10) (noting the lack of effective international remedies for the wrongful confiscation of property by foreign governments and the subsequent unjust enrichment by foreign investors from the use of that property at the expense of the rightful owners).

---

*Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006) (footnote omitted).

Thus, under *Spokeo, Inc.*, any argument that the causal chain ceases with the Cuban Government falls short. MSC argues that Plaintiff's injury is not attributable to MSC's conduct, but rather to the Cuban Government's expropriation, and that the traceability prong of standing is therefore not met here. However, MSC's purported reliance on *Trichell* misses the mark because *Trichell* does not stand for the notion that such causal links are insufficient to establish Article III standing, where a concrete and particularized injury otherwise exists. Thus, the Court concludes that MSC's conduct of using and profiting from the Subject Property is fairly traceable to Plaintiff's claimed injuries. *See Focus on the Family*, 344 F.3d at 1273 ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes.").

### 3. Redressability

The final element of Article III standing is redressability.

> The element of redressability requires that "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted). "Redressability is established when a favorable decision would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1290 (11th Cir. 2010) (alteration and internal quotation marks omitted). [Courts] must be able "to ascertain from the record whether the relief requested is likely to redress the alleged injury," [*Steele v. Nat'l Firearms Act Branch*, 755 F.2d 1410, 1415 (11th Cir. 1985)] . . . . *See* [*DiMaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1303 (11th Cir. 2008)] (dismissing complaint for lack of standing because it did not "suggest in any way how [the] 'injury' could be redressed by a favorable judgment").

*Hollywood Mobile Estates Ltd. v. Seminole Tribe of Fla.*, 641 F.3d 1259, 1266 (11th Cir. 2011).

The Court of Appeals for the Eleventh Circuit has explained that, where the injury alleged is a monetary injury, such an injury can be redressed by an award of compensatory damages. *See, e.g.*, *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) ("Plaintiffs allege a monetary injury and an award of compensatory damages would redress that injury."); *see also Made in the*

*USA Found. v. United States*, 242 F.3d 1300, 1310-11 (11th Cir. 2001) (explaining that even partial relief suffices for redressability).

Although MSC does not raise any challenge to the redressability prong of Plaintiff's Article III standing, the Court must nonetheless assure itself that redressability is met here. Havana Docks also notes that a favorable decision would directly redress its injury by compensating Plaintiff for the value of its interests in the Subject Property that were confiscated, and the Court agrees. Obtaining a favorable judgment would allow Plaintiff to recover monetary damages as provided by Title III—compensation which would sufficiently redress the harm Havana Docks suffered from the Cuban Government's confiscation of the Subject Property and MSC's subsequent unjust enrichment from the use of the confiscated property at Plaintiff's expense. *See, e.g.*, *Resnick*, 693 F.3d at 1324 ("Plaintiffs allege a monetary injury and an award of compensatory damages would redress that injury."); *Wilding*, 941 F.3d at 1127 (same); *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1263 (11th Cir. 2006) ("'Substantial economic harm is plainly the type of injury for which parties may seek redress in federal court.' The injury was 'the direct result of "putatively illegal" [G]overnmental action in the form of an allegedly unlawful forfeiture. This injury would be redressed by a successful challenge to the forfeiture. Article III does not require more.'" (quoting *United States v. Cambio Exacto*, 166 F.3d 522, 528 (2nd Cir. 1999))). At this stage, the Court concludes that Plaintiff has sufficiently established the redressability requirement of Article III standing.

Based on the discussion above, the Court finds that Havana Docks has met its burden at this stage of establishing injury in fact, causation, and redressability, as required for Article III standing. As such, MSC's Motion is denied as it relates to Plaintiff's alleged lack of standing.

## B. *Ex Post Facto* Clause

MSC argues that applying Title III to its pre-May 2019 conduct in Cuba would violate the *Ex Post Facto* Clause. It urges that such an application would be retroactive, given the suspension of lawsuits under Title III since the LIBERTAD Act's enactment in 1996, and would impose treble damages that are so punitive as to constitute criminal penalties. Havana Docks responds that applying Title III to MSC would not violate the *Ex Post Facto* Clause because there is no retroactive application—Title III was enacted in 1996 and has been in force since then, despite the suspension of Title III lawsuits from 1996 until 2019.

"The *Ex Post Facto* Clause prohibits Congress and state legislatures from enacting 'any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" *Holland v. Governor of Ga.*, 781 F. App'x 941, 944 (11th Cir. 2019) (quoting *United States v. W.B.H.*, 664 F.3d 848, 852 (11th Cir. 2011)). "The presumption against the retroactive application of new laws is an essential thread in the mantle of protection that the law affords the individual citizen. That presumption 'is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.'" *Lynce v. Mathis*, 519 U.S. 433, 439 (1997) (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994)). The *ex post facto* prohibition "is only one aspect of the broader constitutional protection against arbitrary changes in the law. In both the civil and the criminal context, the Constitution places limits on the sovereign's ability to use its lawmaking power to modify bargains it has made with its subjects." *Id.* at 440.

The *Ex Post Facto* Clause

prohibits [Congress] from enacting "any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed.'" *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (quoting *Cummings v. Missouri*, 4 Wall. 277, 325-26 (1867)). Thus, in order for a

criminal or penal law to be ex post facto, it must be retroactively applied and must disadvantage the offender because it may impose greater punishment. *Id.* at 29. Furthermore, the law need not impair a "vested right" to be ex post facto; a violation may occur when the law "merely alters penal provisions accorded by the grace of the legislature [.]" *Id.* at 30. However, if a statute is merely procedural and does not affect the quantum of punishment attached to the crime, there is no ex post facto violation even when the statute is applied retroactively. *Dobbert v. Florida*, 432 U.S. 282, 293 (1977). The Ex Post Facto Clause operates not to protect an individual's right to less punishment, but rather as a means of assuring that an individual will receive fair warning of criminal statutes and the punishments they carry. *Weaver*, 450 U.S. at 28-30; *Dobbert*, 432 U.S. at 298.

*Hock v. Singletary*, 41 F.3d 1470, 1471-72 (11th Cir. 1995). "This prohibition applies only to criminal laws, not to civil regulatory regimes." *Holland*, 781 F. App'x at 944 (citing *W.B.H.*, 664 F.3d at 852). Nonetheless, "the constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation, *see Malloy v. South Carolina*, 237 U.S. 180, 183 (1915), and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance." *Dobbert*, 432 U.S. at 293 (quoting *Beazell v. Ohio*, 269 U.S. 167, 171 (1925)).

Title III explicitly sets forth its effective date and the procedures regarding the president's suspension authority:

> **(a) In general**
> Subject to subsections (b) and (c), this subchapter and the amendments made by this subchapter shall take effect on August 1, 1996.
> **(b) Suspension authority**
> **(1) Suspension authority**
> The President may suspend the effective date under subsection (a) for a period of not more than 6 months if the President determines and reports in writing to the appropriate congressional committees at least 15 days before such effective date that the suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba.
>
> **(2) Additional suspensions**
> The President may suspend the effective date under subsection (a) for additional periods of not more than 6 months each, each of which shall begin on the day after the last day of the period during which a suspension is in effect under this subsection, if the President determines and reports in writing to the appropriate congressional committees at least 15 days before the date on which the additional

suspension is to begin that the suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba.

**(c) Other authorities**

**(1) Suspension**

After this subchapter and the amendments of this subchapter have taken effect—

. . . .

(B) the President may suspend the right to bring an action under this subchapter with respect to confiscated property for a period of not more than 6 months if the President determines and reports in writing to the appropriate congressional committees at least 15 days before the suspension takes effect that such suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba.

**(2) Additional suspensions**

The President may suspend the right to bring an action under this subchapter for additional periods of not more than 6 months each, each of which shall begin on the day after the last day of the period during which a suspension is in effect under this subsection, if the President determines and reports in writing to the appropriate congressional committees at least 15 days before the date on which the additional suspension is to begin that the suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba.

22 U.S.C. §§ 6085(a)-(c)(2). Thus, Title III specifies an effective date of August 1, 1996, and authorizes the president to suspend either the effective date of Title III or, after Title III takes effect, the right bring an action under Title III. *Id.*

On March 12, 1996, President Clinton signed the LIBERTAD Act into law. *See* Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, Pub. L. No. 104-114, §§ 301-306, available at https://www.congress.gov/104/plaws/publ114/PLAW-104publ114.pdf; Statement on Signing the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, 1 Pub. Papers 433, 433 (Mar. 12, 1996), available at https://www.govinfo.gov/content/pkg/PPP-1996-book1/pdf/PPP-1996-book1-doc-pg433.pdf ("Today I have signed into law [the LIBERTAD Act, which] . . . . creates a cause of action enabling U.S. nationals to sue those who expropriate or 'traffic' in expropriated properties in Cuba . . . ."). Further, on July 16, 1996, President Clinton issued a statement, explaining in relevant part that:

Title III allows U.S. nationals to sue foreign companies that profit from American-owned property confiscated by the Cuban regime. The law also provides me with the authority to suspend the date on which Title III enters into force, or the date on which U.S. nationals can bring suit, if I determine that suspension is necessary to the national interest and will expedite a transition to democracy in Cuba. I have decided to use the authority provided by Congress to maximize Title III's effectiveness in encouraging our allies to work with us to promote democracy in Cuba.

*I will allow Title III to come into force. As a result, all companies doing business in Cuba are hereby on notice that by trafficking in expropriated American property, they face the prospect of lawsuits and significant liability in the United States.* This will serve as a deterrent to such trafficking, one of the central goals of the LIBERTAD Act.

At the same time, I am suspending the right to file suit for 6 months . . . .

. . . Our allies and friends will have a strong incentive to make real progress because, *with Title III in effect, liability will be established irreversibly during the suspension period and suits could be brought immediately when the suspension is lifted. And for that very same reason, foreign companies will have a strong incentive to immediately cease trafficking in expropriated property, the only sure way to avoid future lawsuits.*

. . . .

Today's action is the best way to achieve the bipartisan objectives we all share: to isolate the Cuban Government and to bring strong international pressure to bear on Cuba's leaders, while holding out the very real prospect of fully implementing Title III in the event it becomes necessary.

Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD)

Act of 1995, 2 Pub. Papers 1136, 1137-38 (July 16, 1996), available at

https://www.govinfo.gov/content/pkg/PPP-1996-book2/pdf/PPP-1996-book2-doc-pg1136.pdf

(emphasis added) ("July 16, 1996, Statement"); *see also* Statement on Efforts To Bring Democracy

to Cuba, 2 Pub. Papers 1299, 1299 (Aug. 16, 1996), available at

https://www.govinfo.gov/content/pkg/PPP-1996-book2/pdf/PPP-1996-book2-doc-pg1299.pdf

("On July 16, I decided to allow title III of the Cuban Liberty and Democratic Solidarity Act

(LIBERTAD) to enter into force, *putting companies doing business in Cuba on notice that by*

*trafficking in expropriated properties they face the prospect of lawsuits in the United States*. I also

suspended the right to file suit for 6 months to allow us time to forge a common approach with our

allies and trading partners to accelerate democratic transition in Cuba." (emphasis added)) ("August 16, 1996, Statement").

As these statements make clear, President Clinton explicitly and repeatedly indicated his intention to allow Title III to take effect, but to nevertheless suspend *the right to bring an action under Title III* with respect to confiscated property, as set forth in 22 U.S.C. § 6085(c). This suspension decision is entirely separate from the authority granted pursuant to § 6085(b) to suspend *the effective date* of Title III. Accordingly, pursuant to § 6085(a), Title III took effect on August 1, 1996. As a result, once in effect, Title III established that anyone who, "*after the end of the 3-month period beginning on* [*August 1, 1996*,]" traffics in confiscated property "shall be liable to any United States national who owns the claim to such property for money damages . . . ." 22 U.S.C. § 6082(a)(1)(A) (emphasis added).

MSC argues that Title III is retroactive because the cause of action contained within Title III lay dormant, having no effect and carrying no legal consequences, until the suspension was lifted in May 2019. Thus, MSC contends that applying Title III to its pre-May 2019 operations in Cuba serves to attach new legal consequences to its conduct that did not previously exist at the time MSC engaged in this conduct. MSC also argues that it began its operations in Cuba based upon the federal government's explicit encouragement, and it relied on this encouragement and the continuous suspension of Title III in conducting its operations in Cuba. As such, MSC argues that it lacked adequate notice of the legal consequences of such conduct because Title III was consistently suspended for over twenty years.

"To fall within the *ex post facto* prohibition, a law must be retrospective—that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it,' by altering the definition of criminal conduct or increasing the punishment for the crime[.]"

*Lynce*, 519 U.S. at 441 (quoting *Weaver*, 450 U.S. at 29) (citing *Collins v. Youngblood*, 497 U.S. 37, 50 (1990)); *see also United States v. Rosello*, 737 F. App'x 907, 909 (11th Cir. 2018) ("Even if a 'change in the law obviously ha[s] a detrimental impact upon the defendant, . . . the law [is] not ex post facto . . . [unless the law] ma[kes] criminal a theretofore innocent act, . . . aggravate[s] a crime previously committed, . . . provide[s] greater punishment, []or change[s] the proof necessary to convict.'" (quoting *Dobbert*, 432 U.S. at 293)).

> An "ex post facto inquiry . . . [focuses] not on whether a legislative change produces some ambiguous sort of 'disadvantage,' . . . but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable." [*Ca. Dep't of Corr. v. Morales*, 514 U.S. 499, 506 n.3 (1995)]. The Clause does not "forbid[] any legislative change that has any conceivable risk of affecting a [litigant's] punishment." *Id.* at 508. Instead, the Clause prohibits only those retroactively applied laws that "produce[] a sufficient risk of increasing the measure of punishment attached to the covered crimes," *id.* at 509, or affects "the quantum of punishment" imposed, *Dobbert v. Fla.*, 432 U.S. 282, 294 (1977). That prohibition "operates not to protect an individual's right to less punishment, but rather as a means of assuring that an individual will receive fair warning of criminal statutes and the punishments they carry." *Hock v. Singletary*, 41 F.3d 1470, 1472 (11th Cir. 1995) (citing *Dobbert*, 432 U.S. at 298, and *Weaver v. Graham*, 450 U.S. 24, 28-30 (1981)).

*Rosello*, 737 F. App'x at 908; *see also Weaver*, 450 U.S. at 30 (explaining that the central concerns of the *Ex Post Facto* Clause are "the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated").

MSC's arguments regarding the retroactivity of Title III are misplaced and unsupported by law. Specifically, MSC's arguments that the application of Title III here would be retroactive are seemingly premised upon the incorrect contention that Title III was not in effect during its operation in Cuba, and that lifting the suspension in May 2019 caused Title III to take effect. This reading of Title III ignores the explicit language of the statutory text and the distinct provisions authorizing the president to either suspend the effective date of Title III or to suspend the right to

bring an action under Title III, despite Title III's other provisions remaining in effect. *See* 22 U.S.C. §§ 6085(b), (c).

As noted above, Title III took effect on August 1, 1996, *see id.* § 6085(a), and liability for trafficking thus attached to conduct on confiscated property beginning on November 1, 1996 (i.e., three months after Title III's effective date), *see* § 6082(a)(1)(A). Likewise, President Clinton's statements regarding the actions taken pursuant to Title III of the Act further buttress the notion that liability for trafficking in confiscated property under Title III could be imposed for conduct occurring on or after November 1, 1996.[6] Thus, contrary to its position in the Motion, MSC's alleged conduct on the Subject Property was not lawful prior to the suspension being lifted in May 2019. Instead, liability for trafficking under Title III attached beginning on November 1, 1996, and the consistent suspension of the right to bring an action under Title III did not affect this liability. In other words, MSC's alleged conduct in Cuba occurred after the enactment of Title III,[7] and the

---

[6] *See* July 16, 1996, Statement, 2 Pub. Papers 1137 ("[W]ith Title III in effect, *liability will be established irreversibly during the suspension period and suits could be brought immediately when the suspension is lifted*. And for that very same reason, foreign companies will have a strong incentive to immediately cease trafficking in expropriated property, the only sure way to avoid future lawsuits." (emphasis added)); *see also id.* ("[F]or countries and foreign companies that take advantage of expropriated property the choice is clear: They can cease profiting from such property, they can join our efforts to promote a transition to democracy in Cuba, or they can face the risk of full implementation of Title III."); August 16, 1996, Statement, 2 Pub. Papers 1299 ("On July 16, I decided to allow title III of the Cuban Liberty and Democratic Solidarity Act (LIBERTAD) to enter into force, *putting companies doing business in Cuba on notice that by trafficking in expropriated properties they face the prospect of lawsuits in the United States*. I also suspended the right to file suit for 6 months to allow us time to forge a common approach with our allies and trading partners to accelerate democratic transition in Cuba." (emphasis added)).

[7] Moreover, that MSC began its operations in Cuba at the encouragement and licensure of the federal government is of no moment. During all times relevant, including the period during which the government encouraged increased relations with Cuba under the Obama Administration, the LIBERTAD Act expressly made trafficking in confiscated property unlawful and imposed liability for such trafficking. Thus, the fact that MSC began conducting business in Cuba pursuant to this encouragement is not relevant to the Court's analysis. MSC's decision to operate in Cuba *by trafficking in the Subject Property*, which was previously confiscated by the Cuban Government, was independent from the encouragement it received from the federal government. Indeed, MSC could, in theory, have operated in Cuba at the encouragement of the government, while nonetheless avoiding liability under Title III by not conducting its operations on property that was confiscated by the Cuban Government or by obtaining Plaintiff's consent.

penalty for liability has remained unchanged since Title III was enacted, thus putting traffickers on notice of their potential liability under § 6082(a)(1)(A) since Title III took effect in 1996. *See Lynce*, 519 U.S. at 441; *see also Rosello*, 737 F. App'x at 909. As such, the imposition of liability under Title III is not retroactive.

The *ex post facto* prohibition "operates not to protect an individual's right to less punishment, but rather as a means of assuring that an individual will receive fair warning of criminal statutes and the punishments they carry." *Rosello*, 737 F. App'x at 908 (quoting *Hock*, 41 F.3d at 1472). Because the Court concludes that the *ex post facto* concerns regarding fair notice and governmental restraint are satisfied here, MSC's Motion is denied on this ground.

## C. Due Process Clause – Retroactivity and Fair Notice

MSC further argues that it lacked fair notice, as required under the Due Process Clause, of the possibility of Title III's retroactive application to its conduct in Cuba that occurred during the suspension period, or to its conduct that was licensed and encouraged by the federal government. As an initial matter, the Court notes that this due process argument is founded upon MSC's assumption that it is correct regarding the retroactive application of Title III to its conduct in Cuba—a theory the Court has already rejected. In particular, the Court has explained that, although the right to bring an action under Title III was suspended for over twenty years since the date of its enactment, neither the effective date of Title III nor the provision imposing liability for trafficking were suspended. Instead, Title III's suspension was solely limited to the *timing* of when claimants could file suit against traffickers in their confiscated property. President Clinton explained that his intent in allowing Title III to take effect, while also suspending the right to bring an action under Title III, was to incentivize foreign companies to immediately cease trafficking in confiscated property, or face liability under Title III once the suspension was lifted, and to promote

the United States' foreign policy goals relating to Cuba. Throughout the suspension period, however, and upon the removal of the suspension, Title III's civil remedy that created liability for trafficking in confiscated property remained intact and in force. Thus, as MSC's due process arguments relate to the retroactive application of Title III to its conduct in Cuba, these arguments are without merit.

Moreover, with regard to MSC's contention it lacked fair notice that liability under Title III could be imposed for its conduct in Cuba due to the government's encouragement of relations with Cuba and Title III's consistent history of suspensions, the Court again remains unpersuaded. Neither the government's encouragement and licensure nor the history of suspending Title III is sufficient to establish a lack of fair notice under the Due Process Clause. "Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply." *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982). "All persons are charged with knowledge of the provisions of statutes and must take note of the procedure adopted by them and when that procedure is not unreasonable or arbitrary there are no constitutional limitations relieving them from conforming to it." *N. Laramie Land Co. v. Hoffman*, 268 U.S. 276, 283 (1925); *see also Texaco, Inc.*, 454 U.S. at 532 n.25.

> In altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it, and, to the extent the statute regulates private conduct, affording those within the statute's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements.

*United States v. Locke*, 471 U.S. 84, 108 (1985) (citing *Texaco, Inc.*, 454 U.S. at 532; *Anderson Nat'l Bank v. Luckett*, 321 U.S. 233, 243 (1944); *N. Laramie Land Co.*, 268 U.S. at 283).

Despite the absence of any lawsuits being filed pursuant to Title III since its enactment, MSC was on notice of Title III's existence from the time it became law in 1996, and it had an

obligation to familiarize itself with the mandates of Title III, especially once it began operating in Cuba. *Locke*, 471 U.S. at 108; *Texaco, Inc.*, 454 U.S. at 532; *N. Laramie Land Co.*, 268 U.S. at 283. Moreover, the government's encouragement to travel to Cuba and to increase commercial relations with Cuba does not in any way absolve MSC of its obligations to also comply with federal law—namely, by not trafficking in confiscated property without the consent of a Title III claimant. Thus, MSC has failed to meet its burden to demonstrate that the application of Title III to its conduct in Cuba constitutes a due process violation. *See Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984) ("It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come . . . with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976))). Accordingly, MSC's Motion is denied as to its first due process claim.

### D.  Due Process Clause – Grossly Excessive Penalty

MSC also argues that Title III's oppressive and excessive penalty violates due process, and it clarifies in its Reply that this challenge is both a facial and as-applied challenge to the constitutionality of Title III's penalty. In its Response, Havana Docks argues that an as-applied challenge to the excessiveness of a penalty is not ripe for this Court's review until after the penalty has been imposed. Moreover, with regard to the facial excessiveness challenge, Plaintiff contends, in part, that MSC cannot establish that the penalty for liability under Title III would be excessive in every possible application, as required to sustain a facial excessiveness challenge.

First, regarding the as-applied excessiveness challenge, the Court agrees with Havana Docks—Eleventh Circuit precedent dictates that such a challenge is not ripe at this juncture.

> Ripeness doctrine "originate[s] from the Constitution's Article III requirement that the jurisdiction of the federal courts be limited to actual cases and controversies."

> [*Elend v. Basham*, 471 F.3d 1199, 1204-05 (11th Cir. 2006)]. For a court to have jurisdiction, the claim must be "sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court." *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir. 1995). "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Digital Props., Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted).
>
> Because the question of ripeness depends on the timing of the adjudication of a particular issue, *see Atlanta Gas Light Co. v. Fed. Energy Regulatory Comm'n*, 140 F.3d 1392, 1403-04 (11th Cir. 1998), it applies differently to facial and as-applied challenges. A facial challenge asserts that a law "*always* operates unconstitutionally," Black's Law Dictionary 223 (7th ed. 1999) (emphasis added); therefore, a facial challenge will succeed only if the statute "could never be applied in a constitutional manner." *DA Mortgage, Inc. v. City of Miami Beach*, 486 F.3d 1254, 1262 (11th Cir. 2007). In the context of a facial challenge, a purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record. *See Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 854-55 (D.C. Cir. 2006); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1274 (11th Cir. 2005); *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1232 (10th Cir. 2001). An as-applied challenge, by contrast, addresses whether "a statute is unconstitutional on the facts of a particular case or to a particular party." Black's Law Dictionary at 223. Because such a challenge asserts that a statute cannot be constitutionally applied in particular circumstances, it necessarily requires the development of a factual record for the court to consider. *See Siegel v. LePore*, 234 F.3d 1163, 1171 (11th Cir. 2000).

*Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009).

In addressing an as-applied due process challenge to the excessiveness of a statutory penalty in *Harris*, the Eleventh Circuit explained that "[w]hen a damages award is punitive in nature, it is subject to constitutional excessiveness review." *Id.* at 1309 (citing *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1334 (11th Cir. 1999)). These as-applied excessiveness challenges, however, are typically reviewed "after a jury has delivered a damages award," because a court's review otherwise requires a number of assumptions regarding the resolution of directly disputed issues. *Id.* (citing *State Farm Mut. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) (finding that the jury's punitive damages award of $145 million was unconstitutionally excessive); *Action*

*Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302 (11th Cir. 2007) (upholding a jury's punitive

damages award of $17,500,000); *Kemp v. Am. Tel. & Tel. Co.*, 393 F.3d 1354 (11th Cir. 2004)

(reducing a jury's punitive damages award of $1,000,000 to $250,000)).

In this case, it is apparent that any as-applied excessiveness challenge would require this

Court to make numerous assumptions about factual issues that are still premature and in dispute

(e.g., assuming that MSC's liability is proven at trial, assuming that all of MSC's defenses fail,

and assuming the amount of damages awarded). As such, MSC's as-applied excessiveness

challenge, like the one at issue in *Harris*, is not ripe for review at this stage. *Id.* at 1310.

MSC's facial excessiveness challenge also fails. Although the Motion contends that the

penalty Title III generally imposes upon defendants for trafficking is arbitrary and excessive in

violation of the Due Process Clause, MSC makes no attempt to address how Title III's statutory

penalty *always* yields unconstitutionally excessive results, as required for a facial challenge.

Rather, MSC broadly states that "Title III imposes penalties on defendants that are so disconnected

from any actual damages they might cause to plaintiffs as to be irrational." ECF No. [69] at 19.

Yet, "it is conceivable that in the future a party with actual harm that is difficult to compute will

bring a case seeking statutory damages. In such a case, the actual harm might be very close to the

statutory damages." *Harris*, 564 F.3d at 1313. Indeed, it is entirely plausible that a claimant under

Title III might seek to recover statutory damages in an amount close to the amount of profits

generated from a defendant's trafficking.[8] Further, it is well settled that "[t]his mere possibility of

---

[8] Moreover, the Supreme Court has explained that

> the power of the state to impose fines and penalties for a violation of its statutory
> requirements is coeval with government; and the mode in which they shall be enforced,
> whether at the suit of a private party, or at the suit of the public, and what disposition shall
> be made of the amounts collected, are merely matters of legislative discretion. Nor does
> giving the penalty to the aggrieved [party] require that it be confined or proportioned to his
> loss or damages; for, as it is imposed as a punishment for the violation of a public law, the

a constitutional application is enough to defeat a facial challenge to the statute." *Id.* at 1313 (citing *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1228 (11th Cir. 1982)). As such, MSC's facial and as-applied constitutional excessiveness challenges are both denied.

### E. Failure to State a Claim

Finally, MSC briefly argues that Havana Docks has failed to sufficiently allege that it trafficked in *all* of the property interests memorialized in the Certified Claim—i.e., the securities, accounts receivable, debts of the Cuban Government, railroad tracks, office furniture, and the indemnity right—rather than just in the concession itself. Plaintiff, on the other hand, notes that liability under Title III attaches for trafficking in confiscated property, not in specific property interests.

The Court is unpersuaded by MSC's final argument here because this argument seemingly ignores the explicit language of the LIBERTAD Act, which defines "traffics" as follows:

> a person "traffics" in *confiscated property* if that person knowingly and intentionally—
>
> (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of *confiscated property*, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in *confiscated property*,
>
> (ii) engages in a commercial activity using or otherwise benefiting from *confiscated property*, or
>
> (iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

---

Legislature may adjust its amount to the public wrong rather than the private injury, just as if it were going to the state.

*St. Louis, I.M. & S. Ry. Co. v. Williams*, 251 U.S. 63, 66 (1919) (citations and internal quotation marks omitted).

Case No. 19-cv-23588-BLOOM/Louis

without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13)(A) (emphasis added).

Moreover, as discussed above, Plaintiff has not only alleged MSC's purported trafficking in the Subject Property, *see* ECF No. [56] ¶¶ 21-27, but it has also explicitly delineated the various property interests encompassed in the Certified Claim, *see id.* ¶¶ 12-17 (describing the various confiscated property interests in the Subject Property), all of which constitute "confiscated property" under the Act. At this stage in the litigation, these allegations are sufficient to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Therefore, MSC's Motion is denied as to this claim.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. MSC's Motion to Dismiss, **ECF No. [69]**, is **DENIED**.

2. MSC is ordered to file its Answer to the Amended Complaint **by no later than September 18, 2020**.

3. Plaintiff's Motion for Leave to File Response to Notices of Supplemental Authority, **ECF No. [86]**, is **DENIED AS MOOT**.

**DONE AND ORDERED** in Chambers at Miami, Florida on September 7, 2020.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record

31