**IN THE UNITED STATES DISRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:19-cv-23588-BLOOM/Louis

HAVANA DOCKS CORPORATION,

                *Plaintiff*,

v.

MSC CRUISES (USA) INC. and
MSC CRUISES SA CO.

                *Defendants*.

**MSC CRUISES (USA) INC.'S AND MSC CRUISES SA CO.'S
<u>MOTION TO COMPEL DISCOVERY</u>**

**INTRODUCTION**

Plaintiff Havana Docks Corporation ("HDC") is refusing to produce basic information about its corporate shareholders' ownership interest in Havana Docks—a single-asset entity that currently exists solely for the purpose of bringing lawsuits to attempt to collect on the value of that asset. The information that Defendants MSC Cruises (USA) Inc. and MSC Cruises SA Co. ("MSC Cruises") seek with this motion—dates each shareholder obtained their shares, the price of those shares, and documents related to offers to buy or sell interest in HDC—is relevant to the valuation of HDC's alleged damages and MSC Cruises' post-liability excessive damages argument grounded in the Due Process Clause. By contrast, the burden on Havana Docks to produce this information is minimal. Thus, MSC Cruises' request is proportional to the needs of the case and its motion should be granted.

On July 30, 2020, MSC Cruises propounded discovery requests, including requests seeking information regarding HDC's shareholders, including the date(s) on which each shareholder obtained any interest in HDC, and regarding any offers to buy or sell any ownership interest in

1

HDC or interest in the Certified Claim. These requests are copied below (collectively, the "HDC Shareholder Requests").

> **INTERROGATORY NO. 10.** Identify all shareholders in HDC as of the date of filing the Complaint and identify the date(s) on which each shareholder obtained any interest in HDC. For the avoidance of doubt, this Interrogatory seeks each and every date on which any shareholder in HDC acquired any interest in HDC, including but not limited to any instance in which a shareholder who had an interest acquired any additional interest.
>
> **DOCUMENT REQUEST NO. 7.** Documents sufficient to identify all of your shareholders, including the number of shares owned and citizenship of each shareholder and the date each person or entity became a shareholder, from 1960 to the present.
>
> **DOCUMENT REQUEST NO. 8.** Documents and communications related to any offers to buy or sell any ownership interest in HDC or interest in the Certified Claim.

HDC objected to Interrogatory No. 10 and Request No. 7 on the basis of relevance and refused to produce responsive documents. For Document Request 8, which seeks the transactional shareholder documents and related offers,[1] HDC agreed to provide any documents related to "offers to buy or sell any . . . interest in the *Certified Claim*," but objected to producing offers to buy or sell interests in the corporation based on the same relevance objection. HDC's responses to MSC Cruises' First Set of Document Requests and Interrogatories are attached as **Exhibit A**.

At the parties' October 14, 2020 hearing, this Court heard argument regarding these requests and ultimately granted MSC Cruises leave to file this brief to argue why information and documents sought by the HDC Shareholder Requests should be produced in discovery by HDC. These Requests were discussed at pages 26–44 of the transcript, attached hereto as **Exhibit B**. As demonstrated below, the dates each shareholder obtained their shares, the price of those shares,

---

[1] MSC Cruises would accept the purchase price and share amount as part of HDC's answer to Interrogatory No. 10 in lieu of producing any of the transactional documents, whichever is more convenient for HDC. On the other hand, MSC Cruises prefers that HDC produce the communications and related documents surrounding shareholder acquisitions, including offers and discussions about the Certified Claim and HDC's rights thereunder.

2

and documents related to offers to buy or sell interests in HDC are relevant both to the valuation of HDC's alleged damages (i.e., fair market value of the confiscated property) and MSC Cruises' post-liability excessive damages argument grounded in the Due Process Clause.

## LEGAL STANDARD

Motions to compel discovery are governed by Rule 37 of the Federal Rules of Civil Procedure.  The moving party "bears the initial burden of proving that the information sought is relevant."  *Lesniak v. Geico Gen. Ins. Co.*, No. 2:19-cv-494-FtM-60MRM, 2020 U.S. Dist. LEXIS 185071, at *3 (M.D. Fla. May 7, 2020).  However, courts have made clear that the term "relevant" is to be construed broadly. *See United States v. Tinoco,* 304 F.3d 1088, 1120 (11th Cir. 2002) ("The standard for what constitutes relevant evidence is a low one."); *Underwriters Ins. Co. v. Atlanta Gas Light Co.*, No. 1:03-cv-0121-JEC, 2008 U.S. Dist. LEXIS 128100, at *7 (N.D. Ga. Oct. 14, 2008) (relevance "has been construed broadly to encompass 'any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'") (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).

## ARGUMENT

I. **The Information Sought from the HDC Shareholder Requests is Relevant to the Parties' Claims and Defenses**

   A. **The HDC Shareholder Requests Seek Information Relevant to HDC's Damages**

Title III of the Helms-Burton Act prescribes two methods for calculating the damages recoverable for "trafficking" in confiscated property which was certified by the Foreign Claims Settlement Commission (FCSC): a plaintiff can either recover the established value of its certified claim or prove fair market value of the confiscated property, "calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater . . . ."  22 U.S.C. § 6082(a)(1)(A)(i).  In this case, HDC has not ruled out any damages

theory, and therefore, MSC Cruises is entitled to conduct discovery as to the valuation of the Subject Property in 1960 and at present.

The details reflecting who the current HDC shareholders are, when they obtained their interests, for how much, and the transactional documents reflecting this are relevant to this damages inquiry. After confiscation in 1960, the company no longer conducted any business at the piers; indeed, HDC's sole purpose for the last six decades has been to properly value and recover for its confiscated property. *See* **Exhibit C** (HDC011164) (informing stockholders in annual report that HDC "is dormant and it is the intention [of HDC] to maintain corporate existence indefinitely in case of any possible recovery of the properties and business seized by the Cuban Government, or compensation therefore."). HDC's "principal asset" since 1971 has been the FCSC Certified Claim, which valued its confiscated property as of the date of confiscation in 1960.[2] *See* Mar. 9, 2020 Hrg. Tr. at 6:1-2; Sept. 23, 2020 Discovery Hrg. Tr. at 11:25-12: 1 ("The subject property is the certified claim is the main asset of the company."). Because the Certified Claim is HDC's sole asset, MSC Cruises has the right to explore through discovery the extent to which any purchase or sale of HDC's shares bears on the market's opinion as to the fair value of the Certified Claim itself, which values the confiscated property as of 1960. *See In re Appraisal of Dole Food Co., Inc.*, 114 A.3d 541, 558–59 (Del. Ch. 2014) (merger price "is a data point evidencing what knowledgeable lay people (the buyers and sellers) believed about the value of the company [which] a trial court can consider . . . as evidence of fair value."); *Highfields Cap., Ltd. v. AXA Fin., Inc.,* 939 A.2d 34, 59–61 (Del. Ch. 2007) (transaction price provided a solid indicator of fair value); *In re Nanovation Techs., Inc.*, 364 B.R. 308, 337 (Bankr. N.D. Ill. May 17, 2007) ("[C]orroboration of KPMG's valuation can be found by looking to the market value of Stamford

---

[2] HDC has represented that the company does own some small amounts of cash, but the company operates for the sole purpose of owning and collecting on its FCSC Certified Claim. *See* Exhibit B at 49:13-19.

4

International, a publicly traded company, because Stamford's only asset was Nanovation common stock").

Courts have noted that, in the case of a single-asset corporation, the value of the sole asset may be used as a proxy for the value of the corporation itself. *See, e.g.*, *Learner v. Commissioner*, No. 4355-80, 1983 Tax. Ct. Memo LEXIS 662, at *8 (T.C. Mar. 9, 1983) (the IRS "reasoned that since 619 Second Street was the sole asset of Learner-Eureka, Inc. the value of the corporation's stock was equivalent to the value of its sole asset"); *Bosserman v. Bosserman*, 384 S.E.2d 104, 107, 109 (Va. Ct. App. 1989) (noting that "[s]ince Mr. Bosserman did not offer any evidence of fair market value of the stock, the trial court accepted the stipulated value . . . of the corporation's sole asset, the farm," and finding that "[t]he trial court's determination of the value of the stock based on the value of the corporation's net assets was reasonable and supported by credible evidence"); *In re Am. Elk Inc.,* No. 93-38330-HCA-11, 2002 WL 31934160, at *2 (Bankr. N.D. Tex. Nov. 1, 2002) (where a company's sole asset was "the Ranch," "in effect, the value of the shares owned by Gary was represented by the value of his percentage of the Ranch."). By the same token, the value of a single-asset corporation is indicative of the value of the corporation's sole asset—in this case, the Certified Claim.

MSC Cruises seeks information responsive to the HDC Shareholder Requests so that its expert witness(es) can consider additional datapoints for presenting an opinion on fair market value damages as well as to potentially challenge any HDC expert opinion concerning fair market value damages. Although the price at which a shareholder bought or sold its interest may not reflect a perfect one-to-one correlation of valuation of the confiscated property, it need not be a perfect proxy for valuation to satisfy the relevance threshold at the discovery stage. *See Dole Food Co., Inc.*, 114 A.3d at 559–60 ("At a minimum, the '[m]arket price of a traded security must always be

evaluated to ascertain the degree of weight it deserves in an appraisal.'") (citation omitted). The need for such information is especially relevant given that (1) the calculation of damages under Title III is a novel issue and (2) calculating the fair market value of the Subject Property is complicated by the fact that Cuba is a closed economy rather than a free market economy. HDC's counsel agrees that it is difficult to value the port "because [Cuba] is a closed economy." *See* Ex. B at 35:9–10 (Mr. Martinez).

For example, at the October 14 hearing, Mr. Martinez argued that HDC was seeking discovery on how much MSC Cruises paid the Havana port manager not to prove trafficking/liability, but to use "income generated" to present a valuation theory. The problem with that type of methodology, of course, is that it still does not reflect true market value because the Cuban government could charge cruise lines whatever it wanted, and there were no market alternatives to sail to Cuba. The Court recognized that a creative approach to valuation may be warranted especially in the absence of other objective market datapoints:

> If this case goes forward and you end up advancing experts in front of a jury to value your damages, this will be novel. There is no prior case that an expert has attempted to do what we're doing here in this case . . . The only thing that the company owns is the claim. The observation I was making, that we don't have something else to look for in this case in its uniqueness . . . we [do not] have a very set playbook on precisely how damages may be appropriate under these Helms-Burton cases.

Ex. B at 36, 38-39 (Louis, J.).

At this juncture,[3] the question is whether the information responsive to the HDC Shareholder Requests may be relevant to an expert's consideration, and not whether any such

---

[3] MSC Cruises is not confined to applying appraisal methods that HDC believes to be applicable. *See* Ex. B at 35:2–5 (Martinez) ("There are three basic methods of doing it [valuing the confiscated property] that qualify pursuant to appraisals and also under *Daubert*. They would be the replacement costs of the property, the costs of construction, it would be comparables."). Instead, it is the Court's gatekeeping duty to determine, only at the appropriate stage of discovery, what expert methodology is admissible.

6

expert analysis would ultimately pass muster under the *Daubert* standard. *See id.* at 42:8–10 ("It is not a question of whether or not you're going to prevail at [the *Daubert*] stage. It is a question of whether or not it is relevant."). Courts within this circuit have granted discovery of documents which may "bear upon" issues in the case to avoid a "premature finding" that such evidence is inadmissible or improper as a basis for expert testimony. *See, e.g., Jordan v. Scott Fetzer Co.*, No. 4:07-cv-80 (CDL), 2009 WL 1885063 (M.D. Ga. June 30, 2009) (granting plaintiffs' motion to compel documents it sought "to provide to their expert who intends to rely upon the materials in support of his aggregate damages theory" because "at this stage of the proceedings," "Plaintiffs should be able to obtain the requested information upon which their expert intends to rely" without a "premature finding" on expert methodology). Because one of HDC's potential damages theories is based on valuation of a property that was confiscated 60 years ago and that exists in a closed economy, the Court must liberally apply the scope of relevancy to permit MSC Cruises to pressure test novel valuation methods. *See Adelman v. Boy Scouts of Am.*, 276 F.R.D. 681, 688 (S.D. Fla. 2011) ("The Courts have long held that relevance for discovery purposes is much broader than relevance for trial purposes," and "[d]iscovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought has no possible bearing on the subject matter of the action.") (internal citation omitted).

Finally, in addition to considering the requested information and documents for the purpose of establishing a fair market valuation of the subject property, HDC stockholders' purchase or sale of shares (or documents and communications reflecting offers to buy or sell shares) are relevant to the assessment of the FCSC's valuation. Under Title III of the LIBERTAD Act, the certified value for confiscated property established by the FCSC is not a conclusive damages figure, but rather there is a "rebuttable" presumption that the certified damages are appropriate damages

amount. *See* 28 U.S.C. § 6082(a)(2) ("The presumption shall be rebuttable by clear and convincing evidence . . . ."). Thus, MSC Cruises is entitled to pressure test the FSCS's valuation process. If the FCSC considered the value of the company, its assets, or its shareholders' shares in establishing its valuation, MSC Cruises should be entitled not only to the backup documentation submitted to and considered by the FCSC, but also information that reflects the price for which HDC shareholders acquired or disposed of stock (and offers related thereto).

Accordingly, HDC should produce information and documents responsive to Interrogatory 10 and Requests 7-8.

> **B. Information Responsive to the HDC Shareholder Requests May Be Relevant to the MSC Cruises' Potential Post-Liability Argument That A Title III Damages Award Violates the Due Process Clause.**

If found liable, MSC Cruises may re-raise its argument that the Title III damages provision, and the specific damages award issued against it, violates MSC Cruises' rights under the Due Process Clause. *See* MSC Cruises' Motion to Dismiss the Amended Complaint, at 18–19 (D.E. 69). The Supreme Court has held that a civil remedy prescribed by Congress violates the Due Process Clause where "the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. C. v. Williams*, 251 U.S. 62, 66–67 (1919). This well-settled principle has been recently applied to a variety of types of statutory damages schemes, such as a TCPA class action and a Copyright Act infringement case. *See Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 962 (8th Cir. 2019); *Capitol Records, Inc. v. Thomas-Rasset*, 692 F.3d 899, 907 (8th Cir. 2012) ("[T]his standard is still good law.").

For example, In *Golans,* a defendant was found liable after a jury trial in a TCPA class action suit for making over 3.2 million illegal robocalls in a weeklong campaign to advertise a movie. *See Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2017 WL 3923162, at *4

(E.D. Mo. Sept. 7, 2017). Congress set the damages to be $500 per violation, which meant the TCPA established a damages award of $1.6 billion. *See id.* The defendant filed a post-liability motion to reduce the damages due to the Due Process Clause and, in support, <u>cited evidence from discovery and trial</u> which suggested that the damages were grossly disproportionate to the offense. including that (a) the defendant did not know the calls were in violation of the TCPA due to the law's unsettled nature and he believed the calls fell under a statutory exemption from liability, (b) the class representatives—the only plaintiffs to testify—were not home and never even heard the phone call, and (c) of the 3.2 million calls, more than 3 million never even heard the advertisement for the movie because they did not stay on the line long enough to hear the part of the call which violated the TCPA. *See id.* at D.E. 458 (Mot. to Reduce Damages) at 7-14. The district court, found the award to be "obviously unreasonable and wholly disproportionate to the offense" and reduced the damages from $500 per call to $10 per call (or roughly $32 million) to "reflect[] the severity of the offense." *Id.,* 2017 WL 3923162, at *4 (E.D. Mo. Sept. 7, 2017). On appeal, the Eighth Circuit affirmed finding $1.6 billion to be a "shockingly large amount":

> We agree with the district court that the statutory damages here of $1.6 billion violate the Due Process Clause. To state the obvious, $1.6 billion is a shockingly large amount. Compare that to the conduct of ccAdvertising. It plausibly believed it was not violating the TCPA . . . The call campaign was conducted for only about a week. And the harm to the recipients was not severe — only about 7% of the calls made it to the third question, the one about the film. Under these facts, $1.6 billion is "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable."

*Golans,* 930 F.3d at 962–63.

MSC Cruises has asserted a similar excessive-damages affirmative defense, and it is entitled to develop relevant facts during discovery in the event it is later found liable. This reasonably includes basic information about Havana Docks shareholders' interests, including: (a) how many of HDC's current shareholders owned interests in HDC at the time of confiscation, (b)

9

how many shareholders who owned interest in HDC at the time of confiscation have been subsequently bought out, (c) when HDC's current shareholders obtained their interests, (d) for how much they obtained their interests after confiscation, if any, and (e) the nationalities of HDC's current shareholders.

In sum, MSC Cruises is entitled to know when each of HDC's shareholders first obtained their interests in HDC and whether they continued to consolidate interests subsequent to the confiscation of the Subject Property, particularly in light of the fact that the origin of the damages award (confiscation) dates back to 1960 and these current shareholders are seeking damages derived from confiscation by the Cuban Government which did not involve MSC Cruises. These facts may ultimately support the argument that a damages award against MSC Cruises is excessive, irrational, and disproportionate to its conduct as to violate the Due Process Clause. And just like with its potential relevance to establish valuation, the Court need not determine now whether such information is admissible either at trial or in a post-liability motion now, only whether the information bears on the issue of a Due Process argument and satisfies the "remarkably low bar" standard of relevance. *Pinilla v. Northwings Accessories Corp.*, No. 07-21564-CIV, 2007 WL 2826608, at *4 (S.D. Fla. Sept. 25, 2007).

### C. The Documents Sought from Request No. 8 Are Independently Relevant

In addition to its relevance described above, the information sought by MSC Cruises in Document Request No. 8—offers to buy or sell ownership interests in HDC or the Certified Claim—is relevant for another reason. MSC Cruises is entitled to know how HDC and its agents have characterized, discussed, or described the Certified Claim or HDC's rights thereunder through either offers or negotiations. As discussed above, HDC agreed to produce documents related to offers to buy or sell interests in the Certified Claim, not the company. Offers to buy or sell the corporation itself—which exists for the sole purpose of holding and pursuing the Certified

10

Claim—are no different. All offers to buy or sell shares in HDC (or the company as a whole) inherently relate to offers to buy or sell the Certified Claim; it is the only reason a third party or an existing shareholder would want to own an interest in the company. The two cannot be divorced from one another. Because HDC has agreed to produce documents responsive to one, it must produce documents responsive to the other.

Further, HDC has already agreed to produce—and has produced—some of these documents through a separate Document Request No. 9, which seeks "[d]ocuments and communications concerning HDC's discussions or characterizations of its rights in the Subject Property, the Certified Claim and/or under the LIBERTAD Act, including but not limited to, shareholder meeting minutes and notes, shareholder presentations and communications to shareholders and/or third parties." Ex. A (emphasis added); *see, e.g.,* HDC015247 (attached hereto as **Exhibit D**) (7/23/13 email among HDC shareholders: "It is hard to know if there ever will be value to the stock beyond liquidating the Corporation, but it seems worth 'hanging in there.'"). *See also Havana Docks Corp. v. Norwegian Cruise Line Holdings Ltd.,* No. 1:19-cv-23591-BB, D.E. 83, 87 (S.D. Fla.) (HDC "withdrew its objection to producing . . . documents and communications between Plaintiff and any third-party . . . referring or relating to the LIBERTAD Act"). Thus, if any communication related to buying or selling an interest in HDC bears upon, relates to, or discusses the Certified Claim, HDC has effectively waived its relevance objection and must produce these documents.

Finally, requiring HDC to produce all non-privileged documents responsive to Request No. 8 is entirely consistent with HDC's own discovery requests to MSC Cruises. HDC seeks from MSC Cruises (1) documents made to third parties "describing its cruises to Cuba," (3) all communications "related to the *prospect* of MSC USA offering cruises to Cuba," (3) documents

11

"relating to the Plaintiff" and (4) documents relating to the LIBERTAD Act. None of these categories of documents is directly relevant to trafficking—HDC separately requests documents which "identify the activities . . . occurring on the Subject Property by MSC USA"— and instead, these documents primarily seek to understand how MSC Cruises characterized its cruise travel and discussed its activities in Cuba in light of the Certified Claim and Title III. MSC Cruises seeks similar documents from HDC. Just as HDC seeks communications related to what MSC Cruises believed its rights were with respect to using the Subject Property, MSC Cruises requests documents in which HDC shareholders describe or discuss the Certified Claim, the value of the Claim, and/or what shareholders believed HDC's rights derived from the Claim were.

## II. The Burden Required for HDC To Comply with MSC Cruises' Requests Is Low

Producing the information to the HDC Shareholder Requests would not impose any undue burden or costs upon HDC. HDC's counsel already represented that it had a collected and reviewed all of HDC's documents. *See* Sept. 23, 2020 Disc. Hrg. Tr. at 11:16-12:6 (collected hard copy documents dating back to 1917 and client emails and "reviewed all of it"). Consequently, HDC likely already has this information, but if not, the documents sought are not likely to be difficult to locate or burdensome to review: the information reflects typical corporate records as well as emails, if any exist, related to offers to buy or sell a company which does no business and exists for one purpose. If such responsive records exist, HDC should have them readily available. And none of this information is embarrassing, sensitive or otherwise extremely confidential.

Furthermore, HDC's blanket relevance objection is undermined by the fact that HDC has *already produced* certain shareholder information responsive to these Requests, including, for example, stockholder lists for certain years and an email referencing a 200:1 reverse stock split which occurred after HDC obtained a Certified Claim. *See* Ex. D at HDC015248. If more

information exists regarding the same shareholders referenced in these produced documents, then MSC Cruises has a right to discover it.

## CONCLUSION

For the foregoing reasons, MSC Cruises respectfully requests that the Court grant their Motion to Compel and order HDC to respond fully to the HDC Shareholder Requests.

## RULE 37(a) CERTIFICATION

I hereby certify that counsel for MSC Cruises conferred in good faith with counsel for Havana Docks Corp. in an effort to obtain the requested documents and information without court action but was unable to do so.

Dated: October 28, 2020

Respectfully submitted,

/s/ *J. Douglas Baldridge*
J. Douglas Baldridge (Florida Bar No. 708070)
Andrew T. Hernacki (admitted *pro hac vice*)
Justin B. Nemeroff (admitted *pro hac vice*)
VENABLE LLP
600 Massachusetts Avenue
Washington, D.C. 20001
T: (202) 344-4703
F: (202) 344-8300
JBaldridge@venable.com
ATHernacki@venable.com
JBNemeroff@venable.com

*Counsel for MSC Cruises*

## CERTIFICATE OF SERVICE

I hereby certify that on the 28th day of October, 2020, a copy of the foregoing was filed through the Court's CM/ECF management system and electronically served upon counsel of record.

/s/ *J. Douglas Baldridge*