UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 19-cv-23588-BLOOM/Louis

HAVANA DOCKS CORPORATION,

    *Plaintiff*,
v.
MSC CRUISES (USA) INC.,
MSC CRUISES SA CO. and
MSC CRUISES S.A.

    *Defendants*.
_____/

**MSC CRUISES' STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF
ITS INDIVIDUAL MOTION FOR SUMMARY JUDGMENT**

Defendants MSC CRUISES (USA) Inc. ("MSCC USA"), MSC CRUISES SA Co. ("MSCC SA Co.") and MSC CRUISES S.A. ("MSC Cruises S.A."), (collectively, "MSC Cruises"), pursuant to Local Rule 56.1, submit their statement of material facts as to which there is no genuine issue to be tried.

1.  MSC Cruises S.A. is a Swiss corporation based in Geneva, Switzerland, which serves as the parent entity for all MSC Cruises operations. ECF No. 133 ¶ 2; Ex. 1, Mio Dep. at 14:14-15, 15:2-4.

2.  MSC Cruises S.A. operates all cruise travel under the brand "MSC Cruises," including operating the cruise travel between the United States and Cuba from 2018 to 2019. ECF No. 133 ¶ 2; Ex. 2, Sasso Dep. at 27:19.

3.  MSC Cruises S.A. did not profit from its cruises between the United States and Cuba from December 2018 to June 2019, and in fact, lost more than €6.3 million on those cruises. *See* Ex. 3, MSC000000236 (spreadsheet of U.S.-to-Cuba revenues and expenses reflected in "Net Income before taxes" in "Total" column); Ex. 4, 9/8/21 MSC Cruises' Am. Resp. to HDC's First Req. for Admiss. at No. 51 (MSC Cruises S.A. "denies that it made any profit from those cruises.").

4.  MSCC USA is a Delaware corporation with a principal place of business in Florida, and is wholly owned by MSC Cruises S.A. *See* ECF No. 133 ¶ 4.

5.  Pursuant to the governing contract between MSCC USA and MSC Cruises S.A., MSCC USA only provided support services within the United States in connection with ticket sales for MSC Cruises S.A.'s cruises, including MSC Cruises S.A.'s Miami-based itinerary which traveled to Havana, Cuba, and MSCC USA only received compensation on a cost-plus basis. *See id.*; Ex. 2, Sasso Dep. at 27:21–28:1, 136:13-25, 191:25–192:11, 262:5–263:4 (MSCC USA sold tickets within the United States on behalf of MSC Cruises S.A., but performed no operations related to cruises); Ex. 5, MSCCUSA0000066389 at 392 (Sales & Marketing Agreement stating that MSCC USA is annually compensated "on the Cost-Plus Method (CPM) [with] a mark-up of 4.00% over [MSCC USA]'s general and administration costs."); Ex. 6, Fusaro Dep. at 42:12-17; Ex. 11, Onorato Dep. at 16:2-11 (MSC Cruises S.A. was the actual seller of all tickets).

6.  MSCC USA did not earn any revenues for tickets sold for MSC Cruises S.A.'s cruises to Cuba. *See* Ex. 2, Sasso Dep. at 139:12-20 ("We're paid on a pay-for service formula ... So all the revenue belonged to S.A."); 140:13-25 (payment "not connected to the ticket sales."); *id.* at 136:20-25 (passengers "paid MSC Cruises USA on behalf of MSC Cruises S.A."); Ex. 6, Fusaro Dep. at 46:18-22 (no commissions kept by MSCC USA).

7.  MSCC USA had no involvement in MSC Cruises S.A.'s cruise operations. *See* Ex. 2, Sasso Dep. at 89:5-14 ("sales and marketing" in the U.S. was the "extent of the services performed by [MSCC USA] with regards to cruises to Cuba"); 134:9–135:7 (MSCC USA "did not

1

get involved in any of" the cruise operations or use of the Terminal); *id.* at 159:7-18 (same); 156:7-19; *id.* at 96:25–97:10 (same); Ex. 6, Fusaro Dep. at 38:3-9 (only MSC Cruises S.A. "developed the itineraries"), *id.* at 66:7-10 (MSCC USA not involved in "any communications about where to berth ships in Cuba"), *id.* at 104:19-21 (same with respect to shore excursions in Cuba).

8.   MSC Cruises SA Co. is an inactive Florida corporation. It never had offices or employees, and never performed any business activities. *See* Ex. 2, Sasso Dep. at 21:18-24 ("MSC Cruises S.A. Co. has no function and no employees."); *id.* at 24:21-23 (MSCC SA Co. "[n]ever engage[d] in any business"); *id.* at 133:16-21, 262:5–263:4.

9.   The Obama Administration lifted travel restrictions to Cuba and, effective September 21, 2015, OFAC issued general licenses authorizing cruise lines to conduct carrier services "between the United States and Cuba," and the U.S. Department of Commerce, Bureau of Industry and Security ("BIS") amended the Export Administration Regulations to permit cruise ships to go to Cuba. *See* 80 Fed. Reg. 56916; 31 C.F.R. § 515.572(a)(2)(i); 80 Fed. Reg. 56,898; 15 C.F.R. § 740.15 and § 746.2 (the "General Licenses").

10.   Under these OFAC authorizations, "a person authorized to provide carrier services" to Cuba could "transport[], directly or indirectly, between the United States and Cuba" persons who satisfied one of five categories, including those "[p]ersons subject to U.S. jurisdiction who are traveling to or from Cuba pursuant to a general license under one of the 12 categories of travel listed in § 515.560 or under a specific license from [OFAC] . . . ." 31 C.F.R. § 515.572, Note to § 515.572, Subpart (1).

11.   One of the "12 categories of travel listed in § 515.560" permitted under the OFAC General Licenses was for "educational people-to-people travel," which was "for the purpose of engaging, while in Cuba, in a full-time schedule of activities that enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities." *See* Ex. 7, 31 C.F.R. § 515.565(b)(2) (Effective: Nov. 9, 2017 to June 4, 2019).

12.   The General Licenses authorized cruise travel anywhere in Cuba, including Havana, without limitation (and without any reference to the Helms-Burton Act). *See id.*; Ex. 8 (HDC's Answers to NLCH's Req. for Admiss.) at No. 57.

13.   Between December 10, 2018 and June 5, 2019, MSC Cruises S.A. operated 25 week-long voyages that traveled from Miami, Florida to several Caribbean destinations, including Havana, Cuba. *See* Ex. 9, 9/8/20 MSCC USA's and MSCC SA Co.'s First Supp. Resp. to Pl.'s

First Interrogs. ("MSCC USA First Supp. ROG Resps.") at No. 3(c)-(d) (identifying itineraries for each cruise from Miami to Cuba); Ex. 4, MSC Cruises' Am. Resp. to Pl.'s Req. for Admiss. at No. 40; Ex. 2, Sasso Dep. at 29:25–30:6; Ex. 10, MSCCUSA0000074985 at 86.

14. MSC Cruises S.A. ceased sailing to Cuba before the authorization to provide carrier services to Cuba was revoked on June 5, 2019. *See* BIS AVS § 740.15(d) (effective June 5, 2019); Ex. 9 at No. 3(c)-(d) (on its last cruise from Miami to Cuba, the *MSC Armonia* left Havana on June 2, 2019); Ex. 11, Onorato Dep. at 222:19-23 ("We continued until the OFAC license wasn't valid"); Ex. 12, MSCCUSA0000079729 at 730.

15. The *MSC Armonia* was the only MSC Cruises S.A. vessel which conducted cruises from the United States to Cuba. *See* Ex. 13 (9/23/20 MSCC USA's and MSCC SA Co.'s Sec. Supp. Resp. to Pl.'s First Interrogs.) at No. 3(a).

16. Havana was the only destination in Cuba to which the *MSC Armonia* traveled during its U.S.-based cruises to Cuba. *See id.* at No. 3(c)-(d).

17. Each time that the *MSC Armonia* stopped in Havana, it docked at only one location: the San Francisco Pier (or Pier No. 1) of the Sierra Maestra Terminal ("SMT"). *See* Ex. 14 (6/30/20 MSCC USA and MSCC SA Co.'s Resp. to Pl.'s First Interrogs.) at No. 3(d); Ex. 15 (8/30/21 MSC Cruises S.A.'s Resp. to Pl.'s Third Interrogs.) at No. 2; Ex. 1, Mio Dep. at 23:2-5.

18. MSC Cruises S.A.'s use of the San Francisco Pier to dock and embark and disembark passengers was pursuant to the General Licenses. *See* Ex. 1, Mio Dep. at 68:6-13 (general licenses "allow[ed] MSC Cruises to bring passengers from the US to Cuba"), 74:1-3, 106:2-13; Ex. 11, Onorato Dep. at 46:18-24 ("OFAC general license" gave MSC Cruises S.A. "the opportunity to travel . . . to Cuba . . . according to a specific program called the people-to-people").

19. MSC Cruises S.A. developed a program to ensure all passengers who disembarked from the *Armonia* in Havana were in compliance with the General Licenses. *See* Ex. 16, MSCCUSA0000073695 at 96–97 ("For all cruises sailing from an American port to Cuba it is required that guests comply with local regulations, in particular with the People-to–People program"); Ex. 11, Onorato Dep. at 200:24–201:1; Ex. 17, MSCCUSA0000080078 at 78 ("All cruises starting from Dec 10th will be under the P2P regulation" and "a communication will be shared [with guests] to explain the general concept of the P2P, why excursions are included and why there is a declaration to be signed."); Ex. 18, Iaccarino Decl. ¶ 4.

20. MSC Cruises' website provided the public and prospective passengers with information regarding compliance with the government regulations and requirements for cruising to Cuba. *See* Ex. 18, Iaccarino Decl. ¶ 7; Ex. 19, MSCCUSA0000075233 at 33-34 (FAQs from MSCC USA website, including discussion of OFAC requirements); Ex. 20, HDC-MSC000056 at 56-57; Ex. 21, Iaccarino Dep. at 18:10-21.

21. In order to board the *Armonia* in Miami before cruising to Cuba, MSC Cruises S.A. required every passenger to complete certifications stating under which of the 12 categories the passenger was traveling or, if the passenger was traveling under a specific license, to provide the number of that license, and provide that completed declaration to MSC Cruises S.A. *See* Ex. 22 (MSC Cruises S.A. form travel affidavit); Ex. 23, MSCCUSA0000079064 at 64; Ex. 21, Iaccarino Dep. at 92:24–93:3, 94:14-20 ("upon embarkations," guests "had to fill in the declaration [to state] if they were falling under the 12 other categories allowed to travel to Cuba"); Ex. 2, Sasso Dep. at 201:12–202:7; Ex. 16, MSCCUSA0000073695 at 697.

22. While onboard the *Armonia* during cruises to Cuba, MSC Cruises S.A. provided passengers on the *Armonia* scheduled to dock in Havana, Cuba with information regarding compliance with the regulations for cruising to Cuba, including an on-board presentation about the OFAC regulatory requirements. *See* Ex. 18, Iaccarino Decl. ¶ 10.

23. In order to disembark, passengers were required either to purchase a shore excursion compliant with people-to-people regulations or to participate in another of the 12 categories of authorized travel permitted by OFAC. *See* Ex. 23, MSCCUSA0000079064 at 64; Ex. 6, Fusaro Dep. at 106:18-23 ("[P]assengers had to disembark with a shore excursion organized under the people-to-people regulations."); *id.* at 111:15-19; Ex. 21, Iaccarino Dep. at 40:15-22, 97:13-16 ("I can tell you that every guest was taking an excursion . . . and once ashore in Havana, they did the people-to-people excursions."); Ex. 11, Onorato Dep. at 200:19–201:3.

24. All shore excursions offered by MSC Cruises S.A. were vetted to ensure that they complied with the requirements of the people-to-people regulations. *See* Ex. 21, Iaccarino Dep. at 51:3-13, 52:7-11 (MSC Cruises augmented "every single excursion" to "me[e]t the requirements of being a people-to-people."); *id.* at 51:14-25; *id.* at 85:24–86:5 ("We vetted our shore excursions" to ensure inclusion of a "social community project, historical [element], and/or just an interaction with the local people."); *id.* at 86:11-15; *id.* at 91:11-15 ("We have our onboard staff that takes

4

part of the shore excursions and onboard shore excursion managers that usually verifies and supervise every single excursion.").

25. On multiple occasions, HDC demanded that the U.S. Department of State enforce the Helms-Burton Act against cruise lines on the basis that their use of the SMT was supposedly illicit trafficking. *See* Ex. 24, HDC 001498 at 1501 (referring to the "3 separate occasions when I presented these facts to State Department officials and requested a Title IV action against the . . . cruise lines"); Ex. 25, HDC 14348 at 14348 (Bengochea says he is "partnered" with HDC); *id.* at 14350 (Bengochea says he "represent[s]" HDC); Ex. 26 (NCLH Dep. of Johnson) at 141:9-12 (HDC gave Bengochea "permission" to speak for [HDC] . . . when he felt that it would be of . . . interest . . . for [HDC]."); Ex. 27, Behn Dep. at 82:5-21, 74:16-21, 159:21–160:2; Ex. 28, 12/15/20 J. Johnson Dep. at 90:6-11, 191:1–192:5 (describing meeting with State Department).

26. The U.S. Government told HDC that the cruise lines' use of the SMT was within the lawful travel exception contained in the Helms-Burton Act. *See* Ex. 29, HDC 16084 at 84 (email from the State Dept. to HDC) ("As previously discussed, given the clear exclusion in Title IV's definition of 'traffics' of transactions and uses of property incident to lawful travel to Cuba, we [the U.S. State Dept.] are not currently pursuing Title IV actions in relation to commercial cruise lines."); Ex. 30, Deanna Kim Dep. at 21:25–22:5; Ex. 31, HDC 001013 (email from HDC to State Dept.); Ex. 32, HDC 000083 at 84); Ex. 33, HDC 001328 at 28; Ex. 24, HDC 001498 at 1501.

27. HDC engaged lobbyists to assist with HDC's efforts to have the U.S. Government impose penalties on the cruise lines for docking at the SMT for alleged trafficking under the Helms-Burton Act. *See* Ex. 34, 6/30/21 HDC's Answers to MSC Cruises' First Req. for Admiss. at Nos. 170-172, 173, 175, 176.

28. The United States Government never imposed any penalty under the Helms-Burton Act against MSC Cruises. *See id.* at No. 163; Ex. 27, Behn Dep. at 121:22–122:9; Ex. 30, D. Kim Dep. at 22:2-5; Ex. 33, HDC 001328 at 1328 ("The State Dept lawyer specifically told me they viewed docking on our property as 'necessary' and so they wouldn't consider it trafficking.").

29. The *Armonia,* with an overall length of 274.9 meters, is the smallest vessel in MSC Cruises S.A.'s fleet in terms of length, tonnage, and passenger capacity. *See* Ex. 35, 5/28/21 MSC Cruises' Resp. to HDC's Sec. Interrogs. at No. 1; Ex. 36, MSCCUSA0000047644 at 689; Ex. 37, Pastena Dep. at 78:7-11, 83:15-23; Ex. 38, Pastena Decl. ¶ 5.

30. The Cuban Government determines where a ship can anchor or dock in Havana, Cuba. *See* Ex. 38, Pastena Decl. ¶ 4; Ex. 39, Diaz Expert Rept. at 29 (citing a Cuban statute, which "recognizes the Cruise Terminal as the only dock where cruise passengers can disembark in Havana."); Ex. 37, Pastena Dep. at 86:2-6 (the Cuban "port authority" tells cruise lines whether they can enter the port or not); *See* Ex. 1, Mio Dep. at 87:14-25 ("Aries and the Ministry of Transport[ation]" had authority over Cuban ports); *id.* at 100:25–101:24 (MSC Cruises S.A. was "authorized by the Cuban Government to bring [its] ships to [the SMT] in Havana").

31. Aries Transportes S.A. ("Aries") operated the Cuban ports and was responsible for berthing operations in Havana, Cuba when MSC Cruises S.A. sailed there. *See* Ex. 1, Mio Dep. at 87:14-25; Ex. 37, Pastena Dep. at 27:3-7 (Aries runs "the management of all of the port[s] in Cuba" and instructs "if you can go in one port [or] if you cannot go"); *id.* at 31:24-25; Ex. 9 (9/8/20 MSCC USA First Supp. ROG Resps.) at No. 16; Ex. 40, MSCSA0000000048 at 49 (2015 contract between MSC Cruises S.A. and Aries for Aries to "guarantee the conditions" so that MSC Cruises S.A. can "operate . . . the complete itinerary [o]n the "Cruise Terminal of Havana"); Ex. 4, MSC Cruises' Am. Resp. to HDC Req. for Admiss. at Nos. 104-105.

32. Aries informed MSC Cruises S.A., in writing and orally, that it required its vessels calling on Havana, Cuba to dock at the SMT Pier No. 1. *See* Ex. 38, Pastena Decl. ¶¶ 7, 15, 20; Ex. 11, Onorato Dep. at 113:13-25 (Aries told MSC Cruises S.A. that it was required to use the SMT); Ex. 1, Mio Dep. at 98:14-22 ("I got consistent confirmation that the Cuban authorities in charge . . . directed MSC Cruises to go to the [SMT]."); *id.* at 114:17-22; Ex. 37, Pastena Dep. at 111:8-13, 134:9-20 (Aries told MSC Cruises S.A. that "the [SMT] was the only allowed port to dock and disembark passengers in Havana"); Ex. 41, MSCCUSA0000080596 at 596 (emailing Aries that "Captain Pastena told me . . . that MSC Cruises has obtained the permit to dock in Sierra Maestra [Pier No. 1]"); Ex. 42, MSCCUSA0000079326 (email from Aries confirming berth requests at the Terminal for MSC vessels for 2016-2017); Ex. 44 (7/14/17 email from Aries intending to confirm MSC Cruises S.A.'s berth requests "from now until March 2020"); Exs. 40 at 2, 45 at 2 (MSC Cruises S.A.'s 2015 and 2018 contracts with Aries specified use of the "Cruise Terminal in Havana" for each berth).

33. In 2015, MSC Cruises S.A. executives had discussions with the Cuban Government about possible locations for passenger cruise travel, and conducted technical investigations into the only two locations in Havana where a cruise vessel as large as MSC Cruises' vessels could

potentially dock if ultimately approved by the Cuban authorities: the SMT and the Havana Container Terminal ("TCH"). *See* Ex. 38, Pastena Decl. ¶¶ 3, 6, 8-10; Ex. 37, Pastena Dep. at 38:12–39:15, 103:17–104:11, 134:5-8, 97:2–103:5 (discussing technical investigations); Ex. 46, (initial Havana port analysis); Ex. 47 (June 15, 2015 SMT Findings Report).

34. Following its technical assessments of the SMT and TCH, MSC Cruises S.A. asked Aries about docking at SMT Pier No. 1 and proposed to construct an additional mooring dolphin because the pier was shorter than MSC Cruises' vessels, and, as a temporary solution until a dolphin was constructed, to dock at the TCH and construct a passenger tent at the TCH because it lacked any structures for the passenger processing mandated by the Cuban Government, such as customs, immigration, and medical screening. *See* Ex. 38, Pastena Decl. ¶¶ 6, 8-11; Ex. 37, Pastena Dep. at 118:11-16 (ship extended "almost 80, 85 meters out of the pier"); Ex. 48, MSCCUSA0000079557 at 560 (Pier No. 1 was "202 meters"); Ex. 14, 6/30/20 MSCC USA and MSCC SA Co.'s Resp. to Pl's First Interrogs. at No. 2; Ex. 11, Onorato Dep. at 133:19–134:7; *id.* at 136:8-16 ("one of the options was to build the dolphin" at the SMT and "[a]nother one was to use . . . [the TCH] which had a much longer pier"); Ex. 49, MSCCUSA0000077396 at 396 ("the Cuba Authority [is] more oriented to keep Passenger vessel at [SMT] No. 1."); Ex. 50, MSCCUSA0000080645 (technical presentation provided to Aries); Ex. 37, Pastena Dep. at 132:22–133:1 (SMT was the "only place where th[ere] is" customs and immigration facilities in Havana), *id.* at 93:19–94:3, 98:13-22; 104:22–106:13 ("[From] my technical point of view, the best option was the [TCH]" but to embark/disembark passengers "you need some structure" for processing and "in this container terminal there is nothing. It's only [a] large berth.").

35. Aries and the Cuban Government rejected MSC Cruises S.A.'s proposal to install a mooring dolphin at SMT Pier No. 1 or to install a passenger tent and dock its ships at the TCH, and instead instructed MSC Cruises S.A. to dock its vessel on the north side of Pier No. 1 at the SMT for all of its calls to Havana. *See* Ex. 38, Pastena Decl. ¶¶ 11-16; Ex. 11, Onorato Dep. at 135:2-7 (dolphin "has never been built" "[b]ecause they didn't want to"), 136:8-22 ("[T]he Cuban authorities . . . said that this was not possible to use [the TCH] because they could not have customs and immigration operations there for all the passengers. That's why they gave us as the only option the [SMT No. 1]."); Ex. 37, Pastena Dep. at 107:5-15 ("[The Cuban] authority denied the container terminal of Havana. The only option you have is to go at Sierra Maestra one north without any dolphin, any – any facility."); *id.* at 108:23–109:1 ("[W]e [did] not get the authorization to go [to

7

the TCH]. We get only the authorization to go at [SMT]."); *id.* at 115:13-25 (Aries told Capt. Pastena "we have to use the Sierra Maestra number one"); *id.* at 93:19–94:15 (Aries rejected request to construct a mooring dolphin); Ex. 1, Mio Dep. at 99:14-24.

36. Since 2015, MSC Cruises S.A. has been required to dock at the SMT Pier No. 1 for each call. *See* Ex. 42, MSCCUSA0000079326 at 326 (Aries confirming berth requests for 2016-2017); Ex. 51, MSCCUSA0000077047 (Aries requesting SMT berth requests for 2018-2020); Ex. 40, MSCSA0000000048 at 2; Ex. 45, MSCCUSA0000079403 at 2.

37. The Cuban Government required cruise lines, including MSC Cruises S.A., to dock at SMT Pier No. 1 when calling Havana. Other cruise lines also asked the Cuban Government for permission to dock at other facilities in or nearby Havana, including the TCH, but the Cuban Government did not authorize any such request and required each cruise ship to dock at SMT No. 1. *See* Ex. 52, 10/22/20 G. Israel Dep. at 139:21–141:19 (Carnival's requests to "use the cargo piers" or a dock in nearby Matanzas were rejected by the Cuban Government); *id.* at 159:21–160:9 (Carnival had "identical" conversations as other cruise lines proposing to build "an immigration facility on the cargo pier"); Ex. 53, 12/3/2020 Israel Dep. at 174:9-22 (Carnival "raised numerous times" a request to use "the two cargo piers in the Port of Havana that were standing empty," "but they always rejected" Carnival); Ex. 54, Del Rio Dep. at 234:12–236:4 ("And the Cuban Government told [Norwegian], if you want to go to Havana, that's where you have to go. You don't have a choice. I inquired about the possibility of Mariel. They said no. Mariel is an industrial port. We're not allowing any cruise ships there. There are no customs facilities there . . . You can't go."); Ex. 55, Delgado Dep. at 193:23–196:3, 206:19–207:12 (rejecting Royal Caribbean's proposal to dock at Matanzas); Ex. 56, Skogland Dep. at 12:17-20, 36:7-14, 77:2-6, 79:3-17, 80:15–81:5, 81:7-21, 83:4-6 (because Viking Cruises was "unable to secure the slots at the [cruise] terminal in Havana due to other traffic," it had to reserve berths in Cienfuegos).

38. Indeed, when MSC Cruises S.A.'s ships arrived in Havana, the Cuban harbor pilots physically boarded the ships and ***themselves*** docked the ships at SMT Pier No. 1. *See* Ex. 48, MSCCUSA0000079557 at 559, Row 8 ("compulsory" pilotage to drive the ship into the berth); Ex. 37, Pastena Dep. at 87:18–88:3 (Cuban Government pilot "obliged to take [control] to enter in the port"); Ex. 38, Pastena Decl. ¶ 15; Ex. 43, MSCCUSA0000076742 at 743 (Aries and Capt. Pastena discussing training of Cuban pilots for "docking of these large ships in the Havana Cruise Terminal"); Ex. 39, Diaz Expert Rpt. at 28-29.

8

39.     The Cuban Government prohibited cruise lines, including MSC Cruises S.A., from anchoring offshore and transporting passengers ashore by tender boat. *See id.* at 23 ("the use of ship tenders is not permitted in the port of Havana"); *id.* at 29 ("Res. 251 states that in the Port of Havana ship tenders cannot be used"); Ex. 48, MSCCUSA0000079557 at 561, Rows 17-18 ("vessels are not currently allowed to anchor" and "tenders use not allowed."); Ex. 1, Mio Dep. at 86:15–87:25 (Aries told MSC Cruises S.A. "no anchor[ing] was allowed"); Ex. 38, Pastena Decl. ¶¶ 15, 17; Ex. 55, Delgado Dep. at 203:17–204:15, 205:8-13, 205:23–206:3, 206:4-18 (Royal Caribbean was prohibited from anchoring offshore or tendering in Havana); Ex. 57, D. Farkas Dep. at 16:3-11 (Cuban Government repeatedly said Norwegian had to use the SMT and could not tender and use some secondary pier to disembark passengers), 18:6-15 (same); Ex. 52, 10/22/20 G. Israel Dep. at 141:17-19 (Carnival "asked to tender" but was required to dock at SMT).

40.     Even if MSC Cruises S.A. had been allowed to anchor offshore in Havana, it would have been required to use the SMT because of the medical screening, immigration, and customs facilities. Ex. 38, Pastena Decl. ¶¶ 10, 19; Ex. 39, Diaz Expert Rpt. at 29 ("the Cruise Terminal is the only permitted point of disembarkation"); Ex. 48, MSCCUSA0000079557 at 564 ("All crew and pax [p]assports to be checked at the terminal").

41.     All of MSC Cruises' vessels, including the *MSC Armonia,* were too large to sail into Cienfuegos or Santiago de Cuba. *See* Ex. 38, Pastena Decl. ¶ 6; Ex. 11, Onorato Dep. at 85:18–87:7, 113:13–114:14 (Aries told Onorato that "Havana was the only option" due to "the size of that ship"), 142:4-12; Ex. 37, Pastena Dep. at 77:25–78:2 ("There is no other port in Cuba that can attend [a] vessel of the size of the MSC vessel[s]."); *id.* at 133:2-18 ("the other destinations in Cuba could not feasibly handle" MSC Cruises' vessels); Ex. 1, Mio Dep. at 114:17–116:5 (MSC Cruises S.A. port operations confirmed that "Santiago and Cienfuegos were not suitable for our ships."); Ex. 58, MSCCUSA0000069108, at 109-110 (1/16/19 email from Capt. Pastena in response to a proposal to visit the "tender port" of Cienfuegos: "We cannot go in any place in Cuba except Havana."); Ex. 59, MSCCUSA0000069734 at 736 ("Cienfuegos is not feasible.").

42.     After technical assessments and speaking with the Cuban Government, other cruise lines that sailed to Cuba similarly concluded that longer cruise vessels could not sail to Cienfuegos and Santiago de Cuba, and only smaller vessels could travel to these ports due to port and pier size restrictions. *See* Ex. 52, 10/22/20 Israel Dep. at 48:25–50:17 ("smaller ships" could go to other ports, but bigger ships "could only go to Havana."); Ex. 53, 12/3/20 Israel Dep. at 164:13–165:17

9

("the smallest ship" of each brand name cruise line "cannot enter currently any of the other [ports] in Cuba" besides Havana); *id.* at 175:23–177:6 (Carnival "started operating . . . with a smaller ship" to "operate into three Cuban Ports"); Ex. 55, Delgado Dep. at 134:8-13 and 134:14–135:20 (Cuban Government "assigned for the cruise industry" Havana, Cienfuegos, and Santiago, and encouraged Royal Caribbean to use "smaller ships" "that could fit" in non-Havana ports); Ex. 60, C. Allen Dep. at 57:24–58:4, 64:21-24 (the "Cuban Government place[d] . . . prohibition[s] on Royal ships" due to "size limitations"); Ex. 61, M. Parodi Dep. at 50:23–53:20, 99:6-14 (smaller ships "were authorized to call all three ports," but larger Norwegian ships "could only call Havana").

43. Every cruise ship that docked at or anchored offshore from Cienfuegos or Santiago de Cuba was at least 45 meters shorter than the *Armonia*. *See* Ex. 62 (summary chart listing all cruise ships, by length, which sailed to each Cuban port; the largest ship to dock at or anchor offshore from Cienfuegos or Santiago was 228 meters).

44. HDC is not aware of any alternatives for MSC Cruises S.A. to sail to Havana other than using SMT. Ex. 28, Johnson Dep. at 149:19–150:1 ("I am not aware" of "any alternatives").

45. MSC Cruises first learned of the Certified Claim—and that the SMT had allegedly been confiscated by the Cuban Government in 1960—on or about February 11, 2019, when MSC Cruises received a letter from HDC's attorney. *See* Ex. 1, Mio Dep. at 44:14–46:7.

46. In 2018, HDC's President, Mickael Behn, sent emails discussing the possibility that the Certified Claim could be read to mean HDC's interest was a lease that "had run out," and HDC's claim against the cruise lines was not "as clear cut as we would like to have it." *See* Ex. 63, HDC018289 at 289-290 (4/16/18 email from Behn to lobbyists: "the waterfront holding was for 99 years but from the date of Ports creation with [sic] I think [was] in 1901. So I [w]as always under the impression the Waterfront lease was until 2001."); Ex. 27, Behn Dep. at 49:1-2, 49:18-12 ("99 years is what I understood from the certified claim"); Ex. 64, HDC 015207 at 208-209 (9/10/18 Behn tells a shareholder that "the [certified] claim covers . . . the building . . . under the lease and we would lose the land (with the building) if we didn't renew our lease"; "the issue then becomes [whether] lease of the land [] has expired," and "it [is] not as clear cut as we would like to have it"); Ex. 27 (Behn Dep.) at 136:17–137:3 (Behn describing his email in Ex. 64 as an effort to determine "on the concession issue, had it run out or not"); *id.* at 138:20-22 ("I specifically stated nothing was clear-cut, and . . . I was trying to find facts, and trying to understand it").

10

Dated: September 20, 2021                    Respectfully submitted,

*/s/ J. Douglas Baldridge*
J. Douglas Baldridge (Fla. Bar No. 708070)
Andrew T. Hernacki (admitted *pro hac vice*)
Justin B. Nemeroff (admitted *pro hac vice*)
VENABLE LLP
600 Massachusetts Avenue
Washington, D.C. 20001
T: (202) 344-4703
F: (202) 344-8300
JBaldridge@venable.com
ATHernacki@venable.com
JBNemeroff@venable.com

*Counsel for MSC Cruises*

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2021, MSC Cruises' Statement of Undisputed Facts In Support of Its Individual Motion For Summary Judgment was filed with the Clerk of Court using the Court's CM/ECF system, which will serve a Notice of Electronic Filing on all counsel of record.

/s/ *J. Douglas Baldridge*