**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| HAVANA DOCKS CORPORATION, | **Case No. 19-cv-21724** |
| Plaintiff, | **BLOOM/McAliley** |
| v. | |
| CARNIVAL CORPORATION, | |
| Defendant. | |
| _____/ | |
| HAVANA DOCKS CORPORATION, | **Case No. 19-cv-23588** |
| Plaintiff, | **BLOOM/Louis** |
| v. | |
| MSC CRUISES SA, MSC CRUISES SA CO, and MSC CRUISES (USA) INC., | |
| Defendants. | |
| _____/ | |
| HAVANA DOCKS CORPORATION, | **Case No. 19-cv-23590** |
| Plaintiff, | **BLOOM/Louis** |
| v. | |
| ROYAL CARIBBEAN CRUISES, LTD., | |
| Defendant. | |
| _____/ | |
| HAVANA DOCKS CORPORATION, | **Case No. 19-cv-23591** |
| Plaintiff, | **BLOOM/Louis** |
| v. | |
| NORWEGIAN CRUISE LINE HOLDINGS LTD., | |
| Defendant. | |
| _____/ | |

**DEFENDANTS' OPPOSING STATEMENT OF**
**FACTS AND ADDITIONAL UNDISPUTED MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

Defendants Carnival Corporation d/b/a Carnival Cruise Line ("Carnival"); MSC Cruises S.A., MSC Cruises SA Co., and MSC Cruises (USA) Inc. (collectively, "MSC Cruises"); Royal Caribbean Cruises Ltd. ("Royal Caribbean"); and Norwegian Cruise Line Holdings Ltd. ("Norwegian" and, collectively with Carnival, MSC, and Royal Caribbean, "Defendants"), pursuant to Local Rule 56.1, submit their statement of facts and additional undisputed material facts as to which there is no genuine issue to be tried.

1. Undisputed.

2. Disputed as phrased. HDC's Articles of Incorporation contain these quotes but expressly state in Article 3(A) that any rights that it is acquiring are subject to Decree 467, which is governed by Cuban law. Ex. 27 to Pl.'s SUMF.  Pursuant to Cuban law, the Piers were owned, operated and controlled by the Cuban Government. Defs.'s SUMF ¶¶ 1-5, 10-11; ECF No. 219-1 (Expert Report of Ambar Diaz), p. 4-5, 14-16.

3. Undisputed.

4. Disputed as phrased. The concession contemplates expropriation, but requires indemnification only if the project was expropriated pursuant to Article 50 of the Law of Ports, which deals with situations where it "should become necessary to utilize or destroy" works constructed by private parties. Carnival Case, ECF No. 73-3; MSC Case, ECF No. 41-3; Royal Caribbean Case, ECF No. 31-3; NCL Case, ECF No. 43-3; ECF No. 219-1 (Expert Report of Ambar Diaz) p. 20-22.

5. Disputed. This Map does not refer to any of the Presidential Decrees that form the concession, so there is no way to know if these are indeed the "proposed piers".

6. Undisputed.

7. Disputed as phrased.  The cited documents show that the Cuban Government's approval was required for any modification, and that the Government approved this specific modification.

8. Disputed as phrased.  Undisputed that Port of Havana Docks Company executed an indenture in February 1911 for £800,000 worth of bonds.  Disputed that Port of Havana Docks Company ever owned the Piers or, as stated in the indenture, was able to convey works constructed pursuant to the concession. Ex 25 to Pl.'s SUMF.  Port of Havana Docks had only a limited cargo concession, which only provided a limited right of use of the docks.  Defs.'s SUMF ¶¶ 1-5, 10-11, ECF No. 219-1 (Expert Report of Ambar Diaz), p. 4-5, 14-16.  Further, the indenture states that a Cuban mortgage would be prepared in accordance with the laws of Cuba and properly filed in Cuba.  Ex 25 to Pl.'s SUMF.  HDC has offered no evidence of any such Cuban mortgage.

9. Undisputed.

10. Disputed.  It is unclear which piers the corporate minutes referenced refer to.

11. Disputed as phrased.  Undisputed that Port of Havana Docks Company sold the concession and all rights and interests in the concession to HDC.  Disputed that Port of Havana Docks Company owned or could sell "piers[,] wharfs [or] docks" to HDC as stated in the stockholder minutes.  Ex. 21 to Pl.'s SUMF, at HDC 010038-39; Ex. 31 to Pl.'s SUMF, at HDC 022604 & 022609.  As recognized in the stockholder minutes, the rights and interests that Port of Havana Docks sold to HDC were only those granted in the concession. Ex. 21 to Pl.'s SUMF, at HDC 010034-35; Ex. 21 to Pl.'s SUMF, at HDC 022599.  As noted above, the concession only provided a limited right to conduct cargo operations.  ECF No. 219-1 (Expert Report of Ambar Diaz), p. 4-5, 14-16.

12. Undisputed.

13. Disputed.  There is no page HDC 022588 in Ex. 31 to Pl.'s SUMF.

14. Disputed as phrased.  The cited documents show that the Cuban Government's approval was required for any modification, and that the Government approved this specific modification.

15. Disputed as phrased. Exhibit 14, which is the indenture between HDC and Old Colony Trust Company is a private document between these two companies. HDC entered into this contract on its own behalf. Although it seems to be intended to renegotiate the bonds of Port of Havana Docks with Farmers Loan and Trust Company, this document does not support the contention that the use of the funds was for the construction of pier C and the marginal building. More importantly, HDC is executing the indenture on its own behalf and not as an agent of Port of Havana Docks, which was the actual holder of the concession in 1921. Pursuant to Decree 2424, HDC did not complete the acquisition of Port of Havana Docks until 1928 and it was not accepted by the Cuban Government as the "concessionaire" until 1934. Defs.'s SUMF in Support of its Omnibus MSJ, Ex. 125 to Defs.'s Response to Pl.'s SUMF (Decree 2424).

16. Disputed. The referenced paragraph begins "Under the terms of this indenture, Havana Docks agreed that United Fruit Company (…) would pay rent directly to the Old Colony Trust Company". The Indenture cannot create any right or interest over the concession because at the time of this indenture HDC did not hold the concession.  Moreover, even if it did hold the concession, which it did not,   HDC had no more than a time-limited cargo concession for the Terminal and could lease no more than that limited concession interest to the United Fruit

2

Company. Defs.'s SUMF No. 1-5, 10-11; ECF No. 219-1, (Expert Report of Ambar Diaz), p. 4-5, 14-16; *see also* Ex. 126, Cuba Civil Code of 1889, articles 10 and 480.

17. Disputed. This paragraph relies on a purported contract between HDC as agent for Port of Havana Docks with Turner Construction; however, the copy of the contract is missing the first 37 articles or provisions and is not signed. Ex. 19 to Pl.'s SUMF, at HDC 009204-206. Moreover, nothing in pages HDC 009204-009206 of Pl.'s Ex. 19 refers to the Santa Clara, the Machina Pier, or to pier "C".

18. Undisputed.

19. Disputed as phrased. Undisputed that Ex. 36 to Pl.'s SUMF, at HDC 004482, states that the transfer of properties was legally completed in 1929. Disputed that the properties transferred were ownership, a leasehold, or possession of the Piers. The only interest in the Piers that Port of Havana Docks Company could transfer was its time-limited cargo concession. Defs.'s SUMF No. 1-5, 10-11; ECF No. 219-1 (Expert Report of Ambar Diaz), p. 4-5, 14-16. Further, even the concession could not be transferred without the approval of the Cuban Government, and that did not occur until 1934. *Id.*; Ex. 125 to Defs.'s Response to Pl.'s SUMF (Decree 2424).

20. Undisputed.

21. Disputed as phrased. While the enumerated balance sheets do identify the "Concession, Piers, Equipment, Etc." as assets of the company, the Piers themselves were not assets of the Company because HDC did not own the Piers as described herein. Defs.'s SUMF No. 1-5, 10-11; ECF No. 219-1 (Expert Report of Ambar Diaz), p. 4-5, 14-16.

22. Disputed as phrased. While a few of the enumerated financial reports for 1928 (HDC 004483), 1930 (HDC 004517) and 1931 (HDC 004531) identify income from "operation and lease of the piers", the balance of the financial reports from 1932-1959 simply state income for "operations." No definition of "operations" is provided. *See e.g.* Ex. 36 to Pl.'s SUMF, at HDC 012184, HDC 01062, HDC 010257, HDC 010368.

23. Disputed as phrased. While some monthly reports detailing HDC's revenues and costs include a line under "Auxiliary Operations" that is called "Passengers," there is no explanation of this term or any information to conclude that HDC offered passenger services or conducted any operations except identifying passengers who may have incidentally traveled as part of the cargo operations occurring at the pier. Indeed, these revenues were *de minimis* in comparison to HDC's total revenues (less than 1%). For instance during 1955 "Passengers" revenue represented $9,748 out of $2,338,300 total revenues, or 0.4% (HDC006066), and during 1958 "Passengers" revenue

accounted for $14,664 out of $2,477,754 of total revenues, or 0.6% (HDC 009226 and HDC 008060). Conspicuously missing from the evidence cited by HDC is any evidence that it serviced a passenger *vessel*, incurred an expense related to passenger services, or that it operated a passenger terminal. Moreover, HDC had no right to provide or charge for passenger services pursuant to the concession and applicable Cuban law. ECF No. 219-1 (Ambar's report), at p. 16-18

24. Disputed as phrased. Undisputed that HDC in 1946 issued an indenture for $1,600,000 in mortgage bonds. Disputed because "Subject Property" is undefined. While Cuban law recognizes the right to mortgage a concession interest, if Subject Property refers to the Terminal, HDC did not own, lease, or possess the Terminal in order to encumber it. Further, the Indenture did not satisfy the requirements of Cuban law to perfect a mortgage on the Terminal. Ex. 126, Cuba Civil Code of 1889, articles 1857.2, 1858, and 1874; Ex. 127, Cuba Mortgage Law of 1893, article 107.6.

25. Disputed as phrased. Undisputed that the Indenture states what HDC alleges. Disputed that HDC ever had any "right title or interest in the waters and lands in and under the harbor of Havana, Republic of Cuba, and all its docks, warehouses, buildings … and improvements of all descriptions[.]" other than the limited right of use provided in its time-limited cargo concession. Ex. 126, Cuba Civil Code of 1889, articles 1857.2, 1858, and 1874; Ex. 127, Cuba Mortgage law of 1893, article 107.6; Ex. 128, Regulations to the Cuban Mortgage Law of 1893, article 25.

26. Disputed as phrased. Undisputed that the Indenture was recorded in Havana. Disputed that the recordation or protocolization of the 1946 Indenture effected a mortgage beyond HDC's limited right of use in its time-limited cargo concession. Ex. 128, Regulations to the Cuban Mortgage Law of 1893, article 25; Ex. 129, Cuba Notarial Code of 1929, article 215.

27. Undisputed.

28. Undisputed.

29. Disputed. HDC used the Havana Port Terminal in accordance with the restrictions set forth in the concession for a time limited cargo concession. Defs.'s SUMF ¶¶1-5, 10-11; ECF No. 219-1 (Expert Report of Ambar Diaz), at p. 4-5, 14-16. Pursuant to Cuban law, Havana Docks, did not, and could not, operate or manage the Havana Port Terminal. *Id*.

30. Disputed as phrased. The term Subject Property is not defined. If the term Subject Property includes the Terminal, then it was impossible for the Ministry of Revolution Armed Forces to seize the Terminal because it was already owned by the Cuban Government. Defs.'s SUMF ¶¶ 1-5, 10-

4

11; ECF No. 219-1 (Expert Report of Ambar Diaz), at p. 4-5, 14-16. Furthermore, the "Acta" cited by Plaintiff does not mention the seizure of any real estate, let alone the Piers.

31. Disputed as phrased. Subject Property is not defined. To the extent "Subject Property" refers to the Terminal itself, the Cuban Government has always owned this property and did not confiscate it from HDC by continuing to own it. Defs.'s SUMF ¶¶ 1-5, 10-11; ECF No. 219-1 (Expert Report of Ambar Diaz), at p. 4-5, 14-16.

32. Undisputed.

33. Disputed as phrased. HDC submitted a claim to the FCSC in April 1967, but included several items that it cannot claim as "losses". In its April 27, 1967 claims application, Plaintiff's then-Vice President Thomas Whittaker stated that Plaintiff owned real estate in Havana made up of "land and concessions." Defs.'s SUMF ¶¶17-18. In addition, in answering the FCSC's specific questions regarding the extent of HDC's property in Cuba, Plaintiff stated:

> Answers to:
>
> INFORMATION QUESTIONNAIRE FOR
> UNITED STATES PROPERTY OWNERS IN CUBA
>
> The HAVANA DOCKS CORPORATION owns and operates in Havana Harbor, three Ocean Steamship piers, named respectively, the San Francisco, Machina and Santa Clara piers linked by a marginal building. This terminal company offers docking and warehousing facilities for import and export, bonded warehouses and provisional cargo deposits for merchandise pending customs appraisement, etc.

(Defs.'s SUMF ¶ 18.). As is now known, these representations were untrue: HDC had only a limited right to operate a cargo business at the Terminal; it did not own the Terminal, including any of its Piers or marginal building. (Defs.'s SUMF ¶¶ 1-5, 10-11; ECF No. 219-1 (Expert Report of Ambar Diaz), at p. 4-5, 14-16.)

34. Dispute as phrased. While the FCSC entered its Final Decision as to the claim submitted by HDC on September 28, 1971, the decision itself was based upon misstatements HDC made to the FCSC regarding its ownership of real estate in Havana. These misstatements included representations that HDC owned "land" in Cuba as well as "three Ocean Steamship piers" in Havana Harbor. Defs.'s SUMF ¶¶ 1-4, 17, 18. HDC had only a limited right to operate a cargo business at the Terminal; it did not own the Terminal, including any of its Piers or marginal building. Defs.'s SUMF ¶¶ 1-5, 10-11; ECF No. 219-1 (Expert Report of Ambar Diaz), at p. 4-5, 14-16.

35. Disputed. This holding by the FCSC was not consistent with the concession nor the Cuban laws the concession incorporates. Specifically, HDC never acquired "real property with all

improvements and appurtenances located on the Avenida del Puerto between Calle Amargura and Calle Santa Clara in Havana". Outside of HDC's representations to the FCSC, there was no evidence submitted to the FCSC for it to base its conclusion that HDC owned this real estate in Cuba. This is because no such evidence existed, as the Cuban government owned the Terminal before, during and after the concession. Defs.'s SUMF ¶¶ 1-5, 10-11; ECF No. 219-1 (Expert Report of Ambar Diaz), at p. 4-5, 14-16.)

36. Disputed. The FCSC did not write "had the confiscation not occurred." Carnival Case, ECF No. 73-8; MSC Case, ECF No. 41-8; Royal Caribbean Case, ECF No. 31-8; NCL Case, ECF No. 43-8.

37. Undisputed that the FCSC wrote that in the 1970s, and not in connection with, or in reference to, the Helms-Burton Act's later, and distinct, definition of "United States national."

38. Disputed as phrased. The FCSC decision does not specifically identify by name the San Francisco, Machina, and Santa Clara piers as assets confiscated by the Cuban Government. ECF No. 104-1. Notwithstanding, it appears the FCSC decision improperly considered the value of these piers in its determination of the value of the claim due to HDC's misstatements regarding its ownership of the same. Carnival Case, ECF No. 73-8; MSC Case, ECF No. 41-8; Royal Caribbean Case, ECF No. 31-8; NCL Case, ECF No. 43-8.

39. Disputed as phrased. While this quote correctly states the FCSC's final decision on valuation, the decision itself is defective in that it improperly accepted HDC's representation that it owned real estate in Cuba. *See* responses to *supra*, ¶¶33-35.

40. Undisputed.

41. Undisputed.

42. Undisputed.

43. Undisputed.

44. Disputed as phrased. Undisputed that in a document dated April 30, 2021, the Secretary of State of the State of Delaware certified the following with respect to Plaintiff: Plaintiff was duly incorporated under the laws of the state of Delaware; in good standing; had a legal corporate existence, not having been cancelled or dissolved so far as the records of the office of the Secretary of the State of Delaware showed; was duly authorized to transact business; Plaintiff had filed a series of certificates; the annual reports had been filed to date; and the franchise taxes had been paid to date. Ex. 29 to Pl.'s SUMF.

45. Disputed as phrased.  Undisputed that in a document dated April 30, 2021, the Secretary of State of the State of Delaware certified the following with respect to Plaintiff:  Plaintiff was "duly authorized to transact business" and had a legal corporate existence, not having been "cancelled or dissolved" so far as the records of the office of the Secretary of the State of Delaware showed.  Ex. 29 to Pl.'s SUMF.

46. Disputed as phrased.  Undisputed that in a document dated April 30, 2021, the Secretary of State of the State of Delaware certified the following with respect to Plaintiff:  the annual reports had been filed to date and the franchise taxes had been paid to date.  Ex. 29 to Pl.'s SUMF.

47. Disputed as phrased because the following referenced document(s) are partially or entirely illegible: HDC 002980-2981, HDC 002982-2983, HDC 002985-2986, HDC 003033-34, HDC 003036-37, HDC 003065-3066, HDC 003068-69, HDC 003076-77, HDC 003081, HDC 003088, HDC 003205, HDC 003294, HDC 003299-3300, HDC 008379-8380; and the following referenced document(s) are missing a signature:  HDC 018743-18745, HDC 008748-8758, Bush subpoena docs (2011, 2012, 2013).

48. Disputed as phrased.  Undisputed that since the confiscation, Plaintiff's "primary business" been to "maintain its corporate existence indefinitely in case [Plaintiff] is able to recover any part of [its Certified] [C]laim."  Exs. 26 & 2 to Pl.'s SUMF.  Disputed that the evidence referenced in this paragraph mentions the potential recovery of property.

49. Undisputed.

50. Disputed as phrased.  Undisputed that in the fall of 2011, Mickael Behn (Havana Docks-then Director, Vice President, and Secretary) and Aphra Behn (also a Director and Vice President) engaged Jerry Johnson to "maintain[] [Plaintiff's] corporate status active and in good standing" and to "manag[e] Havana Docks' investments."  Ex. 3 to Pl.'s SUMF.

51. Disputed.  Undisputed that Mr. Johnson was Plaintiff's Secretary and Treasurer in 2018; disputed that he was Plaintiff's Vice President and Comptroller in 2018. ECF No. 219-76 at 34:23-35:6.

52. Disputed as phrased.  Undisputed that between fall 2011 and when he executed this Declaration in January 2021, Mr. Johnson at one point performed duties to maintain Plaintiff's corporate status active and in good standing to protect Plaintiff's rights under the Certified Claim, but the Declaration does not evidence the frequency with which he performed these duties or the scope of these duties; disputed that the referenced evidence establishes that Mr. Johnson has done

so since fall 2011 or that Plaintiff has in-fact remained an active corporation in good standing during that period.  Ex. 3 to Pl.'s SUMF.

53. Disputed as phrased.  Undisputed that Mr. Johnson, through his role as Senior Vice President and head of the Wealth Management Department at Bank of the Bluegrass & Trust Company, manages Plaintiff's marketable securities.  Ex. 1 to Pl.'s SUMF at 205:21–206:3; ECF No. 219-75 at No. 4 (p. 2); ECF No. 219-76, at 14:12-14:18.

54. Disputed as phrased.  Undisputed that between fall 2011 and when he executed this Declaration in January 2021, Mr. Johnson coordinated with Plaintiff's CPA each year in regard to Plaintiff's Form 1120 tax filing to the IRS and in regard to the annual franchise tax filing to the state of Delaware.  Ex. 3 to Pl.'s SUMF, at ¶ 3(f)-(g).

55. Disputed as phrased.  Undisputed that between fall 2011 and when he executed this Declaration in January 2021, Mr. Johnson at one point maintained Plaintiff's ledger (balance sheets and income statements), but the Declaration does not evidence the frequency with which he performed this duty or the scope of this duty; disputed that the cited to evidence establishes that Mr. Johnson has done so since fall 2011.  Ex. 3 to Pl.'s SUMF at ¶3(h).

56. Disputed as phrased.  Undisputed that between fall 2011 and when he executed this Declaration in January 2021, Mr. Johnson at one point updated and maintained Plaintiff's "Stockholders' Registry" and coordinated and distributed information to stockholders for annual meetings, but the Declaration does not evidence the frequency with which he performed these duties or the scope of these duties; disputed that the cited to evidence establishes that Mr. Johnson has done so since fall 2011.  Ex. 3 to Pl.'s SUMF at ¶3(j)-(k).

57. Disputed as phrased.  Undisputed that between fall 2011 and when he executed this Declaration in January 2021, Mr. Johnson at one point recorded results from annual stockholders meetings, but the Declaration does not evidence the frequency with which he performed this duty or the scope of this duty; disputed that the cited to evidence establishes that Mr. Johnson has done so since fall 2011.  Ex. 3 to Pl.'s SUMF at ¶3(l).

58. Disputed as phrased.  Undisputed that between fall 2011 and when he executed this Declaration in January 2021, Mr. Johnson at one point engaged lawyers, lobbyists, and consultants to protect and pursue Plaintiff's rights under the LIBERTAD Act, including the instant actions, with Plaintiff's President, Mickael Behn's, approval from London, but the Declaration does not evidence the frequency with which he performed this duty or the scope of this duty; disputed that the referenced evidence establishes that Mr. Johnson has done so since fall 2011.  Ex. 3 to Pl.'s

8

SUMF at ¶3(c); ECF No. 219-77, at 97:17–97:21, 151:4–151:8; ECF No. 219-76, at 235:7–236:1, 237:6–237:25.

59. Disputed as phrased. Undisputed that Mr. Johnson exercises his responsibilities from the Bank of the Bluegrass & Co. Trust Company - 215 Southland Drive, Lexington, Kentucky, where he is employed as the Senior Vice President and head of the Wealth Management Department. Ex. 1 to Pl.'s SUMF, at 202:23–203:1. Disputed that Johnson directed, controlled, and coordinated Plaintiff's business in 2019. ECF No. 219-77, at 97:17–97:21, 151:4–151:8; ECF No. 219-76, at 235:7–236:1, 237:6–237:25; ECF No. 219-77, at 131:12–131:15, 132:11–132:14; ECF No. 219-76, at 57:25–58:7; ECF No. 219-89, at HDC 021755-56; ECF No. 217-46, at AJohnson 0525; ECF No. 219-90, at 37:10–37:20; ECF No. 217-47, at AJohnson 0088; ECF No. 217-48, at AJohnson 0087; ECF No. 219-91, at HDC 021512ddp; ECF No. 219-92, HDC 021720ddp.

60. Disputed. ECF No. 219-93, at MAC001315 ("I don't have the records of that lease at hand. They are in my house in Miami. As are the incorporation papers of the company in 1917. All that paperwork was submitted to be able to get recognition of our claims."); ECF No. 217-35, at 231:18–232:3.

61. Undisputed; but this fact concerning Plaintiff's operations after the filing of these actions in 2019 is immaterial.

62. Undisputed, but this fact concerning Plaintiff's operations after the filing of these actions in 2019 is immaterial.

63. Disputed that Aphra Behn presently resides in the United States; undisputed that presently Mickael Behn does not reside in the United States and that Jerry Johnson does. ECF No. 217-35, at 3-7; ECF No. 219-76, at 62:17-62:20. Nonetheless, this fact concerning Plaintiff's operations after the filing of these actions in 2019 is immaterial.

64. Disputed as phrased. The cited evidence does not address the citizenship of all of Havana Dock's current shareholders. Ex. 131, HDC 023141 at HDC 023145.

65. Undisputed.

66. Disputed as phrased. The cited provision required a summary of certain provisions of subchapter III.

67. Disputed as phrased. The notice was dated May 11, 1996, but effective and published on May 17, 1996.

68. Disputed as phrased with respect to the statement's title, which was the "Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1995."

Undisputed that the statement is correctly quoted, including that it says nothing about lawful travel activities.

69. Undisputed.

70. Undisputed.

71. Disputed as phrased. Defendants will interpret the Terminal to mean the three piers and the marginal building linking the piers.[1] Undisputed that Royal Caribbean's ships docked at Pier 1 at the Terminal between 2017 and 2019; Norwegian's ships docked at Pier 1 at the Terminal between 2017 and 2019; Carnival's between 2016 and 2019; and MSC's US-Cuba Cruises between 2018-2019.

72. Undisputed that the quoted language appears in a document written by employees at Royal Caribbean who did not serve as attorneys and were merely providing a general update. Disputed that the document considers or analyzes the ability of the Executive Branch to license travel to Cuba within the applicable statutory and regulatory framework.

73. Disputed as phrased. Undisputed that on April 1, 2015, Norwegian's President and CEO, who did not serve as an attorney, stated that, "Tourism is still illegal under today's set of rules and policies and guidelines. And it would be difficult for us to have a ship with 4,000 tourists – people let's call them – show up in Havana and call that people-to-people travel. That would be a stretch of the – of the rules." Ex. 57 to Pl.'s SUMF, at 7:4-10; *see also* Ex. 56 to Pl.'s SUMF. Disputed that the document considers or analyzes the ability of the Executive Branch to license travel to Cuba within the applicable statutory and regulatory framework.

74. Undisputed that the language of the NSPM-5 is accurately quoted, and also undisputed that the same NSPM-5 states that, "The regulatory changes shall not prohibit transactions that . . . concern air and sea operations that support permissible travel." *See* 82 Fed. Reg. 48875, 48876 (Oct. 20, 2017).

75. Undisputed.

76. Disputed as phrased. The subcommittee heard testimony, and some of the testimony mentioned Title III, but the cited pages do not discuss whether to continue the suspension.

---

[1] Plaintiff does not define the term "Havana Port Terminal" anywhere in its Statement of Facts. Moreover, Defendants dispute both as a factual and legal matter the presupposition that Plaintiff owned the Terminal. *See* Defendant's Omnibus Statement of Undisputed Material Facts at ¶¶ 1, 4. Rather than raise this issue in response to each statement that uses the term "Havana Port Terminal," Norwegian incorporates by reference this dispute each time it disputes a statement that uses the term "Havana Port Terminal."

77. Undisputed that the cited article reports those things.

78. Undisputed.

79. Undisputed that the cited document contains the quoted language.

80. Undisputed that the cited document contains the quoted language, but the statement places some of the quoted language in an incorrect context. For example, the document contains a subsection entitled "Overall Strategic Position," in which the writer "*recommend[s]* that we work behind the scenes" (emphasis added). Ex. 41 to Pl.'s SUMF.

81. Undisputed that the referenced document is an email from CLIA to a group that includes one employee at each Defendant, and that the email says, "Attached is draft language to clarify that legal claims permitted under Title III of the Helms Burton Act do not apply to cruise lines." Ex. 41 to Pl.'s SUMF.

82. Undisputed that Ms. Kalisch wrote the quoted language and, in that same email, reported the Congressman's view that cruises were "lawful travel" under the then-existing OFAC regulations. Ex. 46 to Pl.'s SUMF ("He suggested that our cruises would not be considered 'lawful travel' once Trump makes additional changes to the OFAC regulations.").

83. Disputed as phrased. Undisputed that on February 11, 2019, each of the Defendants received a letter from Plaintiff's counsel stating that Plaintiff "has rights over the shipping ports and cruise ports, in the harbor of Havana ('the Property')" that were "certified by the United States Foreign Claims Settlement Commission" and demanded "that the unlawful trafficking on my client's property cease immediately." Exs. 47-52 of Pl.'s SUMF.

84. Disputed as phrased. Undisputed that in response, "CLIA members requested that CLIA Counsel analyze, on behalf of its members, the merits of potential Title III claims and the risks that an active Title III pose[d] to cruise lines" and that "CLIA members, along with CLIA Counsel, discussed . . . having CLIA jointly settle or resolve Title III claims on behalf of all of its members;" disputed that the referenced paragraphs refer to lobbying options. Ex. 40 of Pl.'s SUMF.

85. Disputed as phrased. Undisputed that the cited documents include a single memorandum prepared by counsel, which addresses various issues related to Title III and was circulated to the Defendants. Ex. 41 of Pl.'s SUMF, at NCLH_23591-00580236, NCLH_23591-00578179.

86. Undisputed that Defendants' ships continued to dock at Pier 1 at the Terminal while the general licenses and authorizations permitting them to do so remained in effect. ECF No. 217-6; ECF No. 217-7; ECF No. 217-8; ECF No. 217-9; ECF No. 217-10, at NCLH_23591-00556558-69; ECF No. 217-11, at NCLH_23591-00027586; ECF No. 217-12, at No. 3(c); ECF No. 217-16;

ECF No. 217-14, at No. 3(c)-(d); ECF No. 219-21, at No. 3(c)(p. 4); ECF No. 217-15, at 6, 11; ECF No. 219-22, at 145:07-146:08; *see also* 84 Fed. Reg. 25992 (June 5, 2019) (containing the relevant CACR amendments); 84 Fed. Reg. 25986 (June 5, 2019) (containing the relevant EAR amendments).

87. Disputed as phrased. Undisputed that the letter Plaintiff identifies as Ex. 8 was sent to Secretary Pompeo; disputed that Defendants sent this letter to lobby for legal protection from liability under the LIBERTAD Act for the cruise industry's use of the confiscated ports in Cuba, such as the Havana Port Terminal. Ex. 8 to Pl.'s SUMF at NCLH_23591-00111666-67.

88. Undisputed.

89. Undisputed, including that the media note said nothing about transactions and uses of property that were incident to lawful travel to Cuba, and necessary to the conduct of such travel.

90. Disputed as to the characterization of the discussion of the Helms-Burton Act, as Mr. Arison and Carnival neither had Helms-Burton as an agenda item, nor raise that topic. Bondi Deposition, Ex. 132, at 120:24-121:12 (Q. And can you tell me – walk me through that meeting, plase. A. As I recall we, - the meeting took place less than 30 minutes. Initially, Micky and the President were catching up on various matters unrelated to Cuba. The President was talking about the Jones Act, the cost of building ships. There was kind of a number of different topics. As I recall, the discussion on Cuba was – was very brief, and that discussion, as I recall, focused on the People-to-People license – general license in our sailings to Cuba. I don't recall during the meeting that Title II of Helms-Burton was discussed."); *id*. at 123:8-14 (Q. Did President Trump make any comments – regardless of whether Carnival Corporation raised it, did President Trump make any comments about the Helms-Burton law? A. No. Q. Did he say anything about Title III? A. No.); Plaintiff's SUMF, Ex. 4 at 144:16-17; 144:20-23 ("I don't even know that we discussed Helms-Burton. Actually, it wasn't on my agenda. What's his name? Bolton, who was – what was his position at the time? Whatever Bolton's position was, he brought it up in the meeting.").

91. Disputed that Mr. Arison (or Carnival) was seeking "legal protection;" rather, Carnival sought that the Administration clarify and affirm that Carnival's actions constituted "lawful travel" under the LIBERTAD Act. Ex. 4 to Pl.'s SUMF, at 151:9-15 ("Well, the way I interpret it is that we had been getting threatened of significant lawsuits despite the fact that we don't think that it applies to us, that there was a travel exception. And we wanted clarification because we felt it didn't apply to us. We felt that he didn't feel it applied to us, but the language was unclear.")

Undisputed that Carnival caused the email to be sent on April 17, 2019, that contained the above excerpt.

92. Undisputed.

## ADDITIONAL FACTS

93. In its four actions, since the filing of its Complaints, Plaintiff has asserted that it is a United States national under 22 U.S.C. § 6023(15)*(B)* (emphasis added). ECF No. 149, at ¶6, Case No. 19-21724; ECF No. 104 at ¶1, Case No. 19-23588, ECF No. 1 at ¶ 1, Case No. 19-23591; ECF No. 56 at ¶ 1, Case No. 19-23591; ECF No. 1 at ¶2; Case No. 19-23590; ECF No. 46 at ¶1, Case No. 19-23590; ECF No. 219-75 at No. 4 (p. 2).

94. Plaintiff has had no employees in the United States – the closest thing Plaintiff has to an employee is Mr. Behn, and he is an independent contractor. Ex. 130, at 29:17–31:18; ECF No. 219-76, at 53:2–53:4.

95. The Cuban authorities would not provide Viking Cruises with space at the Terminal despite Viking repeatedly asking to travel directly to Havana by ship and, as a result, Viking docked its ships in the city of Cienfuegos and took passengers on daytrips from Cienfuegos to Havana that involved a 3.5 to 4.5 hour bus-ride each way. ECF No. 219-65, at 12:17-20, 36:7-14, 77:2-6, 79:3-17, 80:15-81:5, 81:7-21, 83:4-6.

96. Of the equipment, furniture, and fixtures that Plaintiff owned in 1960, Plaintiff cannot identify any specific pieces of equipment, furniture, or fixtures that the cruise lines used during the period of time when their cruise ships traveled to Havana. ECF No. 219-73, at 89:4-101:6, 199:16-200:22.

97. Plaintiff cannot confirm that its submissions and statements to the FCSC are (or were) accurate and truthful. Ex. 133, 48:25-53:8, 67:1-69:12.

Dated: October 18, 2021

Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida
Telephone: (954) 356-0011

By:/s/ *Stuart H. Singer*
Florida Bar No. 377325
ssinger@bsfllp.com
Meredith Schultz
Florida Bar No. 29536
mschultz@bsllp.com
Corey P. Gray
Florida Bar No. 0115473
cgray@bsfllp.com

Pedro A. Freyre
Florida Bar No. 192140
Pedro.freyre@akerman.com
**AKERMAN LLP**
98 S.E. 7th Street, Suite 1100
Miami, Florida 33131
Telephone: (305) 374-5600

George J. Fowler, III (admitted *pro hac vice*)
gfowler@joneswalker.com
Luis Llamas
Florida Bar No. 89822
llamas@joneswalker.com
**JONES WALKER LLP**
201 St. Charles Avenue
New Orleans, LA 70170
Telephone: (504) 582-8752

*Counsel for Carnival Corporation*

**HOGAN LOVELLS US LLP**
600 Brickell Avenue, Suite 2700
Miami, Florida 33131
Telephone (305) 459-6500
Facsimile: (305) 459-6550

By: /s/ *Allen P. Pegg*
Richard C. Lorenzo
Florida Bar No. 071412
richard.lorenzo@hoganlovells.com
Allen P. Pegg
Florida Bar No. 597821
allen.pegg@hoganlovells.com

*Counsel for Norwegian Cruise Line Holdings Ltd.*

**HOLLAND & KNIGHT LLP**
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Telephone: (305) 374-8500
Facsimile: (305) 789-7799

By: /s/ *Scott D. Ponce*
Sanford L. Bohrer
Florida Bar No. 160643
sbohrer@hklaw.com
Scott D. Ponce
Florida Bar No. 0169528
sponce@hklaw.com

*Counsel for Royal Caribbean Cruises Ltd.*

**VENABLE LLP**
600 Massachusetts Avenue
Washington, D.C. 20001
Telephone: (202) 344-4703
Facsimile:  (202) 344-8300

By:/s/ *J. Douglas Baldridge*
Florida Bar No. 708070
JBaldridge@venable.com
Andrew T. Hernacki (admitted *pro hac vice*)
ATHernacki@venable.com
Justin B. Nemeroff (admitted *pro hac vice*)
JBNemeroff@venable.com

*Counsel for MSC Cruises*

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2021, the foregoing was filed under seal with the Clerk of Court using CM/ECF.  I also certify that the foregoing is being electronically served this October 18, 2021, on all counsel of record.

By:  /s/  *J. Douglas Baldridge*
J. Douglas Baldridge