# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

HAVANA DOCKS CORPORATION,

     Plaintiff,

v.

CARNIVAL CORPORATION,

     Defendant.

_____/

**Case No. 19-cv-21724**
**BLOOM/MCALILEY**

HAVANA DOCKS CORPORATION,

     Plaintiff,

v.

MSC CRUISES SA,
MSC CRUISES SA CO, and
MSC CRUISES (USA) INC.,

     Defendants.

_____/

**Case No. 19-cv-23588**
**BLOOM/LOUIS**

HAVANA DOCKS CORPORATION,

     Plaintiff,

v.

ROYAL          CARIBBEAN
CRUISES, LTD.,

     Defendant.

_____/

**Case No. 19-cv-23590**
**BLOOM/LOUIS**

HAVANA DOCKS CORPORATION,

     Plaintiff,

v.

NORWEGIAN  CRUISE  LINE
HOLDINGS, LTD.,

     Defendant.

_____/

**Case No.: 19-cv-23591**
**BLOOM/LOUIS**

**TABLE OF CONTENTS**

I.   STATUTORY AND REGULATORY BACKGROUND ................................................... 6

  A.   Relevant Statutes ................................................................................................ 7

    1.   International Claims Settlement Act ............................................................ 7

    2.   Cuban Democracy Act ................................................................................ 8

    3.   LIBERTAD Act ........................................................................................... 8

    4.   Trade Sanctions Reform and Export Enhancement Act ............................. 10

  B.   Relevant Regulations ....................................................................................... 10

    1.   Cuban Asset Control Regulations .............................................................. 10

    2.   OFAC's CACR Amendments ....................................................................... 11

II.  PROCEDURAL BACKGROUND ......................................................................... 16

  A.   Havana Docks' Allegations ............................................................................. 16

  B.   The Omnibus Summary Judgment Motions ..................................................... 19

    1.   Defendants' Omnibus Motion .................................................................... 19

    2.   Havana Docks' Omnibus Motion ............................................................... 19

  C.   The Individual Summary Judgment Motions ................................................... 21

    1.   Havana Docks ............................................................................................ 21

    2.   Carnival ..................................................................................................... 22

    3.   MSC ........................................................................................................... 23

    4.   Royal Caribbean ........................................................................................ 23

    5.   Norwegian .................................................................................................. 24

III. MATERIAL FACTS ............................................................................................. 24

  A.   Havana Docks ................................................................................................. 25

  B.   Confiscation of the Terminal by the Cuban Government ................................. 29

  C.   The Concession and the Certified Claim .......................................................... 30

  D.   Defendants and Related Entities ..................................................................... 33

    1.   Carnival ..................................................................................................... 33

    2.   MSC ........................................................................................................... 34

    3.   Royal Caribbean ........................................................................................ 35

    4.   Norwegian .................................................................................................. 35

  E.   Specific and/or General Licenses .................................................................... 36

    1.   Carnival ..................................................................................................... 36

    2.   MSC ........................................................................................................... 39

    3.   Royal Caribbean ........................................................................................ 40

    4.   Norwegian ................................................................................................... 42

   F.   Defendants' Use of the Terminal ......................................................................... 43

    1.   Carnival ...................................................................................................... 43

    2.   MSC ........................................................................................................... 44

    3.   Royal Caribbean ........................................................................................ 45

    4.   Norwegian ................................................................................................. 45

   G.   Defendants' Contracts and Payments to Cuban Entities ................................... 46

    1.   Carnival ...................................................................................................... 46

    2.   MSC ........................................................................................................... 47

    3.   Royal Caribbean ........................................................................................ 48

    4.   Norwegian ................................................................................................. 49

   H.   Defendants' Shore Excursions ........................................................................... 50

    1.   Carnival ...................................................................................................... 50

    2.   MSC ........................................................................................................... 55

    3.   Royal Caribbean ........................................................................................ 59

    4.   Norwegian ................................................................................................. 63

   I.   Havana Docks' Notice ........................................................................................ 69

   J.   Defendants' Knowledge of the LIBERTAD Act and the Certified Claim ........................ 69

   K.   Defendants' Revenues and Profits ..................................................................... 69

    1.   Carnival ...................................................................................................... 69

    2.   MSC ........................................................................................................... 70

    3.   Royal Caribbean ........................................................................................ 71

    4.   Norwegian ................................................................................................. 71

   L.   Other Cruises to Cuba ........................................................................................ 72

   M.   Defendants' Experts ........................................................................................... 72

    1.   Ambar Diaz ................................................................................................ 72

    2.   Julian Ackert .............................................................................................. 73

**IV.  LEGAL STANDARD ..................................................................................... 75**

   A.   Summary Judgment Standard ............................................................................. 75

   B.   *Daubert* Standard ................................................................................................ 78

   C.   Review of Report and Recommendation Standard ............................................ 79

**V.  DISCUSSION ..................................................................................................... 80**

   A.   "Person" ............................................................................................................. 80

   B.   "Traffics" ............................................................................................................ 80

|   | 1. | Scope of Havana Docks' Claim | 82 |
|---|----|------------------------------|----|
|   |    | a) Carnival | 82 |
|   |    | b) Royal Caribbean | 83 |
|   |    | c) Norwegian | 83 |
|   |    | d) MSC | 85 |
|   | 2. | Trafficking Activity | 86 |
|   | 3. | "Knowingly and Intentionally" | 90 |
| C. |   | Property Confiscated by Cuban Government | 98 |
| D. |   | United States National | 99 |
| E. |   | Ownership of Claim to Confiscated Property | 105 |
| F. |   | Trafficking After November 1, 1996 | 112 |
| G. |   | Defendants' Affirmative Defenses | 113 |
|   | 1. | Lawful Travel Exception | 113 |
|   |    | a) "Lawful Travel" Prong | 113 |
|   |    | b) "Necessary to the conduct of such travel" Prong | 145 |
|   | 2. | Ex Post Facto Clause | 151 |
|   | 3. | The Fifth Amendment's Due Process Clause | 152 |
|   | 4. | Expiration of the Concession | 152 |
|   | 5. | Failure to State a Claim | 153 |
|   | 6. | Lack of Knowledge and Intent | 153 |
|   | 7. | Lack of Standing Due to Lack of Injury-in-Fact | 154 |
|   | 8. | Lack of Indemnity Right | 155 |
|   | 9. | Lack of Causation | 156 |
|   | 10. | Lack of Use of Claimed Property | 156 |
|   | 11. | Article II of the United States Constitution | 157 |
|   | 12. | Act of State Doctrine | 158 |
|   | 13. | Extraterritorial Application of United States Law | 159 |
|   | 14. | Election of Remedies under Title III | 159 |
|   | 15. | Failure to Join an Indispensable Party | 160 |
|   | 16. | Purpose of Certified Claim | 161 |
|   | 17. | Statute of Limitations or Repose | 161 |
|   | 18. | Eighth Amendment | 163 |
|   | 19. | Non-U.S. Sailings | 165 |
| **VI.** | **CONCLUSION** | | **165** |

## OMNIBUS ORDER

**THIS CAUSE** is before the Court upon ten (10) pending summary judgment motions filed in the four (4) above-styled cases. The Court conducted a hearing on each summary judgment motion over the course of two (2) days. *See, e.g.*, *Havana Docks Corporation v. Carnival Corporation*, No. 19-cv-21724, ECF Nos. [442], [449]. The Court has reviewed the parties' memoranda and statements of facts, the record in each case, the applicable law, and is otherwise fully advised.

Plaintiff Havana Docks Corporation ("Havana Docks") filed separate actions to recover damages against Defendants Carnival Corporation d/b/a Carnival Cruise Line ("Carnival"); MSC Cruises S.A. ("MSC SA"), MSC Cruises SA Co. ("MSC Co."), and MSC Cruises (USA) Inc. ("MSC USA") (collectively, "MSC"); Royal Caribbean Cruises Ltd. ("Royal Caribbean"); and Norwegian Cruise Line Holdings Ltd. ("Norwegian"). The Defendants are four cruise operators whose ships used the Havana Cruise Port Terminal, also called the Sierra Maestra Terminal (the "Terminal"), when traveling to Havana, Cuba. Havana Docks claims each Defendant unlawfully trafficked in property confiscated by the Cuban Government—the Terminal and its piers—in violation of the Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C. §§ 6021, *et seq.*, referred to as the LIBERTAD Act or Helms-Burton Act.

Pending before the Court are the following motions for summary judgment:

**(1)** Defendants' Omnibus Motion for Summary Judgment, *Havana Docks Corporation v. Carnival Corporation*, No. 19-cv-21724, ECF No. [330]; *Havana Docks Corporation v. MSC Cruises, SA, et al.*, No. 19-cv-23588, ECF No. [216]; *Havana Docks Corporation v. Royal Caribbean Cruises Ltd.*, No. 19-cv-23590, ECF No. [137]; *Havana Docks Corporation v Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, ECF No. [227];

(2)      Plaintiff Havana Docks Corporation's Omnibus Motion for Partial Summary Judgment, *Havana Docks Corporation v. Carnival Corporation*, No. 19-cv-21724, ECF No. [336]; *Havana Docks Corporation v. MSC Cruises, SA, et al.*, No. 19-cv-23588, ECF No. [222]; *Havana Docks Corporation v. Royal Caribbean Cruises Ltd.*, No. 19-cv-23590, ECF No. [143]; *Havana Docks Corporation. v Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, ECF No. [232];

(3)      Carnival Corporation's Individual Motion for Summary Judgment, *Havana Docks Corporation v. Carnival Corporation*, No. 19-cv-21724, ECF No. [324];

(4)      Plaintiff Havana Docks Corporation's Individual Motion for Summary Judgment against Carnival Corporation, *Havana Docks Corporation v. Carnival Corporation*, No. 19-cv-21724, ECF No. [333];

(5)      MSC Cruises' Individual Motion for Summary Judgment, *Havana Docks Corporation v. MSC Cruises, SA, et al.*, No. 19-cv-23588, ECF No. [209];

(6)      Plaintiff Havana Docks Corporation's Individual Motion for Summary Judgment against MSC Cruises, SA & MSC Cruise (USA). Inc., *Havana Docks Corporation v. MSC Cruises, SA, et al.,* No. 19-cv-23588, ECF No. [225];

(7)      Defendant's [Royal Caribbean Cruises, Ltd.] Individual Motion for Summary Judgment, *Havana Docks Corporation v. Royal Caribbean Cruises Ltd.*, No. 19-cv-23590, ECF No. [132];

(8)      Plaintiff Havana Docks Corporation's Individual Motion for Summary Judgment Against Royal Caribbean Cruises, Ltd., *Havana Docks Corporation v. Royal Caribbean Cruises Ltd.*, No. 19-cv-23590, ECF No. [142];

(9)      Plaintiff Havana Docks Corporation's Individual Motion for Summary Judgment against Defendant Norwegian Cruise Line, Ltd., *Havana Docks Corporation v Norwegian Cruise*

*Line Holdings, Ltd.*, No. 19-cv-23591, ECF No. [229]; and

(10)   Norwegian's Individual Motion for Summary Judgment, *Havana Docks Corporation. v Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, ECF No. [230].

Also before the Court, and pertinent to the summary judgment motions, is Havana Docks' Motion to Exclude the Expert Opinions of Julian Ackert and Pablo Spiller. *Havana Docks Corporation v. Carnival Corporation*, No. 19-cv-21724, ECF No. [328]; *Havana Docks Corporation v. MSC Cruises, SA, et al.*, No. 19-cv-23588, ECF No. [214]; *Havana Docks Corporation v. Royal Caribbean Cruises Ltd.*, No. 19-cv-23590, ECF No. [138]; *Havana Docks Corporation v Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, ECF No. [226]. Magistrate Judge Chris M. McAliley issued a Report and Recommendation regarding Julian Ackert only. *Havana Docks Corporation v. Carnival Corporation*, No. 19-cv-21724, ECF No. [425]. Havana Docks filed partial Objections to the Report and Recommendation. *Havana Docks Corporation v. Carnival Corporation*, No. 19-cv-21724, ECF No. [430].[1] The Court has conducted a *de novo* review of the Report and Recommendation, the record in this case, and is otherwise fully advised. *See Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009) (citing 28 U.S.C. § 636(b)(1)).

Each Motion is ripe for the Court's consideration.

## I.   STATUTORY AND REGULATORY BACKGROUND

Since Fidel Castro seized power in Cuba in 1959, "communist tyranny and economic mismanagement" has plagued the island nation, substantially deteriorating the welfare and health of the Cuban people. *See* 22 U.S.C. § 6021(1)(A), (2). The communist Cuban Government has systematically repressed the Cuban people through, among other things, "massive and systemic

---

[1] In the interest of brevity and clarity, the Court will refer to each respective case as *Carnival*, *MSC*, *Royal Caribbean*, and *Norwegian* in place of its case number.

violations of human rights" and deprivations of fundamental freedoms. *Id.* § 6021(4), (24). In response, the United States has consistently sought to impose international sanctions against the Castro regime. *Id.* § 6021(8)–(10).

The result is a "pervasive" economic embargo against Cuba. *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1277 (11th Cir. 2013). But the federal regime governing the embargo "contains numerous exceptions, permitting certain kinds of transactions with Cuba through licensing as well as through complete exemptions." *Id.* The federal scheme "is designed to sanction strongly the Castro regime while simultaneously permitting humanitarian relief and economic transactions that will benefit the Cuban people." *Id.* at 1278. A brief description of the relevant legislative acts and executive regulations follows.

### A. Relevant Statutes

#### 1. *International Claims Settlement Act*

The International Claims Settlement Act ("Settlement Act"), 22 U.S.C. §§ 1621, *et seq.*, established the Foreign Claims Settlement Commission ("FCSC") (formerly called the International Claims Commission) to adjudicate claims against foreign governments that involve the expropriation of property belonging to nationals of the United States. *See Dames & Moore v. Regan*, 453 U.S. 654, 680–81 (1981) (discussing history of FCSC). In 1964, Congress amended the Settlement Act "to provide for the determination of the amount and validity of claims against the Government of Cuba . . . which have arisen since January 1, 1959[.]" 22 U.S.C. § 1643. The Settlement Act tasks the FCSC with determining "the amount and validity of claims by nationals of the United States against the Government of Cuba . . . arising since January 1, 1959 . . . for losses resulting from the nationalization . . . [of] property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States." 22

U.S.C. § 1643b(a). A claim certified by the FCSC under the Settlement Act serves as both conclusive proof of ownership of a property interest and as the presumptive measure of damage under the LIBERTAD Act. 22 U.S.C. §§ 6082(a)(2), 6083(a)(1). Since February 9, 2015, all FCSC Commission decisions issued under its Cuba claims program have been available online.[2]

### 2. *Cuban Democracy Act*

In 1992, Congress passed the Cuban Democracy Act of 1992 ("CDA"), 22 U.S.C. §§ 6001, *et seq.*, which "ramped up economic sanctions against the Cuban government while simultaneously permitting humanitarian relief to the Cuban people." *Odebrecht*, 715 F.3d at 1276. Four years later, following an unprovoked attack by Cuban military jets on an American civilian aircraft, *see* 22 U.S.C. § 6046 (Congressional condemnation of the Brothers to the Rescue incident), Congress passed the Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C. §§ 6021, *et seq.*, referred to as the LIBERTAD Act or Helms-Burton Act.

### 3. *LIBERTAD Act*

The LIBERTAD Act, effective March 12, 1996, aimed to address "the 36 years of communist tyranny and economic mismanagement by the Castro government" and improve "the welfare and health of the Cuban people." 22 U.S.C. § 6021(1), (2). Among the LIBERTAD Act's goals were "to assist the Cuban people in regaining their freedom and prosperity," § 6022(1), "to strengthen international sanctions against the Castro government," § 6022(2), and "to protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." § 6022(6).

To accomplish those goals, the LIBERTAD Act codified "[t]he economic embargo of Cuba" and "the regulatory sanctions that were in place on March 1, 1996." *Odebrecht*, 715 F.3d at

---

[2] *Final Opinions and Orders*, United States Department of Justice, https://www.justice.gov/fcsc/final-opinions-and-orders-5#Cuba. (last visited Mar. 16, 2022).

1277; *see* 22 U.S.C. § 6032(h) (stating that "[t]he economic embargo of Cuba, as in effect on March 1, 1996, including all restrictions under part 515 of title 31, Code of Federal Regulations, shall be in effect on March 12, 1996, and shall remain in effect, subject to section 6064 of this title."); *see also* 22 U.S.C. § 6023(7)(A) (defining "economic embargo of Cuba" as "the economic embargo (including all restrictions on trade or transactions with, and travel to or from, Cuba, and all restrictions on transactions in property in which Cuba or nationals of Cuba have an interest) that was imposed against Cuba pursuant to section 2370(a) of this title, section 4305(b) of Title 50, the Cuban Democracy Act of 1992 (22 U.S.C. 6001 and following), or any other provision of law or any other provision of law[.]").

Title III of the LIBERTAD Act provides a private cause of action to victims of confiscations by the Cuban Government. *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006). Specifically, the LIBERTAD Act states that "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages" and attorneys' fees and costs. 22 U.S.C. § 6082(a)(1)(A). But the LIBERTAD Act excludes from trafficking acts "transactions and uses of property incident to lawful travel to Cuba." 22 U.S.C. § 6023(13)(B)(iii). The LIBERTAD Act defines a "United States national" as "any United States citizen" or "any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States." 22 U.S.C. § 6023(15)(A)–(B).

The LIBERTAD Act grants the President the authority to suspend the right to bring a cause of action under Title III at six-month intervals. *Glen*, 450 F.3d at 1255; *see* 22 U.S.C. § 6085(c). Every President has done so from 1996 to May 2019, until President Donald J. Trump allowed the

suspension to expire. *N. Am. Sugar Indus. Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, No. 20-CV-22471, 2021 WL 3741647, at *2 (S.D. Fla. Aug. 24, 2021).

### 4.  *Trade Sanctions Reform and Export Enhancement Act*

In 2000, Congress passed the Trade Sanctions Reform and Export Enhancement Act ("TSRA") of 2000, 22 U.S.C. §§ 7201, *et seq.*, which "loosened the restrictions on exporting agricultural and medical products to Cuba." *Odebrecht*, 715 F.3d at 1277; *see* 22 U.S.C. § 7209(a). At the same time, the TSRA reinforced the "[p]rohibition on travel relating to tourist activities." § 7209(b)(1). The TSRA clarified that:

> Notwithstanding any other provision of law or regulation, the Secretary of the Treasury, or any other Federal official, may not authorize the travel-related transactions listed in subsection (c) of section 515.560 of title 31, Code of Federal Regulations, either by a general license or on a case-by-case basis by a specific license for travel to, from, or within Cuba for tourist activities.

*Id.*

> The TSRA defines "tourist activities" as:

> any activity with respect to travel to, from, or within Cuba that is not expressly authorized in subsection (a) of this section, in any of paragraphs (1) through (12) of section 515.560 of title 31, Code of Federal Regulations, or in any section referred to in any of such paragraphs (1) through (12) (as such sections were in effect on June 1, 2000).

§ 7209(b)(2).

### B.  **Relevant Regulations**

#### 1.  *Cuban Asset Control Regulations*

In 1963, under the Trading with the Enemy Act ("TWEA"), 50 U.S.C. §§ 4301–41, the Treasury Department's Office of Foreign Assets Control ("OFAC") issued the Cuban Assets Control Regulations ("CACR"), 31 C.F.R. § 515.101. "Broadly speaking, the regulations prohibit, unless specifically authorized, any dealing in any property in which Cuba or a Cuban national has

an interest of any nature." *Odebrecht*, 715 F.3d at 1276; *see* 31 C.F.R. § 515.201(a)–(b).

As of 1996, when the LIBERTAD Act was enacted, the CACR permitted travel to Cuba under a general license to government officials, regularly employed journalists, and family members visiting "close relatives" with an "extreme humanitarian need," but for a limited period. 31 C.F.R. § 515.560(a)(1)(i)–(iii) (1996). The CACR also authorized travel to Cuba via specific licenses to family members outside the general limits, for other humanitarian needs, for "professional research and similar activities," to freelance journalists, for "clearly defined educational activities," for "religious activities," to "human rights organizations investigating human rights violations," and "for purposes related to the exportation, importation, or transmission of information or informational materials." § 515.560(b) (1996). The CACR clarified that no provision "authorizes transactions in connection with tourist travel to Cuba." § 515.560(a)(2), (b)(2) (1996).

### 2. *OFAC's CACR Amendments*

In 1999, OFAC amended the CACR to authorize travel to Cuba via general or specific license under twelve (12) travel categories of activities. § 515.560 (1999). Those categories—in effect in 2000 when the TSRA was enacted—were: (1) "Family visits"; (2) "Official business of the U.S. government, foreign governments, and certain intergovernmental organizations"; (3) "Journalistic activity"; (4) "Professional research"; (5) "Educational activities"; (6) "Religious activities"; (7) "Public performances, clinics, workshops, athletic and other competitions, and exhibitions"; (8) "Support for the Cuban people"; (9) "Humanitarian projects"; (10) "Activities of private foundations or research or educational institutes"; (11) "Exportation, importation, or transmission of information or informational materials"; and (12) "Certain export transactions that may be considered for authorization under existing Department of Commerce regulations and

guidelines with respect to Cuba or engaged in by U.S.-owned or controlled foreign firms." § 515.560(a)(1)–(12) (2000). The CACR also underscored that "[n]othing in this section authorizes transactions in connection with tourist travel to Cuba." § 515.560(g) (2000).

In January 2011, OFAC amended § 515.565—the "educational activities" travel regulation—to authorize travel, under a specific license, for "exchanges not involving academic study pursuant to a degree program when those exchanges take place under the auspices of an organization that sponsors and organizes such programs to promote people-to-people contact." 76 Fed. Reg. 5072-01, (Jan. 28, 2011); 31 C.F.R. § 515.565(b)(2) (2011). Section 515.565 clarified, however, that "[t]ransactions related to activities that are primarily tourist-oriented, including self-directed educational activities that are intended only for personal enrichment, will not be authorized pursuant to this section." § 515.565(c) (2011).

In January 2015, OFAC amended the CACR "to authorize travel-related transactions and other transactions incident to activities within the 12 existing travel categories in OFAC's regulations . . . without the need for case-by-case specific licensing, while continuing not to authorize travel for tourist activities, which is prohibited by statute." 80 Fed. Reg. 2291-01 (Jan. 16, 2015); *see* § 515.560(a) (2015). Under those amendments, travel "meant to promote people-to-people contact" (commonly referred to as people-to-people travel), could be done by general license, but under certain conditions:

(1) The exchanges take place under the auspices of an organization that is a person subject to U.S. jurisdiction and that sponsors such exchanges to promote people-to-people contact;

(2) Travel-related transactions pursuant to this authorization must be for the purpose of engaging, while in Cuba, in a full-time schedule of activities intended to enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities;

(3) Each traveler has a full-time schedule of educational exchange activities that

will result in meaningful interaction between the traveler and individuals in Cuba;

(4) An employee, paid consultant, or agent of the sponsoring organization accompanies each group traveling to Cuba to ensure that each traveler has a full-time schedule of educational exchange activities; and

(5) The predominant portion of the activities engaged in by individual travelers is not with individuals or entities acting for or on behalf of a prohibited official of the Government of Cuba . . . or a prohibited member of the Cuban Communist Party[.]

§ 515.565(b)(1)–(5) (2015).

The amended regulations in § 515.565 stated that "[t]ransactions related to activities that are primarily tourist-oriented, including self-directed educational activities that are intended only for personal enrichment, are not authorized pursuant to this section." § 515.565(c) (2015). Section 515.560 also stated that "[n]othing in this section authorizes transactions in connection with tourist travel to Cuba." § 515.560(f) (2015).

Given that OFAC had removed the requirement to apply for a specific license to engage in people-to-people travel under § 515.565, OFAC added examples within § 515.565 of what activities would qualify for a general license. For instance, an organization would satisfy the general license if it sponsored an exchange "for individuals to learn side-by-side with Cuban individuals in areas such as environmental protection or the arts" where "[t]he travelers will have a full-time schedule of educational exchange activities that will result in meaningful interaction between the travelers and individuals in Cuba." § 515.565 (2015) (example). By contrast, "[a]n organization that sponsors and organizes trips to Cuba in which travelers engage in individually selected and/or self-directed activities would not qualify for the general license." *Id.* Rather, "[a]uthorized trips are expected to be led by the organization and to have a full-time schedule of activities in which the travelers will participate." *Id.*

In January 2015, OFAC also amended § 515.572 to allow common carrier services by

aircraft to and from Cuba by general license. § 515.572(a)(2) (Jan. 2015). In September 2015, OFAC removed the limitation by aircraft, effectively covering vessels. *See* § 515.572(a)(2) (Sept. 2015). OFAC also authorized common carrier vessels "to provide lodging services onboard such vessels to persons authorized to travel to or from Cuba pursuant to this part during the period of time the vessel is traveling to, from, or within Cuba, including when docked at a port in Cuba." § 515.572(a)(4) (Sept. 2015). OFAC added a note to the regulation, clarifying that common carrier vessels could transport "[p]ersons subject to U.S. jurisdiction who are traveling to or from Cuba pursuant to a general license under one of the 12 categories of travel listed in § 515.560 or under a specific license from [OFAC]." § 515.572 (Sept. 2015) (note). This note is still part of the regulation in the present version of § 515.572. *See* § 515.572 (note).

In March 2016, OFAC expanded § 515.565 to remove the requirement of a sponsoring organization for people-to-people travel, thus allowing self-guided people-to-people travel. 81 Fed. Reg. 13989-01 (Mar. 16, 2016); *see* § 515.565(b) (2016). People-to-people travel, however, still required "a full-time schedule of activities intended to enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities," and "a full-time schedule of educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba." § 515.565(b)(1)–(2) (2016). OFAC also added a note to § 515.565 stating that "[a]n organization that sponsors and organizes trips to Cuba in which travelers engage in individually selected and/or self-directed activities would not qualify for the general license." § 515.565(b) (2016) (note). Rather, "[a]uthorized trips are expected to be led by the organization and to have a full-time schedule of activities in which the travelers will participate." *Id.* Moreover, § 515.565 reiterated that "[t]ransactions related to activities that are primarily tourist-oriented are not authorized pursuant to this section."

§ 515.565(c) (2016). The regulation set forth specific examples:

Example 1 to § 515.565(b): An organization wishes to sponsor and organize educational exchanges not involving academic study pursuant to a degree program for individuals to learn side-by-side with Cuban individuals in areas such as environmental protection or the arts. The travelers will have a full-time schedule of educational exchange activities that will result in meaningful interaction between the travelers and individuals in Cuba. The organization's activities qualify for the general license, and the individual may rely on the entity sponsoring the travel to satisfy his or her recordkeeping requirement.

Example 2 to § 515.565(b): An individual plans to travel to Cuba to participate in discussions with Cuban artists on community projects, exchanges with the founders of a youth arts program, and to have extended dialogue with local city planners and architects to learn about historical restoration projects in Old Havana. The traveler will have a full-time schedule of such educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba. The individual's activities qualify for the general license, provided that the individual satisfies the recordkeeping requirement.

Example 3 to § 515.565(b): An individual plans to travel to Cuba to participate in discussions with Cuban farmers and produce sellers about cooperative farming and agricultural practices and have extended dialogue with religious leaders about the influence of African traditions and religion on society and culture. The traveler fails to keep any records of the travel. Although the traveler will have a full-time schedule of educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba, the traveler's failure to keep records means that the individual's activities do not qualify for the general license.

Example 4 to § 515.565(b): An individual plans to travel to Cuba to rent a bicycle to explore the streets of Havana, engage in brief exchanges with shopkeepers while making purchases, and have casual conversations with waiters at restaurants and hotel staff. None of these activities are educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba, and the traveler's trip does not qualify for the general license.

Example 5 to § 515.565(b): An individual plans to travel to Cuba to participate in discussions with Cuban farmers and produce sellers about cooperative farming and agricultural practices and have extended dialogue with religious leaders about the influence of African traditions and religion on society and culture. The individual also plans to spend a few days engaging in brief exchanges with Cuban food vendors while spending time at the beach. Only some of these activities are educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba, and the traveler therefore does not have a full-time schedule of such activities on each day of the trip. The trip does not qualify

for the general license.

§ 515.565 (2016).

In October 2017, the Trump Administration issued a National Security Presidential Memorandum that sought, among other objectives, to ensure "adherence to the statutory ban on tourism to Cuba" and "that engagement between the United States and Cuba advances the interests of the United States and the Cuban people." 82 Fed. Reg. 48875-04 (Oct. 20, 2017). In response, OFAC amended the CACR to remove self-guided people-to-people travel, emphasizing that such travel was only authorized if it constituted "a full-time schedule of activities that enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities; and result[s] in meaningful interactions with individuals in Cuba." 82 Fed. Reg. 51998-01 (Nov. 9, 2017); *see* § 515.565(b)(1)–(4) (2017). The regulation maintined that, "[t]ransactions related to activities that are primarily tourist-oriented are not authorized pursuant to this section." § 515.565(f) (2017).

In June 2019, following a foreign policy address from National Security Advisor Ambassador John Bolton "that the Department of the Treasury would further restrict non-family travel," OFAC "remove[d] the authorization for group people-to-people educational travel in § 515.565(b)." 84 Fed. Reg. 25992-01 (June 5, 2019); *see* § 515.565(b) (2019).

## II.  PROCEDURAL BACKGROUND

### A.  Havana Docks' Allegations

Havana Docks filed separate actions for damages under Title III of the LIBERTAD Act against each cruise operator (and some affiliates): (1) Carnival; (2) MSC SA, MSC Co., and MSC USA; (3) Royal Caribbean; and (4) Norwegian. *Carnival*, ECF No. [149]; *MSC*, ECF No. [104]; *Royal Caribbean*, ECF No. [46]; *Norwegian*, ECF No. [56]. In each case, Havana Docks alleges

that it is "a U.S. national as defined by 22 U.S.C. § 6023(15)" and "the rightful owner of an interest in and certified claim to certain commercial waterfront real property in the Port of Havana, Cuba identified specifically by [Cuba] as the Havana Cruise Port Terminal." *E.g.*, *Carnival*, ECF No. [149] ¶ 6. Havana Docks claims that it "and its predecessor in interest constructed and managed the [Terminal]," and that Havana Docks "owned, possessed, used and managed" the Terminal until its confiscation by the Cuban Government in 1960. *Id.* ¶ 7.

The picture below depicts the Terminal. *Id.*, ECF Nos. [337] ¶ 18, [367] ¶ 18.



The first pier is the San Francisco, the second pier is the Machina, and the third is the Santa Clara. *Id.*, ECF Nos. [331] ¶ 22, [331-1] at 3 n.1, [388] ¶ 22.

Havana Docks alleges that the FCSC certified its ownership interest in the Terminal under Certified Claim No. CU-2492 (the "Certified Claim"). *E.g.*, *id.*, ECF No. [149] ¶ 12. The most significant portion of the Certified Claim's valuation is a concession ("Concession") from the Cuban Government, which "granted [Havana Docks] a term of 99 years for the use of, improvement, construction upon, operation and management of the [Terminal]." *E.g.*, *id.*, ECF No.

[149] ¶ 15. Havana Docks contends that upon confiscation, 44 years remained on the Concession. *Id.* The Concession states that Havana Docks would be entitled to indemnification if its property was expropriated under Article 50 of the Law of Ports, but the Cuban Government did not pay the indemnity. *Id.* ¶¶ 15–18.

Havana Docks claims that Defendants "knowingly and intentionally commenced, conducted, and promoted [their] commercial cruise line business to Cuba using the [Terminal] by regularly embarking and disembarking its passengers on the [Terminal] without the authorization of Plaintiff." *Carnival*, ECF No. [149] ¶ 40; *Royal Caribbean*, ECF No. [46] ¶ 22; *Norwegian*, ECF No. [56] ¶ 21. Havana Docks' claim relative to MSC is slightly different; it alleges that MSC "knowingly and intentionally commenced, conducted, and promoted their commercial cruise line business from Miami to Cuba using the [Terminal][.]" *MSC*, ECF No. [104] ¶ 23. Havana Docks alleges that Defendants "knowingly and intentionally participated in and profited from the communist Cuban Government's possession of the [Terminal] without the authorization of Plaintiff." *Carnival*, ECF No. [149] ¶ 41; *MSC*, ECF No. [104] ¶ 24; *Royal Caribbean*, ECF No. [46] ¶ 23; *Norwegian*, ECF No. [56] ¶ 22.

Havana Docks alleges that (1) Carnival used the Terminal from 2016 to 2019, *Carnival*, ECF No. [149] ¶¶ 40–44; (2) MSC used the Terminal from November 1, 1996, to June 2019, *MSC*, ECF No. [104] ¶¶ 23–29; (3) Royal Caribbean used the Terminal for two years beginning on April 23, 2017, *Royal Caribbean*, ECF No. [46] ¶ 22; and (4) Norwegian used the Terminal for two years beginning March 2017, *Norwegian*, ECF No. [56] ¶ 21.

Havana Docks further alleges that Carnival "knowingly and intentionally caused, directed, participated in, and/or profited from" trafficking by Airtours Plc ("Airtours"), or "otherwise engaged in" trafficking through Airtours, which used the Terminal from 1996 through 2001.

*Carnival*, ECF No. [149] ¶¶ 24–30. Havana Docks similarly contends that Carnival engaged in the same conduct with Costa Crociere S.p.A. ("Costa"), a wholly-owned subsidiary that used the Terminal in 1997 and renovated and managed the Terminal in a joint venture with the Cuban Government. *Id.* ¶¶ 31–39. In addition, Havana Docks alleges that Royal Caribbean controlled and operated four cruise brands, including Silversea Cruises. *Royal Caribbean*, ECF No. [46] ¶ 2.

### B.  The Omnibus Summary Judgment Motions

#### 1.  *Defendants' Omnibus Motion*

Defendants' Omnibus Motion seeks summary judgment on Havana Docks' claims based on four grounds: (1) Havana Docks did not own the Terminal but only a "limited right to operate a cargo business in which Defendants did not and could not have trafficked"; (2) Defendants' cruises to Cuba fall within the lawful travel exception; (3) Havana Docks lacks statutory standing because it is not a United States national; and (4) Havana Docks' interpretation of Title III violates the United States Constitution in several ways. *Carnival*, ECF No. [330] at 2–3.

#### 2.  *Havana Docks' Omnibus Motion*

Havana Docks' Omnibus Motion seeks summary judgment on Defendants' common affirmative defenses: (1) the lawful travel exception,[3] (2) the *Ex Post Facto* Clause of the United States Constitution,[4] (3) The Fifth Amendment Due Process Clause,[5] (4) expiration of the

---

[3] *Carnival*, ECF No [160] at 18 (Def. Nos. 1 and 2); *MSC*, ECF No. [115] at 16 (MSC USA and MSC Co. Def. Nos. 1 and 2), [133] at 15 (MSC SA Def. Nos. 1 and 2; *Royal Caribbean*, ECF No. [59] at 5 (Def. No. 1), *Norwegian*, ECF No. [107] at 14 (Def. Nos. 1 and 2).

[4] *Carnival*, ECF No. [160] at 19 (Def. No. 6); *MSC*, ECF Nos. [115] at 17 (MSC USA and MSC Co. Def. No. 6), [133] at 16 (MSC SA Def. No. 6), *Royal Caribbean*, ECF No. [59] at 6 (Def. No. 10), *Norwegian*, ECF No. [107] at 14 (Def. No. 4).

[5] *Carnival*, ECF No. [160] at 18 (Def. No. 4), *MSC*, ECF Nos. [115] at 16 (MSC USA and MSC Co. Def. No. 4), [133] at 15 (MSC S.A. Def. No. 4), *Royal Caribbean*, ECF No. [59] at 5, 6, 9 (Def. Nos. 3, 4, 11, 25, 26); *Norwegian*, ECF No. [107] at 18 (Def. No. 21).

Concession,[6] (5) failure to state a claim,[7] (6) lack of knowledge and intent,[8] (7) lack of standing due to lack of injury-in-fact,[9] (8) lack of indemnity right,[10] (9) lack of causation,[11] (10) lack of use of claimed property,[12] (11) Article II of the United States Constitution,[13] (12) extraterritorial application of United States law,[14] (13) Act of State Doctrine,[15] (14) election of remedies under

---

[6] *Carnival*, ECF No. [160] at 20 (Def. No. 14); *MSC*, ECF Nos. [115] at 18 (MSC USA and MSC Co. Def. No. 13), [133] at 17 (MSC SA Def. No. 13); *Royal Caribbean*, ECF No. [59] at 5 (Def. No. 2); *Norwegian*, ECF No. [107] at 16 (Def. No. 12).

[7] *Carnival*, ECF No. [160] at 20 (Def. No. 15); *MSC*, ECF Nos. [115] at 18 (MSC USA and MSC Co. Def. No. 14), [133] at 17 (MSC SA Def. No. 14); *Royal Caribbean*, ECF No. [59] at 9 (Def. Nos. 22 and 28); *Norwegian*, ECF No. [107] at 16 (Def. No. 13).

[8] *MSC*, ECF No. [115] at 18 (MSC USA and MSC Co. Def. No. 12), [133] at 17 (MSC SA Def. No. 12); *Royal Caribbean*, ECF No. [59] at 9 (Def. Nos. 21 and 27); *Norwegian*, ECF No. [107] at 16 (Def. No. 11). Carnival withdrew this defense. *See Carnival*, ECF No. [279] at 4.

[9] *Carnival*, ECF No. [160] at 19 (Def. No. 8); *MSC*, ECF Nos. [115] at 17 (MSC USA and MSC Co. Def. No. 8), [133] at 18 (MSC SA Def. No. 8); *Royal Caribbean*, ECF No. [59] at 6 (Def. No. 8); *Norwegian*, ECF No. [107] at 15 (Def. No. 6).

[10] *Carnival*, ECF No. [160] at 22 (Def. No. 24); *MSC*, ECF Nos. [115] at 20 (MSC USA and MSC Co. Def. No. 20), [133] at 19 (MSC SA's Def. No. 21); *Royal Caribbean*, ECF No. [59] at 8 (Def. No. 24); *Norwegian*, ECF No. [107] at 17 (Def. No. 19).

[11] *Carnival*, ECF No. [160] at 21 (Def. No. 18); *MSC*, ECF Nos. [115] at 19 (MSC USA and MSC Co. Def. No. 17), [133] at 18 (MSC SA Def. No. 17); *Royal Caribbean*, ECF No. [59] at 9 (Def. No. 29); *Norwegian*, ECF No. [107] at 17 (Def. No. 16).

[12] *Carnival*, ECF No. [160] at 20 (Def. No. 8); *MSC*, ECF Nos. [115] at 19 (MSC USA and MSC Co. Def. No. 15), [133] at 17–18 (MSC SA Def. No. 15); *Royal Caribbean*, ECF No. [59] at 7 (Def. No. 13); *Norwegian*, ECF No. [107] at 16 (Def. No. 14).

[13] *Carnival*, ECF No. [160] at 19 (Def. No. 7); *MSC*, ECF Nos. [115] at 17 (MSC USA and MSC Co. Def. No. 7), [133] at 16 (MSC SA's Def. No. 7); *Royal Caribbean*, ECF No. [59] at 8 (Def. No. 19); *Norwegian*, ECF No. [107] at 15 (Def. No. 5).

[14] *Carnival*, ECF No. [160] at 19 (Def. No. 5); *MSC*, ECF Nos. [115] at 17 (MSC USA and MSC Co. Def. 5); [133] at 16 (MSC SA Def. No. 5); *Royal Caribbean*, ECF No. [59] at 8 (Def. No. 9); *Norwegian*, ECF No. [107] at 14 (Def. No. 3).

[15] *Carnival*, ECF No. [160] at 21 (Def. No. 19); *MSC*, ECF Nos. [115] at 19 (MSC USA and MSC SA Def. No. 18), [133] at 18 (MSC SA Def. No. 18); *Royal Caribbean*, ECF No. [59] at 7 (Def. No. 16); *Norwegian*, ECF No. [107] at 17 (Def. No. 17).

Title III,[16] (15) failure to join an indispensable party,[17] and (16) purpose of Certified Claim.[18] *Carnival*, ECF No. [336] at 10–31. Havana Docks also seeks summary judgment on the issue of its statutory standing, including that it is a United States national under the LIBERTAD Act. *Id.* at 5, 8–10.

### C. The Individual Summary Judgment Motions

#### 1. *Havana Docks*

In each of its Individual Summary Judgment Motions, Havana Docks argues that it has established the elements under Title III of the LIBERTAD Act as a matter of law: (1) the Cuban Government confiscated its property on or after January 1, 1959; (2) Havana Docks owns the claim to the confiscated property; (3) Havana Docks acquired the ownership of that claim before the statutory date; (4) Havana Docks is a United States national; (5) Defendants knowingly and intentionally trafficked in the confiscated property; and (6) the trafficking occurred after November 1, 1996. *Carnival*, ECF No. [333] at 2–9; *MSC*, ECF No. [225] at 2–8; *Royal Caribbean*, ECF No. [142] at 2–10; *Norwegian*, ECF No. [229] at 2–9.

Havana Docks also moves for summary judgment on the affirmative defenses raised by Defendants. As to Carnival, Havana Docks seeks summary judgment regarding Carnival's first and second affirmative defenses (lawful travel exception), third affirmative defense (statute of limitations or repose), twelfth affirmative defense (Eighth Amendment), and twenty-ninth

---

[16] *Carnival*, ECF No. [160] at 20–21 (Def. No. 17); *MSC*, ECF Nos. [115] at 19 (MSC USA and MSC Co. Def. No. 16), [133] at 18 (MSC SA Def. No. 16); *Royal Caribbean*, ECF No. [59] at 7 (Def. No. 14); *Norwegian*, ECF No. [107] at 16 (Def. No. 15).

[17] *Carnival*, ECF No. [160] at 21 (Def. No. 21); *MSC*, ECF Nos. [115] at 18 (MSC USA and MSC Co. Def. No. 11), [133] at 17 (MSC SA Def. No. 11); *Royal Caribbean*, ECF No. [59] at 7 (Def. No. 15); *Norwegian*, ECF No. [107] at 18–19 (Def. No. 22).

[18] *Carnival*, ECF No. [160] at 23 (Def. No. 28); *MSC*, ECF Nos. [115] at 20 (MSC USA and MSC Co. Def. No. 20); ECF No. [133] at 19 (MSC SA Def. No. 20); *Royal Caribbean*, ECF No. [59] at 8 (Def. No. 18).

affirmative defense (non-U.S. sailings). *Carnival*, ECF No. [333] at 10–19.

As to MSC, Havana Docks seeks summary judgment on MSC's first and second affirmative defenses (lawful travel exception), third affirmative defense (statute of limitations or repose), twenty-third affirmative defense (licensing), twenty-fourth affirmative defense (waiver), and twenty-fifth affirmative defense (equitable estoppel), and twenty-sixth affirmative defense (laches). *MSC*, ECF No. [225] at 9–21.

As to Royal Caribbean, Havana Docks seeks summary judgment on Royal Caribbean's first affirmative defense (lawful travel exception), ninth affirmative defense (foreign government conduct), twelfth affirmative defense (venue), twentieth affirmative defense (Eighth Amendment), and twenty-third affirmative defense (statute of limitations). *Royal Caribbean*, ECF No. [142] at 10–21.

As to Norwegian, Havana Docks seeks summary judgment on Norwegian's first and second affirmative defenses (lawful travel exception), tenth affirmative defense (Eighth Amendment), and twentieth affirmative defense (statute of limitations/repose). *Norwegian*, ECF No. [229] at 9–20.

### 2. *Carnival*

Carnival moves for summary judgment on three grounds. First, Carnival argues that it is not liable for its ownership interest in Costa and Airtours. *Carnival*, ECF No. [324] at 7–14. Second, Carnival contends that the use of the Terminal by Costa, Airtours, and Carnival was incident to and necessary for the conduct of lawful travel. *Id.* at 7–14, 18–21. Third, Carnival maintains that any claim based on pre-2004 conduct is time-barred, and the "continuing violation" theory is inapplicable. *Id.* at 14–18.

### 3. *MSC*

MSC moves for summary judgment on three grounds. First, MSC contends that they meet the lawful travel exception. *MSC*, ECF No. [209] at 8–13. Second, MSC argues that MSC Co. and MSC USA did not engage in commercial activity or benefit from the use of the Terminal to constitute trafficking. *Id.* at 13–14. Third, MSC submits that there is no evidence that they trafficked knowingly and intentionally. *Id.* at 15–18.

As a preliminary matter, Havana Docks has abandoned any claim that MSC Co. trafficked under the LIBERTAD Act. *See Cusick v. Yellowbook, Inc.*, 607 F. App'x 953, 954 n.1 (11th Cir. 2015) (holding that district court may deem abandoned claims not addressed in response to a motion for summary judgment). MSC argues in its individual summary judgment motion that MSC Co. is "an inactive Florida corporation which has never had any employees, office and has never performed any business activities," and did not commit a trafficking act. *MSC*, ECF No. [209] at 14 (emphasis in original). Havana Docks does not address that contention in its response. *Id.*, ECF No. [258]. Notably, Havana Docks' individual summary judgment motion is directed only against MSC SA and MSC USA. *Id.*, ECF No. [225]. In its Response, MSC correctly points out that the omission shows that Havana Docks has dropped its claim against MSC Co. *Id.*, ECF No. [256] at 22. Given Havana Docks' lack of argument, MSC Co. is entitled to summary judgment. *See Cusick*, 607 F. App'x at 954 n.1.

### 4. *Royal Caribbean*

Royal Caribbean moves for summary judgment on four grounds. First, Royal Caribbean argues that it is not liable for cruises to Cuba conducted by its subsidiary, Silversea Cruises. *Royal Caribbean*, ECF No. [132] at 2–6. Second, Royal Caribbean contends that it meets the lawful travel exception. *Id.* at 6–9. Third, Royal Caribbean submits that there is no evidence that it acted

with the requisite knowledge and intent. *Id.* at 9–11. Fourth, Royal Caribbean maintains that Havana Docks' time-limited Concession expired in 2004, precluding a finding of trafficking for cruises that used the Terminal after that date. *Id.* at 12.

### 5. *Norwegian*

Norwegian moves for summary judgment on two grounds. First, Norwegian contends that it is legally entitled to the lawful travel exception. *Norwegian*, ECF No. [230] at 6–15. Second, Norwegian submits that there is no evidence that it acted with knowledge and intent. *Id.* at 15–19.

## III.   MATERIAL FACTS

Based on the parties' respective statements of material facts, along with the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.[19]

---

[19] Havana Docks filed a statement of facts in support of its omnibus motion for partial summary judgment. *Carnival*, ECF No. [337], Carnival filed a counter statement, *id.*, ECF No. [367], and Havana Docks filed a reply statement, *id.*, ECF No. [396]. Defendants filed a statement of facts in support of their omnibus motion for summary judgment, *id.*, ECF No. [331], Havana Docks filed a counter statement, *id.* at ECF No. [388], and Defendants filed a reply statement, *id.*, ECF No. [401].

Havana Docks filed a statement of facts in support of its individual motion for summary judgment against Carnival, *Carnival*, ECF No. [332]. Carnival responded. *Id.*, ECF No. [374]. Carnival also filed a statement of facts in support of its individual summary judgment motion. *Id.*, ECF No. [326]. Havana Docks responded, *id.*, ECF No. [377], and Carnival filed a reply, *id.*, ECF No. [404].

Havana Docks filed a statement of facts in support of its individual motion for summary judgment against MSC, *MSC*, ECF No. [224]. MSC filed a response. *Id.*, ECF No. [253]. MSC also filed a statement of facts in support of its individual motion for summary judgment. *Id.*, ECF No. [210]. Havana Docks responded, adding additional facts, *id.*, ECF No. [259], to which MSC filed a reply, *id.*, ECF No. [273].

Havana Docks filed a statement of facts in support of its individual motion for summary judgment against Royal Caribbean, *Royal Caribbean*, ECF No. [141]. Royal Caribbean filed a response, adding additional facts, *id.*, ECF No. [172], to which Havana Docks filed a reply, *id.*, ECF No. [205]. Royal Caribbean also filed a statement of facts in support of its individual motion for summary judgment. *id.*, ECF No. [133]. Havana Docks responded, adding additional facts, *id.*, ECF No. [183], to which Royal Caribbean filed a reply, *id.*, ECF No. [202].

Havana Docks filed a statement of facts in support of its individual motion for summary judgment against Norwegian, *Norwegian*, ECF No. [228]. Norwegian filed a response, adding additional facts, *id.*, ECF No. [282], to which Havana Docks filed a reply, *id.*, ECF No. [310]. Norwegian also filed a statement of facts in support of its individual motion for summary judgment. *Id.*, ECF No. [234]. Havana Docks filed a

### A.  Havana Docks

The following facts relate to this issue of Havana Docks' statutory standing as a United States national:

Havana Docks was incorporated in Delaware in 1917. *Carnival*, ECF Nos. [337] ¶ 1, [331] ¶ 29, [367] ¶ 1, [388] ¶ 29. Pursuant to its articles of incorporation, Havana Docks' stated purpose was to acquire the Concession from the Port of Havana Docks Company. *Id.*, ECF No. [318-27] at 4. Since the Cuban Government confiscated its property, part of Havana Docks' business has been to maintain its corporate existence in the event it is able to recover on its Certified Claim. *Id.*, ECF Nos. [388] ¶ 114, [401] ¶ 114. Havana Docks also manages some income-producing marketable assets. *Id.*, ECF Nos. [388] ¶ 115, [401] ¶ 115. In April 2021, the Delaware Secretary of State certified that Havana Docks has remained in good standing and is authorized to transact business. *Id.*, ECF No. [318-29].

Havana Docks' corporate address is 215 Southland Drive, Lexington, Kentucky. *Id.*, ECF Nos. [331-118] at 9, [388] ¶ 113, [401] ¶ 113. The address also corresponds to Bank of the Bluegrass & Trust Company. *Id.*, ECF Nos. [318-1] at 54, [331-113] at 7. Defendants contend that Havana Docks is not registered to do business in Kentucky. *Id.*, ECF No. [331] ¶ 44. Havana Docks does not dispute this; rather, it contends that Kentucky law allows Havana Docks to engage in significant activities without registering to do business. *Id.*, ECF No. [388] ¶ 44.

In 2011, Mickael Behn, then Havana Docks' Vice President, Secretary, and a director, and Aphra Behn, then also Havana Docks' Vice President and a director, engaged Jerry Johnson to maintain Havana Docks' corporate status as active and in good standing and to manage Havana Docks' investments. *Id.*, ECF Nos. [337] ¶ 50, [367] ¶ 50. Jerry Johnson is a banker with a prior

---

response, adding additional facts, *id.* at ECF No. [284], to which Norwegian filed a reply, *id.*, ECF No. [309].

banking relationship with the Behn family. *Id.*, ECF No. [318-1] at 5. He works at Bank of the Bluegrass & Trust Company. *Id.*, ECF No. [318-1] at 5.

In 2018, Johnson became Havana Docks' Secretary and Treasurer. *Id.*, ECF Nos. [337] ¶ 51, [367] ¶ 51; *see id.*, ECF No. [331-112] (Johnson deposition). Havana Docks states that Johnson also became Havana Docks' Vice President and Comptroller; Defendants dispute those additional titles. *Id.*, ECF Nos. [337] ¶ 51, [367] ¶ 51.

In 2019, when Havana Docks filed these actions, Havana Docks had two directors and officers: Mickael Behn and Jerry Johnson. *Id.*, ECF Nos. [331] ¶ 30, [388] ¶ 30. In 2019, Mickael Behn was Havana Docks' President, a director, and a shareholder, and Jerry Johnson was Havana Docks' Secretary and Treasurer, but not a shareholder. *Id.*, ECF Nos. [331] ¶¶ 31, 33, [388] ¶¶ 31, 33. Since 1999, Mickael Behn's primary residence is in London, United Kingdom. *Id.*, ECF Nos. [331] ¶ 36, [388] ¶ 36. At the time these lawsuits were filed, Johnson's primary place of residence was Lexington, Kentucky. *Id.*, ECF Nos. [331] ¶ 37, [388] ¶ 37. As of December 2020, Behn had not been to Kentucky since he was a child. *Id.*, ECF Nos. [331] ¶ 45, [388] ¶ 45. Havana Docks' historical corporate records are kept in Behn's family home in Miami. *Id.*, ECF Nos. [331] ¶ 58, [388] ¶ 58.

Havana Docks has no employees. *Id.*, ECF Nos. [388] ¶ 111, [401] ¶ 111. Mickael Behn receives a monthly distribution of $250.00 for "work on Havana Docks." *See id.*, ECF No. [331-135]. Jerry Johnson received no stipend. *Id.*, ECF Nos. [331] ¶ 61, [388] ¶ 61.

Under Havana Docks' by-laws, Havana Docks' directors are tasked with the authority to manage Havana Docks' business, and the directors have assigned that responsibility to Mickael Behn and Jerry Johnson. *Id.*, ECF Nos. [331] ¶ 38, [388] ¶ 38. Defendants do not dispute that between 2011 and January 2021, Johnson has at one point:

- performed duties to maintain Havana Docks' corporate status active and in good standing to protect Havana Docks' rights under the Certified Claim, *id.*, ECF Nos. [337] ¶ 52, [367] ¶ 52;

- coordinated with Havana Docks' CPA each year for the filing of Havana Docks' Form 1120 tax filing to the IRS and annual franchise tax filing to the state of Delaware, *id.*, ECF Nos. [337] ¶ 54, [367] ¶ 54;

- maintained Plaintiff's ledger, balance sheets, income statements, *id.*, ECF Nos. [337] ¶ 55, [367] ¶ 55;

- updated and maintained Havana Docks' stockholders' registry and coordinated and distributed information to stockholders for annual meetings, *id.*, ECF Nos. [337] ¶ 56, [367] ¶ 56;

- recorded results from annual stockholders' meetings, *id.*, ECF Nos. [337] ¶ 57, [367] ¶ 57; and

- exercised his responsibilities from Lexington, Kentucky. *Id.*, ECF Nos. [337] ¶ 59, [367] ¶ 59.

Havana Docks asserts that Jerry Johnson also engaged lawyers, lobbyists, and consultants to pursue Havana Docks' rights under the LIBERTAD Act, including these actions. *Id.*, ECF No. [337] ¶ 58. Defendants agree but assert that Johnson engaged these individuals with Mickael Behn's approval from London. *Id.*, ECF No. [367] ¶ 58.

When asked at deposition who decided to hire Havana Docks' attorney, Mickael Behn testified, "[a]ll decisions are executed by Jerry Johnson," and, "Jerry and I always talked about it, what we might do . . . [s]o I would have approved it with Jerry at the same time." *Id.*, ECF No. [331-113] at 26. When asked the same question later in his deposition, Mickael Behn responded, "[i]t would have been Jerry. I mean, in consultation with me. We always made decisions together." *Id.*, ECF No. [331-113] at 40. Mickael Behn was also asked, "Are there any decisions that Mr. Johnson can make on behalf of Havana Docks Corporation that didn't require your input? *Id.* Mickael Behn answered, "I think paying taxes, investments, administration. Pretty much everything, I would say." *Id.* Mickael Behn further testified that decisions relating to Havana

Docks' Certified Claim "would involve all the directors for compensation of the certified claim," and he could not recall a decision Johnson made about Havana Docks' Certified Claim that did not involve Mickael Behn's input. *Id.* Mickael Behn testified that Johnson "has authority . . . to do what he needs to do for Havana Docks. It's a certified claim. And to keep the company running." *Id.*

Jerry Johnson testified that he is "largely responsible" for "the day-to-day business decisions for Havana Docks," but that he "report[s] to Mickael Behn who is the president of Havana Docks." *Id.*, ECF No. [331-102] at 29; *see also id.*, ECF No. [331-112] at 13. Johnson also testified that Mickael Behn approved the hiring of Havana Docks' CPA and corporate lawyer while Mickael Behn was in London. *Id.*, ECF No. [331-112] at 61. Johnson explained that it was his own idea to hire the CPA and corporate lawyer, that he spoke with Mickael Behn on the telephone about it, and that Mickael Behn agreed with Johnson's decision. *Id.* Johnson testified that Mickael Behn does not conduct any Havana Docks business in England, but "as president of the corporation, Mr. Behn is apprised of all of our actions." *Id.*, ECF No. [318-1] at 54.

Defendants contend that "Mickael Behn is the officer who reviews and provides approval for payments, such as occasional consulting fees paid to Aphra Behn, Mickael Behn's mother, Jerry Johnson, and Aaron Johnson (Jerry Johnson's son)." *Id.*, ECF No. [331] ¶ 55. As support, Defendants provide a printout of the "Disbursement Transactions" for Havana Docks showing three distributions made to Jerry Johnson (in 2018) and Aphra Behn (in February 2019) "PER REQUEST OF MICKAEL BEHN FOR CONSULTING FEE." *Id.*, ECF No. [331-135] at 7–8. Defendants also point to a May 2018 email where Jerry Johnson instructed his son to forward "to Mickael for his review and approval with [a] copy to me" an invoice for "time" Aaron Johnson had charged to Havana Docks. *Id.*, ECF No. [331-136]. Aaron Johnson testified that his father

wanted Mickael Behn to look at the invoice because his father "didn't want to raise an issue with Mickael since I am my dad's son." *Id.*, ECF No. [331-137] at 11. Havana Docks disputes that the referenced evidence supports Defendants' assertion. *Id.*, ECF No. [388] ¶ 55.

Defendants also assert that "Mickael Behn is the officer who reviews and provides approval of drafts of corporate governance records." *Id.*, ECF No. [331] ¶ 56. As support, Defendants provide an email from August 1, 2018, with the subject line, "Consent in lieu documents," in which Jerry Johnson instructed his son to forward to Mickael Behn "for his final approval" drafts of certain documents—the documents are not attached to the filed email. *Id.*, ECF No. [331-138]. Defendants also filed as part of their Omnibus Summary Judgment Motion, email communications from August 1 and August 2, 2018, in which Jerry Johnson sent to Mickael Behn "for final review" a PDF titled "Final - 2017 HDC Financial" and a Word document titled "Consent in Lieu of Stockholders Meeting." *Id.*, ECF No. [331-139]. The documents are not attached to the filed email. *Id.*

Defendants submit that "Mickael Behn is the ultimate decision-making officer for Plaintiff with respect to lobbying and legal strategy." *Id.*, ECF No. [331] ¶ 57. As support, Defendants also filed a January 2019 email with the subject line, "Havana Docks Corp Letter for title III partial," in which Jerry Johnson writes to Mickael Behn, "See what you think of the attached edited draft." *Id.*, ECF No. [331-140]. The referenced draft is not attached to the filed email. *Id.* Defendants also rely on an email dated March 5, 2019, in which Mickael Behn relates "some suggestions from the HDC camp" to Jerry Johnson, Aaron Johnson, and third parties, to language in an email detailing "Title III: Next Steps." *Id.*, ECF No. [331-141].

### B. Confiscation of the Terminal by the Cuban Government

On October 24, 1960, under Resolution No. 3, the Fidel Castro-led Cuban Government

naturalized all property located in Cuba of United States nationals, including Havana Docks'
assets. *Carnival*, ECF Nos. [337] ¶¶ 27–28, [367] ¶¶ 27–28; *see Carnival*, ECF No. [73-6]; *MSC*,
ECF No. [41-6]; *Royal Caribbean*, ECF No. [31-6]; *Norwegian*, ECF No. [43-6].

Havana Docks contends that the Cuban Government never compensated Havana Docks for
confiscating the Terminal. *Carnival*, ECF No. [337] ¶ 31. Defendants do not dispute this; instead,
Defendants contend that the Cuban Government has always owned the Terminal and thus did not
confiscate it from Havana Docks by continuing to own it. *Id.*, ECF No. [367] ¶ 31.

## C.  The Concession and the Certified Claim

The Concession was established in 1905 when the Cuban Government awarded it to
Compañía del Puerto for a term of 50 years. *Carnival*, ECF Nos. [337] ¶ 3, [367] ¶ 3. The
Concession was published in 1905 in the Gaceta Oficial of the Republic of Cuba. *Carnival*, ECF
No. [73-3]; *MSC*, ECF No. [41-3]; *Royal Caribbean*, ECF No. [31-3]; *Norwegian*, ECF No. [43-
3]. The Concession was "for the construction of a jetty pier with machinery, a building for the
Customs Department, a special department to be used by customs inspectors, and devices for
loading and offloading, and all other accessory works in the port of this capital city." *Carnival*,
ECF No. [73-3] at 2. Per the Concession, "[t]he State assigns in usufruct[20] during the term of the
concession that part of the San Francisco docks, as well as the public domain area, that will be
occupied by the project's works." *Id.* at 3. The Concession states that

> [i]f at any time during the term of the concession the works were to be
> expropriated . . . by virtue of the application of the aforesaid Article 50 of the Ports
> Act, the Government or its agencies shall indemnify the concession holder for the
> value of all works built by the latter, including the Customs Inspectors Department
> and the dock on the north side of the jetty[.]

*Id.* at 5.

---

[20] "A right for a certain period to use and enjoy the fruits of another's property without damaging or
diminishing it, but allowing for any natural deterioration in the property over time." Usufruct, Black's Law
Dictionary (11th ed. 2019).

In addition, the Concession states:

> During the term of the concession, the concession holder shall, for its own account, maintain in good repair and in such condition the foundations, streets, buildings, and all other plant facilities that, upon the conclusion of said term, it may surrender the works to the Government in perfectly serviceable condition.

*Id.*

The Concession further provides:

> This concession is understood to be granted with no prejudice to third parties, except as regards the right of ownership, and on the understanding that the concession holder is bound by such laws of a general nature as have been, or may in the future be, issued with respect to this class of concessions.

*Id.* at 8.

In 1911, the Cuban Government recognized Compañía del Puerto's transfer of the Concession to the Port of Havana Docks Company. *Id.*, ECF Nos. [337] ¶ 9, [367] ¶ 9. The Port of Havana Docks Company sold the Concession and all rights and interests in the Concession to Havana Docks. *Id.*, ECF Nos. [337] ¶ 11, [367] ¶ 11. In December 1920, the Cuban Government agreed to extend the Concession to 99 years. *Id.*, ECF Nos. [337] ¶ 14, [367] ¶ 14. In September 1934, the Cuban Government recognized the transfer of the Concession from the Port of Havana Docks Company to Havana Docks. *Id.*, ECF Nos. [337] ¶ 20, [367] ¶ 20. The Cuban Government confiscated Havana Docks' assets, which included the Concession, on October 24, 1960. *Id.*, ECF Nos. [337] ¶¶ 27–28, [367] ¶¶ 27–28.

On April 28, 1967, Havana Docks submitted a claim to the FCSC pursuant to the Settlement Act. *Id.*, ECF Nos. [318-10], [337] ¶ 33, [367] ¶ 33. Havana Docks argued to the FCSC "that on the basis of a concession granted by the Government of Cuba, it owned and operated, at the entrance of the harbor of Havana three piers: the 'San Francisco', 'Machina' and 'Santa Clara' linked with a large marginal building." *Id.*, ECF No. [73-8] at 6. Havana Docks claimed losses of

more than $9 million, submitting as evidence (1) a trial balance as of the end of 1958; (2) balance sheets for years 1956 through 1959; (3) an auditor's report from the end of 1958; (4) an evaluation from a civil engineer and professional appraiser in Cuba; and (5) and an inventory of the equipment, furniture, and fixtures as of the end of 1959. *Id.* at 8.

On April 21, 1971, the FCSC issued its Final Decision No. CU-6165, Havana Docks' Certified Claim. *Carnival*, ECF No. [73-8]; *MSC*, ECF No. [41-8]; *Royal Caribbean*, ECF No. [31-8]; *Norwegian*, ECF No. [43-8]. The Certified Claim includes the following findings:

- Havana Docks was a "national of the United States" within § 1643a(1) because U.S. nationals owned more than 50 percent of the capital stock and, at the time of filing the claim, only approximately 3 percent of the shares were held by persons who were not U.S. nationals. *E.g.*, *Carnival*, ECF No. [73-8] at 6.

- In 1934, the Cuban Government granted Havana Docks a "renewal of a concession for the construction and operation of wharves and warehouses in the harbor of Havana, formerly granted to its predecessor concessionaire, the Port of Havana Docks Company." *Id.* at 7.

- Havana Docks "acquired at the same time the real property with all improvements and appurtenances located on the Avenida del Puerto between Calle Amargura and Calle Santa Clara in Havana, facing the Bay of Havana." *Id.*

- In June 1946, "the property was encumbered with a mortgage in favor of certain bondholders for the amount of $1,600,000.00." *Id.*

- Havana Docks "also owned the mechanical installations, loading and unloading equipment, vehicles and machinery, as well as furniture and fixtures located in the offices of the corporation." *Id.*

- "[T]he Cuban assets of [Havana Docks] were nationalized by Resolution No. 3, published in the Official Gazette of October 24, 1960." *Id.*

The FCSC certified that Havana Docks suffered a loss as a result of the actions of the Government of Cuba in the amount of $9,179,700.88, plus six percent annual interest from the date of the loss. *Id.* at 4. The certified loss amount accounted for four categories: (1) "Concession and tangible assets" ($8,684,360.18); (2) "Securities" ($184,005.70); (3) "Accounts Receivable" ($301,055.00); and (4) "Debt of Cuban Government" ($10,280.00). *Id.* at 3.

In determining that amount, the FCSC determined that Havana Docks' balance sheet for the year ending in 1959 represented "the valuation most appropriate to the property and equitable to the claimant." *Id.* at 9. The balance sheet provided a book value for "Land and Concession" ($2,000,000.00), "San Francisco and Machina Piers" ($4,758,829.00), and "Santa Clara Pier" ($2,110,845.00). *Id.* When describing the Concession, the FCSC stated: "[t]he terms of the concession granted by the Cuban Government were to expire in the year 2004, at which time the corporation had to deliver the piers to the government in good state of preservation." *Id.* at 9.

Havana Docks has always been the owner of the Certified Claim. *Carnival*, ECF Nos. [337] ¶¶ 40–41, [367] ¶¶ 40–41. The Certified Claim has been in the public records of the FCSC since 1971. *Id.*, ECF Nos. [337] ¶ 43, [367] ¶ 43.

### D.  Defendants and Related Entities

#### 1.  *Carnival*

Carnival is a foreign corporation with its principal place of business in Miami-Dade County, Florida. *Carnival*, ECF Nos. [332] ¶ 1, [374] ¶ 1. Carnival Cruise Lines ("CCL") is a division and brand of Carnival. *Id.*, ECF Nos. [332] ¶ 2, [374] ¶ 2. HAL Nederland N.V. ("HAL"), Costa, and Fathom Travel Ltd. ("Fathom") are subsidiaries of Carnival. *Id.*, ECF Nos. [332] ¶¶ 3–5, [374] ¶¶ 3–5.

In 1996, Carnival acquired a 29.6% equity interest in Airtours, a publicly-traded United Kingdom tour operator of cruise ships under the "Sun Cruises" brand. *Id.*, ECF Nos. [326] ¶ 1, [332] ¶ 6, [374] ¶ 6, [377] ¶ 1. From 1997 to 2000, Carnival and Airtours each owned a 50% equity interest in Costa, an Italian company. *Id.*, ECF Nos. [326] ¶¶ 8–9, [332] ¶ 10, [374] ¶ 10, [377] ¶¶ 8–9. In 2000, Carnival acquired Airtours' 50% interest in Costa. *Id.*, ECF Nos. [332] ¶ 11, [374] ¶ 11. In 2001, Carnival sold its interest in Airtours. *Id.*, ECF Nos. [332] ¶ 9, [374] ¶ 9.

Before June 1997, when Carnival made its first acquisition in Costa, Costa was in a joint venture with the Cuban Government to manage operations at the Terminal, and Costa was operating a cruise ship that used the Terminal. *Id.*, ECF No. [326] ¶¶ 13, 15, [377] ¶¶ 13, 15. Carnival represents that its acquisition in Costa was authorized by a specific OFAC license. *Id.*, ECF No. [326] ¶¶ 16–18. Carnival's Rule 30(b)(6) Corporate Representative, Arnaldo Perez, testified that as part of Carnival's acquisition of Costa, OFAC issued a specific license in February 1997 requiring that Costa abandon the joint venture and unwind operations in Cuba within six months. *Id.*, ECF No. [326-2] at 71–75. Neither Carnival nor OFAC has been able to locate and produce the 1997 license. *Id.* at 72, 77–78.

## 2. *MSC*

MSC SA is chartered and located in Geneva, Switzerland. *MSC*, ECF Nos. [224] ¶ 1, [253] ¶ 1. Between 2015 and 2019, MSC SA owned and operated the MSC *Opera* and MSC *Armonia* cruise ships, which sailed to Cuba. *Id.*, ECF Nos. [224] ¶ 11, [253] ¶ 11. MSC is the parent company of MSC USA, which is based in Fort Lauderdale, Florida. *Id.*, ECF Nos. [224] ¶¶ 12–15, [253] ¶¶ 12–15. MSC USA transacted business on behalf of MSC SA by selling and marketing MSC SA's cruises from Miami to Cuba. *Id.*, ECF Nos. [224] ¶¶ 16–18, [253] ¶¶ 16–18. MSC USA received revenue from marketing and selling tickets for cruises to Cuba. *Id.*, ECF Nos. [224] ¶ 19, [253] ¶ 19.

MSC SA was also the parent company of MSC Co., another Fort Lauderdale-based subsidiary. *Id.*, ECF Nos. [224] ¶¶ 12, 22, 24, [253] ¶¶ 12, 22, 24. MSC Co. was administratively dissolved during the pendency of this lawsuit, in September 2020. *Id.*, ECF Nos. [224] ¶ 23, [253] ¶ 23.

### 3. *Royal Caribbean*

Royal Caribbean is a foreign corporation that maintains its principal executive office in Miami, Florida. *Royal Caribbean*, ECF Nos. [141] ¶ 1, [172] ¶ 1. Royal Caribbean operated cruises to Cuba under at least two brands: Azamara and Royal Caribbean International. *Id.*, ECF Nos. [141] ¶ 2, [172] ¶ 2. Havana Docks contends that Royal Caribbean also operated under the brand Silversea. *Id.*, ECF No. [141] ¶ 2. Royal Caribbean disputes this, stating that although it owned a two-thirds interest in Silversea, it did not control Silversea or provide Silversea services for its cruises to Cuba. *Id.*, ECF No. [172] ¶ 2. Royal Caribbean acquired its interest in Silversea in 2018. *Id.*, ECF Nos. [133] ¶ 44, [183] ¶ 44.

Royal Caribbean operated *The Majesty of the Seas* and the *Nordic Empress* (also known as the *Empress of the Seas*) ships under the Royal Caribbean International brand. *Id.*, ECF Nos. [141] ¶ 3, [172] ¶ 3. Royal Caribbean also operated the *Journey* and the *Quest* ships under the Azamara brand. *Id.*, ECF Nos. [141] ¶ 6, [172] ¶ 6.

### 4. *Norwegian*

Norwegian is a foreign corporation that maintains its principal executive office in Miami, Florida. *Norwegian*, ECF Nos. [228] ¶ 1, [282] ¶ 1. Norwegian operated three brands that traveled to Cuba: Norwegian Cruise Line, Oceania Cruises, and the Regent Seven Seas. *Id.*, ECF Nos. [228] ¶ 2, [282] ¶ 2. Norwegian Cruise Line operated the *Norwegian Sky* and the *Norwegian Sun* ships; Oceania Cruises operated the *MS Marina*, *MS Insignia*, *MS Regatta*, *MS Sirena*, and *MS Riviera* ships; and Regent Seven Seas operated the *MS Seven Seas Mariner*, *MS Seven Seas Navigator*, and the *MS Seven Seas Voyager* ships. *Id.*, ECF Nos. [228] ¶¶ 3–5, [282] ¶¶ 3–5.

### E.  Specific and/or General Licenses

#### 1.  *Carnival*

In May 2015, Carnival submitted an authorization request to OFAC to conduct carrier services to Cuba. *Carnival*, ECF Nos. [326] ¶ 33, [377] ¶ 33; *see id.*, ECF No. [326-26] at 5–15. In the request, Carnival proposed that "each day ashore will be programmed with at least 8 hours of P2P activity" for its passengers. *Id.*, ECF No. [326-26] at 9. Carnival represented that "[a]ll of the on-shore activities organized and lead by Carnival personnel and its contractors or P2P Licensees are designed to be educational in nature and to provide opportunities for meaningful interaction between the traveler and individuals in Cuba," and that "[t]he on-shore programs will not be individually selected or self-directed and will provide a full-time schedule of activities." *Id.* at 11.

Carnival provided to OFAC an "Illustrative Cuba Itinerary," consisting of one-and-half days in Havana, stops in Cienfuegos and Santiago de Cuba, and two-and-a-half days at sea. *Id.* at 16.  Carnival represented that "[a]ll shore activities and onboard programming will be included in the trip fare and prepaid in the USA" and "[e]ach day of the trip will have sufficient capacity of organized P2P shore activities to accommodate all 740 passengers in motor coaches, vans or other conveyances with English speaking Cuban guides leading the activity." *Id.* at 17. For the first day in Havana, Carnival outlined six activities: "Old City Walking Experience (Cultural Heritage and Micro-Enterprise Development)," "Afro-Cuban Community Meeting (Cultural Exchange and Artistic Impact)," "Cuba Art's Today: Muraleando, La Colmenita (Arts History and the Humanitarian Impact of Arts + Music)," "Journalistic Perspective (Journalism + Documentary)," "Hemingway (Literature and Micro-enterprise History)," and "Alamar: Planned Soviet-style Community (Infrastructure + Community Gardens)." *Id.* at 17–18. For the second day in Havana,

Carnival also outlined six activities: (1) "Rural Cuba (Micro-Enterprise, Community Health + Medical Workshop)," "Old Havana Booksellers (literacy, literature + micro-enterprise)," "Casa Fuster and Fusterlandia (Art + Immersion + Micro-enterprise Development)," "Interaction with Cuban Professionals (Professional Exchange, Meeting and Research, Economic Development)," "Organic Farm: Visit an organoponico (Urban Organic Farm and Agriculture + Microenterprise)," and "Paladares: The Entrepreneurs of Modern Cuba (Economic Development, Entrepreneurship and Micro-Enterprise)." *Id.* at 19–20.

Carnival set forth similar activities for the days ashore in Cienfuegos and Santiago de Cuba. *Id.* at 21–24. In addition, Carnival stated that there would be an on-board film series, lecture series, and entertainment during the days at sea. *Id.* at 19, 21, 25.

Shortly after Carnival submitted its request, a Sanctions Licensing Officer from OFAC's Licensing Division sent an email to Carnival seeking "additional clarification on a few matters before continuing to process the Application." *Id.* at 27. The Licensing Officer asked, among other questions, "Could passengers decide to opt out of the on-the-ground P2P / other authorized activities altogether at certain destinations?" *Id.* Carnival answered,

> Passengers will be expected to participate in the on-the-ground P2P programs. As discussed below, on-the-ground P2P programs will be included in the voyage fare. Carnival will take steps to identify and monitor the passengers that sign up for the full-time programming onshore provided by Carnival. Specifically, all passengers will be expected to participate in one or more of the authorized onshore P2P programs. Carnival will obtain certifications from passengers and will advise them that should they disembark the ship to go on an unauthorized excursion, such activity may be a violation of the OFAC rules.

*Id.* at 26.

In a supplemental letter to OFAC, Carnival stated that it had "launched its new brand, Fathom, dedicated to purpose-driven social impact," and that it would be "using the Fathom program to provide meaningful social impact travel for authorized passengers, and such program

[could] be easily tailored to meet the requirements of the full-time schedule for people-to-people travel pursuant to the [CACR]." *id.*, ECF No. [326-26] at 2–3.

In July 2015, OFAC granted Carnival a specific license to provide "carrier services" to Cuba and lodging, "including when docked at a port in Cuba." *Id.*, ECF Nos. [326] ¶ 37, [377] ¶ 37; *see id.*, ECF Nos. [326-26] at 32, [326-35] at 4.[21] OFAC's letter granting the carrier-services specific license stated that it was not granting a further specific license for people-to-people travel, because the CACR already authorized people-to-people travel by general license. *Id.*, ECF No. [326-26] at 32–33. OFAC explained, "[p]rovided that the organization sponsoring and organizing the program and individuals participating in the program comply with the requirements of the general license, no further authorization would be required." *Id.* at 33.

The letter advised that "OFAC does not view onboard lectures while in port as satisfying the requirements of the general license at section 515.565(b)(2)." *Id.* The letter stated "[t]hat general license authorizes educational exchanges to promote people-to-people contact, namely contact between the traveler *and nationals of Cuba*, which would not occur in the case of an onboard lecture or similar activity." *Id.* (emphasis in original). Moreover, OFAC stated in the letter that "[t]he enclosed specific license does not authorize Carnival to transport any person who will disembark in Cuba and who is not authorized by a general license or a separate specific license." *Id.* Finally, the letter warned that "compliance with the requirements of the CACR does not excuse a U.S. person from the need to comply with other provisions of 31 C.F.R. chapter V, and with other applicable provisions of law." *Id.*

The license itself similarly cautioned that it "does not excuse compliance with any law or regulation (including reporting requirements) administered by [OFAC] or any other agency

---

[21] The CACR did not allow common carrier services by vessel to and from Cuba by general license until September 2015. *See* § 515.572(a)(2) (Sept. 2015).

applicable to the transactions herein licensed, nor does it release the Licensees or third parties from civil or criminal liability for violation of any law or regulation." *Id.*, ECF No. [326-35] at 4. The license also stated, "nothing in this License authorizes any person subject to the jurisdiction of the United States to engage in any transaction or activity prohibited by the CACR, or by any other laws and regulations administered by [OFAC]." *Id.* at 5. Moreover, the license stated that it "appl[ies] only to the laws and regulations administered by OFAC and should not be interpreted to excuse the Licensees from compliance with other laws, regulations, orders, or rulings to which they may be subject[.]" *Id.*

The U.S. Government did not require Carnival to cruise to Havana. *Id.*, ECF Nos. [332] ¶ 46, [374] ¶ 46. The U.S. Government did not direct Carnival where to dock its ships in Cuba. *Id.*, ECF Nos. [332] ¶ 47, [374] ¶ 47. It was not necessary for a Carnival cruise ship to dock at the Terminal to cruise to Santiago de Cuba, Cuba, or Cienfuegos, Cuba. *Id.*, ECF Nos. [332] ¶ 50, [374] ¶ 50. Carnival could, and did, dock its ships and embark and disembark its passengers at Santiago de Cuba and Cienfuegos. *Id.*, ECF Nos. [332] ¶ 53, [374] ¶ 53. Carnival's ships could, and did, anchor offshore and tender passengers in Cienfuegos and Santiago de Cuba. *Id.*, ECF Nos. [332] ¶ 54, [374] ¶ 54.

### 2. *MSC*

OFAC did not give MSC SA a specific license to use, operate, and embark and disembark passengers on the Terminal. *MSC*, ECF Nos. [224] ¶ 81, [253] ¶ 81. OFAC never provided a specific license to MSC SA with regard to any of its cruises to Cuba. *Id.*, ECF Nos. [224] ¶ 82, [253] ¶ 82. The OFAC general license did not specify the use of the Terminal. *Id.*, ECF Nos. [224] ¶ 78, [253] ¶ 78. OFAC did not provide any specific approval of a specific port to be used by the MSC ships during their cruises to Cuba. *Id.*, ECF Nos. [224] ¶ 80, [253] ¶ 80.

The U.S. Government did not require MSC SA to cruise to Havana. *Id.*, ECF Nos. [224] ¶ 70, [253] ¶ 70. The U.S. Government did not instruct, direct or designate MSC SA, whether orally or in writing, to use the Terminal in its cruises to Cuba. *Id.*, ECF Nos. [224] ¶ 73, [253] ¶ 73. The U.S. Government did not inform MSC SA that it could not go to another port in Cuba besides Havana. *Id.*, ECF Nos. [224] ¶ 74, [253] ¶ 74. And MSC SA was not required to cruise to Cuba. *Id.*, ECF Nos. [224] ¶ 75, [253] ¶ 75.

The Cuban Government authorized MSC ships to sail to Punta Frances, Isla de la Juventud, Cuba, and to transport passengers to and from shore by tender boats. *Id.*, ECF Nos. [224] ¶ 93, [253] ¶ 93. MSC SA could and did embark and disembark passengers in Punta Frances. *Id.*, ECF Nos. [224] ¶ 94, [253] ¶ 94.

### 3. *Royal Caribbean*

Neither Havana Docks nor Royal Caribbean address whether Royal Caribbean was ever issued a specific license to travel to Cuba. In any event, Havana Docks and Royal Caribbean agree that the U.S. Government did not direct Royal Caribbean where to sail in Cuba. *Royal Caribbean,* ECF Nos. [141] ¶ 59, [172] ¶ 59. Nor did the U.S. Government require Royal Caribbean to dock at the Terminal. *Id.*, ECF Nos. [141] ¶ 60, [172] ¶ 60. The Cuban Government likewise did not require Royal Caribbean to cruise to Havana. *Id.*, ECF Nos. [141] ¶ 61, [172] ¶ 61. The Cuban Government did not require that Royal Caribbean use the Terminal to cruise to Cuba. *Id.*, ECF Nos. [141] ¶ 62, [172] ¶ 62.

In December 2014, Royal Caribbean identified six ports in Havana that could accommodate its cruise ships: Matanzas, Holguin, Santiago, Manzanillo, Cienfuegos, and Havana. From at least 2017 to 2019, the Cuban authorities allowed Royal Caribbean to operate cruises that called in Cienfuegos and Santiago de Cuba. *Id.*, ECF Nos. [141] ¶ 63, [172] ¶ 63. The ports of

Cienfuegos and Santiago de Cuba have immigration, customs, and medical screening capabilities. *Id.*, ECF Nos. [141] ¶ 75, [172] ¶ 75. The Royal Caribbean ships did not need to use the Terminal to sail to Cienfuegos or Santiago. *Id.*, ECF Nos. [141] ¶ 74, [172] ¶ 74. In 2018 and 2019, Cienfuegos, Cuba, was the first port of call in Cuba for nine cruises on the *Empress of the Seas*. *Id.*, ECF Nos. [141] ¶ 71, [172] ¶ 71. The *Empress of the Seas*, Azamara *Quest*, and Azamara *Journey* called at Cienfuegos between 2017 and 2019 and called at Santiago de Cuba between 2018 and 2019. *Id.*, ECF Nos. [141] ¶¶ 72–73, [172] ¶¶ 72–73. The Royal ships did not need to use the Terminal to sail to Cienfuegos or Santiago. *Id.*, ECF Nos. [141] ¶ 74, [172] ¶ 74.

In 2018, OFAC audited, by way of a subpoena and an on-site visit, Royal Caribbean's "provision of travel, carrier, and other transportation-related services in connection with travel-related transactions involving Cuba." *Id.*, ECF No. [122-23] at 2, 3. Following the audit, in June 2019, OFAC sent Royal Caribbean a "Cautionary Letter." *Id.*, ECF No. [122-23]. The Cautionary Letter informed Royal Caribbean that "[t]ravel-related transactions involving Cuba are authorized by general license only if the travel falls into one of the [12] categories" for travel under the CACR. *Id.* at 4. The letter further emphasized that "[t]ravel-related transactions to, from, or involving Cuba for any other purpose, or that do not meet the full criteria and conditions of one or more of the [12] categories of general licenses, including recordkeeping requirements, are prohibited." *Id.*

The Cautionary Letter advised that the audit had "revealed areas of concern related to [Royal Caribbean's] compliance with its recordkeeping obligations." *Id.* at 5. Specifically, a sampling of passenger affidavits showed that "12 paper certifications failed to either select a general travel license or provide a specific license number" and "five certifications . . . had hand written comments indicating that the individual traveler did not intend to disembark in Cuba," which was contrary to Royal Caribbean's "policy that passengers could not embark on a voyage

to Cuba without providing the general license number that authorized their travel." *Id*. The Cautionary Letter advised that it "represents a final enforcement response to the apparent violations, but does not constitute a final agency determination as to whether violations have occurred." *Id*.

### 4. *Norwegian*

On July 14, 2015, Norwegian submitted a License Application to OFAC to

[r]equest authorization (1) to provide carrier services by vessel to, from, and within Cuba in connection with the travel or transportation between the United States and Cuba of persons, baggage, and cargo authorized pursuant to the Cuban Assets Control Regulations, and (2) to provide lodging aboard vessels to passengers and crew while the vessel is traveling to and from Cuba, docked at port (or otherwise stationary) in Cuban waters, and while traveling from location to location within Cuba.

*Norwegian*, ECF Nos. [234] ¶ 1, [284] ¶ 1. On August 3, 2015, Norwegian submitted an Export License Application to the United States Department of Commerce Bureau of Industry and Security ("BIS") to request authorization for the "[t]emporary sojourn of Oceania and Regent Seven Seas vessels to Cuba, along with accompanying passengers, crew, and ship stores, in connection with OFAC authorized provision of carrier services by vessel to, from, and within Cuba." *Id*., ECF Nos. [234] ¶ 2, [284] ¶ 2. BIS granted Norwegian's August 3, 2015, specific license application. *Id*., ECF Nos. [234] ¶ 3, [284] ¶ 3. From OFAC, Norwegian received a letter dated October 5, 2015, informing Norwegian that "[i]n light of the recent regulatory amendments." *Id*., ECF Nos. [234] ¶ 4, [284] ¶ 4. Neither the U.S. Government nor OFAC directed Norwegian where to sail in Cuba. *Id*., ECF Nos. [228] ¶¶ 51–52, [282] ¶¶ 51–52.

The Cuban Government did not require that Norwegian stop at a particular port in Cuba on any particular day. *Id*., ECF Nos. [228] ¶ 54, [282] ¶ 54. The Cuban Government authorized Norwegian to berth at Santiago de Cuba, Cienfuegos, and Havana. *Id*., ECF Nos. [228] ¶ 55, [282]

¶ 55. Norwegian could, and did, dock its ships and embark and disembark its passengers at Santiago and Cienfuegos. *Id.*, ECF Nos. [228] ¶ 59, [282] ¶ 59. Norwegian's ships also anchored offshore and tendered passengers to shore in Santiago de Cuba and Cienfuegos. *Id.*, ECF Nos. [228] ¶ 60, [282] ¶ 60. The port facilities in the Cuban ports of Santiago and Cienfuegos housed medical screening, immigration, and customs services for cruise passengers. *Id.*, ECF Nos. [228] ¶ 62, [282] ¶ 62. Norwegian acknowledges that persons could satisfy then-existing OFAC travel-category restrictions by visiting cities in Cuba other than Havana. *Id.*, ECF Nos. [228] ¶ 58, [282] ¶ 58.

### F.   Defendants' Use of the Terminal

Carnival's, MSC SA's, Royal Caribbean's, and Norwegian's ships docked at the Terminal's first pier, the San Francisco Pier, when they traveled to Havana. *Carnival*, ECF Nos. [331] ¶ 22, [388] ¶ 22. The following is a summary of the Defendants' activities:

#### 1.   *Carnival*

From May 2016 to April 2017, Fathom ship *Adonia* docked at the Terminal 31 times, listing 20,999 passengers on the manifests. *Id.*, ECF Nos. [332] ¶¶ 23–24, [374] ¶¶ 23–24. From December 2017 to April 2019, HAL ship *Veendam* docked at the Terminal 19 times, listing 30,401 passengers on the manifests. *Id.*, ECF Nos. [332] ¶¶ 25–26, [374] ¶¶ 25–26. From June 2017 to May 2019, CCL ships *Paradise* and *Sensation* docked at the Terminal 33 times, listing 76,213 passengers on the manifests. *Id.*, ECF Nos. [332] ¶¶ 27–28, [374] ¶¶ 27–28.

Carnival's ships docked at the Terminal to disembark and embark passengers. *Id.*, ECF Nos. [332] ¶ 17, [374] ¶ 17. Carnival intentionally traveled to Havana, but Carnival submits that the Cuban Government required Carnival to embark and disembark passengers at the Terminal and repeatedly denied Carnival's requests to dock at other ports in Havana or to anchor and tender in

Havana. *Id.*, ECF No. [374] ¶ 18. Havana Docks further contends that from 2018 to 2020, Carnival provided "recommendations and advice" for the renovation and enhancement of the Terminal. *Id.*, ECF No. [332] ¶ 34. Carnival disputes Havana Docks' characterization but admits that it "provided technical information about requirements for Carnival ships to safely dock at the Terminal." *Id.*, ECF No. [374] ¶ 34.

### 2. *MSC*

Between 2016 and 2018, the *Armonia* made 65 voyages that started and ended in Havana and docked at Terminal. *MSC*, ECF Nos. [224] ¶ 41, [253] ¶ 41. From December 2018 through June 2019, the *Armonia* made 25 voyages from Miami to Havana, docking at the Terminal on 50 calendar days and listing in its manifests 51,908 passengers. *Id.*, ECF Nos. [224] ¶¶ 40, 48, [253] ¶¶ 40, 48. Between 2015 and 2019, the *Opera* made 100 voyages that began and ended in Havana and docked at the Terminal. *Id.*, ECF Nos. [224] ¶ 45, [253] ¶ 45. The *Opera* averaged 2,000 passengers for each call to Havana. *Id.*, ECF Nos. [224] ¶ 61, [253] ¶ 61.

Between 2015 and 2019, the MSC ships docked at the Terminal on all their voyages to Havana. *MSC*, ECF Nos. [224] ¶ 34, [253] ¶ 34. During that period, the *Opera* docked at the Terminal to embark and disembark passengers in Havana in connection with Cuba-to-Cuba cruises. *Id.*, ECF Nos. [224] ¶ 35, [253] ¶ 35. The *Opera* used the Terminal as a homeport from 2015 to 2019. *Id.*, ECF Nos. [224] ¶ 37, [253] ¶ 37.

Between December 2018 and June 2019, the *Armonia* docked at the Terminal to embark and disembark passengers in Havana in connection with Miami-to-Cuba cruises. *Id.*, ECF Nos. [224] ¶¶ 36, 40, [253] ¶¶ 36, 40. The *Armonia* used the Terminal as a homeport in 2016, 2017, and 2018. *Id.*, ECF No. [224] ¶ 38, [253] ¶ 38. The *Opera* homeporting at the Terminal from 2015 through March 2019 in connection with Cuba-to-Cuba cruises overlapped with the *Armonia's*

44

Miami-to-Cuba cruises. *Id.*, ECF Nos. [224] ¶ 39, [253] ¶ 39. The *Armonia* was the only MSC SA ship to cruise from the U.S. to Cuba. *Id.*, ECF Nos. [210] ¶ 15, [259] ¶ 15.

MSC SA disembarked passengers from the *Armonia* at the Terminal for shore excursions in Havana. *Id.*, ECF Nos. [224] ¶ 49, [253] ¶ 49. The shore excursions offered in Havana to passengers on the MSC ships began and ended at the Terminal. *Id.*, ECF Nos. [224] ¶ 50, [253] ¶ 50. MSC cruise passengers also cleared customs and immigration on the first floor of the Terminal. *Id.*, ECF Nos. [259] ¶ 48, [273] ¶ 48.

### 3. *Royal Caribbean*

Between 2017 and 2019, the *Quest*, *Journey*, *Empress of the Seas*, and *Majesty of the Seas* docked at the Terminal on 193 voyages for a total of 334 days, carrying a total of 347,008 passengers. *Royal Caribbean*, ECF Nos. [141] ¶¶ 29–30, [172] ¶¶ 29–30. The first ship to dock at the Terminal was the *Quest* on March 31, 2017. *Id.*, ECF No. [141] ¶ 28, [172] ¶ 28. The *Empress of the Seas* last docked at the Terminal on June 5, 2019. *Id.*, ECF No. [141] ¶ 32, [172] ¶ 32.

Royal Caribbean intentionally docked at the first pier of the Terminal to disembark and embark its passengers. *Id.*, ECF Nos. [141] ¶ 27, [172] ¶ 27. Many of Royal Caribbean's passengers boarded buses parked on the ground floor of the Terminal to take them on excursions, which Royal Caribbean claims are "people-to-people excursions." *Id.*, ECF Nos. [141] ¶ 34, [172] ¶ 34. Most shore excursions began and ended at the Terminal. *Id.*, ECF Nos. [141] ¶ 93, [172] ¶ 93.

### 4. *Norwegian*

Between 2017 and 2019, 10 different Norwegian ships collectively provided passenger carrier services to Havana 166 times, docking at the Terminal for a collective total of 299 calendar days. *Norwegian*, ECF Nos. [228] ¶ 15, [282] ¶ 15. Norwegian intended to travel to Havana, and Norwegian docked at Pier 1 of the Terminal to disembark and embark its passengers. *Id.*, ECF

Nos. [228] ¶ 14, [282] ¶ 14. Norwegian docked its ships at the Terminal on every voyage to Cuba. *Id.*, ECF Nos. [284] ¶ 71, [309] ¶ 71. Some of Norwegian's passengers boarded buses parked on the ground floor of the Terminal to take them on shore excursions, which Norwegian states were people-to-people shore excursions. *Id.*, ECF Nos. [228] ¶ 18, [282] ¶ 18.

### G. Defendants' Contracts and Payments to Cuban Entities

#### 1. *Carnival*

From 2016 to 2018, Carnival contracted with three Cuban Government agencies to use the Terminal. *Carnival*, ECF Nos. [332] ¶¶ 29–31, [374] ¶¶ 29–31; *see id.*, ECF Nos. [311-29], [311-32], [322-6], [322-7], [322-8]. First, Carnival entered into a series of commercial contracts with Aries Transportes, S.A. ("Aries"), part of the Cuban Government's Ministry of Transportation serving as its port authority, for Carnival's ships to dock at the Terminal. *Id.*, ECF Nos. [332] ¶ 29, [374] ¶ 29. Second, Carnival entered into a series of commercial contracts with Empresa Consignataria Mambisa ("Mambisa"), part of the Cuban Government Ministry of Transportation serving as its port agent, for Carnival's ships to use the Terminal. *Id.*, ECF Nos. [332] ¶ 30, [374] ¶ 30. Third, Carnival entered into a series of commercial contracts with Grupo Internacional de Turoperadores y Agencias de Viajes, Havanatur S.A. ("Havanatur"),[22] part of the Cuban Government's Ministry of Tourism serving as its tour operator, related to Carnival's use of the Terminal. *Id.*, ECF Nos. [332] ¶ 31, [374] ¶ 31; *see id.*, ECF Nos. [311-33], [322-7].

Carnival paid a total of $18,629,807.71 related to its cruises to Cuba, with $12,461,542.99 paid to Havanatur; $3,480,380.40 paid to Mambisa; and $2,605,429.34 paid to the Aries. *Id.*, ECF Nos. [332] ¶ 32, [374] ¶ 32. Carnival never made any payments in Cuba to anyone or any entity

---

[22] Carnival identifies Havanatur as "Havanatur Celimar ABG." *Carnival*, ECF No. [332] ¶ 31. The service contracts between Carnival and Havanatur, however, identified Havanatur as "Grupo Internacional de Turoperadores y Agencias de Viajes, Havanatur S.A." *See id.*, ECF Nos. [311-33], [322-7]. The name under the service contracts is also consistent with how other Defendants refer to the Cuban company.

that was not affiliated with the Cuban Government. *Id.*, ECF Nos. [332] ¶ 33, [374] ¶ 33.

### 2. MSC

From 2015 to 2019, MSC SA entered into contracts with Aries to dock at the Terminal. *MSC*, ECF Nos. [224] ¶ 51, [253] ¶ 51; *see id.*, ECF Nos. [202-30], [202-31], [218-13]. In 2015, MSC SA entered into contracts with Agencia Maritima Mapor S.A. ("Mapor") [23] to act as its port agent in Havana. *Id.*, ECF Nos. [224] ¶ 52, [253] ¶ 52; *see id.*, ECF No. [218-14]. MSC SA paid Aries indirectly through Mapor for fees charged for the use of the Terminal by MSC ships for docking and the embarkation and disembarkation of passengers. *Id.*, ECF Nos. [224] ¶ 53, [253] ¶ 53. MSC SA paid Mapor at least $9,314,386.41 related to Mapor's services as ship agent for MSC SA and for the use of the Terminal. *Id.*, ECF Nos. [224] ¶ 55, [253] ¶ 55.

In 2018, MSC SA contracted with Agencia Viajes Cubanacan S.A. ("Cubanacan") to operate shore excursions in Havana that MSC SA sold to passengers. *Id.*, ECF Nos. [224] ¶ 56, [253] ¶ 56; *see id.*, ECF No. [218-9]. Cubanacan was a part of the Cuban Government's Ministry of Tourism. *Id.*, ECF Nos. [224] ¶ 57, [253] ¶ 57. Cubanacan provided ground and transportation services to and from the Terminal for MSC SA passengers going on excursions. *Id.*, ECF Nos. [224] ¶ 58, [253] ¶ 58. MSC SA paid Cubanacan $7,623,480.37 for shore excursions offered to MSC ship passengers. *Id.*, ECF Nos. [224] ¶ 59, [253] ¶ 59.

According to the Shore Excursion Agreement between MSC SA and Cubanacan, "VIAJES CUBANACAN is engaged in the business of organizing, promoting and selling tourist excursions

---

[23] There is some dispute in the record as to whether the Cuban Government owns Mapor. In answers to requests for admissions, MSC could neither admit nor deny that Mapor is owned, or is a part of, the Cuban Government. *MSC*, ECF No. [218-4] at 44–45. Luigi Pastena, Vice President of Port Operations at an MSC-affiliated entity, *id.*, ECF No. [201-8] at 5, testified that Mapor was "a private agency," *id.* at 18. But Massimiliano Mio, MSC SA's chief legal officer, *id.*, ECF No. [201-6] at 4, testified at deposition that Mapor was one of the Cuban entities with which MSC SA contracted, *id.* at 38. The dispute does not change the analysis given that MSC SA paid Aries, a Cuban entity, through Mapor.

in the Cuban national territory." *Id.*, ECF No. [218-9] at 3. The agreement states that Cubanacan is "capable and willing to assume the organization, promotion and sale of tourist excursions in the Cuban national territory," and that it would provide "tourist services described below . . . during the term of the operation of THE VESSELS [defined as the *Opera* and *Armonia*], between December 1, 2018 and November 30, 2019." *Id.* at 3–4. Part of Cubanacan's responsibilities included "[t]o assist . . . the tourists before the authorities of the country and in all the necessary legal procedures during the agreed season, for the realization of [MSC SA's] shore excursions in Cuba." *Id.* at 5. MSC SA, in turn, had to, among other things, ensure that it communicated to Cubanacan the "[l]anguage of the tourists" who bought excursions and "guarantee that the tourists traveling on THE VESSELS and taking the tourist excursions with [Cubanacan] have a valid insurance policy." *Id.* at 7.

The only persons or entities in Cuba to which MSC SA made payments in connection with its U.S.-to-Cuba cruises were Comar (Cuba-based lawyers[24]), Mapor, and Cubanacan. *Id.*, ECF Nos. [259] ¶ 81, [273] ¶ 81.

### 3. *Royal Caribbean*

From 2016 to 2017, Royal Caribbean contracted with three Cuban Government agencies related to the use of the Terminal. *Royal Caribbean*, ECF Nos. [141] ¶¶ 37, 41, 45, [172] ¶¶ 37, 41, 45; *see also id.*, ECF Nos. [128-17], [128-20], [128-21]. First, Royal Caribbean entered into contracts with Aries to dock its ships at the first pier at the Terminal. *Id.*, ECF Nos. [141] ¶ 37, [172] ¶ 37. Second, Royal Caribbean entered into a series of contracts with Mambisa to act as port agent in Havana. *Id.*, ECF Nos. [133] ¶ 23, [141] ¶ 41, [172] ¶ 41, [183] ¶ 23. Third, Royal Caribbean entered into a series of contracts with Havanatur to operate shore excursions in Havana

---

[24] MSC SA paid Comar, a Cuban law firm, $27,000.00 for legal services in connection with cruises to Cuba. *MSC*, ECF Nos. [201-6] at 38–39, [218-4] at 42.

that were sold by Royal Caribbean to its passengers. *Id.*, ECF Nos. [141] ¶ 45, [172] ¶ 45. The Cuban Government owns Aries, Mambisa, and Havanatur. *Id.*, ECF Nos. [141] ¶¶ 39, 43, 46, [172] ¶¶ 39, 43, 46.

Royal Caribbean paid Aries $6,982,902.88 related to cruises to Cuba that sailed from March 2017 to June 2019. *Id.*, ECF Nos. [141] ¶ 40, [172] ¶ 40. Royal Caribbean also paid Mambisa $3,583,630.00 for its port agent services. *Id.*, ECF Nos. [141] ¶ 44, [172] ¶ 44. Royal Caribbean paid Havanatur $19,314,276.21 in connection with shore excursions for passengers in Cuba, most of which began and ended at the Terminal. *Id.*, ECF Nos. [141] ¶ 47, [172] ¶ 47. Royal Caribbean made payments only to Aries, Mambisa, Comar, and Havanatur. *Id.*, ECF Nos. [141] ¶ 36, [172] ¶ 36.

### 4. *Norwegian*

From 2016 to 2019, Norwegian contracted with three Cuban Government agencies related to the use of the Terminal. *Norwegian*, ECF Nos. [228] ¶¶ 21–23, 27–29, 31–32, [282] ¶¶ 21–22, 27–28, 31–32; *see id.*, ECF Nos. [282-2], [282-3], [282-4]. First, Norwegian entered into various agreements and supplements with Aries to provide port berthing operations services for Norwegian's passenger cruises at the Terminal's Pier 1. *Id.*, ECF Nos. [228] ¶ 21, [282] ¶ 21. Aries was the port authority that operated the Terminal, and it acted on behalf of the Cuban Government. *Id.*, ECF Nos. [228] ¶¶ 22–23, [282] ¶¶ 22–23. Second, Norwegian entered into an agreement and supplements with Mambisa to provide port agent services for Norwegian's passenger cruises the Terminal's Pier 1. *Id.*, ECF Nos. [228] ¶ 27, [282] ¶ 27. Mambisa is the port agent that operated the Terminal when Norwegian provided passenger carrier services to Cuba, and Mambisa acted on behalf of the Cuban Government. *Id.*, ECF Nos. [228] ¶¶ 28–29, [282] ¶¶ 28–29. Third, Norwegian entered into agreements and amendments/supplements with Havanatur—the excursion operator

the Cuban Government assigned to Norwegian. *Id.*, ECF Nos. [228] ¶ 31, [282] ¶ 31. Havanatur provided excursions sold by Norwegian related to its passenger carrier services to Havana, which left from, and returned to, the Terminal. *Id.*

Norwegian signed the initial contracts with Aries, Mambisa, and Havanatur at Pier 1 of the Terminal. *Id.*, ECF Nos. [228] ¶ 36, [282] ¶ 36. Norwegian paid Aries and Mambisa through a third-party, Fuego Enterprises, Inc. ("Fuego"). *Id.*, ECF Nos. [228] ¶ 25, [282] ¶ 25. From August 2015 to July 2019, Norwegian paid Fuego $7,481,302.52 related to Norwegian's use of the Terminal, which included payments made to Aries and Mambisa related to Norwegian's use of the Terminal. *Id.*, ECF Nos. [228] ¶ 26, [282] ¶ 26. From February 2017 to July 2019, Norwegian also directly paid Mambisa $1,824,387.44 for its port agent operations services in Cuba, including services to be rendered at the Terminal. *Id.*, ECF Nos. [228] ¶ 30, [282] ¶ 30. Norwegian directly paid Havanatur $6,262,367.00 for Havanatur to provide shore excursions and other travel-related services to passengers in Cuba, including for shore excursions that left from and returned to the Terminal. *Id.*, ECF Nos. [228] ¶ 35, [282] ¶ 35.

## H. Defendants' Shore Excursions

### 1. *Carnival*

Carnival contends that it "developed an OFAC compliance program for its passengers, staff and crew members" and "offered day-long shore excursions for social and educational enrichment exchanges" that complied with the people-to-people travel guidelines. *Carnival*, ECF No. [326] ¶¶ 41–42. Carnival also submits that it "required its passengers to swear in affidavits that they traveled to Cuba pursuant to one of the categories of travel licensed and authorized by the U.S. Government (one of which included educational, people-to-people travel), and complied with those requirements." *Id.*, ECF No. [374] ¶ 78. Havana Docks disputes those facts, contending that

there is no evidence that passengers, staff, and crew complied with Carnival's OFAC compliance program or that Carnival's excursions were people-to-people travel compliant. *Id.*, ECF No. [377] ¶¶ 41–42.

The shore excursions that Carnival offered to its passengers included "Tropicana Cabaret: Rhythms of the Night," "Parisien Cabaret at Hotel Nacional," and "El Canonazo: An Evening Out in Havana." *Id.*, ECF Nos. [332] ¶ 78, [374] ¶ 78. Havana Docks describes these excursions as "tourist shows," incompatible with people-to-people travel. *Id.*, ECF No. [332] ¶ 78. Carnival does not dispute that description but argues: "Carnival offered OFAC compliant fulltime programming for P2P travel, and only offered evening excursions . . . as additional and optional experiences to passengers who completed the full-time schedule. *Id.*, ECF No. [374] ¶ 78.

In the Tropicana Cabaret excursion, Carnival invited guests to "[e]njoy an evening under the beautiful Cuban sky with a performance at the Tropicana Cabaret -- Cuba's largest nightclub." *Id.*, ECF No. [311-38] at 4. Carnival's excursion included: "Elaborate costumes, entertaining performers and a live orchestra -- you'll enjoy it all and much more in this Vegas-style extravaganza. Your cabaret package includes admission, assigned seating, a welcome drink, plus ¼ bottle of rum with mixers." *Id.* Carnival described the Parisien Cabaret excursion as follows: "Hosted at the famed Hotel Nacional, the Parisian Cabaret showcases the soul of Cuba. Inspired by Indo-American, Hispanic and African cultures, the Parisian tells the story of Cuba in traditional cabaret fashion. Your outing includes transportation by motorcoach, entrance and a cocktail." *Id.* at 8. The El Canonazo excursion involved a visit to "El Cristo -- an impressive . . . 55-foot-tall statue of Christ sculpted from Italian marble," which gave travelers "beautiful photo opportunities of the statue and the Havana skyline," as well as the opportunity to watch a "cannon ceremony" at a former Spanish fortress. *Id.* at 6.

51

All three evening excursions had a disclaimer stating, "This evening shore excursion does not comply with the People-to-People guidelines and cannot be considered to be part of the required full schedule of activities." *Id.* at 4, 6, 8.

One of Carnival's excursions marketed as people-to-people travel compliant was "Explore Havana by American Classic Car." *Id.* at 5. Carnival described the excursion as follows:

> Experience a meeting of the ages as you travel in '60s style through Havana's modern neighborhoods. This two-hour joyride in an **American classic vehicle** shows you the sights and introduces you to Havana. Begin with a transfer to the **Plaza de la Revolucion**, where pastel-colored classic Fords, Chevys and Oldsmobiles greet you with bright chrome smiles that belong to a different era. Feel the breeze in your hair as you ride along the **Malecon** and through the Vedado and Miramar districts, seeing some of the city's most famous hotels and embassies.
>
> Visit the Almacenes San Jose market to enjoy free time to interact with the local souvenir vendors and take home your very own piece of Cuban memorabilia.

*Id.* (emphasis in original). The tour description further stated:

> After guests have completed their required full time [sic] schedule of people to people activities, they are welcome to explore Cuba on their own or participate in evening HAL excursions (not designed to be people to people programs).
>
> This tour is designed to be in compliance with People to People guidelines.

*Id.*

Carnival's corporate representative, Giora Israel, testified as follows regarding the evening excursions:

> The person that comes to Havana on the people-to-people, whether by land or by ship, had to be engaged in a day's long activity. It doesn't mean that he couldn't do other things in the evening.
>
> So we -- the only thing we can do is to provide a day long, a[n] eight-hour or so -- and our tours were eight hours or two tours of four hours. And if the ship stayed until midnight and they wanted to do a Havana Tropicana tour, they could do that, and so we would sell them that tour. There's nothing wrong with that.

*Id.*, ECF No. [308-4] at 60.

Israel also testified:

> We did operate strictly in accordance to [sic] US OFAC regulations that applied to us, and I can tell you that people-to-people can be done in various places. But what the people wanted to see, what the people demanded is Havana, and that's it. Nobody would have operated -- we would have not planned for it, nor did any other cruise line, to go to Cuba without going to Havana. Havana is Cuba and Cuba is Havana notwithstanding the restrictions that it has to be people-to-people.

*Id.* at [326-32] at 88–89.

Israel explained how excursions were offered on Carnival ships. *Id.*, ECF No. [326-32] at 172–74. Initially, tours were provided to *Adonia* passengers free of charge. *Id.* at 172. Once other Carnival ships began sailing to Cuba, passengers had to purchase "people-to-people elements from us" and "satisfy us by issuing the appropriate people-to-people certifications that they have acquired/purchased from us." *Id.* at 173. Carnival had, in turn, "bought those from Havanatur tour elements that qualify under people-to-people that in total had to fill at least an eight-hour day of engaging in people-to-people activities." *Id.* As Israel described it, "we were the seller, and we had bought it from Havanatur which was the only entity we could buy those tours [from]." *Id.* at 174. "After a relaxation of the regs," passengers "did not need to buy tours from us anymore," although Carnival "encouraged them to buy the tours from us -- mainly so they are protected to be under the people-to-people." *Id.* at 173.

According to Carnival's Fathom Travel Ltd. Cuba Operations Compliance Plan,[25] "Passengers have two options for participating in qualifying P2P [people-to-people] exchange programs: (i) participation in a 'Fathom-Guided' group program fully arranged and sponsored by Fathom; or (ii) participation in a 'self-guided' P2P program arranged individually by the passenger." *Id.*, ECF No. [326-45] at 7. The plan further stated that "[a]ll guests must participate

---

[25] As stated earlier, when applying for a specific license to travel to Cuba, Carnival informed OFAC that it would be "using the Fathom program . . . to meet the requirements of the full-time schedule for people-to-people travel pursuant to the [CACR]." *Carnival*, ECF No. [326-26] at 3.

in a people-to-people program on each day in Cuba," and that "[a]ll daytime Carnival Adventure excursions fulfill this requirement." *Id.* at 45.

Carnival's Shore Excursion Manager Tour Operations Guide ("Guide"), dated March 2019, listed four evening excursions lasting 2.5 to 3 hours: (1) "Tropicana Cabaret - Rhythms of the Night," beginning at 8:00 p.m. and lasting 3.5 hours; (2) "El Canonazo Evening Tour," beginning at 7:30 p.m. and lasting 2.5 hours; (3) "The Parisien Cabaret at the Hotel Nacional," beginning at 9:15 p.m. and lasting 3 hours; and (4) "Buenavista Social Club at Havana Cafe," beginning at 8:00 p.m. and lasting 3.5 hours. *Id.*, ECF No. [326-46] at 8–9. Carnival also offered several excursions that took place during the day, including "Explore Modern Havana in an American Classic." *Id.* at 8–9. The guide states that the daytime excursions were part of "Community Projects where guests have the People to People cultural interaction with the people from Cuba that is required per law." *Id.* at 12. By contrast, "[n]ight tours [did] not have these Community projects" and "therefore [were not] in compliance with the P2P guidelines." *Id.*

One section of the Guide, labeled "People to People guidelines," addressed whether it is "**mandatory to have an excursion to exit the ship**." *Id.* (emphasis in original). The guide cautioned that this "sensitive question" must be "answered with honesty in order to avoid future conflicts, complaints and being involved in bad situation with guests." *Id.* The guide stated that "[t]he answer is **NO**, [it] is not mandatory to have an excursion to leave the ship." *Id.* (emphasis in original). The guide continued that "[g]uests without excursions can come in and out as much they want" but "**they will not be in COMPLIANCE** with the P2P guidelines (unless they claim they have 3rd party P2P experience . . . but once again we cannot vouch for that to be valid)." *Id.* (emphasis in original).

## 2. *MSC*

MSC contends that it "developed a program to ensure all passengers who disembarked from the *Armonia* in Havana were in compliance with the General Licenses." *MSC*, ECF No. [210] ¶ 19. According to MSC, its website informed passengers about governmental regulations. *Id.* ¶ 20. Before boarding, every passenger was required to submit a certification that they were traveling under one of the twelve permissible OFAC categories. *Id.* ¶ 21. While on board the *Armonia*, MSC provided passengers "with information regarding compliance with the regulations for cruising to Cuba, including an on-board presentation about the OFAC regulatory requirements." *Id.* ¶ 22. Before debarkation, "passengers were required either to purchase a shore excursion compliant with people-to-people regulations or to participate in another of the 12 categories of authorized travel permitted by OFAC." *Id.* ¶ 23. And "[a]ll shore excursions offered by MSC [SA] were vetted to ensure that they complied with the requirements of the people-to-people regulations." *Id.* ¶ 24.

Havana Docks concedes that MSC's website informed passengers of the *Armonia* that they had to either participate in a people-to-people program or qualify under another permissible category of travel. *Id.*, ECF No. [259] ¶ 20. But Havana Docks contends that MSC SA did not have a policy to ensure that its passengers and the excursions provided complied with the people-to-people guidelines. *Id.* ¶¶ 19, 24. Havana Docks further submits that MSC SA did not require people-to-people programming in all aspects of the cruises or require that *Armonia* passengers purchase excursions. *Id.* ¶¶ 21, 23. Moreover, Havana Docks argues that no competent evidence shows that passengers received onboard OFAC training. *Id.* ¶ 22.

It is undisputed that MSC SA, in consultation with Cubanacan, chose and approved the shore excursions that could be offered to passengers on the cruise ships and contracted with Cubanacan for these excursions. *Id.*, ECF Nos. [224] ¶ 101, [253] ¶ 101. The parties also agree

that MSC SA sold its passengers shore excursions that were designed and marketed as complying with the OFAC regulations. *Id.*, ECF Nos. [259] ¶ 68, [273] ¶ 68. MSC adds that the excursions were implemented as marketed. *Id.*, ECF No. [273] ¶ 68.

On Cuba-to-Cuba cruises, MSC SA provided excursions entitled "Sun, Sea and Sand at Varadero Beach," "Beach Time at Santa Maria del Mar," and "Tropicana Cabaret." *Id.*, ECF Nos. [224] ¶¶ 102–104, [253] ¶¶ 102–104. MSC contends that the Varadero Beach and Santa Maria del Mar excursions were not available on U.S.-to-Cuba cruises. *Id.*, ECF No. [253] ¶¶ 102–103. MSC does not dispute that the Tropicana Cabaret excursion was offered on U.S.-to-Cuba cruises. *Id.*, ECF No. [253] ¶ 104.

The excursions available on the *Armonia* included "Havana City Tour by Vintage American Cars," "Cultural Havana, Rum & Cigars," and "A Night at the Tropicana Cabaret." *Id.*, ECF No. [253-2] at 30. According to the *Armonia's* Shore Excursion Program, the 3.5-hour Havana City Tour by Vintage American Cars involved traveling "around Havana's historical cityscape in a vintage car," "a Cuban cocktail before continuing on down the seafront Malecón boulevard and Quinta Avenida," and visits to landmarks, including "'Proyecto Comunitario Callejón de Hamel', a colourful street full of murals and surprising sculptures made out of random objects including hand pumps or bathtubs." *Id.* at 30. The 4-hour Cultural Havana, Rum & Cigars excursion involved a "watch[ing] highly-skilled torcedors as they hand-roll the best Cuban cigars"; photos at the "Plaza de la Revolución"; and visits to the "Hotel Nacional de Cuba via the Museum of the Revolution" and the "Havana Club Museum to find out how freshly cut sugarcane is distilled into rum." *Id.* The description also stated: "As a final highlight, you'll be able to enjoy a taste of the finished product. Some free time will then be yours to browse for a memento and take more photos before you return to the ship." *Id.* The 4-hour Tropicana Cabaret excursion featured "dancing girls

wearing scanty costumes and feathered headgear." *Id.* Guests would watch a "[a] live orchestra" and "some 200 performers, whose only remit is to provide a fascinating insight into the things Cubans love most: music, dancing and Havana Club rum, of which you'll be served a ¼ bottle with a suitable mixer to sip during the show." *Id.*

MSC's instructions to passengers stated that "[a] People to People shore excursion program has been designed for these sailings. All guests wishing to go ashore in Cuba, must do so as part of an organized P2P excursion." *Id.*, ECF No. [210-23] at 1. Marialuisa Iaccarino, the Shore Excursion Business Development Manager for MSC SA, *Id.*, ECF No. [201-7] at 5, testified:

> The requirement of the American laws and not MSC only. So MSC was just informing or trying even under every single possible way -- even before they were boarding the ship to get the proper information about the travel restrictions when a cruise starting from US and then going to Cuba.
>
> So it was highly recommended to buy shore excursions or the guests were a select -- they had to fill in the declaration that if they were falling under the 12 other categories allowed to travel to Cuba, that was their responsibility to do so. It wasn't MSC requirement, although, as I said, highly recommended.

*Id.* at 26.

> Iaccarino testified:
>
> Okay. Let me rephrase it. MSC did anything in any possible way to inform guests that it was their responsibility to be part of the shore excursion of MSC or be part of any other categories, but it was a separate declaration. It was still under the responsibility of the guests itself, whatever they will do in Havana. It's referring to -- the department I'm referring to -- I can tell you that every guest was taking an excursion, was proving the ticket that they were taking an excursion, and once ashore in Havana, they did the people-to-people excursions.

*Id.* Iaccarino also testified: "Our responsibility is not to police guests but to inform them about the local regulations and the things to respect when on shore excursions." *Id.* at 25.

Mark Zeller, Vice President of US Hotel Operations for MSC SA, stated in a December 2018 internal email, "we do not police guests, we do not check whether a guest has purchased a

tour ticket or not, we do not block guests at the gangway." *Id.*, ECF No. [202-47] at 2. Iaccarino testified that Zeller was mistaken about MSC's policy. *Id.*, ECF No. [201-7] at 27.

In addition, Iaccarino testified that MSC's excursions had "a main element a cultural exchange, historical visits, and that's what we have to try to enhance the program that we used to have for Havana by adding those aspects in every single excursion we were planned to have." *Id.* at 15. Iaccarino also stated that MSC relied on Cubanacan to develop the people-to-people excursions—"Being our tour operator, that's practically their job, to sell to us a product"—but that MSC "vetted every single excursion content and verify that it was meeting the people-to-people criteria." *Id.* at 24.

> When asked about the Tropicana Cabaret excursion, Iaccarino testified:
>
> first of all, it's a historical part of Cuba that was founded in 1939. The iconic celebration of the culture, as you easily mentioned just dancing girls, actually takes place in explaining the people the local culture of the famous mulatta girls, and it's also talking and using historical music or languages such as the Yoruba language that allows the people not only to -- just to see any cabaret that you will see in any other place but really a unique experience in Cuba, hearing what is the music, what is the dance -- typical dances of Cuba itself. So it's not only a cabaret show. It really has a historical background, not only because it's situated in a historical location but because the contents of the show are historical itself. And they teach a lesson and they explain to tourists even. And it's also really a way to see the Cuban life from another point of view that is not only just going and seeing monuments.

*Id.*, ECF No. [201-7] at 21.

Concerning the Vintage Car Tour, Iaccarino testified: "In every excursion we created the possibility to interact or to discover some commentary or social so-called project. In this specific case, although the experience is not from the buses but is from cars that -- I mean, every single tourist would love to be in it." *Id.*

In a declaration filed in support of MSC's Individual Summary Judgment Motion, Iaccarino testified that "[e]very shore excursion that MSC Cruises S.A. provided, with the assistance of local

Cuban tour operator Cubanacan, was vetted internally to ensure that each possessed a predominant cultural or historical component." *Id.*, ECF No. [210-18] ¶ 5. She also states in her declaration that "MSC Cruises S.A.'s program also required passengers to show proof of excursion before a passenger was permitted to disembark in Havana." *Id.* ¶ 11.

Roberto Fusaro, a director at MSC USA, *id.*, ECF No. [201-2] at 9, testified that his "understanding was that under the people-to-people license that we applied while . . . MSC Cruises S.A. was offering cruises from the US to Cuba, passengers had to disembark with a shore excursion organized under the people-to-people regulations." *Id.* at 29. Fusaro further testified that "[t]he policy of MSC Cruises S.A. in the past was that no passengers would be allowed to disembark in Havana unless they have purchased a shore excursion," but he did not recall what procedures were in place to enforce that policy. *Id.*

MSC SA's CEO, Giovanni Onorato, *id.*, ECF No. [201-3] at 4, testified that he did not know whether cruise passengers were educated about the lack of political freedoms in Cuba or met with Cuban dissidents. *Id.* at 53–54.

### 3. *Royal Caribbean*

Havana Docks states that Royal Caribbean approved, developed, and determined the shore excursions that could be offered to passengers on its ships. *Royal Caribbean*, ECF No. [141] ¶ 91. Royal Caribbean does not dispute that fact; instead, it clarifies that Havanatur ran the shore excursions that Royal Caribbean developed. *Id.*, ECF No. [172] ¶ 91. The excursions Royal Caribbean offered included Cocktail Making Classes (the Art of Cuba Cocktails), Tropicana Cabaret, Parisien Cabaret, Arsenio Rodriguez Band, and Old Havana Sightseeing and Walking Tour Combination. *Id.*, ECF Nos. [141] ¶ 96, [172] ¶ 96.

A 2018 shore excursion catalog for Royal Caribbean listed 40 excursions. *Id.*, ECF No.

[131-43] at 4–5. The catalog stated that "[f]or all excursions, the people-to-people component will appear with the symbol **P2P**." *Id.* at 6 (emphasis in original).

The Cocktail Making Classes, which were 3.5 hours long, had the following description:

• Welcome and group meeting by the guide at the Cruise Terminal (20 min)
• Depart to the locales for interaction in relation to making Cuban cocktails. (20 min).
• Clients will receive explanations from specialists in making cocktails on how to make these types of drinks at home. (20 [to] 30 min).
• Sub-groups will be formed within the locales so the clients can comfortably prepare the drinks being taught, and competitions will take place between the groups to determine which preparations were the best (25 min).
• **At the end there will be time to interact with the training specialists and hear some of their experiences and anecdotes about the profession (P2P). (15 min).**
• Taste some hors d'oeuvres as well as 3 beverages, with a choice of mojito, daiquiri, cubalibre, soft drink, beer, water. (45 min).
• Return to port. (25 min).

*Id.* at 29 (emphasis added).

The catalog listed two Tropicana excursions, one without dinner and a VIP experience, both lasting 3.5 hours. *Id.* at 17–18. None of them have a "P2P" designation. *Id.* The description of the non-VIP version stated that there is a 90-minute "Tropicana performance," which "[i]ncludes [a] welcome cocktail, 1 bottle of rum per table, 1 soft drink, mixed hors d'oeuvre and one tobacco." *Id.* at 17. The catalog also stated that "[o]ur guides provide the clients a historical summary of the locale and the Italian American Mafia's management of the space prior to 1959." *Id.*

The catalog described the "Cabaret Parisién" excursion as follows:

Enjoy one of the most well-known typical night cabaret shows of Cuban Culture in the world, in the Hotel Nacional de Cuba, renowned worldwide. A night visit to the Malecon of Havana and part of the city from the gardens of the Hotel Nacional de Cuba. In the Hotel Nacional, they will find historical information about the stays of Frank Sinatra, Ava Gardner, Buster Keaton and Winston Churchill, who attended the Cabaret Parisien decades before to admire the sensational show "Cubano, Cubano".

*Id.* at 19. The description for the Cabaret Parisién does not include a "P2P" designation. *Id.*

The catalog described the Arsenio Rodriguez Band excursion as follows:

> Treat yourself with one of the most well-known typical night cabaret shows of Cuban Culture in the world, the Arsenio Rodriguez Band show, music experienced in the US in the first half of the 20th Century, which even has a street named after it. Creator of the "Salsa" style in Cuba. Pure Cuban rhythm with traditional musical offerings like son, chachacha, montuno, rumba, guaracha, among other surprises.

*Id.* at 18. As the "P2P" component, the catalog stated, "[t]he visitor will have the opportunity to be not just a spectator, but also actively with [sic] some of the orchestra's musical instruments. There may be a small interaction with some of the musicians to learn about their academic and musical training, customs, etc." *Id.* at 19.

The Old Havana Sightseeing and Walking Tour Combination, which lasts 9 hours, includes visits to various locations in Havana for photos; explanations of the various sites; and "[t]ime to taste an exquisite tobacco, and a rum beverage." *Id.* at 32–33. The only "P2P" designation is a 90-minute segment that states: "Walking tour through the Plaza de San Francisco de Asis, Plaza de Armas, Plaza de la Catedral and Plaza Vieja. There, they will have the opportunity to have ongoing exchanges with locals, vendors, artisans, entrepreneurs, and to learn about the customs of the residents of Old Havana." *Id.* at 33.

Maria "Megan" Shaw, Royal Caribbean's Account Manager of Product Development, and involved with Royal Caribbean's shore excursions for 29 years, *id.*, ECF No. [122-4] at 5, characterized the Tropicana Cabaret as "one of the most iconic shows that were very popular from like the '30s through the '50s onwards in Havana." *Id.* at 28. She described the experience as follows:

> It was actually a super neat experience. Guests were taken over. They were put into the show area, and then they saw the performers, the music. There was a little bit of history on . . . how the styles kind of changed along the way in dancing and music. And then at the end, the guests had a chance to participate and come on stage and dance [a] little bit with the performers.

*Id.* When asked about the people-to-people component of the Tropicana Cabaret show, Shaw answered that "throughout the show," there was "an MC kind of giving you a history of Cuba." *Id.* at 35.

Regarding the Cabaret Parisién, Shaw testified:

That's along the same lines as the Tropicana. So this one took place, if I remember correctly, at Hotel Nacional, which is one -- probably one of the most iconic hotels in Havana proper. And it's the same sort of thing -- it had a lot of history, which I thought was really neat, of performers in the past that have either performed there or stayed at the property. The property was just gorgeous. And then they had the same sort of concept. So they would go ahead and talk about the history of Cuba. They'll talk about the performers that had performed at that location. They did different musical routines with dancers. And then at the end they would have interactivity with our guests before going back to the ship.

*Id.* at 29.

Concerning the "Art of Cuba Cocktails," Shaw stated:

So that one we had as kind of a workshop. It was a smaller group of people that would actually interact with people that have worked in particular hotels that were -- again, had a history of ties with the US in the past. So, you know, there was -- back in the earlier '50s, there were ties with casino people here in the United States that maybe would have owned property in Cuba and -- and so they talked about the history, and then they also showed them the most popular cocktails. So like the mojitos -- other cocktails that they can go ahead and do and at the same time learn with them, much like other interactions where I felt it was actually a neat way of exposing people through food and beverage, which people really feel much more comfortable about and enjoying.

*Id.* at 30.

In January 2019, Jorge Delgado, Vice President of Global Business Development at Celebrity Cruises, one of Royal Caribbean's brands, *Id.*, ECF No. [122-6] at 10, sent an internal email to Celebrity's Director of Strategy & Consumer Insights, three other Celebrity employees, regarding current developments in Cuba. *Id.*, ECF No. [123-29] at 3–4. Delgado related that Cuba's socioeconomic and political environment had worsened in the last six months, reaching levels unseen since the "special period" in the 1990s, after the collapse of the Soviet Union. *Id.* at 3.

Havanatur's tour guides were "tired, hungry, scared, and much like everybody else, don't believe in the regime any longer." *Id.* Delgado explained that "many of them are hired from the Cuban Ministry of Foreign Relations Academy (because of their language skills) these individuals (after being brainwashed for four years) come to work for Havanatur believing our guests are not tourists, but the American invaders they were told were coming." *Id.* at 4.

At deposition, Delgado recalled that during the later years of the tours, the tour guides would "enter all kinds of nonsensical discussions with our guests on political issues." *Id.*, ECF No. [122-6] at 27. As Delgado put it, "What they were doing basically to our guests was reading the communist party bible on whatever they believe in." *Id.* Delgado also stated, "I believe that many of these guys got those positions and were trained on how to respond to questions from the guests in the way they did, basically brainwash[ed]." *Id.*

####     4.   *Norwegian*

Norwegian sold shore excursions to its passengers that it designed, approved, marketed, and guaranteed complied with the "general license for people-to-people travel." *Norwegian*, ECF Nos. [284] ¶ 73, [309] ¶ 73. Norwegian approved every shore excursion in Cuba that it sold to its passengers. *Id.*, ECF Nos. [228] ¶ 78. [282] ¶ 78. Havanatur operated and organized the shore excursions approved and sold by Norwegian. *Id.*, ECF Nos. [228] ¶ 80, [282] ¶ 80.

Norwegian contends that it "implemented a robust program to ensure [OFAC] compliance." *Id.*, ECF No. [234] ¶ 16. Norwegian submits that it maintained an OFAC compliance manual, required each passenger to execute an affidavit attesting that they were traveling for a permissible reason, and educated passengers regarding OFAC regulations. *Id.*, ECF No. [234] ¶¶ 17–19. Havana Docks agrees that Norwegian had an OFAC compliance manual but disputes the rest of the facts and raises hearsay objections. *Id.*, ECF No. [284] ¶¶ 16–19.

The shore excursions approved, offered, and sold by Norwegian in Havana included "The Legendary Tropicana Cabaret," "Parisien Cabaret at the Hotel Nacional de Cuba," "Buena Vista Social Club at Habana Café," "An Evening Stroll in Colonial Havana," "The Old Colonial Havana," "Modern Havana in an American Classic," "Colors and Flavors in Havana," and "Las Terrazas and It's Nature." *Id.*, ECF Nos. [228] ¶ 85, [282] ¶ 85. Norwegian also approved, offered, and sold the excursions "Submerged Pearl," "Cienfuegos Dolphins," and "Cienfuegos & Its Nature" during cruises to Cienfuegos that included a stop at the Terminal. *Id.*, ECF Nos. [221-16], [217-6], [228] ¶ 86, [282] ¶ 86. Havana Docks states that these cruises also docked at the Terminal, and Norwegian does not present evidence to the contrary. *Id.*

Norwegian's Shore Excursion Program ("Program") informed passengers:

Please be advised that the Cruise *tourism* in Cuba is operated by a Government owned Tour company. Therefore, guides, venues and any means of transportation are selected & provided solely at their own discretion. Tour Guides' English competency varies greatly, please expect heavy accents. Tour durations are approximate and unforeseen delays may be expected. The American Cruise Industry is fairly new to Cuba, therefore, we appreciate your understanding if the same quality and standards are not met as to those other more tourism-developed cruise destinations.

*Id.*, ECF No. [217-6] at 6 (emphasis added)

The Program states that the "Tropicana Cabaret" excursion involves a show but provides no detail about its content. *Id.* For the "Parisien Cabaret," the program states that guests will "[e]njoy the atmosphere of the [Hotel Nacional] while waiting for the show to start" (30 minutes); watch "a spectacular Vegas style performance, which blends the Indo-American, Hispanic and African cultures that led to the Cuban culture as it is known today" (two hours); and "[e]njoy leisure time at the club" (15 minutes). *Id.* at 7. For the "Buena Vista Social Club," the program states that guests will "[e]njoy the atmosphere of the [Habana Café] while waiting for the show to start" (35 minutes) and "[e]njoy the musical performance of Buena Vista Social Club" (an hour

and 40 minutes). *Id.* at 6.

For the "An Evening Stroll in Colonial Havana" tour, the Program states that guests will visit Cathedral Square, Arms Square, Old Square, and Sloppy Joe's Bar. *Id.* at 7. "The Old Colonial Havana" excursion had a similar itinerary, adding that passengers could "[v]isit the Almacenes de San Jose and have the opportunity to buy [a] Cuban souvenir." *Id.* The "Modern Havana in an American Classic" is described as encompassing various Havana landmarks in a vintage automobile. *Id.* at 6.

> Norwegian's January 2019 Program contained a slightly different disclaimer:
>
> Please be advised that shore excursions in Cuba are operated by a third party, therefore guides, venues and any means of transportation are selected and provided solely at their discretion. Tour Guides' English competency varies greatly, please expect heavy accents. Tour durations are approximate, content can change and unforeseen delays up to 1-2 hours are expected and quite common. The U.S. Cruise Industry is new to Cuba; therefore, we appreciate your understanding if the quality and standards are not met as compared to other more developed cruise destinations. **All our shore excursions are OFAC compliant**.

*Norwegian*, ECF No. [301-2] at 3 (emphasis added).

The "Modern Havana in an American Classic" excursion added the following disclaimer: "The Vintage Car ride is an orientation drive operated by a driver only. Drivers barely [s]peak English and are not guides. Information is very limited. However, a tour guide will provide explanations to the group at each stop during the bus drive." *Id.*

Disclaimers were also added to the "Tropicana Cabaret" excursion: dinner was not included, beverages were an additional charge, and "show may contain sensual dancing." *Id.*

The 2019 Program also included descriptions of excursions in Cienfuegos and Santiago de Cuba. *Id.*, ECF No. [301-2] at 5–6. The "Cienfuegos Dolphins" excursion included a visit to various sites, a "[d]olphin show and opportunity to talk to the coaches," and "free time on the historical Boulevard Santa Isabel, where you may browse the shops before returning to the pier."

*Id.* at 5. The "Cienfuegos & Its Nature" excursion included "1h30min of hiking in the park," "[f]ree time to swim in . . . natural pools," and a "Creole-style lunch" at a local restaurant. *Id.*; *see also id.*, ECF No. [301-3] at 4 (stating that guests "will have free time for [a] bath in natural settings and to take photos"). According to another document describing some of the Norwegian's Cienfuegos shore excursions, "The Submerged Pearl" excursions involved visits to several Cienfuegos sites and the opportunity to buy souvenirs in the Boulevard Santa Isabel. *Id.*, ECF No. [301-3] at 9.

In another document describing the Havana excursions, in "Colors and Flavors in Havana," Norwegian passengers would "[d]elve into the local culture by visiting a superb dance company, sampling Cuban rum paired with cigars, and learning to make classic cocktails before dining on Cuban cuisine." *Id.*, ECF No. [301-1] at 7. "Las Terrazas and It's Nature" involved an eight-hour tour of "an environmentally conscious small town where most of the activities revolve around nature." *Id.* at 2. According to the excursion description, "[a]s you meander around the eco-friendly town, you will probably see artists in their workshops and encounter hikers on their way to and from the many trails surrounding Las Terrazas." *Id.* The excursion included a visit to a museum, coffee at a café, and a drive to the San Juan River, where travelers were "free to swim in the gently flowing waters or simply relax in the shade and gaze out over the tropical landscape." *Id.*

Regarding the Tropicana, Norwegian's Corporate Representative, Mario Parodi, was asked at deposition, "That's a great tourist attraction; correct, sir?" *Id.*, ECF No. [214-1] at 34. Parodi answered, "Yes, it is." *Id.* In addition, when asked, "[b]esides the Tropicana Nightclub, what other similar type of tourist excursions did Havanatur organize for the NCL passengers?" he answered, "I know there are two other shows that we offer through Havanatur, and then there are the monuments and the local attractions." *Id.* In addition, Parodi was not aware of any Norwegian

excursion that met with religious organizations. *Id.* at 35. Parodi also confirmed that Havanatur did not organize excursions where passengers met with members of the dissident movement in Cuba, persons not affiliated with the Cuban Government, or artists not employed by a Cuban Government agency. *Id.*

Christine Manjencic, who was responsible for shore excursions in Cuba for Norwegian, testified that the people-to-people components of the "Buena Vista Social Club" excursion included a "meet and greet by maître d', wait staff" and "a component where our guests met with the artists" and "where guests had the opportunity to dance with the artists or partake in the activity that was happening at that time." *Id.*, ECF No. [214-8] at 41. Manjencic testified similarly about the Tropicana Cabaret, adding that "guests could have an exchange with the artists, with the performers, with the musicians, the presenters -- so they could discuss about the show and about their art history," and learn salsa at the end of the show. *Id.* Manjencic provided similar testimony regarding the "Parisien Cabaret." *Id.* at 41–42.

Norwegian also filed a Declaration of Christine Manjencic in support of its opposition to Havana Docks' Individual Motion for Summary Judgment. *Id.*, ECF No. [282-12]. Manjencic described "An Evening Stroll in Colonial Havana" as "a walking tour, led by a Cuban guide, of various culturally significant locations throughout the densely populated Old Havana, including a local pedestrian street where passengers had an opportunity to interact with locals, such as artists and street vendors." *Id.* ¶ 3. Manjencic stated that "[t]he excursion concluded with a stop outside of the historical Sloppy Joe's Bar" but did not take place "inside Sloppy Joe's Bar." *Id.* ¶ 4. Manjencic describes "The Old Colonial Havana" excursion in the same manner, adding that "passengers also had an opportunity to interact with the owners of privately owned businesses at the Almacenes de San Jose." *Id.* ¶¶ 5–6.

Concerning the "Modem Havana in an American Classic" shore excursion, Manjencic stated that "passengers were paired with a local Cuban driver." *Id.* ¶ 7. Manjencic testified that "Cienfuegos Dolphins" allowed passengers to "interact[] with and learn[] from local Cubans who worked with dolphins and interacting with the locals at the historic Boulevard Santa Isabel -- a dense urban commercial street for pedestrians to interact with local vendors and artisans." *Id.* ¶ 10. As to "Cienfuegos & Its Nature," Manjencic stated that "passengers were led by a local Cuban guide through the historically significant Escambray Mountains," "had an opportunity to personally interact with local residents," and "dined at a privately owned restaurant that served Creole-style lunch at which passengers had an opportunity to interact with the chef and employees." *Id.* ¶¶ 11–12. Manjencic also stated that for "The Submerged Pearl," "a local Cuban guide facilitated exchanges between passengers and locals at various architectural landmarks in Cienfuegos" and "passengers had an opportunity to interact with local fishermen about the history and significance of this unique area as well as their daily life." *Id.* ¶ 13.

In April 2015, Norwegian's President and CEO, Frank Del Rio, when publicly speaking at the "Inaugural Cuba Opportunity Summit" at the University of Pennsylvania, was asked, "So travel restrictions when it comes to non-tourism travel have been eased dramatically, but is there anything that President Obama announced in December that allows you to do that?" *Id.*, ECF No. [221-15] at 4. Del Rio answered,

> I think it gets us one step closer. It starts the conversation. It starts the wheels moving. But today, no cruise line that is American-based -- certainly not a publicly traded company like Norwegian – can routinely go to Cuba with tourists. Tourism is still illegal under today's set of rules policies and guidelines. And it would be difficult for us to have a ship with 4,000 tourists -- people let's call them -- show up in Havana and call that people-to-people travel. That would be a stretch of the -- of the rules.

*Id.*

## I.   Havana Docks' Notice

On February 11, 2019, each Defendant received a letter from Havana Docks' counsel, informing each Defendant of the Certified Claim and accusing each of trafficking under the LIBERTAD Act. *Carnival*, ECF Nos. [332] ¶ 41, [374] ¶ 41; *MSC*, ECF Nos. [224] ¶ 28, [253] ¶ 28; *Royal Caribbean*, ECF Nos. [141] ¶ 20, [172] ¶ 20; *Norwegian*, ECF Nos. [228] ¶ 11, [282] ¶ 11. No Defendant obtained authorization from Havana Docks to use the Terminal. *Carnival*, ECF Nos. [332] ¶ 43, [374] ¶ 43; *MSC*, ECF Nos. [224] ¶ 32, [253] ¶ 32; *Royal Caribbean*, ECF Nos. [141] ¶ 24, [172] ¶ 24; *Norwegian*, ECF Nos. [228] ¶ 12, [282] ¶ 12.

## J.   Defendants' Knowledge of the LIBERTAD Act and the Certified Claim

Defendants have been aware of the LIBERTAD Act since 1996 or 1997. *Carnival*, ECF Nos. [332] ¶ 14, [374] ¶ 14; *MSC*, ECF Nos. [224] ¶ 26, [253] ¶ 26; *Royal Caribbean*, ECF Nos. [141] ¶ 8, [172] ¶ 8; *Norwegian*, ECF Nos. [228] ¶ 6, [282] ¶ 6.

Carnival had a general awareness since 1996 that there was a Certified Claim concerning the Terminal, and Carnival specifically learned of the Certified Claim in 2012. *Carnival*, ECF Nos. [332] ¶¶ 15–16, [374] ¶¶ 15–16. Norwegian learned of the Certified Claim in February 2017. *Norwegian*, ECF Nos. [228] ¶ 9, [282] ¶ 9. MSC and Royal Caribbean learned of the Certified Claim from the Havana Docks notice, in February 2019. *MSC*, ECF Nos. [210] ¶ 45, [259] ¶ 45; *Royal Caribbean*, ECF Nos. [141] ¶ 20, [172] ¶ 20.

## K.   Defendants' Revenues and Profits

### 1.   *Carnival*

Havana Docks states that Carnival earned money, or profited from, its cruises to Cuba. *Carnival*, ECF No. [332] ¶ 36. Carnival disputes that assertion, but Carnival's only counter-fact is that the *Adonia* was not profitable. *Id.*, ECF No. [374] ¶ 36. Based on Carnival's answers to

requests for admissions, Havana Docks asserts Carnival earned total net revenue for the CCL ships that docked at the Terminal of $67,788,397.00 and revenues for *Veendam* cruises that docked at the Terminal of $44,496,253.86. *Id.*, ECF No. [332] ¶¶ 37, 39; *see id.*, ECF No. [322-2] at 24, 38. Carnival disputes that those figures represent monies earned from the use of the Terminal, explaining that they represent revenues from every voyage that included a stop in Havana. *Id.*, ECF No. [374] ¶¶ 37–38.

Havana Docks also claims that Carnival earned $4,047,742.00 in revenue from the *Adonia*. *Id.*, ECF No. [332] ¶ 40. Carnival disputes that claim by stating that the *Adonia* was not profitable and by faulting Havana Docks for citing to 600 pages of documents without providing a pin citation. *Id.*, ECF No. [374] ¶ 40.

### 2. *MSC*

MSC denies that it profited from any of its cruises to Cuba. *MSC*, ECF No. [253] ¶ 69. MSC, however, admits that MSC SA earned approximately €247,000,000.00 in net cruise revenues from the *Armonia* and *Opera* cruises to the Terminal between 2015 and 2019. *Id.*, ECF Nos. [224] ¶ 62, [253] ¶ 62. For cruises from the U.S. to Cuba on the *Armonia* that docked at the Terminal between December 2018 and June 2019, the net cruise revenue was €38,994,000.00, and the net ticket revenue was €26,387,000.00. *Id.*, ECF Nos. [224] ¶¶ 63–64, [253] ¶¶ 63–64. MSC SA further admits that it earned revenues from *Opera* cruises that docked at the Terminal between December 2015 and March 2019, from *Opera* cruises that used the Terminal as the homeport, *Armonia* cruises that docked at the Terminal between November 2016 and June 2019, and *Armonia* ships that used the Terminal as the homeport, although neither party provides any figures. *See id.*, ECF Nos. [224] ¶¶ 65–68, [253] ¶¶ 65–68. In addition, from 2015 to 2019, MSC SA earned €21,614,000.00 from the sale of shore excursions to *Opera* and *Armonia* passengers. *Id.*, ECF Nos. [259] ¶ 70, [273]

¶ 70.

### 3. *Royal Caribbean*

From 2017 to 2018, Royal Caribbean earned $430,925,849.00 in gross revenue for its cruises to Cuba, of which $304,461,457.00 was for gross ticket revenue for cruises that docked at the Terminal. *Royal Caribbean*, ECF Nos. [141] ¶ 52, [172] ¶ 52; *see also id.* ¶¶ 48–50. Havana Docks contends that subtracting costs results in net revenues of $329,094,322.00. *Id.*, ECF No. [141] ¶ 52. Royal Caribbean disputes that figure, explaining that it "does not track net revenue or profit on a cruise-by-cruise basis." *Id.*, ECF No. [172] ¶ 52.

When addressing the recission of people-to-people travel in June 2019, Royal Caribbean's Chief Financial Officer, Jason Liberty, described Cuba as a "high yielding destination," *Id.*, ECF No. [131-32] at 6. Liberty added, "The result of this policy change has created a short-term impact to our guests, operations and earnings." *Id*. Liberty estimated that the regulatory change would affect Royal Caribbean's earnings per share by $0.25 to $0.35 per share. *Id.* Cruises to Cuba earned a "premium"—meaning that they outperformed, on a yield basis, non-Cuba cruises. *Id.*, ECF Nos. [141] ¶ 55, [172] ¶ 55.

### 4. *Norwegian*

Norwegian admits that it earned money, or profited from, providing passenger carrier services on the vessels that docked at the Terminal. *Norwegian*, ECF Nos. [228] ¶ 48, [282] ¶ 48. Cruises to Cuba commanded a premium price due to pent-up demand and limited availability. *Id.*, ECF Nos. [228] ¶ 49, [282] ¶ 49. Norwegian earned $299,860,891.00 in total revenue for voyages to Cuba. *Id.*, ECF Nos. [228] ¶ 50, [282] ¶ 50. Norwegian adds that its net revenue for voyages to Havana and excursions in Havana was $25,139,622.00. *Id.*, ECF No. [282] ¶ 50.

### L.  Other Cruises to Cuba

From 2017 to 2019, Viking Cruises offered cruises to Cienfuegos that transported passengers to Havana by bus for a one or two-day excursion. *MSC*, ECF Nos. [224] ¶ 90, [253] ¶ 90; *Royal Caribbean*, ECF Nos. [141] ¶ 81, [172] ¶ 81. Other cruise lines, such as Thomson, Fred Olsen, and Noble Caledonia, offered cruises to Cuba that stopped in Cienfuegos, Santiago, or Holguin, but did not include a stop in Havana. *MSC*, ECF Nos. [224] ¶ 98, [253] ¶ 98; *Royal Caribbean*, ECF Nos. [141] ¶ 67, [172] ¶ 67.

### M. Defendants' Experts

#### 1.  *Ambar Diaz*

Defendants retained Ambar Diaz as their expert attorney. Attorney Diaz has been licensed to practice law in Florida since 2003, specializing in advising U.S. companies how to navigate the Cuban market. *Carnival*, ECF No. [331-1] at 4. Attorney Diaz was a practicing lawyer in Cuba, specializing in maritime and insurance law until she immigrated to the United States in 2000. *Id.* Defendants retained Attorney Diaz to perform two tasks: (1) review the Concession and "opine on what rights the Concession provides under the laws of Cuba," and (2) "opine on Cuban laws and regulations applicable to ports in Cuba that were in effect during 2015 to the present," and their relation to "the mooring of cruise ships in the Port of Havana." *Id.*, ECF No. [331-1] at 3.

On the first topic, Diaz opines that the Concession, when viewed through the lens of various Cuban laws related to marine ports, granted Havana Docks only a non-exclusive, limited right to operate cargo services at the Terminal. *Id.*, ECF No. [331-1] at 5–6, 15–17. On the second topic, Diaz opines that Cuban laws and regulations mandated that Defendants use the Terminal when traveling to Havana. *Id.* at 23–35.

Havana Docks moved to preclude Diaz from testifying before a jury and for the Court to

disregard her report and testimony. *Id.*, ECF No. [366]. Magistrate Judge Chris McAliley issued a Report and Recommendation, recommending denial of Havana Docks' motion to preclude. *Id.*, ECF No. [416]. Judge McAliley explained that "[t]o the extent Ms. Diaz offers opinions about relevant questions of Cuban law, the Court can then determine, under Rule 44.1, whether Ms. Diaz's opinions are worthy of the Court's reliance." *Id.* at 8. Following no objections from the parties, the Court adopted the Report. *Id.*, ECF No. [428].

### 2. *Julian Ackert*

Defendants also retained Julian Ackert, a computer forensics expert, in support of their argument that Havana Docks' principal place of business is outside the United States. *See id.*, ECF No. [325-1]. As such, Defendants contend that Havana Docks is not a United States national pursuant to § 6023(15)(B). According to his declaration, Ackert reviewed 801 emails provided by Havana Docks in discovery ("Production Set"). *Id.* ¶ 20. Ackert extracted the geographic location of the IP addresses for 675 emails. *Id.* Ackert does not "opine[] on the geographic location information for [the remaining] 126 emails." *Id.* at 8 n.2.

Ackert issued two opinions:

Based on an analysis of the available email metadata in the Production Set, 41 of the 42 (98%) of the emails collected from custodian Mickael Behn that were sent from email addresses associated with Mickael Behn routed through computers physically located in the United Kingdom (UK) or European Union (EU). The email metadata for these 41 emails indicates that at the time the email was sent, the sender was geographically located in the UK or EU.

Based on an analysis of the available email metadata in the Production Set, 114 of 165 (69%) emails collected from custodians Mickael Behn and Jerry Johnson that were communications between email addresses associated with Mickael Behn and Jerry Johnson routed through computers physically located in the UK or EU, and up to 164 out of 165 emails (99%) were routed from or to an individual located in the UK or the EU. The email metadata for these 114 emails indicates that at the time the email was sent or received, either the sender or the recipient was geographically located in the UK or EU.

*Id.* ¶¶ 11–12.

In its Motion, Havana Docks seeks to exclude Ackert's opinions under *Daubert* as unreliable, unhelpful, and misleading. *Id.*, ECF No. [328] at 6–12. Havana Docks contends that Ackert provides no authority to support his methodology of tracing emails from their IP address, *id.* at 7, and Ackert did not account for the myriad ways that remote access to computers may skew IP addresses. *Id.* at 7–9. Havana Docks submits that Ackert's opinions are unhelpful because, among other reasons, he does not know the content of the emails he analyzed. *Id.* at 9–11. Moreover, Havana Docks argues that Ackert's opinions are misleading and prejudicial given that it concerns only a subset of emails. *Id.* at 11–12.

Defendants respond that Ackert sufficiently explained his methodology and that expert opinion on metadata is generally admissible. *Id.*, ECF No. [364] at 14–16. Defendants contend that there is no evidence that Behn or Johnson used remote access systems, and even if there was, that evidence would go to the weight of the opinions, not their admissibility. *Id.* at 17–18. Defendants further argue that Ackert's opinions are helpful because they relate to the issue of Havana Docks' statutory standing; moreover, Ackert's opinions will not confuse the trier of fact or prejudice Havana Docks, because Havana Docks may, through effective cross-examination, expose any weakness in Ackert's opinions. *Id.* at 18–21.

Magistrate Judge McAliley concluded that Ackert's methodology is sufficiently reliable. *Id.*, ECF No. [425] at 8–9. Judge McAliley further found that Ackert's inability to rule out whether Behn or Johnson used remote access goes to the weight, not admissibility, of the opinions. *Id.* at 9–10. Judge McAliley also determined that whether Ackert's opinions are helpful would depend on what provision of § 6023 applies. *Id.* at 12. If Havana Docks can simply establish that it is a United States national under 22 U.S.C. § 6023(15)(A), then Ackert's opinions are irrelevant. *Id.*

But if Havana Docks must prove that its principal place of business is in the United States, as set forth in 22 U.S.C. § 6023(15)(B), then Ackert's opinions would be relevant. *Id.* at 12–13. And concerning Ackert's lack of knowledge regarding the content of the emails, Judge McAliley observed that it "may be [a] strong [consideration] when it comes to the weight to be given Ackert's opinions," but it did not make the opinions inadmissible. *Id.* at 13. Finally, Judge McAliley concluded that exclusion under Federal Rule of Evidence 403 was not warranted, because any misleading use of percentages goes to the weight of the opinions. *Id.* at 13–14.

Havana Docks' partial Objection to the Report and Recommendation is based on the fact that Ackert did not review or identify the emails that form the basis of his opinions. *Id.*, ECF No. [430]. Havana Docks argues that Ackert's deficiency cannot be cured on cross-examination and render his opinion that 98% Havana Docks' "business" emails came from overseas misleading. *Id.*

## IV.    LEGAL STANDARD

### A.  Summary Judgment Standard

A district court's disposition of cross-motions for summary judgment employs the same legal standards applied when only one party files a motion. *See United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984). "Nonetheless, cross-motions may be probative of the non-existence of a factual dispute when, as here, they demonstrate a basic agreement concerning what legal theories and material facts are dispositive." *Id.* at 1555–56.

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including, *inter alia*, depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party."

*Miccosukee Tribe of Indians of Fla. v. United States*, 516 F. 3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247–48). The court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in the party's favor. *Crocker v. Beatty*, 886 F.3d 1132, 1134 (11th Cir. 2018). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which a jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court does not weigh conflicting evidence. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (quoting *Carlin Comm'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

The moving party shoulders the initial burden to demonstrate the absence of a genuine issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If a movant satisfies this burden, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs.*, L.L.C., 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343.

In resolving the issues presented under Fed. R. Civ. P. 56, "the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary

judgment must be denied." *Carlin Commc'n, Inc.*, 802 F.2d at 1356; *see also Aurich v. Sanchez*, No. 08-80113-CIV, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913 (11th Cir. 1993)). Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

Furthermore, summary judgment is inappropriate where the Court would be required to weigh conflicting renditions of material fact or determine witness credibility. *See Hairston*, 9 F.3d at 919; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment."); *see also Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he [or she] is ruling on a motion for summary judgment or for a directed verdict." (quoting *Anderson*, 477 U.S. at 255)); *Gary v. Modena*, No. 05-16973, 2006 WL 3741364, at *16 (11th Cir. Dec. 21, 2006) (Fed. R. Civ. P. 56 precludes summary judgment where court would be required to reconcile conflicting testimony or assess witness credibility); *Ramirez v. Nicholas*, No. 13-60820-CIV, 2013 WL 5596114, at *4 (S.D. Fla. Oct.11, 2013) ("The Court may not make the credibility determinations needed to resolve this conflict; only the jury may do so.").

## B. *Daubert* Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *See Rink v. Cheminova*, Inc., 400 F.3d 1286, 1291–92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). To determine whether expert testimony or any report prepared by an expert may be admitted, the court must engage in a three-part inquiry, which includes whether: (1) the expert is qualified to testify competently regarding the matters the expert intends to address; (2) the methodology by which the expert reaches his or her conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *See City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). The Court of Appeals for the Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. *See id.*

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003) (citations omitted) (quotation marks omitted). Consistent with this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to

the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (citations omitted) (quotation marks omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293 n.7.

On the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, as noted, "a district court enjoys 'considerable leeway' in making" evidentiary determinations such as these. *Cook ex rel. Est. of Tessier*, 402 F.3d at 1103 (quoting *Frazier*, 387 F.3d at 1258).

### C. Review of Report and Recommendation Standard

"In order to challenge the findings and recommendations of the magistrate judge, a party must file written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." *Macort v. Prem, Inc.*, 208 F. App'x 781, 783 (11th Cir. 2006) (quoting *Heath v. Jones*, 863 F.2d 815, 822 (11th Cir. 1989)) (alterations omitted). The objections must also present "supporting legal authority." S.D. Fla. L. Mag. J.R. 4(b). The portions of the report and recommendation to which objection is made are reviewed de novo only if those objections "pinpoint the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009); see also Fed. R. Civ. P. 72(b)(3). If a party fails to object to any portion of the magistrate judge's report,

those portions are reviewed for clear error. *Macort*, 208 F. App'x at 784 (quoting *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999)); *see also Liberty Am. Ins. Grp., Inc. v. WestPoint Underwriters, L.L.C.*, 199 F. Supp. 2d 1271, 1276 (M.D. Fla. 2001). A district court may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1).

**V.   DISCUSSION**

Divided into the elements of the claim, the LIBERTAD Act states that (1) "any person"; (2) that "traffics"; (3) "in property which was confiscated by the Cuban Government on or after January 1, 1959"; (4) "shall be liable to any United States national"; (5) "who owns the claim to such property"; and (6) trafficking must occur after November 1, 1996. *See* 22 U.S.C. §§ 6082(a)(1)(A), 6085(a). The Court will address each element in turn, and then address the affirmative defenses.

**A.   "Person"**

Defendants are indisputably "persons" under the LIBERTAD Act. *See* 22 U.S.C. §§ 6023(11) ("The term 'person' means any person or entity, including any agency or instrumentality of a foreign state."). Defendants do not argue to the contrary. Therefore, Havana Docks has established this element as a matter of law.

**B.   "Traffics"**

Title III of the LIBERTAD Act defines the term "traffics" as follows:

a person "traffics" in confiscated property if that person **knowingly and intentionally**--

> (i) sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,
>
> (ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii)) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person,

without the authorization of any United States national who holds a claim to the property.

§ 6023(13)(A) (emphasis supplied).

Title III of the LIBERTAD Act excludes from the term "traffics" several acts, such as:

(i) the delivery of international telecommunication signals to Cuba;

(ii) the trading or holding of securities publicly traded or held, unless the trading is with or by a person determined by the Secretary of the Treasury to be a specially designated national;

(iii) transactions and **uses of property incident to lawful travel to Cuba**, to the extent that such **transactions and uses of property are necessary to the conduct of such travel**; or

(iv) transactions and uses of property by a person who is both a citizen of Cuba and a resident of Cuba, and who is not an official of the Cuban Government or the ruling political party in Cuba.

§ 6023(13)(B) (emphasis supplied).

In its Individual Summary Judgment Motions, Havana Docks argues that each Defendant knowingly and intentionally engaged in various trafficking acts under subsections (i), (ii), and (iii) of § 6023(13)(A). Defendants challenge the alleged trafficking acts, including whether Havana Docks sufficiently alleged in its complaints all trafficking theories it now includes in its moving papers. Defendants, however, admit that they used the Terminal to travel to Havana. *See Carnival*, ECF No. [373] at 8–9 n.2; *MSC*, ECF No. [256] at 15 n.10; *Royal Caribbean*, ECF No. [173] at 4 n.1; *Norwegian*, ECF No. [281] at 3 n.1, 4 n.2. Defendants contend that they did not act knowingly and intentionally, and that any use of the Terminal was incident and necessary to lawful travel under § 6023(13)(B).

**1. *Scope of Havana Docks' Claim***

Preliminarily, in response to Havana Docks' Individual Motions for Summary Judgment, each Defendant contends that Havana Docks is seeking summary judgment on unpled trafficking theories. The Court addresses the arguments in turn.

**a) Carnival**

Carnival contends that Havana Docks did not plead a theory of trafficking beyond disembarking and embarking passengers at the Terminal. *Carnival*, ECF No. [373] at 11. According to Carnival, trafficking based on providing shore excursions or contracting with Cuban entities are beyond the scope of the pleadings. *Id.* Havana Docks responds that a complaint need not specify in detail the precise theory giving rise to liability; rather, a defendant must be on notice of the claim and the grounds upon which it rests. *Id.*, ECF No. [402] at 4. Havana Docks submits that the operative pleading and discovery placed Carnival on notice of Havana Docks' claims. *Id.* at 5. Havana Docks' argument is persuasive.

In the operative Second Amended Complaint, Havana Docks alleged that "Carnival knowingly and intentionally commenced, conducted, and promoted its commercial cruise line business to Cuba using the [Terminal] by regularly embarking and disembarking its passengers" and "participated in and profited from the communist Cuban Government's possession of the [Terminal]." *Carnival*, ECF Nos. [149] ¶¶ 40–41. The disembarkation of passengers at the Terminal was part and parcel to those passengers going on shore excursions—the two acts cannot be separated. Moreover, the allegations encompass the trafficking activities that fall not only under § 6023(13)(A)(i) (using confiscated property), but also under § 6023(13)(A)(ii) (commercial activities) and § 6023(13)(A)(iii) (participating in and profiting from trafficking). As such, the Second Amended Complaint sufficiently alleges trafficking by Carnival through its contracts with

Cuban entities, including for the purpose of operating shore excursions.

### b) Royal Caribbean

Royal Caribbean argues that Havana Docks' trafficking theories based on selling shore excursions or engaging in commercial activities are unpled. *Royal Caribbean*, ECF No. [173] at 2–4. Royal Caribbean also contends that Havana Docks' First Amended Complaint tracks the definition of "traffics" under subpart (i) and (iii) of § 6023(13)(A), but ignores the theory of liability under subpart (ii) of § 6023(13)(A). *Id.* at 4. Havana Docks responds that a complaint need not specify in detail the precise theory giving rise to liability; rather, a defendant must be on notice of the claim and the grounds upon which it rests. *Id.*, ECF No. [206] at 4. Havana Docks submits that the operative pleading and discovery placed Royal Caribbean on notice of Havana Docks' claims. *Id.* at 5. Royal Caribbean's arguments fail.

In the operative First Amended Complaint, Havana Docks alleged that Royal Caribbean "knowingly and intentionally commenced, conducted, and promoted its commercial cruise line business to Cuba using the [Terminal] by regularly embarking and disembarking its passengers on the [Terminal]," and "participated in and profited from the communist Cuban Government's possession of the [Terminal]." *Id.*, ECF No. [46] ¶¶ 22–23. The disembarkation of passengers at the Terminal was inextricably intertwined with passengers going on shore excursions. Moreover, the allegations sufficiently encompass the trafficking activities that fall under § 6023(13)(A)(i) (using confiscated property), § 6023(13)(A)(ii) (commercial activities), and § 6023(13)(A)(iii) (participating in and profiting from trafficking). Therefore, the pleading includes trafficking by Royal Caribbean through its contracts with Cuban entities and related to the shore excursions.

### c) Norwegian

Norwegian similarly argues that Havana Docks' trafficking theories based on selling shore

excursions or engaging in commercial activities are unpled. *Norwegian*, ECF No. [281] at 3–4. Norwegian also maintains that Havana Docks tracked the language of § 6023(13)(A)(i) and (iii) in the First Amended Complaint, but not § 6023(13)(A)(ii). *Id.* at 4. Havana Docks responds that a complaint need not specify in detail the precise theory giving rise to liability; rather, a defendant must be on notice of the claim and the grounds upon which it rests. *Id.*, ECF No. [311] at 4. Havana Docks submits that the operative pleading and discovery placed Royal Caribbean on notice of Havana Docks' claims. *Id.* at 5. Norwegian's arguments are also unpersuasive.

In the operative First Amended Complaint, Havana Docks alleged that Norwegian "knowingly and intentionally commenced, conducted, and promoted its commercial cruise line business to Cuba using the [Terminal] by regularly embarking and disembarking its passengers on the [Terminal]," and "participated in and profited from the communist Cuban Government's possession of the [Terminal]." *Id.*, ECF No. [56] ¶¶ 21–22. As such, the pleading sufficiently provides notice of trafficking by Norwegian through its contracts with Cuban entities and related to the shore excursions. The cases relied upon by Norwegian are inapposite. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) (raising contract claim for the first time in response to a summary judgment motion); *Altadis USA, Inc. v. NPR, Inc.*, 162 F. App'x 926, 928–29 (11th Cir. 2006) (noting that district court properly denied entry of summary judgment on unpled theories of liability, but reviewing district court decision "only to see if the district court properly refused to permit Altadis to amend its complaint to assert alternative theories"); *Cruz v. Advance Stores Co.*, 842 F. Supp. 2d 1356, 1360 (S.D. Fla. 2012) (finding that plaintiff attempted to raise new negligence theories in opposition to summary judgment motion). Here, Havana Docks does not seek to assert new claims or theories of liability. Instead, Havana Docks has asserted one cause of action for trafficking and has sufficiently alleged the scope of the claim.

Norwegian also submits that Havana Docks never alleged that Norwegian trafficked through a third party, Fuego Enterprises. *Norwegian*, ECF No. [281] at 4–5. Havana Docks alleges that Norwegian "participated in and profited from the communist Cuban Government's possession of the [Terminal]." *Id.*, ECF No. [56] ¶¶ 21–22. While discovery may have revealed that Norwegian used Fuego Enterprises as a third-party intermediary to make payments to Aries and Mambisa, Cuban Government-owned entities, *id.*, ECF Nos. [228] ¶¶ 25–26, 28–29, [282] ¶¶ 25–26, 28–29, the allegations of participation and profit are sufficient. As such, indirect payments made to Aries and Mambisa through Fuego Enterprises fall within the scope of Havana Docks' pleading.

### d) MSC

MSC argues that Havana Docks' allegations are limited to Miami-to-Cuba cruises, and do not include Cuba-to-Cuba cruises—where the *Armonia* and *Opera* homeported in Havana. *MSC*, ECF No. [256] at 5–11. Havana Docks responds that the operative pleading includes Cuba-to-Cuba cruises. *Id.*, ECF No. [281] at 4–7. Havana Docks is correct. Cuba-to-Cuba cruises are expressly encompassed within Havana Docks' Second Amended Complaint against MSC. *Id.*, ECF No. [104]. The First Amended Complaint alleged that MSC SA "operated the cruises to Cuba from Miami that are the subject of this lawsuit." *Id.*, ECF No. [56] ¶ 2. However, the operative Second Amended Complaint clarified that MSC SA "owns and operates cruise ships which, after November 1, 1996 traveled to Cuba, *including* the cruises to Cuba from Miami[.]" *Id.*, ECF No. [104] ¶ 2 (emphasis added). In addition, although the First Amended Complaint alleged trafficking acts under § 6023(13)(A)(iii) that began in December 2018, *id.*, ECF No. [56] ¶ 22, the Second Amended Complaint *expanded* the activities timeline to after November 1996, *id.*, ECF No. [104] ¶ 24. The *Armonia* traveled from Miami to Cuba beginning in December 2018. *Id.*, ECF Nos. [224]

¶ 40, [253] ¶ 40. But the *Armonia* and *Opera* used the Terminal as their homeport at different points between 2015 and 2019. *Id.*, ECF Nos. [224] ¶¶ 38–39, [253] ¶¶ 38–39. Therefore, the Second Amended Complaint, although not a model of clarity, sufficiently alleges that the alleged trafficking encompasses Cuba-to-Cuba cruises.

### 2. *Trafficking Activity*

While disclaiming liability on other grounds, Carnival, MSC SA, Royal Caribbean, and Norwegian admit in their memoranda that they used the Terminal. *See Carnival*, ECF No. [373] at 8–9; *MSC*, ECF No. [256] at 15 n.10; *Royal Caribbean*, ECF No. [173] at 4 n.1; *Norwegian*, ECF No. [281] at 3 n.1, 4 n.2. It is undisputed that during the time Carnival, MSC SA, Royal Caribbean, and Norwegian cruised to Havana, their ships docked at the Terminal's Pier 1 to embark and disembark passengers. *Carnival*, ECF Nos. [331] ¶ 22, [332] ¶¶ 17, 23–28, [374] ¶¶ 17, 23–28, [388] ¶ 22; *MSC*, ECF Nos. [224] ¶¶ 35, 40, 41, 45, [253] ¶ 35, 40, 41, 45; *Royal Caribbean*, ECF Nos. [141] ¶¶ 27, 29–30, [172] ¶¶ 27, 29–30; *Norwegian*, ECF Nos. [228] ¶¶ 14–15, [282] ¶¶ 14–15. In addition, the *Opera* and *Armonia* used the Terminal as a homeport from 2015 to 2019. *MSC*, ECF Nos. [224] ¶¶ 37–38, [253] ¶¶ 37–38. The Terminal was often used as a starting or stopping point for shore excursions for cruise travelers. *MSC*, ECF Nos. [224] ¶¶ 49–50, [253] ¶¶ 49–50; *Royal Caribbean*, ECF Nos. [141] ¶¶ 34, 93, [172] ¶¶ 34, 93; *Norwegian*, ECF Nos. [228] ¶ 18, [282] ¶ 18.

As such, by using the Terminal and one of its piers in various ways, Carnival, MSC SA, Royal Caribbean, and Norwegian committed trafficking acts under § 6023(13)(A)(i). *See Exxon Mobil Corp. v. Corporacion Cimex S.A.*, No. 19-CV-1277 (APM), 2021 WL 4709566, at *2 (D.D.C. Oct. 8, 2021) ("Title III makes any subsequent user of confiscated property . . . liable for trafficking in such property."); *see also* § 6023(13)(A)(i) ("a person 'traffics' in confiscated

property if that person knowingly and intentionally . . . uses . . . confiscated property[.]").

Importantly, there is no threshold level or type of trafficking activity that must occur for liability to attach under the LIBERTAD Act. Section 6082(a)(1) unambiguously states that a person who "traffics" in confiscated property is liable, § 6082(a)(1), and "traffics" is defined broadly and disjunctively, encompassing many types of acts. *See* § 6023(13). Moreover, the LIBERTAD Act sets forth that a person who "traffics in property" is presumptively liable for "the amount, if any, certified to the claimant by the Foreign Claims Settlement Commission under the International Claims Settlement Act" or "the fair market value of that property," if the presumption is rebutted by clear and convincing evidence. § 6082(a)(1)(A)(i), (2).

In addition, Defendants' use of the Terminal and commercial contracts with Cuban entities constituted "engag[ing] in a commercial activity" under § 6023(13)(A)(ii). The LIBERTAD Act states that "[t]he term 'commercial activity' has the meaning given that term in section 1603(d) of Title 28." § 6023(3). Section 1603(d) defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." § 1603(d).

Carnival, MSC SA, Royal Caribbean, and Norwegian contracted with Aries to dock at the Terminal. *Carnival*, ECF Nos. [332] ¶ 29, [374] ¶ 29; *MSC*, ECF Nos. [224] ¶ 51, [253] ¶ 51; *Royal Caribbean*, ECF Nos. [141] ¶ 37, [172] ¶ 37; *Norwegian*, ECF Nos. [228] ¶ 21, [282] ¶ 21. Carnival, Royal Caribbean, and Norwegian contracted with Mambisa as port agent for the Terminal, *Carnival*, ECF Nos. [332] ¶ 30, [374] ¶ 30; *Royal Caribbean*, ECF Nos. [133] ¶ 23, [141] ¶ 41, [172] ¶ 41, [183] ¶ 23; *Norwegian*, ECF Nos. [228] ¶ 27, [282] ¶ 27, while MSC SA contracted with Mapor as port agent for the Terminal, *MSC*, ECF Nos. [224] ¶ 52, [253] ¶ 52.[26]

---

[26] Although there is some dispute whether the Cuban Government owns Mapor, there is no dispute that Mapor was the port agent for MSC SA, for which MSC SA paid Mapor $9,314,386.41. *MSC*, ECF Nos. [224] ¶ 55, [253] ¶ 55. As such, Mapor benefited from use of the Terminal, and MSC SA participated in Mapor's use of the Terminal.

MSC SA contracted with Cubanacan to operate shore excursions, *MSC*, ECF Nos. [224] ¶ 56, [253] ¶ 56, while Carnival, Royal Caribbean, and Norwegian contracted with Havanatur, *Carnival*, ECF Nos. [332] ¶ 31, [374] ¶ 31; *Royal Caribbean*, ECF Nos. [141] ¶ 45, [172] ¶ 45; *Norwegian*, ECF Nos. [228] ¶ 31, [282] ¶ 31.

The revenues earned by the cruise operators and the payments they made to Cuban entities evidence the commercial nature of the transactions. As the Court has previously noted, Carnival, MSC SA, Royal Caribbean, and Norwegian earned hundreds of millions of dollars for their trips to Cuba, and they paid Cuban entities tens of millions of dollars to use the Terminal and operate shore excursions. *See Carnival*, ECF No. [332] ¶¶ 32, 37–39, [374] ¶¶ 32, 37–39; *MSC*, ECF Nos. [224] ¶ 55, 59, 62, [253] ¶ 55, 59, 62; *Royal Caribbean*, ECF Nos. [141] ¶¶ 40, 44, 47, 52, [172] ¶¶ 40, 44, 47, 52; *Norwegian*, ECF Nos. [228] ¶¶ 24–26, 30, 35, 50 [282] ¶¶ 24–26, 30, 35, 50.

The contracts with Cuban entities also constitute trafficking acts under subpart (iii) of § 6023(13)(A) given that, to use the Terminal, Carnival, MSC SA, Royal Caribbean, and Norwegian "participate[d] in" trafficking under § 6023(13)(A)(iii) by entering into agreements with Cuban entities that "manage[d]," "use[d]," or "benefit[ed] from" the Terminal. § 6023(13)(A)(i), (ii).

Moreover, Defendants admit or fail to dispute that they profited from the use of the Terminal, which constitutes trafficking under subpart (iii) of § 6023(13)(A). Although Carnival contends that the *Adonia* was not profitable, *Carnival*, ECF No. [374] ¶ 36, Carnival does not state that its other cruises were not profitable. Havana Docks submits that Carnival earned total net cruise revenue and shore excursion net revenue for the CCL ships that docked at the Terminal of $67,788,397.00 and revenues for *Veendam* cruises to Cuba that docked at the Terminal of $44,496,253.86. *Id.*, ECF No. [332] ¶¶ 37, 39. Carnival responds that those figures represent

revenues from every voyage that included a stop in Havana, *id.*, ECF No. [374] ¶¶ 37–39, yet that response does not deny that using the Terminal resulted in profits to Carnival.

MSC denies that it profited from any of its cruises to Cuba. *MSC*, ECF No. [253] ¶ 69. MSC, however, admits that MSC SA earned approximately €247,000,000.00 in *net* cruise revenues from the *Armonia* and *Opera* cruises to the Terminal between 2015 and 2019. *Id.*, ECF Nos. [224] ¶ 62, [253] ¶ 62. For cruises from the U.S. to Cuba on the *Armonia* that docked at the Terminal between December 2018 and June 2019, the *net* revenue for cruises was €38,994,000.00, and the *net* ticket revenue was €26,387,000.00. *Id.*, ECF Nos. [224] ¶¶ 63–64, [253] ¶¶ 63–64. Moreover, from 2015 to 2019, MSC SA earned €21,614,000.00 from the sale of shore excursions to *Opera* and *Armonia* passengers. *Id.*, ECF Nos. [259] ¶ 70, [273] ¶ 70.

Havana Docks contends that Royal Caribbean earned net revenues of $329,094,322.00 from cruises that docked at the Terminal. *Royal Caribbean*, ECF No. [141] ¶ 52. Royal Caribbean responds that it "does not track net revenue or profit on a cruise-by-cruise basis." *Id.*, ECF No. [141] ¶ 52. That statement is not a denial that using the Terminal resulted in a profit to Royal Caribbean. Notably, Royal Caribbean's Chief Financial Officer, Liberty, described Cuba as a "high yielding destination," *Id.*, ECF No. [131-32] at 6. He also added that the recission of people-to-people travel "created a short-term impact to our guests, operations and earnings," affecting Royal Caribbean's earnings per share by $0.25 to $0.35 a share. *Id.* Royal Caribbean admitted that cruises to Cuba earned a "premium," outperforming non-Cuba cruises. *Id.*, ECF Nos. [141] ¶ 55, [172] ¶ 55.

Norwegian admits that it earned money, or profited from, providing passenger carrier services on the vessels that docked at the Terminal. *Norwegian*, ECF Nos. [228] ¶ 48, [282] ¶ 48. Norwegian earned $299,860,891.00 in total revenue for voyages to Cuba, resulting in net revenue

for voyages to Havana and excursions in Havana of $25,139,622.00. *Id.*, ECF Nos. [228] ¶ 50, [282] ¶ 50. Norwegian further admits that cruises to Cuba commanded a premium price due to pent-up demand and limited availability. *Id.*, ECF Nos. [228] ¶ 49, [282] ¶ 49. Norwegian's President and CEO, Frank Del Rio, testified that Cuba "was a profitable itinerary to operate, and we didn't want to see it stopped." *Id.*, ECF No. [214-6] at 22.[27]

Finally, as to MSC USA, Havana Docks' broad trafficking allegations encompass all MSC entities—MSC SA, MSC USA, and MSC Co.[28] *See MSC*, ECF No. [104] ¶¶ 23–24. It is undisputed that MSC USA sold and marketed MSC SA's cruises from Miami to Cuba. *Id.*, ECF Nos. [224] and [253] ¶¶ 16–18. It is also undisputed that MSC USA received revenue from its marketing and ticket sales. *Id.*, ECF Nos. [224] and [253] ¶ 19. As such, MSC USA engaged in commercial activities benefiting from MSC SA's use of the Terminal under § 6023(13)(A)(ii) and participated in MSC SA's use of the Terminal under § 6023(13)(A)(iii).

Based on the undisputed facts, the Court finds that Carnival, MSC SA, MSC USA, Royal Caribbean, and Norwegian engaged in acts enumerated under § 6023(13)(A)(i)–(iii) of the LIBERTAD Act as a matter of law. The Court now considers whether Defendants engaged in those acts "knowingly and intentionally." § 6023(13)(A).

### 3. *"Knowingly and Intentionally"*

As discussed previously, Defendants are liable under the LIBERTAD Act if they

---

[27] Given this ruling, the Court need not address the factual dispute concerning whether Carnival provided "recommendations and advice" for the renovation and enhancement of the Terminal. *Carnival*, ECF No. [332] ¶ 34; *see id.*, ECF No. [374] ¶ 34. Nor does the Court need not reach the issue of whether Carnival also trafficked through Airtours or Costa or any of the related issues. Carnival engaged in direct trafficking acts. There is likewise no need to address whether Royal Caribbean trafficked through Silversea or any of the related issues. Royal Caribbean also engaged in direct trafficking acts.

[28] As stated previously, however, the Court grants summary judgment in favor of MSC Co. due to Havana Docks' lack of argument.

"knowingly and intentionally" engaged in trafficking acts. § 6023(13)(A). The LIBERTAD Act defines "knowingly" as being "with knowledge or having reason to know." § 6023(9).

The parties' knowledge and intent arguments are substantially similar throughout the Motions. Havana Docks argues that Defendants' acts were "[d]one with the aim of carrying out the act," which is Black's Law Dictionary's definition of "intentional." *E.g.*, *Carnival*, ECF No. [333] at 7. Concerning the definition of "knowingly," Havana Docks argues that "knowledge" refers to actual knowledge, while "having reason to know" indicates constructive knowledge. *Id.* at 7–8.

According to Havana Docks, Carnival has admitted that it was generally aware of a Certified Claim since 1996 and learned of the Certified Claim in 2012. *Id.*, ECF No. [333] at 8. Norwegian has admitted that it learned of the Certified Claim in February 2017, *Norwegian*, ECF No. [229] at 7.[29] MSC and Royal Caribbean learned of the Certified Claim in February 2019, and both had access to the Certified Claim from public records since 1971. *MSC*, ECF No. [225] at 6–7, *Royal Caribbean*, ECF No. [142] at 7–8.[30]

Defendants respond that a reasonable person reading the Certified Claim would not have known or had reason to know that Havana Docks had an interest in confiscated property that extended beyond 2004. *Carnival*, ECF No. [373] at 13; *MSC*, ECF Nos. [209] at 16–17, [256] at 24; *Royal Caribbean*, ECF Nos. [132] at 10, [173] at 6; *Norwegian*, ECF Nos. [230] at 16–17, [281] at 6. Defendants rely on this Court's initial interpretation of the Concession, abandoned on

---

[29] Although the record establishes *when* Carnival and Norwegian gained actual knowledge of the Certified Claim, the record does not indicate *how* they gained that knowledge.

[30] Havana Docks also argues that Royal Caribbean gained constructive knowledge of the Certified Claim due to comments from Congressman Mario Diaz-Balart, two billboards that appeared near Royal Caribbean's principal executive office, and four articles published in the Tampa Bay Times and Miami Herald. *Royal Caribbean*, ECF No. [142] at 8–9. Based on the Court's rulings, none of these facts are necessary to establish the requisite knowledge and intent.

reconsideration, that Havana Docks could not state a claim for trafficking that occurred after its leasehold interest would have expired. *Carnival*, ECF No. [373] at 13; *MSC*, ECF No. [209] at 17; *Royal Caribbean*, ECF No. [132] at 11; *Norwegian*, ECF No. [230] at 17–18. In addition, Defendants interpret the scienter requirement as applying to all elements of a cause of action under the LIBERTAD Act, including whether Havana Docks was a United States national and whether the property was confiscated by the Cuban Government. *Carnival*, ECF No. [373] at 13; *MSC*, ECF No. [256] at 24; *Royal Caribbean*, ECF No. [173] at 5; *Norwegian*, ECF No. [281] at 5–6.

Knowledge generally entails "actual knowledge," while having "reason to know" denotes "constructive knowledge." *Luxottica Grp., S.p.A. v. Airport Mini Mall, LLC*, 932 F.3d 1303, 1312 (11th Cir. 2019) (explaining that a person engages in contributory infringement where the infringer "supplies a 'product' to the direct infringer whom it 'knows' is directly infringing (actual knowledge), or . . . "has reason to know" is directly infringing (constructive knowledge)." As this Court has explained in another LIBERTAD Act case, trafficking in confiscated property after receiving notice from the plaintiff is enough to establish scienter. *See de Fernandez v. Seaboard Marine, Ltd.*, No. 20-CV-25176, 2021 WL 3173213, at *8 (S.D. Fla. July 27, 2021).

Also instructive is how courts have interpreted the term "knowingly" under the False Claims Act (FCA), which is defined as "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(a)(A)(i)–(iii). As the Eleventh Circuit has explained, reckless disregard encompasses "the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1303 (11th Cir. 2021). Thus, "a person acts with reckless disregard—and thus 'knowingly'—under the

FCA when he knows or has reason to know of facts that would lead a reasonable person to realize that harm is the likely result of the relevant act." *Id.* (internal marks omitted).

Here, the undisputed facts show that Defendants continued using the Terminal after gaining actual knowledge of the Certified Claim. Carnival learned of the Certified Claim in 2012. *Carnival*, ECF Nos. [332] ¶¶ 15–16, [374] ¶¶ 15–16. Norwegian learned of the Certified Claim in February 2017. *Norwegian*, ECF Nos. [228] ¶ 9, [282] ¶ 9. MSC and Royal Caribbean learned of the Certified Claim in February 2019 (or shortly thereafter). *MSC*, ECF Nos. [210] ¶ 45, [259] ¶ 45; *Royal Caribbean*, ECF Nos. [141] ¶ 20, [172] ¶ 20. Yet despite their knowledge, Carnival, MSC SA, MSC USA, Royal Caribbean, and Norwegian continued using the Terminal until May or June 2019. *See Carnival*, ECF Nos. [337] ¶ 86, [367] ¶ 86 (general admission that Defendants continued using the Terminal after receiving Havana Docks' letters on February 11, 2019); *id.*, ECF Nos. [332] ¶¶ 27–28, [374] ¶¶ 27–28 (Carnival's use of the Terminal until May 2019); *MSC*, ECF Nos. [224] ¶¶ 16–18, 40, 48, [253] ¶¶ 16–18, 40, 48 (MSC USA's sales and marketing of MSC SA's cruises from Miami to Cuba and the *Armonia's* use of the Terminal until June 2019); *Royal Caribbean*, ECF No. [141] ¶ 32, [172] ¶ 32 (Royal Caribbean's use of the Terminal until June 2019); *Norwegian*, ECF Nos. [228] ¶ 16, [282] ¶ 16 (Norwegian's use of the Terminal after February 11, 2019). Under the plain language of the statute, the post-actual-notice trafficking by Carnival, MSC SA, MSC USA, Royal Caribbean, and Norwegian is enough to establish liability under the LIBERTAD Act. *See* § 6082(a)(1).

It is also undisputed that Defendants had reason to know of the Certified Claim long before cruise operators started traveling to Havana. The Certified Claim has been a matter of public record since 1971.[31] *Carnival*, ECF Nos. [337] ¶ 43, [367] ¶ 43. Defendants have also been aware of the

---

[31] According to the Department of Justice's website, all FCSC decisions were electronically compiled in

LIBERTAD Act since 1996 or 1997. *Carnival*, ECF Nos. [332] ¶ 14, [374] ¶ 14; *MSC*, ECF Nos. [224] ¶ 26, [253] ¶ 26; *Royal Caribbean*, ECF Nos. [141] ¶ 8, [172] ¶ 8; *Norwegian*, ECF Nos. [228] ¶ 6, [282] ¶ 6. Therefore, Defendants had reason to know of the Certified Claim well before they gained actual knowledge of the Certified Claim.

Concerning the intentional element of the knowledge prong, the Court finds instructive *United States v. Tosca*, 848 F. App'x 371, 376 (11th Cir. 2021), which defined "knowingly" under a criminal statute as "an act was done voluntarily and intentionally and not because of a mistake or by accident." Here, Defendants did not use the Terminal by mistake or accident; they voluntarily and intentionally traveled to Havana and used the Terminal.[32] *See Carnival*, ECF Nos. [332] ¶¶ 17–18, [374] ¶¶ 17–18; *Royal Caribbean*, ECF Nos. [141] ¶ 27, [172] ¶ 27; *MSC*, ECF Nos. [224] ¶¶ 36–38 [253] ¶¶ 36–38; *Norwegian*, ECF Nos. [228] ¶ 14, [282] ¶ 14.

The Court is not persuaded by Defendants' contention that they lacked the requisite scienter because a reasonable reading of the Certified Claim revealed an expired interest in the Terminal. In 2006, the Eleventh Circuit established that although the LIBERTAD Act deemed confiscations by the Cuban Government wrongful, it did not proclaim those confiscations ineffective. *Glen v. Club Mediterranee, S.A.*, 450 F.3d 1251, 1255 (11th Cir. 2006). And while victims of confiscations had lost their property, the LIBERTAD Act set forth that "the property interest that former owners of confiscated property now have [is] ownership of a 'claim to such property.'" *Id.* Applying *Glen* to Havana Docks' Certified Claim, this Court previously explained that "the Cuban Government's expropriation of the [Terminal] extinguished all rights Havana Docks had to the remaining

---

October 2009, and the decisions have been available online since February 9, 2015. *See* Foreign Claims Settlement Commission of the U.S., The United States Department of Justice, https://www.justice.gov/fcsc. (last visited Mar. 16, 2022).

[32] By the same token, MSC USA did not accidentally or mistakenly sell cruise tickets to Cuba.

concession term of 44 years." *Havana Docks Corp. v. MSC Cruises SA Co.*, 455 F. Supp. 3d 1355, 1369 (S.D. Fla. 2020). But "in lieu of its property interest in the remaining 44 years of the concession," Havana Docks "now owns an interest only in the Certified Claim," which has no time limitation. *Id.*[33] This Court's initial reading of the Certified Claim is not a shield from liability. Defendants were in possession of facts from the Certified Claim—either through public records or directly from Havana Docks—which, in light of *Glen*, would lead a reasonable person to conclude that using the Terminal may constitute trafficking under the LIBERTAD Act.

The case of *United States ex rel. Sheldon v. Allergan Sales, LLC*, 24 F.4th 340 (4th Cir. 2022), which Defendants provided as supplemental authority, in distinguishable. In that case, the Fourth Circuit held that "[u]nder the [Fair Credit Reporting Act], a defendant cannot act 'knowingly' if it bases its actions on an objectively reasonable interpretation of the relevant statute when it has not been warned away from that interpretation by authoritative guidance." *Id.* at 348. Here, the LIBERTAD Act is clear: "any person that . . . traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages." § 6082(a)(1)(A). Defendants did not reasonably rely on a different interpretation of the LIBERTAD Act, but on a different interpretation of the Certified Claim. Moreover, *Glen*, which is binding authority from 2006, should have warned Defendants, precluding their limiting interpretation of the Certified Claim.

The Court also disagrees with Defendants that the LIBERTAD Act's scienter requirement also applies to the United States national element—meaning that Defendants had to know or have

---

[33] As its twenty-fifth affirmative defense, Carnival submits that "Congress lacks Article I power to create property rights abroad." *Carnival*, ECF No. [160] at 22. This is a pure issue of law, and the defense is foreclosed by *Glen*, which explained that under the LIBERTAD Act, victims of confiscated property have lost their property interests abroad but are suing upon a Certified Claim to that interest. Thus, Havana Docks is entitled to summary judgment on this affirmative defense.

reason to know that Havana Docks is a United States national. Defendants rely on *Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316 (D. Del. 2021), which found "persuasive the analyses of numerous other courts that have interpreted statutes having specific knowledge requirements as requiring knowledge of all the elements listed in the statute." *Id.* at 331 n.16. *Glen*, however, relied on a series of cases that support the proposition that "[a]s a matter of ordinary English grammar, we normally read the statutory term 'knowingly' as applying to all the subsequently listed elements of the crime." *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019).

*Rehaif* concerned 18 U.S.C. § 924(a), which set forth criminal penalties for a person who "knowingly violates" 18 U.S.C. § 922(g), which made it unlawful for certain individuals, like illegal aliens, to possess firearms. *Rehaif*, 139 S. Ct. at 2194. The issue before the Supreme Court was whether a defendant had to both knowingly possess a firearm and know that he could not possess a firearm, or simply knowingly possess a firearm. *Id.* The Court held that the term "knowingly" applied to the entirety of § 922(g), and thus to both the possession element and status element. *Id.* at 2195.

The LIBERTAD Act is different. The LIBERTAD Act does not place the term "knowingly" before all subsequently listed elements of a Title III claim. Instead, the LIBERTAD Act states that a person who "traffics in property which was confiscated by the Cuban Government . . . shall be liable to any United States national who owns the claim to such property[.]" § 6082(a)(1)(A). The terms "knowingly and intentionally" are included only within the *definition* of "traffics," which lists what constitutes trafficking acts. § 6023(13) (stating, "a person 'traffics' in confiscated property if that person knowingly and intentionally," and then listing trafficking acts). Thus, under the plain terms of the statute, the term "knowingly and intentionally" modifies only the listed trafficking acts. Consequently, a Title III plaintiff need only show that the defendant knowingly

and intentionally engaged in a trafficking act.

Defendants also rely on *Gonzalez v. Amazon.com*, Inc., No. 19-23988-CIV, 2020 WL 1169125, at *2 (S.D. Fla. Mar. 11, 2020), which found that the plaintiff did not sufficiently allege scienter because he did not set forth that "Defendants knew the property was confiscated by the Cuban government nor that it was owned by a United States citizen." *Gonzalez* concerned only the sufficiency of the plaintiff's complaint. *Gonzalez* did not address the scope of the scienter requirement. In this case, the plain text of the statute shows that the scienter requirement applies only to trafficking acts.

Even if the requisite scienter must be established as to all elements of the LIBERTAD Act, Defendants' arguments still fail. The Certified Claim, of which Defendants had both constructive and actual knowledge, sets forth Havana Docks' claim "that on the basis of a concession granted by the Government of Cuba, it owned and operated, at the entrance of the harbor of Havana three piers: the 'San Francisco', ''Machina' and 'Santa Clara' linked with a large marginal building." *Carnival*, ECF No. [73-8] at 6. The FCSC found, among other things, that (1) Havana Docks was a "national of the United States"; (2) owned a "concession for the construction and operation of wharves and warehouses in the harbor of Havana"; (3) "acquired at the same time the real property with all improvements and appurtenances located on the Avenida del Puerto between Calle Amargura and Calle Santa Clara in Havana, facing the Bay of Havana," as well as other property; (4) had its assets nationalized by the Cuban Government; and (5) that the loss was valued at more than $9 million. *Carnival*, ECF No. [73-8]; *see also MSC*, ECF No. [41-8]; *Royal Caribbean*, ECF No. [31-8]; *Norwegian*, ECF No. [43-8]. Thus, the Certified Claim contained facts from which Defendants knew, or had reason to know, that Havana Docks once held an interest in the Terminal related to its operation and management that was unjustly confiscated by the Cuban Government.

The Court determines that Carnival, MSC SA, MSC USA, Royal Caribbean, and Norwegian acted "knowingly and intentionally" under the LIBERTAD Act.

## C. Property Confiscated by Cuban Government

It is undisputed that on October 24, 1960, the Fidel Castro-led Cuban Government naturalized all property located in Cuba of United States nationals, including Havana Docks' assets. *Carnival*, ECF Nos. [337] ¶¶ 27–28, [367] ¶¶ 27–28; *see id.*, ECF No. [73-6]; *MSC*, ECF No. [41-6]; *Royal Caribbean*, ECF No. [31-6]; *Norwegian*, ECF No. [43-6]. Defendants do not dispute that Havana Docks was not compensated by the Cuban Government for the Terminal. Instead, Defendants contend that the Cuban Government has always owned the Terminal. *Carnival*, ECF No. [367] ¶ 31. The FCSC, however, has conclusively determined that Havana Docks had an interest in the confiscated property.

Title III of the LIBERTAD Act states that "the court shall accept as conclusive proof of ownership of an interest in property a certification of a claim to ownership of that interest that has been made by the [FCSC]" § 6083(a)(1). The LIBERTAD Act is consistent with the limitation on judicial review of certified claims. The Settlement Act states that "[t]he decisions of the [FCSC] with respect to claims shall be final and conclusive on all questions of law and fact, and shall not be subject to review by the Attorney General or any other official of the United States or by any court by mandamus or otherwise." 22 U.S.C. § 1622g; *see Haven v. Polska*, 215 F.3d 727, 734 n.8 (7th Cir. 2000) (citing § 1622g for the proposition that "FCSC decisions may not be reviewed by a federal court."). Similarly, the Settlement Act states that "[t]he action of the [FCSC] in allowing or denying any claim . . . shall be final and conclusive on all questions of law and fact and not subject to review by the Secretary of State or any other official, department, agency, or establishment of the United States or by any court by mandamus or otherwise." 22 U.S.C.

§ 1623(h); *see Robles v. Kerry*, 74 F. Supp. 3d 254, 264 (D.D.C. 2014) (explaining that per § 1623(h), the Settlement Act "explicitly provides that [FCSC] decisions are not subject to judicial review"). Accordingly, under the plain terms of the LIBERTAD Act and Settlement Act, the Court must accept as true the FCSC's certification of an ownership of an interest in confiscated property made in favor of Havana Docks.

The Court finds that Havana Docks has established that the Cuban Government confiscated property to which Havana Docks owned an interest.

### D. United States National

Havana Docks contends that the FCSC conclusively determined its nationality. *Carnival*, ECF No. [336] at 8. Defendants disagree, pointing out that the Settlement Act and LIBERTAD Act define United States nationals differently. *Id.*, ECF No. [368] at 9. Defendants are correct. The Settlement Act defines "national of the United States" as "a corporation or other legal entity which is organized under the laws of the United States . . . if natural persons who are citizens of the United States own, directly or indirectly, 50 per centum or more of the outstanding capital stock or other beneficial interest of such corporation or entity." § 1643a(1). By contrast, the LIBERTAD Act defines a "United States national" as "any United States citizen," § 6023(15)(A), or "any other legal entity which is organized under the laws of the United States, or of any State, the District of Columbia, or any commonwealth, territory, or possession of the United States, and which has its principal place of business in the United States." § 6023(15)(B).

The FCSC found that Havana Docks was a "national of the United States" because U.S. nationals owned more than 50 percent of Havana Docks' capital stock. *Carnival*, ECF No. [73-8] at 6. The LIBERTAD Act does not define a "United States national" corporation in accordance with the citizenship of stockholders. Instead, the corporation must have "its principal place of

business in the United States." § 6023(15)(B). Moreover, although the LIBERTAD Act states that "the court shall accept as conclusive proof of ownership of an interest in property a certification of a claim to ownership of that interest that has been made by the [FCSC]. . . ." § 6083(a)(1), there is no similar provision stating that the Court must also accept as conclusive proof the FCSC's determination of nationality. The reason is obvious: Havana Docks' claim will not change after certification, but its principal place of business might.

Havana Docks also argues that "citizen" under § 6023(15)(A) of the LIBERTAD Act is not limited to natural persons, and Havana Docks is a United States citizen because it is incorporated in the United States. *Carnival*, ECF No. [336] at 9. Defendants respond that Havana Docks has never pled that it is a United States citizen under § 6023(15)(A), and Defendants disagree that § 6023(15)(A) applies to legal entities. *Id.* at 10. The Court agrees with Defendants that "United States citizen" under § 6023(15)(A) does not include corporate entities. "Between competing interpretations, one which renders part of the statute superfluous and one which gives effect to all of its provisions, we opt for the latter." *Bellitto v. Snipes*, 935 F.3d 1192, 1202 (11th Cir. 2019). Section 6023(15)(B) explicitly mentions legal entities, stating that they must be both incorporated in the United States and have their principal place of business in the United States. § 6023(15)(B). If Havana Docks is deemed a United States citizen just by virtue of being incorporated in the United States, then it would render the principal-place-of-business prong superfluous.

Finally, Havana Docks contends that its corporate activities show that its principal place of business is in the United States. *Carnival*, ECF No. [336] at 9. Defendants respond that, under the "nerve center" test, Havana Docks' principal place of business is in the United Kingdom. *Id.*, ECF No. [368] at 11–14. Defendants also move for summary judgment on the issue of Havana Docks' principal place of business, arguing that Havana Docks' nerve center is overseas as a matter of law.

*Id.*, ECF No. [330] at 24–25. Havana Docks responds that the nerve center test points to Kentucky as its principal place of business. *Id.*, ECF Nos. [389] at 25–29, [395] at 6–9.

Under the nerve center test, a corporation's principal place of business is "the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). As the Supreme Court explained:

> in practice it should normally be the place where the corporation maintains its headquarters—provided that the headquarters is the actual center of direction, control, and coordination, *i.e.*, the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).

*Id.* at 93.

For example, in *Annon Consulting, Inc. v. BioNitrogen Holdings Corp.*, 650 F. App'x 729 (11th Cir. 2016), a corporation's principal place of business was in Ontario, Canada, where the corporation, which had loaned money to the defendants, was only affiliated with an Ontario address, the bank account from which funds were wired was in Ontario, and "[n]othing in the record evidences that Annon's corporate activities were directed, controlled, or coordinated from a location other than from Ontario, Canada." *Id.* at 731; *see also Crockett v. Securitas Sec. Servs. USA, Inc.*, 278 F. App'x 863, 865 (11th Cir. 2007) (determining that corporation's principal place of business was California because its corporate headquarters was located in California and 13% of its revenue came from California).

Here, the Court determines that Havana Docks' principal place of business is in the United States as a matter of law. Even issues that are "generally a question of fact . . . may be resolved on summary judgment where the undisputed record evidence would lead a reasonable juror to only one conclusion." *Edge Sys. LLC v. Aguila*, 186 F. Supp. 3d 1330, 1349 (S.D. Fla. 2016). Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* Also, "[i]nferences based on speculation and a mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Daniels v. Jacobs*, 753 F. App'x 748, 755 (11th Cir. 2018) (internal citations omitted).

The only corporate address associated with Havana Docks is in Lexington, Kentucky. *Carnival*, ECF Nos. [331-118] at 9, [388] ¶ 113, [401] ¶ 113. Havana Docks has only two functions: to exist and manage its income-producing assets. *Id.*, ECF Nos. [388] ¶¶ 114–15, [401] ¶¶ 114–15. Indeed, Havana Docks has no employees. *Id.*, ECF Nos. [388] ¶ 111, [401] ¶ 111. Johnson, who operates out of Kentucky, *id.*, ECF Nos. [337] ¶ 59, [367] ¶ 59, is tasked with performing both of those functions. *Id.*, ECF Nos. [337] ¶ 50, [367] ¶ 50. It is undisputed that Johnson has performed duties to, among other things, maintain Havana Docks' corporate status active and in good standing, *id.*, ECF Nos. [337] ¶ 52, [367] ¶ 52; coordinate the filing of Havana Docks' taxes, *id.*, ECF Nos. [337] ¶ 54, [367] ¶ 54; and maintain Havana Docks' ledger, balance sheets, income statements, *id.*, ECF Nos. [337] ¶ 55, [367] ¶ 55.

Mickael Behn, Havana Docks' President, testified that "[a]ll decisions are executed by Jerry Johnson," *id.*, ECF No. [331-113] at 26, and that Johnson could do "[p]retty much everything" without his input, *id.* at 40. Behn added that Johnson "has authority . . . to do what he needs to do for Havana Docks. It's a certified claim. And to keep the company running." *Id.* Johnson similarly testified that although he reports to Behn as President, Johnson is "largely responsible" for "the day-to-day business decisions for Havana Docks." *Id.*, ECF No. [331-102]

at 29. Johnson further stated at deposition that Behn does not conduct any Havana Docks business in England. *Id.*, ECF No. [318-1] at 54.

Defendants fail to raise a genuine issue of material fact that Havana Docks' principal place of business is located outside the United States. "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson*, 477 U.S. at 248. The substantive law in this case— the nerve center test—indicates that the material facts are those showing "the place where a corporation's officers direct, control, and coordinate the corporation's activities." *Hertz*, 559 U.S. at 92–93. Defendants fail to show such material facts.

Defendants' reliance on the fact that Havana Docks' corporate address is also that of a bank where Johnson works or that Havana Docks is not registered to do business in Kentucky is misplaced. Havana Docks does nothing more than continue its corporate existence—which is in Kentucky—and manage some assets—also from Kentucky. Notably, Defendants do not identify any other corporate address for Havana Docks nor any other location where it is registered to do business.

Defendants present no other material facts that Havana Docks' "corporate activities were directed, controlled, or coordinated from a location other than" Lexington, Kentucky. *Annon*, 650 F. App'x at 731. Relying on Ackert's expert report, Defendants represent that "[e]xpert forensic analysis of Mr. Behn's email shows that he sent 98% of Plaintiff's business emails from overseas, primarily from the United Kingdom." *Carnival*, ECF Nos. [330] at 25, [368] at 12 (emphasis removed). But that is not the substance what Ackert states in his declaration. Ackert analyzed metadata data from 675 of 801 emails and determined that 41 out of 42 emails sent by Behn were routed through the UK or UN. *Id.*, ECF No. [325-1] ¶¶ 11, 20–25. Ackert did not identify the

subject matter of those emails, let alone identify them as "business emails." *Id.* Indeed, Ackert testified he did not review the content of the emails at all. *See id.*, ECF No. [325-3] at 31 ("Your review was limited to the metadata in the email files and not the content; correct? A. That is correct. I looked at the metadata of the produced files, not the content."). Ackert clarified at deposition that "[t]he scope of [his] analysis was not to form opinions on the content of emails," but to "form opinions as to the IP addresses located in the email header metadata." *Id.* Ackert further testified that he did know "anything about what they're [Havana Docks' principals] doing to conduct their business because I didn't look at the bodies or the content of the emails." *Id.* Moreover, Ackert testified that he had no opinion "on whether Mickael Behn was directing any . . . business of Havana Docks in any of the emails that [he] reviewed." *Id.* Thus, accepting Ackert's opinions as true, he only established that an unidentified subset of emails came from the UK, not that "98% of Plaintiff's business emails [came] from overseas," *id.*, ECF No. [330] at 25, or that Havana Docks' nerve center is outside of the United States.

Defendants also broadly assert that Mickael Behn "is the officer who reviews and provides approval for payments," *id.*, ECF No. [331] ¶ 55; "is the officer who reviews and provides approval of drafts of corporate governance records," *id.* ¶ 56; and "is the ultimate decision making officer for Plaintiff with respect to lobbying and legal strategy," *id.* ¶ 57. The record, however, does not support those broad factual assertions. For the first assertion, Defendants point to three instances where consulting fees were approved by Behn. *Id.*, ECF No. [331-135] at 7–8. Those instances do not show that Behn is *solely* responsible for approving payments. Moreover, even if he was, such responsibility does not establish that Behn directed or controlled Havana Docks from the United Kingdom. As to the second assertion, Defendants rely on two emails where Behn provided edits to documents that are not part of the record. *Id.*, ECF Nos. [331-138], [331-139]. As such, these

emails do not show that Behn directed or controlled Havana Docks from the United Kingdom. Concerning the last assertion, Defendants also rely on two emails where Behn provided commentary to documents regarding a Title III claim, and the documents are not attached. *Id.*, ECF Nos. [331-140], [331-141]. As such, these emails are not material facts regarding whether Behn directed or controlled Havana Docks from the United Kingdom.

The Court determines that Havana Docks is a "United States national" as defined in § 6023(15)(B) as a matter of law.[34]

### E. Ownership of Claim to Confiscated Property

For LIBERTAD Act claims brought upon a certified claim, Title III states that "the court shall accept as conclusive proof of ownership of an interest in property a certification of a claim to ownership of that interest that has been made by the [FCSC]." § 6083(a)(1).

In their Omnibus Motion, Defendants contend that Havana Docks never owned the Terminal or its piers, which were always owned by the Cuban Government. *Carnival*, ECF No. [330] at 3–12. Defendants rely on the unrebutted expert testimony from Ambar Diaz, an attorney who practiced maritime and insurance law in Cuba. *Id.* at 4–7; *see id.*, ECF No. [331-1] (expert report). Diaz opines that the Concession, when viewed through the lens of various Cuban laws related to marine ports, granted Havana Docks only a non-exclusive, limited right to operate cargo services at the Terminal. *Id.*, ECF No. [331-1] at 5, 15–17. Consequently, according to Defendants, Havana Docks never had a right to exclude others from the Terminal or to offer passenger services. *Id.*, ECF No. [330] at 7–9. Defendants maintain that because Havana Docks only owned a limited, non-exclusive right to engage in cargo services, Defendants did not traffic in "confiscated

---

[34] MSC SA raises as an affirmative defense Havana Docks' status as a United States national. *MSC*, ECF No. [133] at 19 (MSC SA Def. No. 22). This defense is a denial of one of the elements of the cause of action, and the Court has determined that Havana Docks is a United States national as a matter of law.

property" given that Defendants provide passenger services. *Id.* at 11–12.

Regarding § 6083(a)(1), Defendants contend that the Certified Claim is not entitled to deference because Havana Docks misrepresented to the FCSC that it owned the Terminal. *Id.* at 9–10. Defendants submit that Havana Docks then-Vice President Thomas Whittaker falsely represented that Havana Docks owned "land and concessions," and Havana Docks, when answering the FCSC's questions, falsely stated that it "own[ed] and operat[ed]" the Terminal and its piers. *Id.* at 9. Defendants also reject that the FCSC found that Havana Docks owned the Terminal, but merely valued its loss. *Id.* at 10 n.19. Defendants do not point to any particular portion of the Certified Claim but argue that "[t]he FCSC's task was to determine the purported amount of [Havana Docks'] loss, which is precisely what the decision accomplished (although Defendants do not believe it did so correctly)." *Id.* Defendants further argue that relying on the FCSC's findings as conclusive proof of ownership would violate due process. *Id.* at 10–11.

Havana Docks responds that under the LIBERTAD Act, the Certified Claim is conclusive proof of Havana Docks' ownership interest, preluding judicial review of the certification's findings, relying heavily on *United States v. Hernandez*, 864 F.3d 1292 (11th Cir. 2017). *Carnival*, ECF No. [389] at 3–5. *Hernandez* concerned a prosecution under the Maritime Drug Law Enforcement Act ("MDLEA"), which "criminalizes an individual's possessing with intent to distribute a controlled substance '[w]hile on board a covered vessel,' which includes 'a vessel subject to the jurisdiction of the United States,' which in turn includes 'a vessel without nationality.'" *Hernandez*, 864 F.3d at 1296 (quoting 46 U.S.C. §§ 70502(c)(1)(A), 70503(a)(1), (e)(1) (2012)). The MDLEA includes within the meaning of a "vessel without nationality" "a vessel aboard which the master or individual in charge makes a claim of registry and for which the claimed nation of registry does not affirmatively and unequivocally assert that the vessel is of its

nationality." § 70502(d)(1)(C). The MDLEA also states that "[t]he response of a foreign nation to a claim of registry . . . is proved conclusively by certification of the Secretary of State or the Secretary's designee." § 70502(d)(2).

In *Hernandez*, the U.S. Coast Guard arrested four individuals aboard a vessel that was actually registered in Guatemala. *Hernandez*, 864 F.3d at 1296. But the Government produced a written certification from a U.S. Coast Guard Commander declaring that the Guatemalan government "could neither confirm nor deny that the go-fast vessel was registered in Guatemala." *Id.* at 1298–99. The Eleventh Circuit held that, under the plain terms of the MDLEA, the certification was conclusive proof of Guatemala's lack of unequivocal assertion that the vessel was of Guatemalan nationality. *Id.* at 1299.

Havana Docks contends that no misrepresentations were made to the FCSC, and that Defendants rely solely only on Diaz's conclusions, which are contrary to Cuban law and that do not create issues of fact. *Carnival*, ECF No. [389] at 6. Havana Docks argues that reliance on the FCSC's findings does not violate due process because Defendants did not have a pertinent right or interest at the time of certification. Moreover, the FCSC's findings are not conclusive of the ultimate issue of whether trafficking has occurred. *Id.* at 7.

Havana Docks stresses that evidence supports its ownership interest. *Id.* at 8. Specifically, Havana Docks points to corporate minutes evidencing a transfer of "'all rights titles and interest' in the Concession, including 'all of the lands buildings piers wharves docks and all other tangible properties'"; annual balance sheets listing "Concession, Piers, Equipment, Etc." as assets of Havana Docks; a pledge of the Terminal by Havana Docks and its predecessor as collateral for a mortgage; and a lease of one of the piers by Havana Docks, with rent paid to satisfy Havana Docks' personal interest payment. *Id.* at 8–9; *see id.*, ECF Nos. [318-12] (lease between Port of Havana

Docks Company and United Fruit Company), [318-13] (Four Party Agreement between Havana Docks, Port of Havana Docks Company, United Fruit Company, and Old Colony Trust Company), [318-14] (Havana Docks indenture for the issuance of mortgage bonds), [318-18] (The National City Bank of New York Indenture with Havana Docks), [318-21] (1918 Port of Havana Docks Company Meeting Minutes), [318-25] (Port of Havana Docks Company indenture for issuance of mortgage bonds), [318-31] (1919 Havana Docks Directors Meeting Minutes), [318-36] (Havana Docks pre-confiscation financial reports). Havana Docks contends that Diaz misstates Cuban law and does not account for Havana Docks' recorded income from passenger cruise travel to the piers. *Id.*, ECF No. [389] at 8–10.

Havana Docks submits that even if it owned only a concession to engage in cargo service, liability under the LIBERTAD Act is not limited to the previous uses of confiscated property. *Id.* at 10–11. Finally, Havana Docks argues that Cuba's ownership interest is irrelevant because the LIBERTAD Act does not require a fee simple ownership interest. *Id.* at 11–12. The LIBERTAD Act broadly defines "property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." § 6023(12).

In their Reply, Defendants dispute that the evidence before the FCSC showed that Havana Docks owned the Terminal. *Id.*, ECF No. [399] at 2–4. Defendants do not submit any evidence in support; rather, Defendants point out that, under Cuban law, concessions could serve as collaterals to a loan; that the lease with United Fruit Company was only of Havana Docks' limited use of the Terminal; and that "self-servingly" listing assets on books does not prove ownership. *Id.* at 2. Defendants also contend that Havana Docks misinterprets Cuban law. *Id.*

Defendants further submit that Havana Docks' reliance on *Hernandez* is misplaced,

because the MDLEA does not allow certification of an element of a claim, but a certification that is a "diplomatic courtesy." *Id.*, ECF No. [399] at 4 n.5. Finally, Defendants maintain that since the Cuban Government always owned the Terminal and only confiscated a right to engage in cargo services, Defendants did not traffic in confiscated property by virtue of their passenger cruises. *Id.* at 5–6. As support of this last point, Defendants rely on the LIBERTAD Act's definition of "traffics"—"a person 'traffics' in confiscated property"—and "confiscated."[35] *Id.* at 5.

The Court accepts the FCSC's Certified Claim as conclusive proof that Havana Docks owned an interest in the Terminal. § 6083(a)(1). The Court finds *Hernandez* instructive where the Eleventh Circuit, under the plain terms of the MDLEA, accepted a certification as conclusive proof of a foreign country's lack of assertion of foreign nationality. *Hernandez*, 864 F.3d at 1299. There is no record evidence of fraud, and this Court accepts the Certified Claim as conclusive proof of Havana Docks' claim to an interest in the Terminal and its piers. § 6083(a)(1).

The FCSC found that Havana Docks "obtained from the Government of Cuba the renewal of a concession for the construction and operation of wharves and warehouses in the harbor of

---

[35] As used in subchapters I and III, the term "confiscated" refers to:

> (A) the nationalization, expropriation, or other seizure by the Cuban Government of ownership or control of property, on or after January 1, 1959--
> (i) without the property having been returned or adequate and effective compensation provided; or
> (ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure; and
>
> (B) the repudiation by the Cuban Government of, the default by the Cuban Government on, or the failure of the Cuban Government to pay, on or after January 1, 1959--
> (i) a debt of any enterprise which has been nationalized, expropriated, or otherwise taken by the Cuban Government;
> (ii) a debt which is a charge on property nationalized, expropriated, or otherwise taken by the Cuban Government; or
> (iii) a debt which was incurred by the Cuban Government in satisfaction or settlement of a confiscated property claim.

§ 6023(4).

Havana." *Carnival*, ECF No. [73-8] at 7. The FCSC further found that "[t]he terms of the concession granted by the Cuban Government were to expire in the year 2004, at which time the corporation had to *deliver the piers to the government* in good state of preservation." *Id.* at 9 (emphasis added). The FCSC then certified a loss for Havana Docks for the Concession and the piers. *Id.* Consistent with the language of the Certified Claim, the Court characterized Havana Docks' interest as a 99-year leasehold interest that was cut short, leaving 44 years. *See MSC Cruises*, 455 F. Supp. 3d at 1366.

The language of the Concession also supports the conclusion that Havana Docks' interest was a 99-year leasehold interest. Per the Concession, "[t]he State assigns in usufruct during the term of the concession that part of the San Francisco docks, as well as the public domain area, that will be occupied by the project's works." *Id.*, ECF No. [73-3] at 3. The Concession also gave an indemnity right "[i]f at any time during the term of the concession the works were to be expropriated." *Id.* at 5. In addition, the Concession stated that

> During the term of the concession, the concession holder shall, for its own account, maintain in good repair and in such condition the foundations, streets, buildings, and all other plant facilities that, upon the conclusion of said term, it may surrender the works to the Government in perfectly serviceable condition.

*Id.* The fact that Havana Docks managed, operated, and maintained the Terminal, and then had to return the Terminal to the Cuban Government after a period of time, is consistent with a leasehold interest.

Notably, the Certified Claim does not establish liability; only that Havana Docks owned an interest in confiscated property. Havana Docks must still prove that Defendants are liable for knowingly and intentionally trafficking in confiscated property, as well as overcome their affirmative defenses.

Relying on *De Gaster v. Dillon*, 247 F. Supp. 511 (D.D.C 1963), Defendants contend that

the *ex parte* proceeding before the FCSC cannot bind them due to Havana Docks'

misrepresentations. *Carnival*, ECF No. [399] at 4–5. The *Dillon* court denied an injunction

requiring the Secretary of the Treasury to pay an FCSC award because "a fraud was worked upon

the Foreign Claims Settlement Commission by filing with it a false document." *Dillon*, 247 F.

Supp. at 516. A false document was filed contending that the petitioners had gained a favorable

decision in the Supreme Court of Croatia, when they had not. *Id.* However, *De Gaster* is readily

distinguishable.

In *De Gaster*, the party submitted a Croatian Supreme Court decision that was "false,

fictitious or fraudulent." *De Gaster*, 247 F. Supp. at 515. In this case, Havana Docks submitted

several historical documents to the FCSC, such as corporate minutes, balance sheets, mortgage

agreements, a lease agreement, and indentures, which together evidenced that Havana Docks had

an interest in the Terminal. *See Carnival*, ECF Nos. [318-12], [318-13], [318-14], [318-18], [318-

21], [318-25], [318-31], [318-36]. Moreover, the FCSC relied upon the Concession itself. Although

Defendants characterize some of the historical documents as self-serving, they do not claim that

the documents are false, fictitious, or fraudulent.

In the same vein, Defendants' contention that Havana Docks misrepresented to the FCSC

its ownership interest is unavailing. *Carnival*, ECF No. [330] at 9. In support of their position that

Havana Docks only had a limited right to engage in cargo services, Havana Docks' Cuban law

expert, Diaz, relies on interpretations of various Cuban laws and the language of the Concession.

*See id.*, ECF No. [331-1]. But the FCSC also relied on the language of the Concession, and Cuban

law is a matter of public record. Moreover, the record evidence reflects that the FCSC gave full

consideration to the claim and the entire record before it. While Defendants may seek to have the

Court usurp the FCSC's role and issue its own legal and factual conclusions, the Court is unable

to do so based on the express terms of the statute. *See* §§ 1622g, 1623(h), § 6083(a)(1).

Lastly, Defendants' limiting interpretation of the LIBERTAD Act as requiring trafficking in cargo services is unpersuasive, as the Court has already explained. *See MSC Cruises*, 455 F. Supp. 3d at 1374 ("The liability provision [of the LIBERTAD Act] . . . imposes liability for trafficking in the more broadly defined "confiscated property"— a term that . . . is not limited solely to the interest Plaintiff originally owned in the Subject Property."). Specifically, the LIBERTAD Act provides an expansive definition of "property," stating: "The term 'property' means any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." § 6023(12)(A). The definition of "confiscated" incorporates that broad definition of "property." *See* § 6023(4). And the LIBERTAD Act explicitly includes in the definition of "traffics" obtaining "an interest in confiscated property," which strongly contradicts any interpretation limiting "traffics" based on a claimant's property interest or the use of that property interest. *See* § 6023(13)(A)(i). Thus, Title III's plain language creates liability for trafficking in the broadly defined "confiscated property"—*i.e.*, in any property that was nationalized, expropriated, or otherwise seized by the Cuban Government—not in a particular interest or use in confiscated property.

The Court finds that Havana Docks has demonstrated that it owns a claim to confiscated property pursuant to § 6082(a)(1)(A) as a matter of law.[36]

### F.  Trafficking After November 1, 1996

There is no dispute that Defendants' trafficking occurred after November 1, 1996.

---

[36] This Court's ruling also forecloses Carnival's twenty-six and twenty-seventh affirmative defenses, which challenge the FCSC's power to adjudicate Havana Docks' Certified Claim. *See Carnival*, ECF No. [160] at 22.

Carnival's cruises began in 2016; MSC began U.S.-to-Cuba cruises in 2018 and Cuba-to-Cuba cruises in 2015; Royal Caribbean's cruises began in 2017; and Norwegian's cruises began in 2017. *Carnival*, ECF Nos. [332] ¶ 23, [374] ¶ 23; *MSC*, ECF Nos. [224] ¶¶ 35, 41, [253] ¶¶ 35, 41; *Royal Caribbean*, ECF Nos. [141] ¶ 29, [172] ¶ 29; *Norwegian*, ECF Nos. [228] ¶ 15, [282] ¶ 15. This element is established as a matter of law.

### G. Defendants' Affirmative Defenses

#### 1. *Lawful Travel Exception*

##### a) "Lawful Travel" Prong

Havana Docks and Defendants separately move for summary judgment on the lawful travel exception in their respective Motions for Summary Judgment. The LIBERTAD Act excludes from trafficking acts "transactions and uses of property incident to lawful travel to Cuba." § 6023(13)(B)(iii). The LIBERTAD Act, however, does not define "lawful travel." And no court has determined what constitutes lawful travel to Cuba, making it an issue of first impression.

In their Omnibus Motion, Defendants represent that "the United States Government repeatedly and unequivocally agreed that cruise lines' passenger carrier services to Cuba – and specifically cruises lines' that used the Terminal to stop in Havana – met the 'lawful travel' exclusion requirements." *Carnival*, ECF No. [330] at 20. Defendants highlight an email from Deanna Kim, the Acting Coordinator for Cuban Affairs, who responded to Havana Docks' request that the State Department bring an enforcement action under Title IV of the LIBERTAD Act against Defendants for using the Terminal. *Id.*, ECF No. [330-104] at 2, 4. Kim replied that "given the clear exclusion in Title IV's definition of 'traffics' of transactions and uses of property incident to lawful travel to Cuba, we are not currently pursuing Title IV actions in relation to commercial cruise lines." *Id.* at 2. Defendants also rely on statements made from the State Department that

they would not take action against the cruise lines given the lawful travel exception. *Id.*, ECF No. [330] at 21. Defendants argue that these opinions are entitled to deference. *Id.*

Havana Docks resists Defendants' contention that the U.S. Government determined that Defendants met the lawful travel exception. *Id.*, ECF No. [389] at 23–24. Havana Docks points to Kim's deposition testimony, in which she stated that she was not providing a legal interpretation of Title III and did not conduct any investigation. *Id.* at 24. Finally, Havana Docks states that general opinions about a statute's reach merit no special deference. *Id.*

Defendants' reliance on the Kim email and State Department statements is misplaced. The question of the LIBERTAD Act's reach is "a pure question of statutory construction . . . well within the province of the Judiciary." *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004). "While the United States views on such an issue are of considerable interest to the Court, they merit no special deference." *Id.*; *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) ("Deference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate."). As such, the statements relied upon by Defendants do not factor into the Court's statutory analysis.

Next, Defendants assert that their "passenger carrier services to Havana were unquestionably lawful because they were licensed, authorized, and encouraged by the United States Government." *Carnival*, ECF No. [330] at 13. Defendants emphasize that, after the issuance of some specific licenses to travel to Cuba, OFAC promulgated a general license during the Obama Administration for cruise lines to travel to Cuba, and the license did not restrict where cruises could travel. *Id.* Moreover, President Barack Obama made statements regarding the authorization of cruises to Cuba while in Havana. *Id.* Around the same time, the United States Department of Commerce, Bureau of Industry and Security, and the United States Coast Guard relaxed other

restrictions for travel to Cuba. *Id.* at 14. Defendants underscore that they stopped sailing to Cuba when the general licenses were revoked. *Id.* at 15. Defendants add that the LIBERTAD Act does not restrict the promulgation of regulations loosening restrictions on travel, and that the OFAC regulations have not been declared invalid. *Id.* at 22.

Havana Docks' position is that lawful travel "means the authorized travel to Cuba that existed on March 1, 1996 and was codified in the LIBERTAD Act," which allowed only specific and limited forms of travel to Cuba *Id.*, ECF No. [336] at 14–15. Havana Docks contends that OFAC exceeded the statutory restrictions under the TSRA and LIBERTAD Act when it issued the regulations to allow people-to-people travel to Cuba under a general license, rendering the licenses void. *Id.*, ECF Nos. [336] at 15, [389] at 20–21. According to Havana Docks, OFAC could, at most, issue specific licenses on a case-by-case basis and for the limited travel purposes under the CACR. *Id.* Havana Docks further submits that the cruise industry knew that cruises to Cuba would be unlawful, as shown by cautionary comments from members of the industry and their extensive lobbying to undo statutory restrictions. *Id.*, ECF No. [336] at 16.

Alternatively, Havana Docks argues that the CACR did not authorize trafficking in confiscated property. *Id.*, ECF No. [389] at 21. Havana Docks acknowledges that the regulations did not limit where cruises could travel to in Cuba, but Havana Docks points out that the regulations did not require the use of the Terminal either—Defendants could have chosen to dock anywhere else in Cuba. *Id.* at 21–22. Havana Docks points out that President Obama's statements from Havana do not absolve Defendants of complying with federal law—a point this Court already made when ruling on a motion to dismiss. *Id.* at 22.

The Court's analysis of what constitutes "lawful travel" under the LIBERTAD Act begins with the text of the statute. The LIBERTAD Act excludes from trafficking acts "transactions and

uses of property incident to lawful travel to Cuba." § 6023(13)(B)(iii). "[W]e interpret words that are not defined in a statute with their ordinary and plain meaning because we assume that Congress uses words in a statute as they are commonly understood." *Catalyst Pharms., Inc. v. Becerra*, 14 F.4th 1299, 1307 (11th Cir. 2021). "Moreover, courts do not read individual words or terms in isolation, but instead in light of their context within a particular text." *Id.* If the text provides little guidance, however, "absent any other source of guidance, we reluctantly and cautiously turn to legislative history materials." *Hunter v. City of Montgomery, Alabama*, 859 F.3d 1329, 1335 (11th Cir. 2017).

First, contrary to Defendants' argument, "lawful travel" does not simply mean travel licensed and encouraged by the Executive Branch. As the U.S. Supreme Court and the Eleventh Circuit have explained long ago, "[t]he power of an administrative [agency] to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law . . . but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." *Legal Env't Assistance Found., Inc. v. U.S. E.P.A.*, 118 F.3d 1467, 1473 (11th Cir. 1997) (quoting *Dixon v. United States*, 381 U.S. 68 (1965)). "When a regulation implements a statute, the regulation must be construed in light of the statute." *United States v. Marte*, 356 F.3d 1336, 1341 (11th Cir. 2004). As such, where "a regulation conflicts with a statute, the statute controls." *Id.* Even when a federal agency has "broad powers to enact rules and regulations as it deems appropriate to effectuate legislative mandates," the "federal agency may not make law or operate to create rules in disharmony with the congressional statute it administers." *Commodity Futures Trading Comm'n v. Mass Media Mktg., Inc.*, 156 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001); *see United Nat. Bank v. U.S. Dep't of Interior*, 54 F. Supp. 2d 1309, 1312 (S.D. Fla. 1998) ("It is well settled that a regulation that is not in harmony with the statute is *void ab initio* and cannot be relied

upon by the agency.").

Therefore, the fact that OFAC promulgated licenses for traveling to Cuba, and Executive Branch officials, including the President, encouraged Defendants to do so, does not automatically immunize Defendants from liability if they engaged in statutorily prohibited tourism. Indeed, the OFAC regulations specifically state that "[n]o license or authorization contained in or issued pursuant to this part shall be deemed to authorize any transaction prohibited by any law other than the Trading With the Enemy Act, . . . the Foreign Assistance Act of 1961, . . . or any proclamation, order, regulation or license issued pursuant thereto." 31 C.F.R. § 515.101.

Second, contrary to Havana Docks' position, "lawful travel" does not mean only what was lawful in 1996. Although the LIBERTAD Act codified the 1996 regulatory restrictions on travel to Cuba, *see Odebrecht*, 715 F.3d at 1277; *see also* 22 U.S.C. § 6032(h), Congress later refined the scope of those restrictions in another legislative act, the TSRA. *See Odebrecht*, 715 F.3d at 1277; *see also* § 7209(a). As such, "lawful travel" encompasses the restrictions set forth in the TSRA.

Under the TSRA, Congress limited OFAC's power to "authorize . . . travel-related transactions . . . either by a general license or on a case-by-case basis by a specific license for travel to, from, or within Cuba for tourist activities." § 7209(b)(1). Moreover, Congress specifically defined "tourist activities" as "any activity with respect to travel to, from, or within Cuba that is not expressly authorized . . . in any of paragraphs (1) through (12) of section 515.560 of title 31, Code of Federal Regulations." § 7209(b)(2). Therefore, if Defendants' travel-related activities did not fall within the 12 categories for travel promulgated in § 515.560, then the activity is deemed to be tourism under the TSRA.

Third, the Court also disagrees with Havana Docks that OFAC violated the TSRA when it promulgated people-to-people travel rules. At no point did OFAC create a thirteenth exception to

the term "tourist activities," which would have been inconsistent with the TSRA. *See* § 7209(b)(2). Rather, OFAC amended the CACR to expand what constituted "educational activities" within § 515.565. Although OFAC at times amended the CACR to relax certain administrative hurdles for people-to-people travel (a specific license and a sponsoring organization), OFAC simultaneously added conditions for people-to-people travel and illustrative examples of what would be permissible and impermissible. At all times, OFAC explicitly prohibited "primarily tourist-oriented" activities. *See* §§ 515.565(c) (2011)–(2016), 515.565(f) (2017). Consistent with that prohibition were the requirements that cruise travelers engage in "a full-time schedule of activities intended to enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities," and "result in meaningful interaction between the traveler and individuals in Cuba." § 515.565(b)(2)–(3) (2015); § 515.565(b)(1)–(2) (2016); § 515.565(b)(2)–(3) (2017). Thus, consistent with the strict statutory ban on tourism in Cuba, the OFAC regulations were aimed at ensuring that people did not travel to Cuba under the guise of people-of-people exchanges, when in reality, such travel was disguised tourism. Indeed, OFAC has restricted educational travel in the past to prevent disguised tourism. *See Emergency Coal. To Defend Educ. Travel v. U.S. Dep't of Treasury*, 498 F. Supp. 2d 150, 154 (D.D.C. 2007) (addressing OFAC amendments to the CACR implemented when OFAC "concluded that the educational travel provisions of the CACR were being abused by some travelers and educational institutions as 'disguised tourism.'").

Interpreting OFAC regulations consistent with the TSRA and the LIBERTAD Act, "lawful travel" means travel-related activities that strictly complied with the 12 categories for travel promulgated by OFAC, because the TSRA defines "tourist activities" as anything that falls outside of those categories. OFAC did not act outside its statutory authority when it authorized people-to-

people travel within the "educational activities" category. Consistent with the Congressional intent of the LIBERTAD Act and the TSRA, the regulations at all times prohibited tourism, and OFAC continuously implemented conditions to ensure that people-to-people travel did not transform into tourism, such as requiring a full-time schedule of activities and meaningful interactions with the Cuban people. As such, "lawful travel" included *proper* people-to-people travel. However, the record evidence establishes that Defendants' activities were outside the regulation's dictates of people-to-people exchanges and thus, interpreted people-to-people travel impermissibly broad. The record reveals that the Defendants engaged in tourism expressly prohibited by the TSRA.

The Court recognizes that "the role of the judiciary in foreign affairs is limited." *United States v. Plummer*, 221 F.3d 1298, 1309 (11th Cir. 2000). As such, the Court does not question the wisdom of OFAC amendments to the CACR. *See id.* Nor will "[a]djudication of the present claim . . . interfere with the executive's handling of foreign relations or show a lack of respect to the executive's power in foreign affairs." *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1235 (11th Cir. 2004). Rather, the lawful travel exception is an affirmative defense that Defendants bear the burden of proving. *See Garcia-Bengochea v. Carnival Corp.*, 407 F. Supp. 3d 1281, 1286 (S.D. Fla. 2019) ("Based on the text and structure of Helms-Burton, the Court holds that the lawful travel exception is an affirmative defense to trafficking that must be established by Carnival, not negated by Plaintiff.").

Through that lens, the Court concludes that there is no genuine issue of material fact. The record evidence allows the Court to conclude that Defendants have not met their burden of demonstrating that they complied with the people-to-people travel requirements under § 515.565. Rather, during the relevant period of travel in each case, Defendants engaged in "tourist activities" under the TSRA and thus do not meet the lawful travel exception under the LIBERTAD Act.

### (1) Carnival's Tourist Activities

Carnival used the Terminal from May 2016 to May 2019. *Carnival*, ECF Nos. [332] ¶¶ 23–28, [374] ¶¶ 23–28. Thus, the CACR governing people-to-people travel, amended in March 2016 and November 2017, applies to the Court's analysis.[37]

Carnival admits that its night excursions—Tropicana Cabaret: Rhythms of the Night, Parisien Cabaret at Hotel Nacional, El Canonazo: An Evening Out in Havana, and Buenavista Social Club at Havana Cafe—did not constitute people-to-people travel. *Id.*, ECF Nos. [374] ¶ 78; *see id.*, [326-46] at 12. As set forth in the TSRA, travel-related activities that do not fall within the 12 permissible reasons for travel are, by definition, "tourist activities." § 7209(b)(2). Therefore, Carnival impermissibly engaged in tourist activities.

The descriptions of the evening excursions support the conclusion that the excursions constituted tourism. The Tropicana Cabaret, "Cuba's largest nightclub," involved guests watching a "Vegas-style extravaganza" with "a welcome drink, plus ¼ bottle of rum with mixers." *Id.*, ECF No. [311-38] at 4. The Parisien Cabaret likewise involved a show and drinks. *Id.* at 8. And El Canonazo was a sightseeing and photo tour through Havana landmarks, ending with a "cannon ceremony" at a former Spanish fortress. *Id.* at 6.[38] None of these evening tours involved "a full-time schedule of activities intended to enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities," or that "result[ed] in meaningful interaction between the traveler and individuals in Cuba." § 515.565(b)(1)–(2) (2016); § 515.565(b)(2)–(3) (2017). The excursions centered around watching shows, visiting

---

[37] Section 515.565 was also amended in October 2016, but only in a minor way that does not affect this case. *See* § 515.565 (Oct. 2016). After November 2017, § 515.565 was amended in June 2019 to remove people-to-people travel. *See* § 515.565(b) (2019). This is why the Court is referring to the March 2016 and November 2017 OFAC amendments to the CACR.

[38] There is no description in the record of the Buenavista Social Club excursion.

landmarks, and taking photos—"primarily tourist-oriented" activities. *See* §§ 515.565(c) (2016), 515.565(f) (2017).

Carnival contends that it offered the evening excursions "as additional and optional experiences to passengers who completed the full-time schedule" of people-to-people activities. *Id.*, ECF No. [374] ¶ 78. But Carnival has failed to show that its guests only attended evening shows after spending a full day engaged in people-to-people exchange. Carnival's shore excursion Guide stated that guests were not required to buy *any* excursion to exit the ship. *Id.*, ECF No. [326-46] at 12. Carnival's Corporate Representative, Israel, similarly testified that, at one point, passengers "did not need to buy tours from us," although Carnival "encouraged them to buy the tours[.]" *Id.*, ECF No. [326-32] at 173. Carnival's Cuba Operations Compliance Plan did state that "[a]ll guests must participate in a people-to-people program on each day in Cuba," *id.*, ECF No. [326-45] at 45, but nowhere does the guide state that guests who did not participate in a people-to-people program were prohibited from buying an evening excursion.

Carnival's daytime excursions were not people-to-people compliant, in any event. A prime example is the "Explore Havana by American Classic Car" tour, which involved a "two-hour joyride in an American classic vehicle" through Havana landmarks, ending with a visit at a local market, where guests would "enjoy free time to interact with the local souvenir vendors and take home [their] very own piece of Cuban memorabilia." *Id.*, ECF No. [311-38] at 5. In Example 4 to the 2016 version of § 515.565(b), OFAC instructed that "[a]n individual [who] plans to travel to Cuba to rent a bicycle to explore the streets of Havana, engage in brief exchanges with shopkeepers while making purchases, and have casual conversations with waiters at restaurants and hotel staff," has not participated in "educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba, and the traveler's trip does not qualify for the general

license." § 515.565(b) (2016). There is no meaningful distinction between OFAC's hypothetical bike tour and Carnival's classic car tour—the only difference is the vehicle used.

Even if Carnival's daytime excursions were OFAC complaint, neither the TSRA nor the CACR support the proposition that a passenger can spend the night at the Cuban nightclub simply because they spent the day engaged in people-to-people activities. "Broadly speaking, the regulations prohibit, unless specifically authorized, any dealing in any property in which Cuba or a Cuban national has an interest of any nature." *Odebrecht*, 715 F.3d at 1276. The TSRA defines "tourist activities" as anything that falls outside the 12 permissible reasons for travel. § 7209(b)(2). The evening excursions are thus "tourist activities," irrespective of whether daytime activities were not.

In addition, even accepting that Carnival's excursions had some components of people to people exchanges, it was physically impossible for all passengers to string together a full-time schedule of people-to-people exchanges by completing one full-day tour or two half-day tours. Carnival offered full-day tours of seven hours (with one of 11 hours) and half-day tours of four to six-and-a-half hours. *Carnival*, ECF No. [326-46] at 8–9. Each tour had a maximum capacity, ranging from 60 guests to 420 guests. *Id.*

In the four-hour "Hemingway's Havana" tour, guests would "travel by bus to Hemingway's former home, Finca Vigia, and learn about the author's attachment to Cuba and its people"; "[e]xplore with your guide the fishing town of Cojimar, which served as inspiration for the novel, *The Old Man and the Sea*"; and "enjoy a cocktail named in honor of the *Pilar's* first mate [t]here." *Id.*, ECF No. 311-28 at 3. The tour also included "[a] visit to a local community will provide guests the opportunity to engage with local Cubans working to improve their communities, a mission that Papa also strongly believed in." *Id.* Travelers would then return to "Old Havana" and "discover

the Plaza de Armas." *Id.* The tour description stated that "[t]his is a half day tour, a second tour or self-certification activity will need to be completed to meet the 7-8 hour People-to-People requirement." *Id.*

The local community visit is the only arguable people-to-people component in the excursion. As the show description expressly states, "[t]he community project associated with this tour is included to promote further understanding and interaction with the Cuban people," and given "the fluid nature of community projects in Cuba, the location and type of community project visited may vary to provide the best experience for our guests." *Id.* Therefore, only a portion of the four hours is devoted to people-to-people exchanges.

Similarly, in the "Art in Havana Past & Present" excursion, travelers would "visit the Bellas Artes Fine Arts Museum to learn more about Cuban art and styles from an art expert working at the museum;" "[t]ravel to Fusterlandia, the neighborhood of artist Jose Fuster, who has turned his community into a mosaic playground, with every inch of whimsical fantasy inspired by the works of Gaudi and Picasso"; and "visit the Muraleando community project, where local residents have used the Arts to improve their impoverished neighborhood." *Id.* at 7. Again, the tour description states that "[t]he community project associated with this tour is included to promote further understanding and interaction with the Cuban people." *Id.* But taking that as true, the community projects are only portions of a tour that chiefly involved visiting museums and enjoying art—primarily tourist activities. Thus, a traveler who booked both the "Hemingway's Havana" and "Art in Havana Past & Present" tours would not be participating in a full-time schedule of people-to-people exchanges.

Further illustrating the point, the eight-hour "Hemingway's Hangouts & Hideaways" excursion was described as follows:

First, travel by bus to Hemingway's former home, Finca Vigia and learn about the author's attachment to Cuba and its people.

Explore with your guide the fishing town of Cojimar, which served as inspiration for the novel, *The Old Man and the Sea*.

Back in Old Havana, a visit to a local graphic arts workshop where various artists create and display their work will provide the opportunity to engage with local artisans. Enjoy lunch at a local restaurant.

Discover the Plaza de Armas. This is the center of town and is where Papa Hemingway resided when he first moved to Cuba.

Visit the Plaza de la Catedral in one of the five main squares in Old Havana. Enjoy an hour of free time to explore and interact with the locals. Beverage stops will be made at the La Bodeguita and El Floridita.

*Id.*, ECF No. 311-28 at 13.

Out of the eight-hour tour, only some portions are designated "opportunities" to engage with local Cubans, with one of those portions described as "*an hour of free time to explore* and interact with the locals." *Id.* (emphasis added). Even taking as true that these opportunities go beyond casual conversions and brief exchanges, a guest on these tours would not have engaged in a full-time schedule of meaningful interactions with Cuban people. Also, the traveler who booked this full-day tour would not have had the opportunity to complete another daytime tour to add additional people-to-people components. All that would be left are the nighttime tours, which were not people-to-people compliant. *Id.*, ECF Nos. [374] ¶ 78; see id., [326-46] at 12.

Next, as the Eleventh Circuit has recognized, Havanatur is the "travel agency exclusively authorized by Cuba to provide *tourist* services in Cuba." *United States v. Fuentes-Coba*, 738 F.2d 1191, 1194 (11th Cir. 1984) (emphasis added). Indeed, Havanatur is part of the Cuban Government's Ministry of Tourism. *Carnival*, ECF Nos. [332] ¶ 31, [374] ¶ 31. As Carnival's Corporate Representative, Israel, testified, Carnival sold excursions to its passengers that Carnival had, in turn, purchased from Havanatur. *Id.*, ECF No. [326-32] at 172–74. The fact that Carnival

purchased tours from a *tourism* excursion provider is powerful, additional evidence that Carnival was engaging in tourism.

In addition, Carnival's Cuba Operations Compliance Plan stated that guests could engage in either self-guided people-to-people activities or purchase Carnival's daytime activities, which "fulfill this requirement." *Id.*, ECF No. [326-45] at 45. OFAC, however, prohibited sponsoring organizations from having travelers "engage in individually selected . . . activities." §§ 515.565(b) (2016) (note). And yet that is exactly what Carnival did: it presented a menu of excursions for passengers to pick and choose from. *See id.*, ECF No. [326-46] at 8–9. Carnival's shore excursion Guide stated that it was not mandatory for travelers to buy an excursion to leave the ship, leaving open the opportunity for passengers to enter Cuba and engage in non-compliant transactions. *Id.* at 12.

In the same vein, Carnival impermissibly disclaimed responsibility for passengers who traveled to Cuba and did *not* engage in people-to-people travel. *Id.* Carnival's position was that a guest may "come in and out as much [as] they want" even if not in compliance with people-to-people guidelines. *Id.* However, the general license allowing for vessels to travel to Cuba indicated that vessels may only transport "[p]ersons subject to U.S. jurisdiction who are traveling to or from Cuba pursuant to a general license under one of the 12 categories of travel listed in § 515.560 or under a specific license from [OFAC]." § 515.572 (note).

Carnival's 2015 specific license further shows that Carnival engaged in tourism and that licensure in general cannot act as a shield to liability under the LIBERTAD Act. To begin, none of the evening excursions Carnival later provided to its guests were included in the "Illustrative Cuba Itinerary" Carnival presented to OFAC. *See Carnival*, ECF No. [326-26] at 16–25. Neither was the "Explore Havana by American Classic Car" tour. *Id.* The activities Carnival presented to OFAC

when seeking a specific license, and the excursions Carnival ultimately offered to guests under the general licenses, are glaringly different. Moreover, Carnival represented to OFAC that it would monitor and ensure that passengers engage in full-time people-to-people programing while onshore in Cuba. *Id.* at 26. But Carnival's Guide stated that it was not mandatory for travelers to buy an excursion to leave the ship. *Id.*, ECF No. [326-46] at 9.

In addition, the specific license issued to Carnival contained numerous qualifications regarding its limited scope. OFAC stated in the letter granting the specific license that "[t]he . . . license does not authorize Carnival to transport any person who will disembark in Cuba and who is not authorized by a general license or a separate specific license." *Id.*, ECF No. [326-26] at 33. The letter also informed Carnival that "compliance with the requirements of the CACR does not excuse a U.S. person from the need to comply with other provisions of 31 C.F.R. chapter V, and with other applicable provisions of law." *Id.* The license itself specified that (1) it "does not . . . release the Licensees or third parties from civil or criminal liability for violation of any law or regulation"; (2) does not "authorize[] any person subject to the jurisdiction of the United States to engage in any transaction or activity prohibited by the CACR, or by any other laws and regulations administered by [OFAC]"; and (3) "appl[ies] only to the laws and regulations administered by OFAC and should not be interpreted to excuse the Licensees from compliance with other laws, regulations, orders, or rulings to which they may be subject[.]" *Id.*, ECF No. [326-35] at 4–5. The same qualifications apply with equal force to OFAC's general licenses. *See* § 515.101.

One of "the purposes behind the Trading with the Enemy Act and the Cuban Assets Control Regulations"is "[t]o deny to Cuba or its nationals hard currency which might be used to promote activities inimical to the interests of the United States." *De Cuellar v. Brady*, 881 F.2d 1561, 1569 (11th Cir. 1989); *see Regan v. Wald*, 468 U.S. 222, 229 (1984) (explaining that the CACRs were

meant to "reduce Cuba's hard currency earnings from travel by U.S. persons to and within Cuba"). "[W]hen it codified and strengthened the embargo by enacting the [LIBERTAD] Act, Congress justified the measure by describing Cuba as a threat to national security and making extensive findings to that effect." *Plummer*, 221 F.3d at 1310 n.8. Yet Carnival paid more than $18 million to Cuban Government-owned and controlled entities to use the Terminal. *See Carnival*, ECF Nos. [332] ¶ 32, [374] ¶ 32. Carnival never made any payments in Cuba to anyone or any entity that was not affiliated with the Cuban Government. *Id.*, ECF Nos. [332] ¶ 33, [374] ¶ 33. Carnival's cruises constituted tourist activities and not proper people-to-people activities, paying millions of dollars to the Cuban Government to engage in impermissible travel.

Based upon the undisputed facts, the Court determines that from May 2016 to May 2019, Carnival did not engage in lawful travel to Cuba under the LIBERTAD Act.[39]

### (2) MSC's Tourist Activities

#### (a) Miami-to-Cuba Cruises by MSC

The *Armonia* traveled from Miami to Havana and used the Terminal from December 2018 to June 2019. *MSC*, ECF Nos. [224] ¶¶ 40, 48, [253] ¶¶ 40, 48. Thus, the CACR governing people-to-people travel amended in November 2017 applies to the Court's analysis.

Like Carnival, MSC SA offered on the *Armonia* Tropicana Cabaret excursion, with "dancing girls wearing scanty costumes and feathered headgear"; "[a] live orchestra"; and "music, dancing and Havana Club rum." *Id.*, ECF No. [253-2] at 30. But unlike Carnival, MSC contends that the excursion was people-to-people compliant. Iaccarino, the Shore Excursion Business Development Manager for MSC SA, characterized the excursion as "not only a cabaret show," but a historical lesson on Cuban music and dance. *Id.*, ECF No. [201-7] at 21.

---

[39] Based on this ruling, the Court need not decide whether cruises by Airtours or Costa also fall within the lawful travel exception.

MSC's characterization of the Tropicana Cabaret excursion blurs the line between tourism and people-to-people travel. Virtually all music and dance have some historical origin. A tourist who cruises to Hawaii and attends a luau performance may witness some brief historical lessons on Polynesian culture. But one would be hard-pressed to deem such an excursion anything but primarily tourism or conclude that the tourist had a meaningful interaction with native Hawaiians. The same common-sense conclusion applies to the Tropicana Cabaret, a "primarily tourist-oriented" show. *See* § 515.565(f) (2017). The show provided, at most, casual contact with some Cuban performers and wait staff, which does not qualify as "educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba." § 515.565(b)(2)–(3) (2017). A contrary conclusion would create disharmony between the TSRA and the CACR. *See Commodity*, 156 F. Supp. 2d at 1333.

MSC SA's other excursions fare no better. Like Carnival, MSC SA offered on the *Armonia* a vintage car tour, which involved traveling "around Havana's historical cityscape in a vintage car," "a Cuban cocktail," and visits to landmarks. *See MSC*, ECF No. [253-2] at 30. Iaccarino testified: "In every excursion we created the possibility to interact or to discover some commentary or social so-called project. In this specific case, although the experience is not from the buses but is from cars[.]" *Id.*, ECF No. [201-7] at 21. But there is no meaningful distinction between OFAC's non-compliant hypothetical bike tour and MSC's classic car tour. § 515.565(b) (note) (2016).[40] At most, the tour provided an unspecified "possibility to interact or to discover some commentary or social so-called project." *Id.*, ECF No. [201-7] at 21. This is contrary to OFAC's requirement of a "full-time schedule of activities" that "result in meaningful interaction between the traveler and individuals in Cuba." § 515.565(b)(2)–(3) (2017).

---

[40] Although the bicycle example was not included in the 2017 version of § 515.565, the Court still finds it instructive.

The same conclusion applies to the *Armonia's* Cultural Havana, Rum & Cigars excursion, which involved watching Cubans roll cigars, taking photos at the Plaza de la Revolución, and visiting the "Havana Club Museum to find out how freshly cut sugarcane is distilled into rum." *MSC*, ECF No. [253-2] at 30. Guests would "enjoy a taste of" rum and have "free time . . . to browse for a memento and take more photos before you return to the ship." *Id.* These are "primarily tourist-oriented" activities. § 515.565(f) (2017). The same is true of the "Hemingway & Havana Tour," which involved visit to Hemingway's former home; a "pass through the historical fishing village of Cojimar"; "a Don Gregorio cocktail at the La Terraza de Cojimar restaurant"; and visits to "the historical Ambos Mundos Hotel, San Geronimo University and Plaza de la Catedral en route to the Restaurante Floridita for a daiquiri." *Id.,* ECF No. 253-2 at 30. In the same vein, the "Legendario de Guajirito with Guest of Buena Vista" tour involved a "fabulous show at Iberostar Habana Riviera Hotel." *Id.*

Notably, MSC SA's CEO, Onorato, testified that he did not know whether cruise passengers were educated about the lack of political freedoms in Cuba or met with Cuban dissidents. *MSC*, ECF No. [201-3] at 53–54.

In addition, even accepting that MSC SA's excursions had some components of people-to-people exchanges, it was physically impossible for all passengers to string together a full-time schedule of people-to-people exchanges by completing one or more tours. The tours on the *Armonia* ranged from 3 hours to 8 hours. *Id.*, ECF No. [253-2] at 29–32. The Armonia made 25 voyages from Miami to Havana, listing in its manifests 51,908 passengers. *Id.*, ECF Nos. [224] ¶¶ 40, 48, [253] ¶¶ 40, 48. While the tour excursions do not indicate the maximum capacity of each tour, each tour would have had a limit, as was the case with other cruise operators. As such, even if "every excursion . . . created the possibility to interact or to discover some commentary or social

so-called project," *id.*, ECF No. [201-7] at 21, or "possessed a predominant cultural or historical component," *id.*, ECF No. [210-18] ¶ 5, the record evidence fails to establish enough tours in a single day to fulfill a full-time schedule of meaningful interactions.[41]

MSC SA contracted with Cubanacan, which is part of the Cuban Government's Ministry of Tourism, to operate shore excursions in Havana that MSC SA sold to passengers. *MSC*, ECF Nos. [224] ¶ 57, [253] ¶ 57. The Shore Excursion Agreement between MSC SA and Cubanacan states that Cubanacan provided tourism-related services. Specifically, the agreement stated that "VIAJES CUBANACAN is engaged in the business of organizing, promoting and selling *tourist excursions* in the Cuban national territory." *Id.*, ECF No. [218-9] at 3 (emphasis added). The agreement set forth that Cubanacan is "capable and willing to assume the organization, promotion and sale of *tourist excursions* in the Cuban national territory," and that it would provide "*tourist services* described below . . . during the term of the operation of THE VESSELS [including the *Armonia*], between December 1, 2018 and November 30, 2019." *Id.* at 3–4 (emphasis added). Part of Cubanacan's responsibilities included "[t]o assist. . . the *tourists* before the authorities of the country and in all the necessary legal procedures during the agreed season, for the realization of [MSC SA's] shore excursions in Cuba." *Id.* at 5 (emphasis added). MSC SA, in turn, had to, among other things, ensure that it communicated to Cubanacan the "[l]anguage of the *tourists*" who bought excursions and "guarantee that the *tourists* traveling on THE VESSELS and taking the *tourist excursions* with [Cubanacan] have a valid insurance policy." *Id.* at 7 (emphasis added).

In addition, MSC impermissibly disclaimed responsibility for guests who traveled to Cuba and did not engage in people-to-people travel. *Id.*, ECF No. [201-7] at 25–26. Iaccarino, the Shore Excursion Business Development Manager for MSC SA, *id.* at 5, testified that it was only "highly

---

[41] This conclusion applies with equal force to the *Opera* cruises, which averaged 2,000 passengers for each call to Havana. *Id.*, ECF Nos. [224] ¶ 61, [253] ¶ 61.

recommended" that guests purchase shore excursions; it was ultimately the guests' responsibility to certified that they were traveling for permissible reasons. *Id.* at 26. Zeller, Vice President of US Hotel Operations for MSC SA, likewise stated in an internal email, "we do not police guests, we do not check whether a guest has purchased a tour ticket or not, we do not block guests at the gangway." *Id.*, ECF No. [202-47] at 2. The general license allowing for vessels to travel to Cuba indicated that vessels may only transport "[p]ersons subject to U.S. jurisdiction who are traveling to or from Cuba pursuant to a general license under one of the 12 categories of travel listed in § 515.560 or under a specific license from [OFAC]." § 515.572 (note).

### (b) Cuba-to-Cuba Cruises by MSC

The Court next analyzes whether the LIBERTAD Act and CACR govern MSC's Cuba-to-Cuba cruises. MSC contends that the LIBERTAD Act does not apply extraterritorially, *MSC*, ECF No. [256] at 13, and that "non-U.S.-based trips . . . were not required to comply with OFAC regulations," *id.*, ECF No. [272] at 9 (emphasis removed). Anticipating that the Court might disagree with its first point, MSC argues that Cuba-to-Cuba cruise constitute lawful travel under Cuban and Swiss law. *Id.*, ECF No. [256] at 14.

Havana Docks argues that the LIBERTAD Act does have extraterritorial reach. *Id.*, ECF No. [281] at 8. Havana Docks further contends that the LIBERTAD Act applies U.S. law, not Cuban or Swiss law. *Id.*, ECF No. [281] at 8–9. Havana Docks does agree that the general licenses under the CACR do not apply to Cuba-to-Cuba cruises but interprets that conclusion as meaning that the lawful travel exception is inapplicable to Cuba-to-Cuba cruises. *Id.* at 9.

The LIBERTAD Act *does* apply extraterritorially. Indeed, the LIBERTAD Act is broad in reach, having "caused an international uproar among United States' allies due to the extraterritorial reach of Title III." *Odebrecht Const., Inc. v. Prasad*, 876 F. Supp. 2d 1305, 1311–12 (S.D. Fla.

2012). This reach is what led to the advent of the EU blocking statute and President Bill Clinton waiving the right to bring a cause of action. *Id.* at 1312. But "Congress unquestionably has the authority to enforce its laws beyond the territorial boundaries of the United States." *Plummer*, 221 F.3d at 1304.

The CACR also applies extraterritorially. The CACR places "restrictions on any '[p]erson . . .subject to the jurisdiction of the United States,' . . . which is defined by regulation to include U.S. corporations, their domestic and foreign subsidiaries, and any foreign company owned or controlled by a U.S. citizen." *Odebrecht*, 715 F.3d at 1276 (quoting 50 U.S.C. § 4305(b)(1) and citing 31 C.F.R. § 515.329). MSC does not argue that it is not subject to the jurisdiction of the United States. Moreover, the CACR broadly prohibit "any dealing in any property in which Cuba or a Cuban national has an interest of any nature," including dealings that do not originate in the U.S. *See id.* (explaining that OFAC regulations "apply to exports to Cuba, whether from the U.S. or even through offshore dealing by a person or entity subject to the CACR"); *see also Plummer*, 221 F.3d at 1307 (applying CACR prohibition on dealing in Cuban merchandise to individual prosecuted for attempting to smuggle Cuban cigars where all predicate acts occurred outside of the United States).[42]

The general license within § 515.572 does not state otherwise. The licenses states that "[p]ersons subject to U.S. jurisdiction are authorized to provide carrier services to, from, *or within* Cuba in connection with travel or transportation, directly or indirectly, between the United States

_____

[42] The Court recognizes that Magistrate Judge Lauren Louis, when resolving a discovery dispute, found that "[t]he shore excursions that took place on . . . Cuba-to-Cuba cruises are not relevant to rebutting [the] lawful travel defense" because "[w]hile Defendants indeed argue that the Miami-to-Cuba cruises were made pursuant to OFAC licenses and that they complied with the OFAC terms, the OFAC regulations do not govern the Cuba-to-Cuba cruises." *Havana Docks Corp. v. MSC Cruises (USA) Inc.*, No. 1:19-CV-23588, 2021 WL 4973458, at *4 (S.D. Fla. Aug. 16, 2021). Judge Louis did not analyze the extraterritorial reach of the CACR but premised her statement on MSC's erroneous position that Cuba-to-Cuba cruises fall outside the CACR.

and Cuba of persons, baggage, or cargo authorized pursuant to this part." § 515.572(a)(2)(i) (emphasis supplied). Moreover, even if § 515.572 only concerns travel to and from the United States and Cuba, § 515.572 simply allows cruises to act as common carriers. Section 515.572 does not address at all the permissible reasons for travel, including people-to-people requirements.

Having established that the LIBERTAD Act and the CACR apply to MSC's Cuba-to-Cuba cruises, it is evident that such cruises present an even clearer case of tourism. Both the *Armonia* and *Opera* used Cuba as a homeport between 2015 and 2019. *MSC*, ECF Nos. [224] ¶¶ 35, 37, 38–39, [253] ¶¶ 35, 37, 38–39. Thus, the people-to-people OFAC regulations amended in 2015, March 2016, and November 2017 apply to the Court's analysis.

It is undisputed that on Cuba-to-Cuba cruises, MSC SA provided several excursions that included activities not just at nightclubs, such as the Tropicana Cabaret, but at the beach. *MSC*, ECF No. [218-17].[43] In Example 5 to the 2016 version of § 515.565(b), OFAC advised that an individual who "plans to spend a few days engaging in brief exchanges with Cuban food vendors while spending time at the beach" would not be engaging in "educational exchange activities that will result in meaningful interaction between the traveler and individuals in Cuba. § 515.565 (note) (2016). MSC SA's beach excursions fall squarely within that prohibited example.

The record reflects that MSC only "highly recommended" that guests purchase shore excursions and did not verify whether a guest had purchased a shore excursion before exiting the ship. *MSC*, ECF Nos. [201-7] at 26, [202-47] at 2. OFAC, however, prohibited sponsoring organizations from having travelers "engage in individually selected . . . activities." § 515.565(b)

---

[43] It is unclear whether beach excursions were also available in Miami-to-Cuba cruises. MSC contends that the beach excursions were only available on the *Opera*. *MSC*, ECF No. [253] ¶¶ 102–103. A July 2018 Excursion Revenue Report for the *Armonia* shows revenues for the beach excursions. *Id.*, ECF No. [218-10] at 2. But the *Armonia* also engaged in Cuba-to-Cuba cruises. *Id.*, ECF Nos. [224] ¶ 38, [253] ¶ 38. Given this factual dispute, the Court did not address the beach excursions in relation to the Miami-to-Cuba cruises.

(2016) (note). And yet that is precisely what MSC did: it presented a menu of excursions for passengers to choose from, but passengers were not required to select any. *MSC*, ECF Nos. [201-7] at 26, [202-47] at 2.

As stated, one of the purposes behind CACR is "[t]o deny to Cuba or its nationals hard currency which might be used to promote activities inimical to the interests of the United States." *De Cuellar*, 881 F.2d at 1569; *see Regan*, 468 U.S. at 229. MSC SA paid more than $16.9 million to Cuban Government-owned and controlled entities to use the Terminal. *MSC*, ECF Nos. [224] ¶¶ 55, 59, [253] ¶¶ 55, 59. MSC's cruises constituted tourist activities and not proper people-to-people activities, paying millions of dollars to the Cuban Government to engage in impermissible travel.

Based upon the undisputed facts, the Court determines that from 2015 to June 2019, MSC did not engage in lawful travel to Cuba under the LIBERTAD Act.

### (3) Royal Caribbean's Tourist Activities

Royal Caribbean used the Terminal from March 2017 to June 2019. *Royal Caribbean*, ECF Nos. [141] ¶¶ 28, 32, [172] ¶¶ 28, 32. Therefore, the CACR governing people-to-people travel, amended in March 2016 and November 2017, apply to the Court's analysis.

Like other cruise operators, Royal Caribbean offered guests a visit to the Tropicana Cabaret, which involved a 30-minute "Tropicana performance"; "[a] welcome cocktail, 1 bottle of rum per table, 1 soft drink, mixed hors d'oeuvre and one tobacco"; and a history lesson on the Mafia's use of the cabaret. *Id.*, ECF No. [131-43] at 17. Royal Caribbean likewise offered a similar show at the "Cabaret Parisién." *Id.* at 19. Although Royal Caribbean indicated in its shore excursion catalog what portions of tours were people-to-people compliant with a "P2P" symbol, neither of these tours had a "P2P" designation. *Id.*, ECF No. [131-43] at 6, 17–19.

At her deposition, Shaw, who was involved in shore excursions with Royal Caribbean for 29 years, *id.*, ECF No. [122-4] at 5, testified that the Tropicana Cabaret involved "a little bit of history" and "then at the end, the guests had a chance to participate and come on stage and dance [a] little bit with the performers." *Id.* at 28. She likewise testified that the Cabaret Parisién involved a similar experience: "they would go ahead and talk about the history of Cuba. They'll talk about the performers that had performed at that location. They did different musical routines with dancers. And then at the end they would have interactivity with our guests before going back to the ship." *Id.* at 29.

Shaw's description of the excursion amounts to passive history lessons—involving no interactions between the travelers and Cuban people—and then casual and brief exchanges in the form of guests dancing on stage. Such activities are not consistent with OFAC's people-to-people exchanges, such as a full schedule of "discussions with Cuban artists on community projects, exchanges with the founders of a youth arts program, and . . . extended dialogue with local city planners and architects to learn about historical restoration projects in Old Havana." § 515.565(b) (2016) (Example 2). To interpret people-to-people travel to include the Tropicana Cabaret and Cabaret Parisién is to ignore the regulation's express distinction between permitted educational travel and impermissible tourist travel.

Royal Caribbean's excursions with a "P2P" symbol were likewise not people-to-people compliant, despite the designation. The designations only underscore that the excursions involved "primarily tourist-oriented" activities, §§ 515.565(c) (2016), 515.565(f) (2017), lacking "a full-time schedule of activities intended to enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities," or that "result[ed] in meaningful interaction between the traveler and individuals in Cuba." § 515.565(b)(1)–(2)

(2016); § 515.565(b)(2)–(3) (2017).

For example, in Royal Caribbean's 3.5-hour long cocktail making class, only a 15-minute segment was designated as P2P, which stated: "At the end there will be time to interact with the training specialists and hear some of their experiences and anecdotes about the profession." *Royal Caribbean*, ECF No. [131-43] at 29. Having only 15 minutes of a 3.5-hour excursion dedicated to people-to-people interactions implicitly acknowledges that the excursion is "primarily tourist-oriented." §§ 515.565(c) (2016), 515.565(f) (2017). In addition, Shaw testified that, during the cocktail-making class, some history would be discussed, and then guests were taught how to make classic Cuban drinks, like the mojito. *Royal Caribbean*, ECF No. [122-4] at 30. OFAC, however, had already advised that "brief exchanges" and "casual conversations" do not constitute meaningful interactions with the Cuban people. *See* § 515.565(b) (2016).

Similarly, in The Old Havana Sightseeing and Walking Tour Combination, which lasts 9 hours, the "P2P" segment is a 90-minute walk through various plazas where guests would "have the opportunity to have ongoing exchanges with locals, vendors, artisans, entrepreneurs, and to learn about the customs of the residents of Old Havana." *Royal Caribbean*, ECF No. [131-43] at 33. The remainder of the tour consisted of visits to various photo spots in Havana, with "[t]ime to taste an exquisite tobacco, and a rum beverage." *Id.* at 32–30. Even if the 90-minute "P2P" portion involved more than "brief exchanges with shopkeepers while making purchases," § 515.565(b) (2016), travelers who engaged in this tour spent at least 7.5 hours engaging in "primarily tourist-oriented" activities. §§ 515.565(c) (2016), 515.565(f) (2017).

In addition, even accepting that Royal Caribbean's excursions had *some components* of people-to-people exchanges, it was physically impossible for all passengers to string together a full-time schedule of people-to-people exchanges by completing more than one tour. Tours had a

maximum capacity of 75 to 500 people. *Royal Caribbean*, ECF No. 131-43 at 4–5. The eight-hour "Best of Havana" tour had one 45 minute "P2P" segment ("interact with workers and local residents" at the "Fusterlandia community project") and another 35 minute "P2P" segment ("[t]ime for shopping and interact[ing] with artisans and private vendors . . . in the Almacenes de San Jose"). *Id.* at 7. The full day "Best of Havana with Colon Cemetery" tour had the same two people-to-people components. *See id.* at 8. As did the seven hour "Best of Havana with Hemingway's House" tour. *See id.* at 8–9. No guests taking these full-day tour would have engaged in a full-time schedule of people-to-people exchanges.

Similarly, the four to five hour "Havana Half Day Walking Tour without lunch" excursion only had a 90-minute "P2P" segment ("the opportunity to have ongoing exchanges with locals, vendors, artisans, entrepreneurs, and to learn about the customs of the residents of Old Havana"). *Id.* at 9. Likewise, the five-and-a-half hour "Havana By Classic American [Car]" tour had a 50 minute "P2P" segment ("interaction with members of the community" within "the Callejon de Hammel, a religious art space"). *Id.* at 10. And in another example, the four-and-a-half hour "Easy Panoramic Havana" tour only included a 45 minute "P2P" component ("[t]ransfer to the Fusterlandia community project" to "interact with workers and local residents"). *Id.* at 11. Even taking two half-day tours and then engaging in a nighttime excursion, there simply were not enough people-to-people components to piece together a full-time schedule of people-to-people exchanges.

Similar to Carnival, Royal Caribbean contracted with Havanatur to operate shore excursions. *Royal Caribbean*, ECF Nos. [141] ¶ 45, [172] ¶ 45. As explained, Havanatur is the "travel agency exclusively authorized by Cuba to provide tourist services in Cuba." *Fuentes-Coba*, 738 F.2d at 1194. The fact that Royal Caribbean purchased tours from a tourism excursion provider

further supports that Royal Caribbean was engaging in tourism.

The January 2019 email and testimony from Delgado, the Vice President of Global Business Development at one of Royal Caribbean's brands, *Royal Caribbean*, ECF No. [122-6] at 10, demonstrates that excursions from Havanatur fell short of the people-to-people travel requirement of enhancing contact with the Cuban people, supporting civil society in Cuba, or promote the Cuban people's independence from Cuban authorities. According to Delgado, Havanatur's tour guides had been "hired from the Cuban Ministry of Foreign Relations Academy (because of their language skills) [and] these individuals (after being brainwashed for four years) come to work for Havanatur believing our guests are not tourists, but the American invaders they were told were coming." *Id.*, ECF No. [123-29] at 4. At deposition, Delgado recalled that during the later year of the tours, the tour guides would "enter all kinds of nonsensical discussions with our guests on political issues." *Id.*, ECF No. [122-6] at 27. As Delgado put it, "What they were doing basically to our guests was reading the communist party bible on whatever they believe in." *Id.* Delgado also stated, "I believe that many of these guys got those positions and were trained on how to respond to questions from the guests in the way they did, basically brainwash[ed]." *Id.*

In addition, the record demonstrates that Royal Caribbean presented a series of excursions that travelers could pick and choose from, in the same manner that any other tourist cruising to another Caribbean destination would be able to do. *See Royal Caribbean*, ECF No. [131-43] at 4–5. OFAC, however, prohibited sponsoring organizations from having travelers "engage in individually selected . . . activities." §§ 515.565(b) (2016) (note).

The June 2019 OFAC Cautionary Letter to Royal Caribbean also establishes that Royal Caribbean failed to keep proper records, and that it transported passengers to Cuba for impermissible purposes. *See Royal Caribbean*, ECF No. [122-23]. Example 3 to the 2016 version

of § 515.565(b) instructed that "[a] traveler's failure to keep records means that the individual's activities do not qualify for the general license." As OFAC advised in the Cautionary Letter, "[t]ravel-related transactions to, from, or involving Cuba for any other purpose, or that do not meet the full criteria and conditions of one or more of the [12] categories of general licenses, including recordkeeping requirements, are prohibited." *Id.*, ECF No. [122-23] at 4. And yet a sampling of passenger affidavits from Royal Caribbean showed that "12 paper certifications failed to either select a general travel license or provide a specific license number" and "five certifications . . . had hand written comments indicating that the individual traveler did not intend to disembark in Cuba," which was contrary to Royal Caribbean's "policy that passengers could not embark on a voyage to Cuba without providing the general license number that authorized their travel." *Id.* at 5.

As stated, one of the purposes behind the CACR is "[t]o deny to Cuba or its nationals hard currency which might be used to promote activities inimical to the interests of the United States." *De Cuellar*, 881 F.2d at 1569; *see Regan*, 468 U.S. at 229. Collectively, Royal Caribbean paid more than $29.7 million to Cuban Government-owned and controlled entities to use the Terminal. *Royal Caribbean*, ECF Nos. [141] ¶¶ 40, 44, 47, [172] ¶¶ 40, 44, 47. Royal Caribbean's cruises constituted tourist activities and not proper people-to-people activities, paying millions of dollars to the Cuban Government to engage in impermissible travel.

Based upon the undisputed facts, the Court determines that from March 2017 to June 2019, Royal Caribbean's cruises did not engage in lawful travel to Cuba under the LIBERTAD Act.

### (4) Norwegian's Tourist Activities

Norwegian used the Terminal between March 2017 and June 2019. *Norwegian*, ECF Nos. [228] ¶ 15, [282] ¶ 15. Therefore, the people-to-people OFAC regulations, amended in March 2016 and November 2017, apply to the Court's analysis.

139

Like other cruise operators, Norwegian offered excursions at the "The Legendary Tropicana Cabaret," "Parisien Cabaret at the Hotel Nacional de Cuba," and "Buena Vista Social Club at Habana Café." *Id.*, ECF Nos. [228] ¶ 85, [282] ¶ 85. All three excursions involved musical shows, with the Parisien Cabaret being described as "a spectacular Vegas style performance." *Id.*, ECF No. [217-6] at 6–7. As already stated, these tourist shows fall well short of people-to-people exchanges.

The testimony of Manjencic, who was responsible for shore excursions in Cuba for Norwegian, reinforces that conclusion. Manjencic testified that the people-to-people components of the Buena Vista Social Club excursion included a "meet and greet by maître d', wait staff" and "a component where our guests met with the artists" and "where guests had the opportunity to dance with the artists or partake in the activity that was happening at that time." *Id.*, ECF No. [214-8] at 41. Manjencic testified about the Tropicana Cabaret, adding that "guests could have an exchange with the artists, with the performers, with the musicians, the presenters -- so they could discuss about the show and about their art history," and learn salsa at the end of the show. *Id.* Manjencic likewise provided similar testimony regarding the Parisien Cabaret. *Id.* at 41–42. Yet, people-to-people exchanges cannot be interpreted so broadly as to encompass casual conversations with wait staff and dancing on stage without completely blurring the line between educational travel and tourist travel.

The testimony of Norwegian's corporate representative, Parodi, further demonstrates that Norwegian provided tourist excursions. Parodi acknowledged at deposition that the Tropicana Nightclub was "a great tourist attraction." *Id.*, ECF No. [214-1] at 34. When asked, "[b]esides the Tropicana Nightclub, what other similar type of tourist excursions did Havanatur organize for the NCL passengers," he answered, "I know there are two other shows that we offer through

Havanatur, and then there are the monuments and the local attractions." *Id.* Moreover, Parodi was not aware of any Norwegian excursion that met with religious leaders, members of the dissident movement in Cuba, persons not affiliated with the Cuban Government, or artists not employed by a Cuban Government agency. *Id.* at 35.

Statements in Norwegian's Shore Excursion Programs also highlight that Norwegian was engaged in tourist activities. The Shore Excursion Program for April 2017 contained a disclaimer stating, "the Cruise *tourism* in Cuba is operated by a Government owned Tour company," so "guides, venues and any means of transportation are selected & provided solely at their own discretion." *Id.*, ECF No. [217-6] at 6 (emphasis added). The disclaimer continued that guests should not expect "the same quality and standards . . . as to those other more *tourism*-developed cruise destinations." *Id.* (emphasis added). The repeated references to tourism in Norwegian's own shore excursion documents, as well as the warning that a "Government owned Tour company" was solely responsible for selecting guides and venues, further demonstrates that Norwegian's excursions did not constitute people-to-people exchanges.

Norwegian's January 2019 Shore Excursion Program contained a slightly different disclaimer, which removed references to "tourism" and claimed that "[a]ll our shore excursions are OFAC compliant." *Id.*, ECF No. [301-2] at 3. But the substantive changes to the Shore Excursion Program only served to underscore that the excursions were primarily tourist-oriented. For example, the Tropicana Cabaret excursion stated that the "show may contain sensual dancing." *Id*. Moreover, the "Modern Havana in an American Classic" excursion warned that "[t]he Vintage Car ride is an orientation drive operated by a driver only. Drivers barely [s]peak English and are not guides. Information is very limited. However, a tour guide will provide explanations to the group at each stop during the bus drive." *Id.* In her declaration, Manjencic justified the car tour by

that "passengers were paired with a local Cuban driver." *Id.*, ECF No. [282-12] ¶ 7. But noticeably absent is a representation that the drivers and passengers engaged in meaningful interactions, which is not likely given that paired drivers did not speak fluent English.

Norwegian also offered sightseeing tours that were likewise not OFAC compliant. Specifically, Norwegian offered "An Evening Stroll in Colonial Havana" tour, where guests would visit Cathedral Square, Arms Square, Old Square, and Sloppy Joe's Bar. *Id.*, ECF No. [217-6] at 7. "The Old Colonial Havana" excursion had a similar itinerary, adding that passengers could "visit the Almacenes de San Jose and have the opportunity to buy [a] Cuban souvenir." *Id.* The "Modern Havana in an American Classic" involved visiting various Havana landmarks in a vintage automobile. *Id.* at 6. The "Colors and Flavors in Havana" tour involved guests "visiting a superb dance company, sampling Cuban rum paired with cigars, and learning to make classic cocktails before dining on Cuban cuisine." *Id.*, ECF No. [301-1] at 7. And the "Las Terrazas and It's Nature" excursion involved an eight-hour tour of "an environmentally conscious small town where most of the activities revolve around nature," including a visit to a museum, coffee at a café, free time to swim in a river. *Id.* at 2.

These activities represent classic "primarily tourist-oriented" activities. §§ 515.565(c) (2016), 515.565(f) (2017). There is no evidence that travelers engaged in more than "brief exchanges" and "casual conversations" between vendors and wait staff. *See* § 515.565(b) (2016). If activities such as sightseeing, purchasing souvenirs, and swimming in a river constitute people-to-people exchanges, then the CACR would be inconsistent with the statutory prohibition against tourist travel, making the regulations void. *United Nat. Bank*, 54 F. Supp. 2d at 1312. The Court must construe the regulation to avoid such a result. *See Marte*, 356 F.3d at 1341.

Norwegian also offered excursions outside of Havana—but for guests on ships that docked

at the Terminal—that did not constitute people-to-people exchanges: the "Submerged Pearl," "Cienfuegos Dolphins," and "Cienfuegos & Its Nature." *Norwegian*, ECF Nos. [221-16], [217-6], [228] ¶ 86, [282] ¶ 86. The Cienfuegos Dolphins excursion included a visit to various sites, a "[d]olphin show and opportunity to talk to the coaches," and "free time on the historical Boulevard Santa Isabel, where you may browse the shops before returning to the pier." *Id.*, ECF No. [301-2] at 5. The Cienfuegos & Its Nature excursion included an hour and a half "of hiking in the park," "[f]ree time to swim in . . . natural pools," and a "Creole-style lunch" at a local restaurant. *Id.*; *see also id.*, ECF No. [301-3] at 4 (stating that guests "will have free time for [a] bath in natural settings and to take photos"). And "The Submerged Pearl" excursions involved visits to several Cienfuegos sites and the opportunity to purchase some souvenirs. *Id.*, ECF No. [221-16] at 6. Sightseeing, watching trained dolphins, and swimming are indisputably "primarily tourist-oriented" activities. §§ 515.565(c) (2016), 515.565(f) (2017).

Manjencic's testimony supports this conclusion. Manjencic states that "Cienfuegos Dolphins" allowed passengers to "interact[] with and learn[] from local Cubans who worked with dolphins and interacting with the locals at the historic Boulevard Santa Isabel -- a dense urban commercial street for pedestrians to interact with local vendors and artisans." *Norwegian*, ECF No. [282-12] ¶ 10. As to "Cienfuegos & Its Nature," Manjencic declares that "passengers were led by a local Cuban guide through the historically significant Escambray Mountains" and "had an opportunity to personally interact with local residents" and eat at a privately owned restaurant. *Id.* ¶¶ 11–12. Manjencic also stated that for "The Submerged Pearl," "a local Cuban guide facilitated exchanges between passengers and locals at various architectural landmarks in Cienfuegos" and "passengers had an opportunity to interact with local fishermen about the history and significance of this unique area as well as their daily life." *Id.* ¶ 13.

Manjencic's declaration supports that the excursions provided some opportunity for interactions between guests and Cubans. However, the evidence does not establish that guests on these excursions had "a full-time schedule of activities intended to enhance contact with the Cuban people, support civil society in Cuba, or promote the Cuban people's independence from Cuban authorities," or that "result[ed] in meaningful interaction between the traveler and individuals in Cuba." § 515.565(b)(1)–(2) (2016); § 515.565(b)(2)–(3) (2017).

In addition, even accepting that Norwegian's excursions had some components of people-to-people exchanges, it was physically impossible for all passengers to string together a full-time schedule of people-to-people exchanges by completing more than one tour. The excursions ranged from three hours to ten hours. *Norwegian*, ECF No. [301-2] at 2–6. Although the tours do not indicate the exact number of passengers who may attend, the excursions likely had a limit capacity, as is the case with the other cruise lines. Moreover, "delays up to 1-2 hours [were] expected and quite common." *Id.* at 3. Moreover, the regular format of tours provided by Havanatur were either half a day or a full day. As explained, Norwegian's excursions had only limited opportunities that would arguably constitute people-to-people exchanges, the rest being primarily tourist oriented. Thus, passengers could not piece together enough people-to-people components from enough tours to engage in a full-time schedule of people-to-people exchanges.

That point was perhaps best made by Norwegian's own President and CEO, Del Rio, during the April 2015 Inaugural Cuba Opportunity Summit. When asked about the easing of travel restrictions to Cuba under the Obama Administration, Del Rio stated, "it would be difficult for us to have a ship with 4,000 tourists -- people let's call them -- show up in Havana and call that people-to-people travel. That would be a stretch of the . . . rules." *Norwegian*, ECF No. [221-15] at 4. And that is precisely the point: it is a stretch of the people-to-people travel regulation to

encompass tourist activities: visiting landmarks, watching shows, drinking rum, smoking Cuban cigars, buying souvenirs, and swimming in natural pools.

Similar to Carnival and Royal Caribbean, Havanatur operated and organized Norwegian's shore excursions. *Norwegian*, ECF Nos. [228] ¶ 80, [282] ¶ 80. As noted, one of the purposes behind the CACR is "[t]o deny to Cuba or its nationals hard currency which might be used to promote activities inimical to the interests of the United States." *De Cuellar*, 881 F.2d at 1569; *see Regan*, 468 U.S. at 229. Norwegian paid more than $12 million to use the Terminal. *See Norwegian*, ECF Nos. [228] ¶¶ 26, 30, 35, [282] ¶¶ 26, 30, 35. Norwegian's cruises constituted tourist activities and not proper people-to-people activities, paying millions of dollars to the Cuban Government to engage in impermissible travel.

Based upon the undisputed facts, the Court determines that from March 2017 to June 2019, Norwegian did not engage in lawful travel to Cuba under the LIBERTAD Act.

**b)   "Necessary to the conduct of such travel" Prong**

To be excluded from the definition of trafficking, Title III of the LIBERTAD Act requires that "transactions and uses of property" be both "incident to lawful travel to Cuba" and "necessary to the conduct of such travel." § 6023(13)(B)(iii). As shown above, Defendants failed to show that their use of the Terminal constituted lawful travel. But even if the Defendants' use of the Terminal was incident to lawful travel, their use of the Terminal was not *necessary* to the conduct of lawful travel to *Cuba*.

Defendants submit that "'necessary' does not mean having no other alternative." *Carnival*, ECF No. [330] at 16. Defendants argue that necessity is instead governed by a reasonableness test rather than absolute necessity. *Id.* at 16–17. As such, necessity may include "that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought." *Id.* at 17.

145

Defendants contend that the proper inquiry is not whether use of the Terminal was necessary to travel to Cuba in general, but necessary to the conduct of travel to Havana, where the Terminal is located. *Id.* at 19. Defendants continue that their use of the Terminal was "useful, appropriate, helpful, or related to the conduct of the lawful travel at issue." *Id.* at 19–20. Alternatively, Defendants argue that they also meet the absolute necessity standard because the Cuban Government required them to dock at the Terminal when calling on Havana. *Id.*

Havana Docks accuses Defendants of "tortur[ing] the plain meaning of the statutory language to defend their use of the . . . Terminal as 'necessary' to lawful travel." *Id.*, ECF No. [389] at 22. Havana Docks submits that "necessary" means "required, essential, or indispensable." *See Carnival*, ECF No. [333] at 13–15; *MSC*, ECF No. [225] at 12–15; *Royal Caribbean*, ECF No. [142] at 13–16; *Norwegian*, ECF No. [229] at 13–16. According to Havana Docks, Defendants could have used, and did use, other Cuban ports. *See Carnival*, ECF No. [333] at 16–17; *MSC*, ECF No. [225] at 15–17; *Royal Caribbean*, ECF No. [142] at 16–18; *Norwegian*, ECF No. [229] at 16–18. Havana Docks further argues that Defendants "stretch the rules of grammar to conclude that their use of confiscated property needed to be necessary only for travel to Havana, not travel to Cuba." *Carnival*, ECF No. [389] at 23. Havana Docks points out that none of the regulations required that Defendants travel to Havana specifically and disagrees with Defendants that the Cuban Government required them to use the Terminal. *Id.*

The Court's analysis begins with the text of the statute. *See Catalyst*, 14 F.4th at 1307. Under the plain text of the LIBERTAD Act, use of the Terminal must have been "incident to lawful travel *to Cuba*" and "necessary to the conduct of *such travel*," i.e., "travel *to Cuba*" § 6023(13)(B)(iii) (emphasis added). "Such travel" does not mean "travel to Havana" or any other particular part of Cuba. Thus, if it was not necessary for Defendants to use the Terminal to travel

to Cuba, then their use of the Terminal does meet the lawful travel exception.

"To determine the ordinary meaning of an undefined statutory term, we often look to dictionary definitions for guidance." *Spencer v. Specialty Foundry Prod. Inc.*, 953 F.3d 735, 740 (11th Cir. 2020) ("internal quotation marks omitted). Also, "we look at how a phrase was defined at the time the statute was drafted and enacted." *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000).

The Black's Law Dictionary edition in effect in 1996, when the LIBERTAD Act was enacted, states that necessary can have different meanings:

> This word must be considered in the connection in which it is used, as it is a word susceptible of various meanings. It may import absolute physical necessity or inevitability, or it may import that which is only convenient, useful, appropriate, suitable, proper, or conducive to the end sought. It is an adjective expressing degrees, and may express mere convenience or that which is indispensable or an absolute physical necessity. It may mean something which in the accomplishment of a given object cannot be dispensed with, or it may mean something reasonably useful and proper, and of greater or lesser benefit or convenience, and its force and meaning must be determined with relation to the particular object sought.

*Necessary*, Black's Law Dictionary, 1029 (6th ed. 1990).

Non-legal dictionaries, however, generally set forth a strict definition of necessary. For example, at the time the statute was enacted, the Oxford English Dictionary defined "necessary" as "[i]ndispensable, requisite, essential, needful; that cannot be done without." Necessary, OED Online, Oxford University Press (2d. ed. 1989), *available at* https://www.oed.com/oed2/00156288 (last visited Mar. 16, 2022). Merriam-Webster's Collegiate Dictionary defined necessary as "an indispensable item: ESSENTIAL." *Necessary*, Merriam-Webster's Collegiate Dictionary, 776 (10th ed. 1996). And Webster's New World College Dictionary defined necessary as "that cannot be dispensed with," "essential," "indispensable," "that must be done," "mandatory," "not voluntary," "not free to choose," and "compelled by circumstances." *Necessary*, Webster's New

World College Dictionary, 905 (3d ed. 1996).

The Court finds that the LIBERTAD Act employs the strict definition of the word necessary. "Like ordinary English speakers, the common law uses 'necessary' in this strict sense of essential or indispensable." *Vorchheimer v. Philadelphian Owners Ass'n*, 903 F.3d 100, 106 (3d Cir. 2018). "[W]hen Congress wants to loosen necessity to mean just 'sufficiently important,' it uses the phrase 'reasonably necessary.'" *Id.* at 107; *see Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018) ("'18 U.S.C. § 3599' appears to use the term 'necessary' to mean something less than essential. The provision applies to services that are 'reasonably necessary,' but it makes little sense to refer to something as being 'reasonably essential.'"). In the LIBERTAD Act, Congress could have easily excluded from the definition of trafficking transactions that were "[reasonably] necessary to the conduct of" lawful travel. But Congress did not. Courts "are not allowed to add or subtract words from a statute; we cannot rewrite it." *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009).

Moreover, a strict interpretation of necessity would further the LIBERTAD Act's goal of "protect[ing] United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime." § 6022(1), (2), (6). If Defendants' interpretation of necessity is correct, then traffickers in confiscated property may avoid liability by simply showing that using the property was convenient.

With the correct view of necessity in place, the undisputed facts show that it was not necessary (*i.e.*, essential) for Defendants to use the Terminal to Cuba—indeed, Defendants were not required to travel to Havana at all. Concerning Carnival, it is undisputed that the U.S. Government did not require Carnival to cruise to Havana. *Carnival*, ECF Nos. [332] ¶ 46, [374] ¶ 46. Nor did the U.S. Government direct Carnival where to dock its ships in Cuba. *Id.*, ECF Nos.

[332] ¶ 47, [374] ¶ 47. It was not necessary for a Carnival cruise ship to dock at the Terminal to cruise to Santiago de Cuba, Cuba, or Cienfuegos, Cuba. *Id.*, ECF Nos. [332] ¶ 50, [374] ¶ 50. Carnival could, and did, dock ships and embark and disembark its passengers at Santiago de Cuba and Cienfuegos, including by tendering offshore. *Id.*, ECF Nos. [332] ¶¶ 53–54, [374] ¶¶ 53–54.

Concerning MSC, it is undisputed that the U.S. Government did not require MSC SA to cruise to Havana. *Id.*, ECF Nos. [224] ¶ 70, [253] ¶ 70. Nor did the U.S. Government instruct, direct or designate MSC SA to use the Terminal in its cruises to Cuba. *Id.*, ECF Nos. [224] ¶ 73, [253] ¶ 73. The U.S. Government did not inform MSC SA that it could not go to another port in Cuba besides Havana. *Id*., ECF Nos. [224] ¶ 74, [253] ¶ 74. Moreover, the Cuban Government authorized MSC ships to sail to Punta Frances, Isla de la Juventud, Cuba, and to transport passengers to and from shore by tender boats. *Id.*, ECF Nos. [224] ¶ 93, [253] ¶ 93. MSC SA could and did embark and disembark passengers in Punta Frances. *Id.*, ECF Nos. [224] ¶ 94, [253] ¶ 94.

Concerning Royal Caribbean, it is undisputed that the U.S. Government did not direct Royal Caribbean where to sail in Cuba. *Royal Caribbean*, ECF Nos. [141] ¶ 59, [172] ¶ 59. Nor did the U.S. Government require Royal Caribbean to dock at the Terminal. *Id.*, ECF Nos. [141] ¶ 60, [172] ¶ 60. The Cuban Government likewise did not require Royal Caribbean to cruise to Havana. *Id.*, ECF Nos. [141] ¶ 61, [172] ¶ 61. Nor did the Cuban Government require that Royal Caribbean use the Terminal to cruise to Cuba. *Id.*, ECF Nos. [141] ¶ 62, [172] ¶ 62. In addition, the ports of Cienfuegos and Santiago de Cuba have immigration, customs, and medical screening capabilities. *Id.*, ECF Nos. [141] ¶ 75, [172] ¶ 75. And it is undisputed that Royal Caribbean ships did not need to use the Terminal to sail to Cienfuegos or Santiago. *Id.*, ECF Nos. [141] ¶ 74, [172] ¶ 74.

Concerning Norwegian, it is undisputed that the Cuban Government did not require that

Norwegian stop at a particular port in Cuba on any particular day. *Norwegian*, ECF Nos. [228] ¶ 54, [282] ¶ 54. The Cuban Government authorized Norwegian to berth at Santiago de Cuba and Cienfuegos. *Id.*, ECF Nos. [228] ¶ 55, [282] ¶ 55. Norwegian could, and did, dock its ships and embark and disembark its passengers at Santiago and Cienfuegos. *Id.*, ECF Nos. [228] ¶ 59, [282] ¶ 59. Norwegian's ships also anchored offshore and tendered passengers to shore in Santiago de Cuba and Cienfuegos. *Id.*, ECF Nos. [228] ¶ 60, [282] ¶ 60. The port facilities in the Cuban ports of Santiago and Cienfuegos housed medical screening, immigration, and customs services for cruise passengers. *Id.*, ECF Nos. [228] ¶ 62, [282] ¶ 62. In addition, Norwegian acknowledges that persons could satisfy then-existing OFAC travel-category restrictions by visiting cities in Cuba other than Havana. *Id.*, ECF Nos. [228] ¶ 58, [282] ¶ 58.

It is also notable that other cruise lines sailed to other parts in Cuba. From 2017 to 2019, Viking Cruises offered cruises to Cienfuegos that transported passengers to Havana by bus for a one or two-day excursion. *MSC*, ECF Nos. [224] ¶ 90, [253] ¶ 90; *Royal Caribbean*, ECF Nos. [141] ¶ 81, [172] ¶ 81. Other cruise lines, such as Thomson, Fred Olsen, and Noble Caledonia, offered cruises to Cuba that stopped in Cienfuegos, Santiago, or Holguin, but did not include a stop in Havana. *MSC*, ECF Nos. [224] ¶ 98, [253] ¶ 98; *Royal Caribbean*, ECF Nos. [141] ¶ 67, [172] ¶ 67.

Defendants contend, and Havana Docks disputes, that when they traveled to *Havana*, they were required by the Cuban Government to use the Terminal. In their Omnibus Statement of Facts, Defendants submit that "[d]uring the time they were sailing to Havana, Defendants' ships docked at Pier 1, which is one of the three piers at the Terminal, and that "[t]he Cuban Government required Defendants to dock at that pier, at that terminal, when calling in Havana." *Carnival*, ECF No. [331] ¶¶ 22–23. According to Defendants, the Cuban Government denied their requests to

tender passengers offshore or dock at other facilities in Havana. *Id.* ¶ 23. Moreover, Defendants contend that Cuban pilots boarded the ships and docked them at Pier 1 themselves, and that passengers tendered offshore, if available, would still have had to clear immigration and customs. *Id.* ¶¶ 24–25. Even taking Defendants' facts as true, travel to the *city of Havana* was not "necessary" for Defendants to conduct lawful travel to the *country of Cuba*.

The Court determines that the "necessary" prong has not been established by the Defendants, and Defendants have failed to meet their burden on the lawful travel exception affirmative defense. For these additional reasons, Havana Docks is entitled to summary judgment on Defendants' lawful travel exception defense. *Carnival*, ECF No [160] at 18; *MSC*, ECF No. [115] at 16, [133] at 15; *Royal Caribbean*, ECF No. [59] at 5, *Norwegian*, ECF No. [107] at 14.

### 2. *Ex Post Facto Clause*

Defendants contend that in violation of the *Ex Post Facto* clause (as well as the Fifth Amendment Taking and Due Process Clauses), the application of the LIBERTAD Act after its suspension and subsequent licensure is impermissibly retroactive. *Carnival*, ECF No. [330] at 28–30. Havana Docks contends that the Court already ruled that Title III does not apply retroactively because its effective date was not suspended; rather, the right to bring a cause of action was suspended. *Id.*, ECF No. [389] at 30–31. Havana Docks is correct. As this Court previously found, "liability for trafficking under Title III attached beginning on November 1, 1996, and the consistent suspension of the right to bring an action under Title III did not affect this liability." *Havana Docks Corp. v. MSC Cruises SA Co.*, 484 F. Supp. 3d 1177, 1200 (S.D. Fla. 2020). Accordingly, "the imposition of liability under Title III is not retroactive." *Id.* Therefore, Havana Docks is entitled to summary judgment on Carnival's sixth affirmative defense, MSC's sixth affirmative defense, Royal Caribbean's tenth affirmative defense, and Norwegian's fourth affirmative defense.

*Carnival*, ECF No. [160] at 19; *MSC*, ECF No. [115] at 17, [133] at 16; *Royal Caribbean*, ECF No. [59] at 6; *Norwegian*, ECF No. [107] at 14.

### 3.  *The Fifth Amendment's Due Process Clause*

Defendants argue that Havana Docks seeks to punish acts that were licensed and encouraged, in violation of due process principles. *Carnival*, ECF No. [330] at 27. Havana Docks responds that this Court has already rejected this "encouragement" defense, and that the U.S. Government did not license or authorize trafficking in confiscated property. *Id.*, ECF No. [389] at 29–30. Havana Docks is correct. As this Court previously explained, "[n]either the government's encouragement and licensure nor the history of suspending Title III is sufficient to establish a lack of fair notice under the Due Process Clause." *Havana Docks Corp. v. MSC Cruises SA Co.*, 484 F. Supp. 3d 1177, 1201 (S.D. Fla. 2020). "Moreover, the government's encouragement to travel to Cuba and to increase commercial relations with Cuba does not in any way absolve [Defendants] of [their] obligations to also comply with federal law—namely, by not trafficking in confiscated property without the consent of a Title III claimant." *Id.* Therefore, Havana Docks is entitled to summary judgment on Carnival's fourth affirmative defense; MSC's fourth affirmative defense; Royal Caribbean's third, fourth, eleventh, twenty-fifth, and twenty-sixth affirmative defense; and Norwegian's twenty-first affirmative defenses. *Carnival*, ECF No. [160] at 18; *MSC*, ECF No. [115] at 16, [133] at 15; *Royal Caribbean*, ECF No. [59] at 6, 9; *Norwegian*, ECF No. [107] at 18.

### 4.  *Expiration of the Concession*

Based on binding Eleventh Circuit precedent, this Court has already rejected the argument that Defendants could not have trafficked in a time-limited concession that expired in 2004. *See Havana Docks Corp. v. Royal Caribbean Cruises, Ltd.*, No. 19-CV-23590, 2020 WL 1905219, at *8 (S.D. Fla. Apr. 17, 2020); *see also Glen*, 450 F.3d at 1255. ("The Helms–Burton Act refers to

the property interest that former owners of confiscated property now have as ownership of a "claim to such property." 22 U.S.C. § 6082(a)(1)(A). When (or if) the portion of Title III that allows private litigants to bring lawsuits becomes effective, actions brought pursuant to the new statutory scheme would be actions brought "on a claim to the confiscated property" against traffickers in the property. 22 U.S.C. § 6082(a)(4)"). Therefore, Havana Docks is entitled to summary judgment on Carnival's fourteenth affirmative defense, MSC's thirteenth affirmative defense, Royal Caribbean's second affirmative defense, and Norwegian's twelfth affirmative defense. *Carnival*, ECF No. [160] at 20; *MSC*, ECF No. [115] at 18, [133] at 17; *Royal Caribbean*, ECF No. [59] at 5; *Norwegian*, ECF No. [107] at 16.

### 5.  *Failure to State a Claim*

Failure to state a claim is not an affirmative defense, and this case survived the motion-to-dismiss stage. *See Affiliati Network, Inc. v. Wanamaker*, No. 18-22576-CIV, 2019 WL 7376766, at *8 (S.D. Fla. Nov. 25, 2019), *aff'd* 847 F. App'x 583 (11th Cir. 2021) (granting summary judgment on failure to state a claim defense). Therefore, Havana Docks is entitled to summary judgment on Carnival's fifteenth affirmative defense, MSC's fourteenth affirmative defenses, Royal Caribbean's twenty-second and twenty-eighth affirmative defense, and Norwegian's thirteenth affirmative defense. *Carnival*, ECF No. [160] at 20; *MSC*, ECF No. [115] at 18, [133] at 17; *Royal Caribbean*, ECF No. [59] at 9; *Norwegian*, ECF No. [107] at 16.

### 6.  *Lack of Knowledge and Intent*

Havana Docks argues that Defendants' lack of knowledge and intent defense is a mere denial. *See Carnival*, ECF Nos. [336] at 22–23. Defendants do not dispute that assertion. *See Carnival*, [368] at 25–26. Moreover, the Court has already concluded that Defendants knowingly and intentionally trafficked as a matter of law. Therefore, Havana Docks is entitled to summary

judgment on MSC's twelfth affirmative defense, Royal Caribbean's twenty-first and twenty-seventh affirmative defense, and Norwegian's eleventh affirmative defense. *MSC*, ECF No. [115] at 18, [133] at 17; *Royal Caribbean*, ECF No. [59] at 9; *Norwegian*, ECF No. [107] at 16.[44]

### 7.  *Lack of Standing Due to Lack of Injury-in-Fact*

This Court has already determined that that Havana Docks suffered injury-in-fact and that it has standing to bring its claims. *See, e.g.*, *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, 484 F. Supp. 3d 1215, 1227–29 (S.D. Fla. 2020). As the Court explained, Havana Docks' Title III claims satisfy the four elements of injury-in-fact: legally protected interest, concreteness, particularization, and imminence. *Id.* at 1227; *see Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (setting forth elements necessary to establish injury-in-fact). First, under the LIBERTAD Act, "trafficking in confiscated property is an invasion of a legally protected interest," and "[t]he remedy for the violation of that right is compensation from third parties for trafficking." *Havana Docks*, 484 F. Supp. 3d at 1227. Second, Havana Docks' injury was concrete "because it is not receiving the benefit of its interest in the [Terminal] and [Defendants'] subsequent trafficking in the confiscated property has undermined [Havana Docks'] right to compensation for that expropriation." *Id.* at 1228. Third, "Havana Docks' injuries here are particularized because, rather than presenting a generalized harm, Havana Docks' injury is entirely personalized to its interest in its Certified Claim to the [Terminal]." *Id.* at 1229. Fourth, imminence is established because "Havana Docks' injury . . . is actual and not conjectural." *Id.*

Defendants argue that the intervening case of *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) shows that Havana Docks lacks standing. *TransUnion* held that "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their

---

[44] Carnival withdrew this defense. *See Carnival*, ECF No. [279] at 4.

responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III[.]" *Id.* at 2205. But decisions after *TransUnion* persuasively explain that a LIBERTAD Act plaintiff still suffers an injury-in-fact. *See Glen v. Am. Airlines, Inc.*, 7 F.4th 331, 334 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 863 (2022); *see also Sucesores de Don Carlos Nunez y Dona Pura Galvez, Inc. v. Societe Generale, S.A.*, No. 20-CV-851 (KMW), 2021 WL 6065758, at *7 (S.D.N.Y. Dec. 22, 2021).  As the court in *Societe Generale* observed:

> It is not necessary that Defendants benefit from trafficking in ways that correspond to an equal and opposite detriment to Plaintiffs. The Fifth Circuit in *Glen v. American Airlines* [7 F.4th 331, 334 (5th Cir. 2021)] held a Helms-Burton Act injury to be concrete in a case analogous to this one. In *American Airlines*, the owner of a claim to confiscated beachfront land alleged that the airline trafficked in confiscated property by operating a website through which travelers booked twelve reservations at hotels built on the confiscated beachfront land. *American Airlines*, 7 F.4th at 334. The Fifth Circuit held the plaintiff's injury to be concrete even though he would not have been entitled to the booking fees from those reservations if he did own and control the beachfront property. *See id.*; *see also Trip Advisor*, 529 F. Supp. 3d at 327 (similar). The Court is persuaded that a plaintiff is injured concretely when she is shut out wrongfully from the gains produced by exploiting property that is rightfully hers. Under the relevant precedents, then, Plaintiffs have alleged a sufficient injury in fact for Article III standing.

*Id.* at 8.

Havana Docks alleges an injury that is entirely separate from the confiscation of its property rights by the Cuban Government. The use of Havana Docks' property without its authorization constitutes a tangible injury. Accordingly, Havana Docks is entitled to summary judgment on Carnival's eighth affirmative defense, MSC USA's and MSC SA's eighth affirmative defense, Royal Caribbean's eighth affirmative defense, and Norwegian's sixth affirmative defense. *Carnival*, ECF No. [160] at 19; *MSC*, ECF No. [115] at 17, [133] at 18; *Royal Caribbean*, ECF No. [59] at 6; *Norwegian*, ECF No. [107] at 15.

### 8.  *Lack of Indemnity Right*

Havana Docks argues that Defendants' lack of indemnity right defense is a mere denial.

*See Carnival*, ECF Nos. [336] at 23–24. Defendants do not dispute that assertion. *See Carnival*, [368] at 25–26. Moreover, the Court as already determined that, under the Certified Claim, the Cuban Government confiscated Havana Docks' interest in the Terminal, without just compensation. The Certified Claim is now the property interest upon which Havana Docks' claim is premised. *See Glen*, 450 F.3d at 1255. Therefore, Havana Docks is entitled to summary judgment on Carnival's twenty-fourth affirmative defense, MSC USA's twentieth affirmative defense, MSC SA's twenty-first affirmative defense, Royal Caribbean's twenty-fourth affirmative defense, and Norwegian's nineteenth affirmative defense. *Carnival*, ECF No. [160] at 22; *MSC*, ECF Nos. [115] at 20, [133] at 19; *Royal Caribbean*, ECF No. [59] at 8; *Norwegian*, ECF No. [107] at 17.

### 9. *Lack of Causation*

Havana Docks argues that Defendants' lack of causation defense is a mere denial. *See Carnival*, ECF Nos. [336] at 24. Defendants do not dispute that assertion. *See Carnival*, [368] at 25–26. Moreover, the Court has determined that Havana Docks has established all necessary elements for a Title III claim. Therefore, Havana Docks is entitled to summary judgment on Carnival's eighteenth affirmative defense, MSC USA's and MSC's seventeenth affirmative defense, Royal Caribbean's ninth affirmative defense, and Norwegian's sixteenth affirmative defense. *Carnival*, ECF No. [160] at 21; *MSC*, ECF No. [115] at 19, [133] at 18; *Royal Caribbean*, ECF No. [59] at 9; *Norwegian*, ECF No. [107] at 17.

### 10. *Lack of Use of Claimed Property*

Havana Docks argues that Defendants' defense disputing that they trafficked in all property certified by the FCSC is a mere denial. *See Carnival*, ECF Nos. [336] at 23–24. Defendants do not dispute that assertion. *See Carnival*, ECF No. [368] at 25–26. In addition, as explained in this Order, the FCSC certified that Havana Docks had an interest in the Terminal; the Court has also

determined that Defendants knowingly and intentionally trafficked through their use of the Terminal. And as the Court previously recognized, the LIBERTAD Act "imposes liability for trafficking in . . . broadly defined 'confiscated property' — a term that . . . is not limited solely to the interest [Havana Docks] originally owned in the [Terminal]." *MSC Cruises*, 455 F. Supp. 3d at 1374. Therefore, Havana Docks is entitled to summary judgment on Carnival's eighth affirmative defense, MSC's fifteenth affirmative defense, Royal Caribbean's thirteenth affirmative defense, and Norwegian's fourteenth affirmative defense. *Carnival*, ECF No. [160] at 20; *MSC*, ECF No. [115] at 19, [133] at 17–18; *Royal Caribbean*, ECF No. [59] at 7; *Norwegian*, ECF No. [107] at 16.

### 11. *Article II of the United States Constitution*

Article II of the United States Constitution vests executive power exclusively with the President of the United States. U.S. Const. art. II § 1. Havana Docks moves for summary judgment on Defendants' Article II affirmative defense, arguing that foreign policy decisions by the executive branch do not have the force of law, and Title III does not impose liability based on foreign policy decisions. *Carnival*, ECF No. [336] at 27. Defendants respond that the LIBERTAD Act violates Article II because "Title III's private right of action empowers a private plaintiff to sue over—and thus asks an Article III court to decide—not only private property rights but the validity of foreign policy determinations that are relegated to the Executive Branch." *Id.*, ECF No. [368] at 27. Defendants are incorrect.

Title III of the LIBERTAD Act does not empower plaintiffs to invalidate foreign policy determinations made by the Executive Branch. Rather, Title III provides a private cause of action to victims of confiscations by the Cuban Government against persons who traffic in that confiscated property. § 6082(a)(1)(A); *see Glen*, 450 F.3d at 1255. Nor has the Court invalidated

or questioned the foreign policy decisions that led OFAC to amend the CACR to remove procedural requirements for people-to-people travel. To the contrary, the Court has analyzed whether Defendants *complied* with the requirements for people-to-people travel under the CACR in order to determine whether Defendants engaged in lawful travel to Cuba, an affirmative defense in this case. *Garcia-Bengochea*, 407 F. Supp. 3d at 1286. Although this case necessarily stems from the ephemera of various political climates, this Court's Order does not question or invalidate those foreign policy decisions, and thus does not implicate Article II's power-vesting provision.

As such, Havana Docks is entitled to summary judgment on Carnival's seventh affirmative defense, MSC USA's and MSC SA's seventh affirmative defense, Royal Caribbean's nineteenth affirmative defense, and Norwegian's fifth affirmative defense. *Carnival*, ECF No. [160] at 19; *MSC*, ECF No. [115] at 17, [133] at 16; *Royal Caribbean*, ECF No. [59] at 8; *Norwegian*, ECF No. [107] at 15.

### 12.  *Act of State Doctrine*

As the Eleventh Circuit has held, the LIBERTAD Act "explicitly forecloses use of the act of state doctrine as a defense to causes of action for liability for trafficking, the statutory cause of action created by 22 U.S.C. § 6082(a)(1)." *Glen*, 450 F.3d at 1256; *see* § 6082(a)(6) ("No court of the United States shall decline, based upon the act of state doctrine, to make a determination on the merits in an action brought under paragraph (1)."). Defendants recognize that binding Eleventh Circuit precedent forecloses their defense, but Defendants seek to preserve the defense for appellate purposes. *Carnival*, ECF No. [368] at 30. As such, Havana Docks is entitled to summary judgment on Carnival's nineteenth affirmative defense, MSC USA's and MSC SA's eighteenth affirmative defense, Royal Caribbean's sixteenth affirmative defense, and Norwegian's seventeenth affirmative defense. *Carnival*, ECF No. [160] at 21; *MSC*, ECF No. [115] at 19, [133]

at 18; *Royal Caribbean*, ECF No. [59] at 7; *Norwegian*, ECF No. [107] at 17.

### 13.  *Extraterritorial Application of United States Law*

As explained in this Order, both the LIBERTAD Act and the CACR apply extraterritorially. The LIBERTAD Act's broad reach "caused an international uproar among United States' allies due to the extraterritorial reach of Title III." *Odebrecht*, 876 F. Supp. 2d at 1311–12.  The CACR places "restrictions on any '[p]erson . . .subject to the jurisdiction of the United States,' . . . which is defined by regulation to include U.S. corporations, their domestic and foreign subsidiaries, and any foreign company owned or controlled by a U.S. citizen." *Odebrecht*, 715 F.3d at 1276 (quoting 50 U.S.C. § 4305(b)(1) and citing 31 C.F.R. § 515.329). Therefore, Havana Docks is entitled to summary judgment on Carnival's fifth affirmative defense, MSC SA's and MSC USA's fifth affirmative defense, Royal Caribbean's ninth affirmative defense, and Norwegian's third affirmative defense. *Carnival*, ECF No. [160] at 19; *MSC*, ECF No. [115] at 17, [133] at 16; *Royal Caribbean*, ECF No. [59] at 8; *Norwegian*, ECF No. [107] at 14.

### 14.  *Election of Remedies under Title III*

Title III's election of remedies provision states:

(A) any United States national that brings an action under this section may not bring any other civil action or proceeding under the common law, Federal law, or the law of any of the several States, the District of Columbia, or any commonwealth, territory, or possession of the United States, that seeks monetary or nonmonetary compensation by reason of the same subject matter; and

(B) any person who brings, under the common law or any provision of law other than this section, a civil action or proceeding for monetary or nonmonetary compensation arising out of a claim for which an action would otherwise be cognizable under this section may not bring an action under this section on that claim.

§ 6082(f)(1).

Defendants interpret this provision as prohibiting Havana Docks from bringing separate

actions against each Defendant. *Carnival*, ECF No. [368] at 30. A plain reading of § 6082 belies

that assertion. Section (A) of § 6082(f)(1) states that a Title III plaintiff cannot bring another civil

action "under the common law, Federal law, or the law of any of the several States . . . by reason

of the same subject matter[.]" § 6082(f)(1)(A). Conversely, subsection (B) of § 6082(f)(1) states

that if a plaintiff brings a cause of action "under the common law or any provision of law other

than this section . . . for which an action would otherwise be cognizable under this section," then

the plaintiff cannot also maintain a Title III action. In other words, a plaintiff must elect to seek

relief under Title III or relief under other sources, like the common law, but not both. That is the

reason why the four actions in this case raise only one count: violation of the LIBERTAD Act.

Defendants' interpretation would raise form over substance and be unworkable, forcing Title III

plaintiffs to sue all persons who may have trafficked in confiscated property in one case, regardless

of how different the individual facts may be.

Accordingly, Havana Docks is entitled to summary judgment on Carnival's seventeenth

affirmative defense, MSC USA's sixteenth affirmative defense, MSC SA's sixteenth affirmative

defense, Royal Caribbean's fourteenth affirmative defense, and Norwegian's fifteenth affirmative

defense. *Carnival*, ECF No. [160] at 20–21; *MSC*, ECF No. [115] at 19, [133] at 18; *Royal*

*Caribbean*, ECF No. [59] at 7; *Norwegian*, ECF No. [107] at 16.

### 15. *Failure to Join an Indispensable Party*

Each Defendant raised an affirmative defense contending that Havana Docks' President,

Mickael Behn, is an indispensable party to this action. *Carnival*, ECF No. [160] at 21; *MSC*, ECF

No. [115], [133] at 17; *Royal Caribbean*, ECF No. [59] at 7; *Norwegian*, ECF No. [107] at 18–19.

Havana Docks contends that Behn is not an indispensable party because only Havana Docks owns

a claim for confiscated property. *Carnival*, ECF No. [336] at 30–31. Defendants do not address

this affirmative defense in their response to Havana Docks' summary judgment motion, waiving the issue. *See Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 267 F.3d 1303, 1308 n.1 (11th Cir. 2001). In any event, Behn's joinder is not necessary to afford the parties' complete relief. *See* Fed. R. Civ. P. 19(a)(1)(A). Havana Docks has always been the owner of the Certified Claim. *Carnival*, ECF Nos. [337] ¶¶ 40–41, [367] ¶¶ 40–41.

Therefore, Havana Docks is entitled to summary judgment on Carnival's twenty-first affirmative defense, MSC USA's and MSC SA's eleventh affirmative defense, Royal Caribbean's fifteenth affirmative defense, and Norwegian's twenty-second affirmative defense. *Carnival*, ECF No. [160] at 21; *MSC*, ECF No. [115] at 18, [133] at 17; *Royal Caribbean*, ECF No. [59] at 7; *Norwegian*, ECF No. [107] at 18–19.

### 16. *Purpose of Certified Claim*

Carnival, MSC SA, MSC USA, and Royal Caribbean contend as affirmative defenses that a Certified Claim used to obtain reparations from the Cuban Government cannot be used later in a civil lawsuit against a third party. This defense amounts to a mere denial of Havana Docks' claims. Therefore, Havana Docks is entitled to summary judgment on Carnival's twenty-eighth affirmative defense, MSC SA's and MSC USA's twentieth affirmative defense, and Royal Caribbean's eighteenth affirmative defense. *Carnival*, ECF No. [160] at 23; *MSC*, ECF Nos. [115] at 20, [133] at 19; *Royal Caribbean*, ECF No. [59] at 8.

### 17. *Statute of Limitations or Repose*

Title III of the LIBERTAD Act states that "[a]n action under section 6082 of this title may not be brought more than 2 years after the trafficking giving rise to the action has ceased to occur." 22 U.S.C. § 6084. Carnival argues in its Individual Motion For Summary Judgment that § 6084 is a statute of repose, not a statute of limitations, barring a claim for pre-2004 conduct—*i.e.*, those

involving Airtours and Costa. *See Carnival*, ECF No. [324] at 14–18. Carnival further contends that the continuing violation doctrine does not apply to statutes of repose. *Id.* at 17–18.

Havana Docks responds that under the plain language § 6084, Defendants' trafficking did not "cease to occur" until May or June of 2019. *Carnival*, ECF No. [333] at 17–18; *MSC*, ECF No. [225] at 17–18; *Royal Caribbean*, ECF No. [142] at 21; *Norwegian*, ECF No. [229] at 19. Alternatively, Havana Docks argues that § 6084 is a statute of limitations subject to equitable tolling. *Carnival*, ECF No. [378] at 9–14.[45]

MSC raises a different statute of limitations argument, which targets only the Cuba-to-Cuba cruises. MSC, ECF No. [256] at 11–12. MSC contends that it stopped homeporting in Havana in March 2019, but Havana Docks did not advance a Cuba-to-Cuba trafficking theory until June 2021 at the earliest, when it sought discovery regarding Cuba-to-Cuba cruises. *Id.* MSC also contends that an amendment to include Cuba-to-Cuba cruises would not relate back to the filing of the original complaint. *Id.* at 12 n.6.

Royal Caribbean has withdrawn its statute of limitations defense. *Royal Caribbean*, ECF No. [173] at 7.[46] Therefore, Havana Docks is entitled to summary judgment on Royal Caribbean's twenty-third affirmative defense. Similarly, Norwegian did not respond to Havana Docks' statute of limitations arguments. *See Norwegian*, ECF No. [281]. Therefore, Havana Docks is entitled to summary judgment on Norwegian's twentieth affirmative defense.

---

[45] Havana Docks also argues that Carnival waived the statute of repose defense when it stated, in a motion to dismiss, that Havana Docks has a "cause of action against anyone who used the port between 1996 and 2004." *Carnival*, ECF No. [378] at 8; *see id.*, ECF No. [17] at 22 n.3. The Court disagrees. Carnival was merely expressing its position that Havana Docks has no cause of action after the Concession expired. The statement was not an express waiver of a statute of repose defense.

[46] Royal Caribbean has also withdrawn its ninth affirmative defense (foreign government conduct) and twelfth affirmative defense (improper venue), *Royal Caribbean*, ECF No. [173] at 7. Therefore, summary judgment is entered against Royal Caribbean on those defenses.

Concerning Carnival, as already noted, Carnival's alleged trafficking through Airtours and Costa is an academic question. Carnival is liable under the LIBERTAD Act for using the Terminal from 2016 to 2019, regardless of Airtours' and Costa's use of the Terminal before those dates. Consequently, the Court need not address the statute of limitations/repose issue relative to Carnival, and summary judgment on that defense is denied as moot.[47]

As to MSC, as the Court already explained, Havana Docks' Second Amended Complaint, which was filed in September 2020, encompasses Cuba-to-Cuba cruises. *See MSC*, ECF No. [104]. Claims regarding Cuba-to-Cuba cruises were therefore filed within the two-year statute of limitation period. Havana Docks is entitled to summary judgment on MSC USA's and MSC SA's third affirmative defense. *MSC*, ECF Nos. [115] at 16, [133] at 15.[48]

### 18. *Eighth Amendment*

Carnival, Royal Caribbean, and Norwegian raise the Eighth Amendment of the U.S. Constitution as an affirmative defense. *Carnival*, ECF No. [160] at 20 (Def. No. 12); *Royal Caribbean*, ECF No. [59] at 8 (Def. No. 20); *Norwegian*, ECF No. [107] at 16 (Def. No. 10). Havana Docks argues that the Eighth Amendment's Excessive Fines Clause does not apply to

---

[47] Nor does not Court have to address Carnival's twenty-second affirmative defense that the trading or holding of publicly traded securities is not actionable under the LIBERTAD Act. *Carnival*, ECF No. [160] at 22.

[48] Havana Docks also moved for summary judgment regarding MSC SA's twenty-third affirmative defense (licensing), twenty-fourth affirmative defense (waiver), and twenty-fifth affirmative defense (equitable estoppel), and twenty-sixth affirmative defense (laches). *MSC*, ECF No. [225] at 9–21. In a footnote, and only relative to Cuba-to-Cuba cruises, MSC states that the defenses apply because Havana Docks "never notified MSC Cruises S.A. or objected to its use of the Terminal for four years." *MSC*, ECF No. [256] at 12. However, "[w]hen a federal statute enumerates defenses to liability, without specifying that other unenumerated defenses are available, the enumerated statutory defenses are generally deemed to be the exclusive defenses available under the statute." *United States v. Barlow*, 576 F. Supp. 2d 1375, 1381 (S.D. Fla. 2008). The LIBERTAD Act already provides for a limitations period, and Havana Docks' claims were brought within that period. Moreover, as the Court has already explained, licensure is not an absolute defense in this case. Havana Docks is thus entitled to summary judgment on MSC SA's twenty-third through twenty-sixth affirmative defense. *MSC*, ECF No. [133] at 19–20.

163

awards of money damages in a civil action. *Carnival*, ECF No. [333] at 18; *Royal Caribbean*, ECF No. [142] at 20–21; *Norwegian*, ECF No. [229] at 18–19. Carnival, Royal Caribbean, and Norwegian disagree, positing that the LIBERTAD Act allows for an excessive civil penalty to further the Government's goal of punishing and deterring trafficking in confiscated property. *Carnival*, ECF No. [373] at 23–24; *Royal Caribbean*, ECF No. [173] at 17–18; *Norwegian*, ECF No. [281] at 19–20.

Defendants also argue that disproportionate damages violate the Fifth Amendment's Due Process Clause. *Carnival*, ECF No. [330] at 30–31. Defendants raise the disproportionate damages issue within their due process affirmative defenses. *Carnival*, ECF No. [160] at 20 (eleventh affirmative defense); *MSC*, ECF Nos. [115] at 16 (MSC USA's fourth affirmative defense), [133] at 15 (MSC SA's fourth affirmative defense); *Royal Caribbean*, ECF No. [59] at 6 (Royal Caribbean's fifth affirmative defense); *Norwegian*, ECF No. [107] at 15 (Def. No. 9).

Under the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amdt. 8. The Excessive Fines Clause "does not constrain an award of money damages in a civil suit when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded." *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 505 n.18 (2008); *see Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1308 (11th Cir. 2021) (explaining that "the Excessive Fines Clause applies only to payments imposed by the United States (or the States) and payable to it (or them)"). Here, the U.S. Government has not prosecuted this action nor has the right to receive a share of the damages.

In addition, the Court also already determined that whether a statutory penalty is excessive may not be determined until there is a damages award. *See Havana Docks Corp. v. MSC Cruises*

*SA Co.*, 484 F. Supp. 3d 1177, 1203 (S.D. Fla. 2020). Although Havana Docks seeks damages in excess of the Certified Claim total of $9,179,700.88 (plus interest), the LIBERTAD Act states that the certified amount is the presumed measure of damages unless the fair market value of the property is shown, by clear and convincing evidence, to be the most appropriate measure of damages. *See* § 6082. A jury may determine that Havana Docks is entitled to no more than the FCSC certified amount of $9,179,700.88, plus six percent annual interest from the date of the loss. *See Carnival*, ECF No. [149-1] at 4. As such, Defendants' disproportionate-award argument would likely be moot.

     For these reasons, Havana Docks is entitled to summary judgment on Carnival's eleventh and twelfth affirmative defense, Royal Caribbean's fifth and twentieth affirmative defense, Norwegian's ninth and tenth affirmative defense, and MSC's fourth affirmative defense. *Carnival*, ECF No. [160] at 20; *Royal Caribbean*, ECF No. [59] at 8; *Norwegian*, ECF No. [107] at 15–16; *MSC*, ECF Nos. [115] at 16, [133] at 15.

> **19.  *Non-U.S. Sailings***

     Under its twenty-ninth affirmative defense, Carnival argues that cruises from Airtours and Costa were legal under foreign law. *Carnival*, ECF No. [373] at 24–26. Explained previously, whether Carnival trafficked through Airtours and Costa is irrelevant to determine whether Carnival is liable for trafficking through its direct use of the Terminal. Therefore, summary judgment on Carnival's twenty-ninth affirmative defense is denied as moot.

## VI.   CONCLUSION

     As set forth above, it is **ORDERED AND ADJUDGED** as follows:

     1.     Defendants' Omnibus Motion for Summary Judgment, *Havana Docks Corp. v. Carnival Corporation*, No. 19-cv-21724, **ECF No. [330]**; *Havana Docks Corp. v. MSC Cruises,*

*SA, et al.*, No. 19-cv-23588, **ECF No. [216]**; *Havana Docks Corp. v. Royal Caribbean Cruises Ltd.*, No. 19-cv-23590, **ECF No. [137]**; *Havana Docks Corp. v Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, **ECF No. [227]**, is **DENIED**.

      2.      Plaintiff Havana Docks Corporation's Omnibus Motion for Partial Summary Judgment, *Havana Docks Corp. v. Carnival Corporation*, No. 19-cv-21724, **ECF No. [336]**; *Havana Docks Corp. v. MSC Cruises, SA, et al.*, No. 19-cv-23588, **ECF No. [222]**; *Havana Docks Corp. v. Royal Caribbean Cruises Ltd.*, No. 19-cv-23590, **ECF No. [143]**; *Havana Docks Corp. v Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, **ECF No. [232]**, is **GRANTED**.

      3.      Carnival Corporation's Individual Motion for Summary Judgment, *Havana Docks Corp. v. Carnival Corporation*, No. 19-cv-21724, **ECF No. [324]**, is **DENIED**.

      4.      Plaintiff Havana Docks Corporation's Individual Motion for Summary Judgment against Carnival Corporation, *Havana Docks Corp. v. Carnival Corporation*, No. 19-cv-21724, **ECF No. [333]**, is **GRANTED IN PART AND DENIED IN PART**. The motion is denied as moot as to Carnival's third affirmative defense (statute of limitations or repose) and twenty-ninth affirmative defense (Non-U.S. Sailings). The motion is otherwise granted.

      5.      MSC Cruises' Individual Motion for Summary Judgment, *Havana Docks Corp. v. MSC Cruises, SA, et al.*, No. 19-cv-23588, **ECF No. [209]**, is **GRANTED IN PART AND DENIED IN PART**. The motion is granted as to MSC Co., but denied in all other respects.

      6.      Plaintiff Havana Docks Corporation's Individual Motion for Summary Judgment against MSC Cruises, SA & MSC Cruise (USA). Inc., *Havana Docks Corp. v. MSC Cruises, SA, et al.*, No. 19-cv-23588, **ECF No. [225]**, is **GRANTED**.

      7.      Defendant's [Royal Caribbean Cruises, Ltd.] Individual Motion for Summary Judgment, *Havana Docks Corp. v. Royal Caribbean Cruises Ltd.*, No. 19-cv-23590, **ECF No.**

**[132]**, is **DENIED**.

8.      Plaintiff Havana Docks Corporation's Individual Motion for Summary Judgment Against Royal Caribbean Cruises, Ltd., *Havana Docks Corp. v. Royal Caribbean Cruises Ltd.*, No. 19-cv-23590, **ECF No. [142]**, is **GRANTED**.

9.      Plaintiff Havana Docks Corporation's Individual Motion for Summary Judgment against Defendant Norwegian Cruise Line, Ltd., *Havana Docks Corp. v Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, **ECF No. [229]**, is **GRANTED**.

10.     Norwegian's Individual Motion for Summary Judgment, *Havana Docks Corp. v Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, **ECF No. [230]**, is **DENIED**.

11.     Havana Docks' Motion to Exclude the Expert Opinions of Julian Ackert and Pablo Spiller. *Havana Docks Corp. v. Carnival Corporation*, No. 19-cv-21724, ECF No. [328]; *Havana Docks Corp. v. MSC Cruises, SA, et al.*, No. 19-cv-23588, **ECF No. [214]**; *Havana Docks Corp. v. Royal Caribbean Cruises Ltd.*, No. 19-cv-23590, **ECF No. [138]**; *Havana Docks Corp. v. Norwegian Cruise Line Holdings, Ltd.*, No. 19-cv-23591, **ECF No. [226]**, is **DENIED** as to Julian Ackert. Magistrate Judge Chris M. McAliley's Report and Recommendation, *Havana Docks Corp. v. Carnival Corporation*, No. 19-cv-21724, **ECF No. [425]**, is **ADOPTED**. Accepting each of Julian Ackert's opinions, the Court determines that they do not create a genuine issue of material fact as to Plaintiff's statutory standing. As such, the Court need not consider Havana Docks' partial Objections. *Havana Docks Corp. v. Carnival Corporation*, No. 19-cv-21724, ***ECF No. [430]***.

12.     Consistent with this Court's Order, the trials scheduled in each case shall proceed solely on the issue of Havana Docks' damages.

**DONE AND ORDERED** in Chambers at Miami, Florida on March 21, 2022.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record